IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

THE SATANIC TEMPLE, INC.                                                    PLAINTIFF

CASE NUMBER:
V.                              5:22-CV-5033

LAMAR MEDIA COMPANY                                                    DEFENDANTS
LAMAR ADVANTAGE GP COMPANY, LLC and
LAMAR ADVANTAGE HOLDING COMPANY

---

**RESPONSE IN OBJECTION TO MOTION TO DISMISS**

---

**COMES NOW** Plaintiff TST, by and through counsel of record, with a response in objection to Lamar's[1] motion to dismiss. (docs. 10-11). Lamar asserts three grounds for dismissal, none of which are availing. First, Lamar contests whether the complaint adequately pleads at least $75,000 in damages. Because Lamar backed out of the deal, and because Lamar holds an apparent monopoly on all billboards in TST's suitable advertising area, TST is entitled to the net present value of the sum of money it would take to purchase eight billboards in the contracted-for area, less the reasonable value of a discounted future income stream (representing the net profits from owning the billboards), plus attorney's fees, plus punitive damages. As forecasted at § 1, below, that sum should be at or above $643,153.60.

---

[1] "Lamar" generically refers to all three defendants unless the discussion requires specificity as to a particular business entity.

Second, Lamar contends that venue does not properly lie in this Court. Relatedly, third, Lamar contends that the Indiana subsidiary and the parent corporation lie outside this Court's personal jurisdiction. Venue may properly lie where all of the defendants are subject to personal jurisdiction; or where a substantial set of the acts or omissions giving rise to suit took place.

All defendants are within this Court's personal jurisdiction. The Arkansas subsidiary did not emplace the designs as contracted for. The Indiana subsidiary made the contract and then issued notice that Lamar would not fulfill the contract. The parent company induced the breach. Because all defendants are within this Court's personal jurisdiction, venue properly lies under § 1391(b)(1).

Also, venue properly lies under § 1391(b)(2). The substantial "omission" leading to this action was Lamar's failure to emplace the designs in the billboard which is located in this District. The substantial "event" leading to this action was the manager of Lamar's Fayetteville office internal pressure, which as pleaded, substantially contributed to the parent company's determination that TST's copy should be rejected without further commentary.

## ARGUMENT

### 1: The amount in controversy is at or above $643,153.60.

The first issue is whether this Court has diversity jurisdiction. See 28 USC § 1332 (diversity jurisdiction requires complete diversity among the parties, and

an amount in controversy of at least $75,000). Lamar does not dispute that there is a complete diversity among the parties. See complaint, doc. 3 at ¶¶ 4-8 (Plaintiff is a Massachusetts religious corporation with a principal place of business in Massachusetts; Defendants are all Delaware corporations, with principal places of business in Louisiana, Indiana, and Arkansas).

Lamar correctly contends that diversity jurisdiction is a question of subject matter jurisdiction. Lamar's brief at 2 (citing *Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002)). To that end, Lamar has asserted a Rule 12(b)(1) motion, attacking whether the amount in controversy is at least $75,000. Lamar's brief, doc. 11, at 2.

The crux of the inquiry is whether it is legally certain that no jury could lawfully award judgment to TST in an amount of at least $75,000. *Kopp*, 280 F.3d at 885. That raises the question of burden of proof. Lamar asserts that TST must prove by a preponderance of the evidence that a reasonable jury *could* legally conclude that damages exceed $75,000. Doc. 11 at 2. But that is only true in a factual attack. *E.g. Osborn v. United States*, 918 F.2d 724, 729 n. 6 (8th Cir. 1990); *see also*, *e.g.*, *Magness Oil Co. v. Mountain Express Oil Co.*, No. 3:21-CV-03034, 2022 WL 814651, at *6 (W.D. Ark. Mar. 16, 2022) (addressing the facial/factual distinction in resolving a Rule 12(b)(1) attack on the amount in controversy) (citing *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016)).

In *Osborn*, the Eighth Circuit explains that courts tasked with resolving a

Rule 12(b)(1) motion must distinguish between a "facial attack" (*i.e.*, one that is constrained to the face of the complaint) and a "factual attack" (*i.e.*, one that is supported with outside evidence). Lamar's Rule 12(b)(1) argument is a facial attack because it does not adduce any extraneous evidence from the complaint. Thus, the Court "restricts itself to the face of the pleadings" and should not enter a dismissal "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Id.*

Lamar goes awry by seeking to litigate damages at the pleading stage. *See* Lamar's brief at 3-5. The *Kopp* Court helpfully explains: "The jurisdictional fact … is not whether the damages are greater than the requisite amount, but whether a fact finder might legally conclude they are;" stated differently, the Court has jurisdiction "unless, as a matter of law … the amount of damages that she [the plaintiff] could recover is somehow fixed below the jurisdictional amount, or no reasonable jury could award damages totaling more than $75,000 in the circumstances that the case presents." *Kopp*, 280 F.3d at 885. All that is required for the complaint to survive this attack is a showing that the complaint "alleges the jurisdictional amount in good faith" *Id.*, 280 F.3d at 884

The "amount in controversy" requirement "is not measured by the low end of an open-ended claim, but rather by a reasonable reading of the value of the rights being litigated." *Turntine v. Peterson*, 959 F.3d 873, 880 (8th Cir. 2020). When, as here, "the complaint alleges no specific amount of damages," the

Court measures the amount in controversy "by the value *to the plaintiff* of the right sought to be enforced." *Id.* (emphasis added). That question may be answerable from the face of the complaint, or the Court may employ its judicial experience or common sense to ascertain whether the relevant jurisdictional fact is present. *Id.*

In *Turntine*, for example, the plaintiff asserted three counts of defamation and claimed $20,000 per count in damages (summing $60,000). *Id.* But the complaint pleaded damages "*in excess of* $60,000." *Id.* (emphasis in original). The Eighth Circuit looked to similar defamation claims and found that plaintiffs seeking "in excess of $25,000" on a single count of defamation have been awarded in excess of $75,000 in actual damages. *Id.* at 881. Because it was unclear whether a factfinder could legally conclude that actual damages exceed $75,000, (*i.e.*, it was not legally certain that the jury would be bound at law to award less than $75,000), diversity jurisdiction was proper. *Id.*

### 1.1: Compensatory damages are at or above $81,164.80.

With that background in mind, we now turn to the question of contract damages under Arkansas law. The general rule for contract damages is that the plaintiff should receive the amount of money "that would place the injured party in the same position as if the contract had not been breached." *E.g. Deck House, Inc. v. Link*, 98 Ark. App. 17, 25, 249 S.W.3d 817, 824–25 (2007). But

for the fact that Lamar holds a monopoly on Arkansas billboards, TST could have leased a competitor sign company's billboards in the same advertising area for a similar fee. If that fee were greater than Lamar's fee, the difference would be TST's contract damages.

But what happens when TST cannot locate a competitor sign company; not even with Lamar's help? Complaint, doc. 3, at pp. 30-33 ¶¶ 88-98. In order for TST to get its advertising messages heard in the contracted-for area, in the contracted-for manner (*i.e.*, the benefit of its bargain), TST's only recourse was to purchase a sign. And that is exactly what TST did. Complaint, doc. 3, at p. 33 ¶ 99. The problem is that TST could not find any signs for sale in Arkansas. Not even with the help of TST's marketing company (who is in the business of locating these signs) and not even with the help of Lamar (who is in the business of owning and leasing these signs). The closest, cheapest sign that TST could procure cost $80,000–and that only conveyed a long-term lease for a sign outside of TST's advertising area.

Albeit not pleaded in the complaint,[2] TST has also offered to procure another sign in Wichita, Texas for $75,000 (which is within TST's suitable advertising area, although outside the area contracted for). That offer was rejected.

---

[2] If the Court finds this argument impermissible as not being pleaded in the complaint, the Court should grant leave to amend. FRCP 15.

Just as in *Turntine*, the complaint pleads for damages exceeds $75,000. Just as in *Turntine*, the *plaintiff's* assessment of the value of the right to be enforced exceeds $75,000. TST cannot buy a billboard or enter into a long-term lease for a billboard for a penny less than $80,000. Even then, there are no billboards for sale anywhere in Arkansas.[3] As of this writing, the only billboard for sale in Indiana is for $125,000.[4] And that's just for one billboard. TST contracted for eight. Complaint Exhibit 1, doc. 3-1.

Thus, a reasonable jury could conclude that the sum of money damages necessary to provide TST the benefit of its bargain would be the net present value[5] of the sums necessary to purchase eight billboards in the targeted areas, less the net difference between (1) an offset for 11 months' worth of fair market value rent in year 1 and fair market value thereafter; and (2) the administrative costs for marketing the billboards. Or, in a simplified algebraic format:

---

[3] https://www.outdoorbillboard.com/

[4] https://www.outdoorbillboard.com/billboards?sale_type=sale&location=Indiana&distance=&min_price=&max_price= and https://www.outdoorbillboard.com/billboards/1597666-view-to-i80-90-toll-rd-for-sale-in-la-porte-in

[5] The net present value is the net value of an immediate investment, which will produce a given income stream over time, discounted into present dollars. Discounting the future income stream is necessary to account for the opportunity cost of not investing those funds elsewhere.

$$\textit{Damages} = \textit{NPV}\,(\textit{investment} - \{\,\textit{rents} - \textit{variable costs to obtain rents}\,\})$$

The net present value equation requires a discount rate, representing the amount of interest that the investor is giving up by entering into the transaction in question (the "opportunity cost" of the investment). Below, we will be assuming that TST could earn a guaranteed income stream on its investment for a period of ten years. A U.S. Treasury bond meets the same near-guarantee of an income stream and can be purchased on a ten year coupon, for an interest rate of 2.92% as of this writing. See Bloomberg "United States Rates & Bonds," available at https://www.bloomberg.com/markets/rates-bonds/government-bonds/us (rates are in constant flux). The most conservative viable discount rate is 2.92%. To calculate the net present value, a net present value calculator is recommended.[6] Otherwise, the formula is:

---

[6] Undersigned counsel used the "Calculate Stuff" calculator, available at https://www.calculatestuff.com/financial/npv-calculator (last visited May 11, 2022).

$$NPV = \sum_{t=0}^{T} \frac{C_t}{(1+r)^t}$$

Where:

- **C** = Cash Flow at time t
- **r** = discount rate expressed as a decimal
- **t** = time period

Assuming that all eight billboards in Arkansas and Indiana could be acquired at the Indiana price,[7] and without incurring any other expenses in acquiring the assets, TST can currently prove that it would take an upfront investment of at least $125,000 per billboard, times eight billboards; or $1,000,000.

Assuming that TST could obtain the same rents as Lamar and assuming that it can be fairly projected that TST will *never in ten years* have a lapse in rental receipts,[8] TST can project regaining a net $99,275 in year 1 (the projected rental

---

[7] The fact that damages requires an assumption precludes a finding that a jury would be bound at law to award less than $75,000.

[8] Again, the assumption precludes a finding of any legal certainties in this early stage of the proceedings. This assumption is particularly dangerous because markets dominated by a monopoly (like Lamar) are distorted by the fact that monopolists enjoy the power to "overcharge" (*i.e.*, charge a price above the market equilibrium), and consumers will have no choice but to pay the price, until the overcharge exceeds the price elasticity of demand (*i.e.*, the monopolist charged too much, so consumers turned to substitute goods or services, or just did without). Cooter, Robert. "Passing on the Monopoly Overcharge: A

receipts for one year, less using the billboards for the contracted-for month) and $108,300 each year thereafter, through year 10.

For sake of ease, and to refrain from turning this response into a full-fledged business plan, we can assume that there will be zero variable costs to rent out the billboards. Stated differently, we are explicitly assuming that TST will *not* incur any expenses on the following:

- marketing costs for any of the billboards,

- realtor fees,

- legal fees to draft or review or edit any contracts,

- administrative costs to monitor rental payments or contract terms,

- collections fees incurred to collect any outstanding rents,

- costs to repair any of the billboards,

- state or federal taxes on the real estate or on the rental income, and

- more generally, *any* expense beyond purchasing the signs.

Even with all of these highly improbable assumptions, there is *still* an amount in controversy exceeding $75,000. Plugging the above numbers into a

---

Further Comment on Economic Theory." J. Reprints Antitrust L. & Econ. 25 (1995): 861.

At this stage, it is impossible to tell whether the introduction of TST as a bill-board competitor will reduce the fair market value of rents for both Lamar and TST. That uncertainty also precludes the requisite finding that it is "legally certain" a jury would be bound at law to award TST less than $75,000.

net present value calculator will provide a conservative and simplified estimate of TST damages: $81,164.80.

Now let's play with the assumptions. Maybe TST could have earned more interest on the same investment, say 5% on safe corporate bonds. That would increase the discount rate to 5%, up from 2.92%. TST's damages have just ratcheted up to $172,331.35, all else equal. Or what if TST has to spend more than $1,000,000 to purchase the billboards because sign owners increased their prices in response to TST purchasing every billboard on the market? Even just a 10% greater upfront investment (summing $1,100,000), all else equal, increases TST's damages to $181,164.80.

Or what if TST's entry into the market place drives down rents just 10% because there is a new competitor in the market place? That changes year 1 net rents to $89,347.50 (down from $99,275), and years 2-10 net rents to $97,470 (down from $108,300). All else equal, TST's damages are now $273,048.32. The other assumptions have to hold true for another three years before a jury could fairly award less than $75,000.

And what if TST spends *any* money, beyond the sales price for the billboards in this hypothetical endeavor? There are too many variables to account for (see the bulleted list above for some off-the-cuff examples). Suffice it to say, those expenses will increase TST's damages.

All of these uncertainties bolster the point that, at this early stage of

proceedings, there can be no legal certainty what jury might award. All that can safely be said is that there is room for at least some doubt as to whether TST can prove a set of facts in support of the claims at bar which would entitle it to relief. *Osborn*, 918 F.3d 729 at n. 6. Because this is a facial attack, that doubt inures to TST's benefit and the Court should deny the motion.

*1.2: Lamar's contrary take on compensatory damages is wrong.*

Lamar's contrary take on compensatory damages is wrong. Under Lamar's preferred framework, TST is actually better off that Lamar breached the contract because TST now has the exclusive rights to a billboard and the amortized rents for that billboard is less than the average rents that TST would have paid Lamar if Lamar had honored its contract. Lamar's brief, doc. 11, at 3-5.

Lamar's argument fails for four reasons. First, it unfairly assumes that a billboard in Arizona has equal value *to TST* (*Turntine*, 959 F.3d at 880) as one in Arkansas or Indiana. That assumption does not hold: an Indiana billboard costs $125,000 whereas the Arizona billboard costs $80,000. There are no billboards in Arkansas for sale to state with a legal certainty that an Arkansas billboard would definitely have a no-greater-than-$80,000 sales price. For TST to acquire marketing exposure in the contracted-for area, it is reasonable to infer that TST will expend at least $80,000. *Magness Oil Company*, 2022 WL 814651 at *6 n. 8 (reasonable inferences are drawn in favor of the plaintiff).

Second, Lamar's argument ignores that the basic rule of contract damages is to put the plaintiff in the same position that they would have been in but for the breach of contract. TST did not contract with Lamar for one billboard in Arizona, it contracted with Lamar for eight billboards across Arkansas and Indiana. While it is true that the amortized rents for the one Arizona billboard is less than the average for the eight contracted-for billboards, you'd have to equalize the amortized rent obligations for the entire investment (i.e., amortized rents times eight) to approximate the same marketing exposure that TST contracted for. Even then, Lamar's argument can never overcome the problem that TST did not buy marketing exposure in Arizona, it bought marketing exposure in Arkansas and Indiana; and the contracted-for markets are more expensive.

Third, Lamar's argument does not account for the opportunity cost of TST's investment. Lamar's argument implicitly assumes that TST has $1,000,000 lying around in cash with nothing better to do than open a billboard business. That is not the case. The assessment of damages requires accounting for the time-value difference of money today versus money in the future. That is why we applied future discounting in § 1.1.

Fourth, Lamar's argument does not account for the benefit of the bargain. The bargain that TST made was turnkey: TST would provide the designs and money, and Lamar was to take care of the printing, installation costs, and all

other ownership costs related to having a billboard. Because Lamar shirked its contract duties to post the designs, TST had to buy a billboard, hire a printing service, a posting service, and now has a long-term asset it needs to manage. There is an obvious expertise problem in having a church expend tens of thousands to acquire long-term assets, only to enter into an unfamiliar market, all so it can have some advertising exposure. TST is not staffed with outdoor sign marketing professionals, it is staffed with religious leaders. The financial costs unavoidably incurred by TST could have been avoided if Lamar had simply fulfilled the terms of the agreement. Because it didn't, those costs may be properly assessed as damages.

*1.3: Attorney's fees alone are likely to exceed $75,000.*

As if compensatory damages were insufficient, Lamar correctly points out that attorney's fees may properly be considered in determining whether there is at least $75,000 in controversy. *See Basham v. Am. Nat. Cnty. Mut. Ins. Co.*, 979 F. Supp. 2d 883, 889–90 (W.D. Ark. 2013) (citing *Crawford v. F. Hoffman–La Roche Ltd.*, 267 F.3d 760, 766 (8th Cir. 2001)).

Btu the parties part ways when Lamar asserts that the correct attorney's fees are a percentage of the ultimate recovery. See Lamar's brief, doc. 11, at 5 (citing *Basham*, above). While true that the *Basham* Court considered a multiplier to compensatory damages, that was because *Basham* was an insurance fraud class

action case, which is traditionally billed on a contingent fee. *Id.*, 979 F. Supp. 2d at 890 (citing *Phelps v. U.S. Credit Life Ins. Co.*, 340 Ark. 439, 10 S.W.3d 854, 856 (2000)) (statutory attorney's fees under Arkansas law involves considering, among other factors, the "customary fee for similar services.")

This case, to contrast, is a general civil litigation case, which is customarily billed hourly. *E.g.*, *Chenevert v. Smith*, No. 5:20-CV-5172-TLB, 2021 WL 3008601 (W.D. Ark. July 15, 2021) (using the lodestar method in a contracts case). Undersigned counsel is billing TST on an hourly model, not a contingent one, so Lamar's argument that TST should be limited to 40% of compensatory damages is inapposite. Further, undersigned counsel has litigated a sufficient number of both contracts cases and civil rights cases before this Court to opine that this case will likely require at least $75,000 in hourly fees plus reasonable expenses (*e.g.*, deposition transcripts).

For a similar example, the Court may recall *Martinez-Nolan v. Tyson* (5:20-cv-05082),[9] in which undersigned counsel spent time worth $72,610, plus $8,042 in deposition transcripts, service and filing fees, and hearing-related travel expenses. Had *Martinez-Nolan* gone to trial, the parties anticipated a

---

[9] *Martinez-Nolan* was a relatively complex ADA case, the pertinent allegation being that a factory worker who was a diabetic was prohibited from reasonable accommodations to check and maintain his blood sugar. The case was settled at a conference before Judge Comstock, after summary judgment briefing, but before a hearing.

three-day trial, which would have incurred at least another $19,080 (three days for trial, six days for trial preparation).

Or, the Court may recall *SCM v. Pixior* (5:18-CV-05008),[10] in which undersigned counsel expended $24,145.83 in time plus $2,501.73 in deposition costs and the removal filing fee. Had *SCM* gone to trial, the parties anticipated a three-day trial, which would have incurred at least another $19,080 (three days for trial, six days for trial preparation).

This case involves an allegation of religious discrimination, which will likely be hotly contested both factually and legally. If this case proceeds to trial, undersigned counsel anticipates it will take three days if tried by the Court or 4-5 days if tried by a jury. Because it is not-impossible that Lamar will invoke its right to jury trial and it is not-impossible that the jury trial would take five days, the Court should find that it is not-impossible for TST to incur $31,800 for the trial alone (five days for trial and ten days for trial preparation). It is highly unlikely that it will take less than $43,200 to litigate at least two motions to dismiss,[11] probable cross-motions for summary judgment, and intensive

---

[10] *SCM v. Pixior* was a simple contracts case, the pertinent allegation being that a warehouse "tacitly agreed" to pay overages, charged by a retailer, for delayed shipments. The case was settled after summary judgment briefing, without a mediation conference, and before a decision on the motion for summary judgment.

[11] Lamar informed TST at the parties' Rule 26(f) teleconference last Friday that if the Rule 12(b)(1) motion fails, a Rule 12(b)(6) motion will follow.

discovery into whether Lamar and its subsidiaries have a business practice of discriminating against Atheistic or Satanic customers.

Because it is not-impossible to forecast at least $75,000 in attorney's fees and reasonable expenses, the Court should deny Lamar's Rule 12(b)(1) facial attack on the amount in controversy.

*1.4: Punitive damages are at or above $486,988.80.*

Last, Lamar takes issue with whether punitive damages could support a finding of diversity jurisdiction. In addition to the contract claim (punitive damages are not allowed in contract claims, see *Brookewood, Ltd. P'ship v. DeQueen Physical Therapy & Occupational Therapy, Inc.*, 2018 Ark. App. 204, 14, 547 S.W.3d 461, 470 (2018)), TST has asserted an intentional Arkansas Civil Rights Act ("**ACRA**") violation in the form of religious discrimination in private contracting or religious discrimination in a property transaction. ACA § 16-123-107(a)(4) and (3), respectively.

As pleaded, Lamar refused to post TST's designs because of TST's religious beliefs and TST's religious iconography, and not because of the subject matter of the advertisement. Complaint Exhibit 5, doc. 3-5) ("*I do not have the final artwork yet.* Can we reject this based on not meeting the moral standards of our community?") (emphasis added). And Lamar cannot contend that the "good taste" and "moral standards" exclusions apply, because Lamar either abused

its right to reject design elements in bad faith to override the core purpose of the contract (complaint, doc. 3, at p. 37 ¶ 118) or because Lamar's acceptance of other billboards betrays that it has no objection to religious pro-choice messaging (complaint, doc. 3, at p. 26 ¶ 70) (Acceptable Design 6).

A reasonable jury could infer that Lamar intentionally discriminated against TST by posting a Christian pro-choice billboard, but rejecting a Satanic pro-choice billboard, particularly given Lamar's internal correspondence which explicitly takes issue with TST's religious viewpoint before even seeing the final artwork. That would support a punitive damages instruction, which (unlike employment discrimination) is not statutorily capped. Cf. ACA § 16-13-107(c)(2) (just like in a Title VII case, punitive damages in an employment discrimination claim under the ACRA are subject to a statutory cap, determinable by the number of employees). There being no statutory cap, the punitive damages award is only subject to the due process cap. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425, 123 S. Ct. 1513, 1524, 155 L. Ed. 2d 585 (2003) ("in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.")

The *Basham* Court went with a 6x multiplier of punitive-to-compensatory damages. *Basham*, 979 F. Supp. 2d at 889. That is close enough to Lamar's asserted 5.7-to-1 cap. Lamar's brief, doc. 11, at 7. The very conservative back-of-the-envelope compensatory damages forecasted in § 1.1 above was

$81,164.80. Multiply that by six and we have a not-impossible potential punitive damages award of $486,988.80.

*1.5: The Indiana affiliate bears conspiracy liability.*

Lamar concludes its Rule 12(b)(1) argument by asserting, without authority, that the Indiana subsidiary is immune to the claim of punitive damages under the ACRA. Lamar is wrong. The Indiana subsidiary is vicariously liable under a civil conspiracy liability to the same extent as the Arkansas subsidiary and the parent corporation.

A civil conspiracy exists where two or more persons seek to accomplish a purpose "that is unlawful or oppressive or to accomplish some purpose, not itself unlawful, or oppressive or immoral, by unlawful, oppressive, or immoral means, to the injury of another." *Lamb & Assocs. Packaging, Inc. v. Best*, 2020 Ark. App. 62, 22, 595 S.W.3d 378, 391. But a civil conspiracy "is not a separate tort." *Progressive Techs., Inc. v. Chaffin Holdings, Inc.*, No. 20-1474, 2022 WL 1297544, at *4 (8th Cir. May 2, 2022) (cleaned up) (applying Arkansas law).

As pleaded, the Indiana subsidiary was part of a civil conspiracy along with the Arkansas subsidiary and the corporate parent company. The three entities are legally distinct from one another, which precludes the general rule that a corporation cannot conspire with itself. *See Steinbuch v. Univ. of Arkansas*, 2019 Ark. 356, 18, 589 S.W.3d 350, 361 (2019) (the general rule only applies where

the "alleged coconspirators are *not* separate entities") (emphasis added).

The purpose of this conspiracy was to refuse TST service on equal terms as a similarly situated non-Satanic organization. As addressed in § 1.4, Lamar's internal correspondence plainly shows that Lamar's breach of contract was directly linked to the subsidiaries' management's distaste for TST's religious viewpoint. Complaint at Exhibit 5, doc. 3-5. That was an unlawful purpose because the ACRA explicitly prohibits religious discrimination in private contracts and in property contracts. The ACRA even provides a cause of action to punish and deter organizations, like Lamar, from breaching this right.

Based on the above, it is not-impossible for a jury to find that the Indiana subsidiary is jointly and severally liable for the ACRA violation, subject to apportionment. *Stewart v. Hedrick*, 205 Ark. 1063, 172 S.W.2d 416, 418 (1943) ("when such an unlawful agreement is entered into the parties become liable as joint tort-feasors to the extent of the damage done as a result of the conspiracy, and the liability of a particular conspirator does not depend upon the extent to which he profited or his activity in promoting the conspiracy.")

*1.6: Conclusion*

As addressed in § 1.1, a simplified and conservative estimate of damages suggests that a jury could lawfully award TST at least $81,164.80 in compensatory damages. This model generously assumes that TST could procure eight

billboards in the contracted-for areas for an average price of $125,000 each. It also assumes that TST will benefit from an uninterrupted stream of income, with no further expense or effort, in an amount precisely equal to the rate Lamar charged TST for a period of at least ten years. And it assumes that the best alternative investment for TST is to buy treasury bonds. A breakdown in any of these assumptions dramatically increases TST's damages.

As addressed in § 1.2, Lamar's competing model for compensatory damages improperly discounts the amount of investment TST must make to obtain the benefit of its bargain, improperly assumes that TST is equally happy with Arizona exposure as with Indiana or Arkansas exposure, improperly assumes that TST even has the requisite funds to buy eight billboards throughout Arkansas and Indiana, and improperly discounts the financial and administrative burdens in requiring a church to enter into the billboard market.

As addressed in § 1.3, attorney's fees plainly supports a finding that there is at least $75,000 in controversy. This is a complex civil lawsuit. In all likelihood, it will cost more than $75,000 in attorneys fees just to litigate it. Lamar's competing argument that attorney's fees are capped to a proportion of compensatory damages is wrong because its authority comes from an insurance fraud class action case, which is customarily billed on a contingent basis; whereas this case (being a non-personal injury lawsuit) is customarily billed at an hourly basis and is in fact being billed on an hourly basis.

As addressed in § 1.4, it is not-impossible for punitive damages to reach 6x compensatory damages, or $486,988.80. Lamar's competing argument improperly assumes its own conclusion that any jury would necessarily be bound at law to not award TST any compensatory damages.

As addressed in § 1.5, the Indiana affiliate is jointly liable with the Arkansas affiliate and corporate parent for the ACRA claim under a civil conspiracy theory. A civil conspiracy theory did not need to be separately pleaded because "civil conspiracy" is just a means to extend liability among all of the joint tortfeasors. "Civil conspiracy" is not a separate cause of action.

For these reasons, the Court should deny Lamar's Rule 12(b)(1) facial attack on the sufficiency of the amount in controversy pleadings. If the Court finds the complaint to be inadequate as written, the Court should grant TST leave to amend to bolster the damages allegations with particular facts pertaining to the Wichita, Texas billboard addressed in § 1.1 ($75,000 was not enough in Texas), further facts demonstrating the absence of reasonably-acceptable alternative billboards for sale or lease, and other such facts that may become relevant based on the Court's opinion. FRCP 15.

**2: Venue properly lies with this Court.**

Next, Lamar contends that venue does not properly lie in this Court. Lamar's brief, doc. 11, at 7-10. Relatedly, Lamar contends that this Court cannot

lawfully exercise personal jurisdiction over the Indiana subsidiary or the parent corporation. Id. at 10-14. There are two grounds to deny both arguments. First, venue is proper under 28 USC § 1391(b)(1) because each of the Lamar entities "reside" in Arkansas (*i.e.*, each entity is subject to personal jurisdiction here).

Or, venue properly lies in this Court because a substantial part of the events or omissions giving rise to the claim occurred in this District. Specifically, the Fayetteville office manager complained about TST's equal treatment, which (as pleaded) was a substantial "event" which Lamar to breach its contract. And Lamar's failure to affix the designs to the billboard in Springdale (as the contract required) was a substantial "omission" which gave rise to this claim for breach of contract. Either way, venue is proper under 28 USC § 1391(b)(2).

### 2.1: Each entity "resides" in Arkansas for venue purposes.

The first basis for venue is rooted in a finding that each entity "resides" in this State, *i.e.*, is subject to specific personal jurisdiction here. 28 USC § 1391(b)(1), (c)(2). *Newsmax*, 887 F. Supp. 2d at 98-99, is instructive. There, an online marketing firm "transacted business" in the District of Columbia, which was a sufficient predicate for the District of Columbia to assert specific jurisdiction over litigation arising out of that transaction. *Id.* Because the Court had specific personal jurisdiction over the defendant, the defendant "resided" in the District of Columbia for purposes of venue. *Id.*, 887 F. Supp. 2d at 99.

This section will require consideration of the due process limits on personal jurisdiction. A court's power to issue a lawful judgment against a non-resident defendant is limited by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. *Lawson v. Simmons Sporting Goods, Inc.*, 2019 Ark. 84, 6, 569 S.W.3d 865, 870; *see also Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cty.*, 137 S. Ct. 1773, 1779, 198 L. Ed. 2d 395 (2017). Due process demands that the non-resident defendant have "minimum contacts" with the forum state, "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Wash.*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Minimum contacts must be based on "some act by which the defendant purposefully avails himself" of the forum state "such that he should reasonably anticipate being haled into court there." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985).

Personal jurisdiction can be either "general" or "specific." *Id.* General jurisdiction exists when the defendant's affiliations with the State are so "continuous and systematic" as to render them essentially "at home" in the forum State. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919, 131 S. Ct. 2846, 2851, 180 L. Ed. 2d 796 (2011). The paradigm for general jurisdiction against an individual is their domicile; for a corporation, it is the place of incorporation and the principal place of business. *Bristol-Myers*, 137 S. Ct. at 1780.

Specific jurisdiction, on the other hand, arises out of an affiliation between the forum and the underlying controversy. *Goodyear*, 564 U.S. at 919. Those contacts must be of the defendant's own choice, and not "random, isolated, or fortuitous." *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024, 209 L. Ed. 2d 225 (2021). The acts must show that the defendant deliberately "reached out beyond" its home–by, for example, exploiting a market or entering a contractual relationship centered there. *Id.* Even then, the forum State may exercise jurisdiction in only certain cases–those that "arise out of or relate to the defendant's contacts" with the forum. *Id.* The paradigm for specific jurisdiction is "an activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Id.* (cleaned up) (quoting *Bristol Myers*, 137 S. Ct. at 1780).

As addressed under separate headers, each of the three entities are subject to this Court's personal jurisdiction, whether general or specific. Because the Court has personal jurisdiction over each defendant, they all "reside" in Arkansas for purposes of the venue statute such that venue properly lies in this Court.

### 2.1.1: The Arkansas subsidiary "resides" here.

This Court has general jurisdiction over the Arkansas subsidiary (Lamar Advantage Holding Company) because it is "at home" in this State. It is undisputed that the Arkansas affiliate has a principal place of business in Little Rock,

Arkansas. Complaint, doc. 3, at p. 4 ¶ 7; *see also* complaint exhibit 5, doc. 3-5 (the manager for Lamar's Little Rock office signs emails with "Little Rock, AR" and has an office number with the area code 501, which is a Little Rock area code). This fits squarely within the paradigm that a corporation is "at home" where its principal place of business is. *Bristol-Myers*, 137 S. Ct. at 1780. Because the Arkansas subsidiary's principal place of business is here, the Court has general jurisdiction over it.

Moreover, the Court has specific jurisdiction over the Arkansas subsidiary because (as pleaded), the Arkansas subsidiary ratified the contract at issue which required emplacement of a design in Springdale, Arkansas. See complaint exhibit 5, doc. 3-5 ("The contract originated from the Indianapolis office") (cleaned up). And (as pleaded) it subsequently failed to adhere to its contract obligations. Hence this lawsuit. Because the Arkansas subsidiary ratified the contract at issue, but failed to fulfill it, the Court may lawfully exercise specific personal jurisdiction over the Arkansas subsidiary.

### 2.1.2: The Indiana subsidiary "resides" here.

Next, the Court has specific personal jurisdiction over the Indiana subsidiary (Lamar Advantage GP Company, LLC). As pleaded, the Indiana subsidiary has the power to create a contract obligation for Lamar to emplace a display in Arkansas. See complaint exhibit 5, doc. 3-5 ("The contract originated from

the Indianapolis office") (cleaned up).

This fact pattern fits precisely within the *Ford* discussion. As explained there, the Indiana subsidiary deliberately "reached out beyond" its home by entering a contractual relationship centered there. *Ford*, 141 S. Ct. at 1024. The contract was not "random, isolated, or fortuitous" to this action because this action asserts the breach of the very contract which the Indiana subsidiary created. That contract was "centered" in Arkansas (the forum State), with fully half of the contracted-for billboards located in Arkansas. *Id.*; complaint Exhibit 1, doc. 3-1 (the Arkansas billboards were located in North Little Rock, Jacksonville, Little Rock, and Springdale).

And, as argued in § 1.5, the Indiana subsidiary was part of the overall civil conspiracy to deprive TST of equal treatment as any other non-Satanic customer under the Lamar Advertising Company Copy Acceptance Policy. The Lamar Advertising Copy Acceptance Policy explicitly provides that "Lamar will not accept or reject copy based upon agreement or disagreement with the views presented." Complaint Exhibit 4, doc. 3-4. As pleaded, the policy only means what it says if the customer is not a Satanic entity. The Indiana subsidiary is a joint tortfeasor with the Arkansas subsidiary and the parent corporation. As pleaded, the harm that TST suffered in Arkansas is directly attributable to the joint actions of the three entities.

Lamar disputes personal jurisdiction because, it contends, the Indiana

subsidiary did not conduct any activities outside of its home state. Lamar's brief, doc. 11, at 13. That conflates the analysis. There is no requirement that an Indiana subsidiary physically sign a contract here, it is sufficient that the Indiana subsidiary created a contract that "centered" on Arkansas. *Ford*, 141 S. Ct. at 1024. Here, it did so by creating a contract that required the emplacement of TST's designs on four Arkansas billboards. *Id.*

Lamar also offers an inapposite case. Lamar's brief, doc. 11, at 13 (discussing *Walden v. Fiore*, 571 U.S. 277, 134 S. Ct. 1115, 188 L. Ed. 2d 12 (2014)). In *Walden*, a law enforcement officer located in Georgia seized property that belonged to a couple who lived in Nevada. The Nevada couple sued in Nevada, but no Nevada court had jurisdiction. The problem was a disconnect between the conduct and the forum, with the only tie between the two being the plaintiffs. *Walden*, 571 U.S. at 285 ("the plaintiff cannot be the only link between the defendant and the forum.")

The problem with Lamar's reliance on *Walden* is that the Indiana subsidiary (unlike the Georgia law enforcement officer) deliberately created a contact with Arkansas by contracting to lease real estate (the Arkansas billboards) to TST. *Walden*, 571 U.S. at 290 ("The proper question is … whether the defendant's conduct connects him to the forum in a meaningful way.")

When Lamar materially breached that contract, it was the Indiana subsidiary's employees, in the course and scope of their employment, who relayed that

Lamar had no intention of fulfilling its contract obligations. Compare complaint, doc. 3, at p. 27 ¶ 72 (Tom Hill stated that "All of the content" is "misleading and offensive") and p. 29 ¶ 80 ("Jason Graham … responded that Lamar will be canceling the contract") with Aff. Kilshaw, doc. 10-1 at p. 3 ¶¶ 9-10 ("Tom Hill is an Account Executive for Lamar (Indiana)" and "Jason Graham is the General Manager of Lamar (Indiana).") Because the Indiana subsidiary both created the contract at issue and issued the notices that Lamar had no intention of meeting its contract obligations, the Indiana subsidiary may fairly be called into an Arkansas court to answer for any liability.

### 2.1.3: The parent corporation "resides" here.

The Court also has specific personal jurisdiction over the parent corporation (Lamar Media Corporation or, maybe, Lamar Advertising Company).[12] While the parent corporation did not create the contract, that is no impediment to finding that it deliberately "reached out beyond" its home by having its employee, in the course and scope of his employment, opine that the proffered copy did not meet Lamar's Advertising Copy Acceptance Policy, and directed the Arkansas and Indiana subsidiaries to reject the proffered copy. Aff. Kilshaw, doc. 10-1, at pp. 2-3 ¶¶ 6-11; complaint Exhibit 9, doc. 3-9. The Court

---

[12] If the Court finds that the proper party-defendant is "Lamar Advertising Company" instead of "Lamar Media Corporation," the Court should order a substitution of parties.

should find that the parent company "reached out" into Arkansas when it directed its Arkansas and Indiana subsidiaries to breach the contract, sufficiently so that the parent company could reasonably expect to be haled into court to answer for any liability arising from its instructions to not emplace the copy.

To contest the exercise of lawful personal jurisdiction, Lamar's parent corporation contends that the "correct" name of the parent company is "Lamar Media Corp." and not "Lamar Media Corporation." Lamar's brief, doc. 11 at 12. At best this is a misnomer issue, which does nothing to defeat personal jurisdiction. *See May v. Bob Hankins Distrib. Co.*, 301 Ark. 494, 500, 785 S.W.2d 23, 27 (1990) (a misnomer must be "so material and substantial as to indicate a different entity or to produce doubts as to the corporation intended to be sued.") But it isn't even clear if this is a misnomer: "Corp." is short for "Corporation," and "Lamar Media Corp." was both named on the summons (doc. 6) and specifically alleged in the body of the complaint (doc. 3 at ¶ 6). And, "Lamar Media Corp." explicitly joined in the motion to dismiss. Doc. 11 at 2 n. 1. Clearly, Lamar and its subsidiaries are apprised of the fact of this lawsuit and are taking actions to defend against it.

Otherwise, Lamar's contention against personal jurisdiction simply ignores the exhibits to the complaint. Lamar posits that the "only purported connection" between the parent company and the allegations of the complaint is that the parent company is the parent company. Lamar's brief, doc. 11, at 12-13.

Willful ignorance does not change the complaint. The complaint attaches the email wherein Hal Kilshaw, in the course and scope of his employment, directed both the managers of the Indiana and Arkansas subsidiaries "no on all of them [the proffered copy]." Complaint Exhibit 9, doc. 3-9 (dated September 15). Six days later, the Indiana account exhibitive notified TST's marketing firm that the designs were rejected. Complaint, doc. 3 at p. 28 ¶ 71. And four days after that, the Indiana subsidiary's manager informed TST that "Lamar will be canceling the contract." Id., doc. 3 at p. 29 ¶ 80. The exclusion is directly tied to the parent company's instruction. There is no room for disagreement, the parent company induced the breach of contract.

### 2.1.4: Conclusion

The Court may exercise personal jurisdiction over each defendant without a credible argument that it would infringe on any of the entities' due process rights. The Arkansas entity is "at home" here, the Indiana entity created the contract and then breached it, and the parent corporation induced the breach. Each of these entities deliberately "reach[ed] out" into Arkansas and set in motion this cause of action. That is the very definition of specific jurisdiction.

As for the ACRA claim, each of the three entities (by and through their employees, who were acting in the course and scope of their respective employment agreements) worked in tandem to refuse TST equal application of the

Lamar Advertising Copy Acceptance Policy as any other non-Satanic organi-zation.[13] As pleaded, if the management of three entities did not disagree with the views presented by TST's copy, the contracts would have been performed without issue.

Further, Lamar's only viable defense is that the proffered copy is not "in good taste and within the moral standards of the individual communities in which it is to be displayed." Contract ¶ 6. That's in Arkansas. Assuming this case is not disposed of as a matter of law before trial, an Arkansas fact-finder should be the arbiter of whether TST's copy (independent of the religious ma-terial) is "within the moral standards" of Arkansas.

Based on the foregoing, the Court should find that it has personal jurisdic-tion over each defendant, and therefore each defendant "resides" in Arkansas as defined by the venue statute. 28 USC § 1391(c)(2). Because all defendants are "residents" of Arkansas, and because this District is within Arkansas, venue properly lies in this Court under 28 USC § 1391(b)(1).

### 2.2: Lamar failed to emplace the display in this District.

Alternatively, venue properly lies under 28 USC § 1391(b)(2), where "a sub-stantial part of the events or omissions giving rise to the claim occurred, or a

---

[13] Recall, the Lamar Advertising Copy Acceptance Policy explicitly provides that "Lamar will not accept or reject copy based upon agreement or disagree-ment with the views presented." Complaint Exhibit 4, doc. 3-4.

substantial part of the property that is the subject of the action is situated."

In ruling on a motion to dismiss for lack of venue, the question is not which district is the "best" venue, or which venue has the most significant connection to the claim, but "whether the district the plaintiff chose had a substantial connection to the claim," regardless whether "other forums had greater contacts." *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 96 (D.D.C. 2012) (citing *Setco Enters. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir.1994) and *Weinberger v. Tucker*, 391 F.Supp.2d 241, 244 (D.D.C.2005)).

A "substantial" part of the events or omissions giving rise to the claim occurs where "the events giving rise to the action occurred." *Catipovic v. Turley*, No. C 11-3074-MWB, 2012 WL 2089552, at *15 (N.D. Iowa June 8, 2012) (citing *Wisland v. Admiral Beverage Corp.*, 119 F.3d 733, 736 (8th Cir.1997)) (emphasis removed).

Here, that is in this Court's district. As pleaded, this Court's district includes the contracted-for billboard in Springdale, Arkansas. See complaint Exhibit 1, doc. 3-1. Lamar's failure to emplace the designs, as contracted, was a substantial "omission" which directly led to this action. As if that were not enough, Lamar's Fayetteville office manager (the Fayetteville office is also in this Court's district) complained about TST receiving equal treatment as any other non-Satanic organization. See complaint Exhibits 7-8, doc. 3-7 and 3-8.

Very plainly, there were internal grumblings within this Court's district

which substantially contributed toward Lamar not emplacing the designs on the contracted-for billboard within this Court's district. It is borderline frivolous for Lamar to argue otherwise.

But it does. Lamar posits that "all of the events related to the negotiation, execution, and cancellation of the contract at issue took place outside of Arkansas." Lamar's brief, doc. 11, at 9. The negotiation and execution of the contract are both irrelevant because the real inquiry is into the *breach* of this contract. *Catipovic*, 2012 WL 2089552, at *15 ("'a substantial part of the events or omissions giving rise to the claim occurred … means where the events giving rise to the *action* occurred, not where the events giving rise to the plaintiff's *damages* occurred") (emphasis in original). Put another way, if this contract explicitly required Lamar to emplace designs in Arkansas, and Lamar refused to do which caused TST monetary damages in Massachusetts, Lamar must answer to the breach of contract in Arkansas but not in Massachusetts. That is because the benefit of TST's bargain was for advertising in Arkansas, so Lamar's failure to emplace the design in Arkansas is the requisite "omission" that directly led to this action. TST may have suffered damages in Massachusetts, but Lamar's actions and inactions under this hypothetical were directed into Arkansas and not into Massachusetts. Even if Lamar knew that TST would suffer harm in Massachusetts, on the facts given there is no nexus between Lamar's actions and Massachusetts.

The real inquiry is only into the breach. As sufficiently discussed above, the Arkansas subsidiary did not fulfill its contract obligations to emplace the designs on the billboard in this District, the Indiana subsidiary conveyed notice that Lamar would not fulfill its contract obligations to emplace the designs on the billboard in this District, and the parent corporation induced the decision to not emplace the designs on the billboard in this District.

## Conclusion

This Court has subject matter jurisdiction. Compensatory damages alone are above $75,000. Attorney's fees will likely exceed $75,000. Punitive damages will well exceed $75,000. Taken together, it simply cannot be said to a legal certainty that a jury would be bound at law to award TST less than $75,000.

The Court has personal jurisdiction over the defendants. The contract at issue involves four parcels of real estate which the defendants contracted to lease to TST. At issue is whether the defendants breached it and, if so, whether they would have treated a non-Satanic organization the same. The Arkansas subsidiary is at home here. The Indiana subsidiary made the contract and issued notice that Lamar would not fulfill the contract. And the parent corporation induced the breach.

Venue properly lies in this Court. All of the defendants "reside" in Arkansas for the same reasons that this Court has specific personal jurisdiction over them.

Thus, venue is proper under § 1391(b)(1). Or, a substantial set of the "omissions" leading to the action took place here, in that the defendants did not emplace the designs on the billboard which was located in this District. Or, a substantial set of the "events" leading to the action took place here, in that Lamar's Fayetteville office contributed toward the internal pressure to cancel the contract.

  **WHEREFORE**, the Court should deny the motion to dismiss.

<div style="margin-left:40%">

Respectfully submitted on
May 11, 2022,
on behalf of The Satanic Temple, Inc.
</div>

By: Matthew A. Kezhaya, ABA # 2014161

**KEZHAYA LAW PLC**
1202 NE McClain Rd
Bentonville, AR 72712
phone: (479) 431-6112
email: matt@kezhaya.law

<div align="center">

**CERTIFICATE AND NOTICE OF SERVICE**
</div>

**NOTICE IS GIVEN** that I, Matthew A. Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on May 11, 2022 which sends service to registered users, including all other counsel of record in this cause. s/ Matthew A. Kezhaya