IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

THE SATANIC TEMPLE, INC. ("**TST**")                                    PLAINTIFF

*V.*                          CASE NO: 5:22-CV-5033

LAMAR MEDIA COMPANY ("**Big Lamar**");                    DEFENDANTS

LAMAR ADVANTAGE GP COMPANY, LLC
("**Lamar-Indiana**"); and

LAMAR ADVANTAGE HOLDING COMPANY
("**Lamar-Arkansas**") (collectively, "**Lamar**").

═══════════════════════════════════════

**TST'S SURREPLY ON MOTION TO DISMISS**

═══════════════════════════════════════

# SUMMARY

At issue is whether TST can, through application of Arkansas law, seek punitive damages against Lamar for intentionally violating TST's right to be free from religious discrimination. The impetus for this action comes out of Arkansas. All issues should be resolved under Arkansas law by an Arkansas jury. If it is a tort, Arkansas law applies because the wrong was set in motion by Arkansas actors, purportedly to further Arkansas community standards. If it is a contract, an Arkansas jury should determine if Lamar correctly applied Arkansas's "community standards." If it is a property issue, Arkansas law applies to at least the Arkansas lands subject to TST's lease rights.

There is a singular unifying thread between the parties, this contract, the complained-of conduct, the stated justification for that complained-of conduct, and the broken rights sought to be vindicated by this action. That thread firmly ties this case to Arkansas. The same cannot be said for Indiana. Lamar-Indiana made this contract, but Lamar-Arkansas broke it. Arkansas law, as determined by an Arkansas jury, should govern whether Lamar was in its rights to break the agreement and violate TST's Arkansas right to be free from religious discrimination in contracting.

At this stage of proceedings, any ambiguity is resolved in TST's favor. Whether TST is entitled to a punitive damages instruction should be resolved after the summary judgment stage, after the parties have developed a fact record. The Rule 12(b)(1) motion should be denied.

## Procedural history

Lamar filed a Rule 12(b)(1) motion to dismiss, contesting the amount in controversy. Docs. 10-11. TST responded that the amount of controversy requirement is satisfied, in part, because punitive damages were available through the ACRA[1] claim. Doc. 18. Lamar replied that punitive damages are not

---

[1] Short for the "Arkansas Civil Rights Act;" Count 1 (doc. 3, at 34).

available because Arkansas law does not apply to the ACRA claim. Doc. 23, at 7. This was the first time Lamar raised the choice-of-law argument. The Court orally authorized this surreply at the hearing on Lamar's motion to dismiss.

# ARGUMENT

## Legal standards

In a diversity case, a conflict of law analysis begins with the forum State's choice-of-law rules. *Miller v. Pilgrim's Pride Corp.*, 366 F.3d 672, 673 (8th Cir. 2004). Arkansas most recently addressed choice-of-law principles in *Ganey v. Kawasaki Motors Corp., U.S.A.*, 366 Ark. 238, 234 S.W.3d 838 (2006); Howard W. Brill, *Arkansas law Of Damages* § 2:5 (November 2021 Update); John J. Watkins, *A Guide to Choice of Law in Arkansas*, 2005 Ark. L. Notes 151 (2005).

In Arkansas, choice of law depends on the issue at hand. Brill, *Arkansas law Of Damages* § 2:5. A separate choice of law analysis is necessary for each issue in the case. Watkins, *A Guide to Choice of Law in Arkansas*, 2005 Ark. L. Notes at 158 (compiling authorities). Because the analysis is issue-dependent, an Arkansas court may apply multiple States' laws in one case. *Id.* For example, in a single moving vehicle collision case, the Arkansas Supreme Court applied Arkansas's statute to determine comparative fault, but Missouri's rules of the road

to determine whether the parties drove "negligently." *Id.*, at 59 (citing *Wallis v. Mrs. Smith's Pie Co.*, 261 Ark. 622, 550 S.W.2d 453 (1977)).

Certainty is neither expected nor necessary at this stage of proceedings. Where a court cannot conclude with certainty as to which State's law should apply at the motion to dismiss stage, and the plaintiff states a "plausible" claim under Arkansas law, the Court should permit the plaintiff's Arkansas law claim to proceed and "revisit any choice-of-law issues if necessary as the facts are developed." see *Buckley v. G.D USA, Inc., No.* 5:13-CV-05216, 2014 WL 3896178, at *3 (W.D. Ark. Aug. 7, 2014) (deferring a the choice-of-law question until after summary judgment because it was uncertain, and because of the legal standard to be applied when ruling on a motion to dismiss).

## 1: Arkansas law governs the ACRA claim.

The issue at hand is whether a jury may lawfully award TST punitive damages. Assuming Arkansas law applies, and taking the allegations of the complaint as true, the answer is "plainly yes." The statute explicitly provides for punitive damages where the person is injured by an intentional violation of the right to engage in "other contractual transactions without discrimination." ACA § 123-107(a)(4), (b).

Lamar attacks the assumption and argues that Indiana law applies because, Lamar argues, this is a contract issue. Lamar is wrong. Whether punitive

damages are allowed is generally a torts issue. Brill, Arkansas Law of Damages § 9:3 (November 2021 Updated).

Lamar comes to the wrong conclusion because its analytical process did not start with the first step of the analysis. The ACRA claim primarily raises a tort issue because it asserts a "willful or malicious act." Id. Particularly, Lamar intentionally treated TST differently, worse, than it would treat another religion.

The ACRA claim does not sound in contract, or at least not for the reason Lamar argues. Lamar sole basis to claim this is a contract relies on a wrongful discharge case, which sounds exclusively in contract under Arkansas law. But this is not a wrongful discharge case, so Lamar's brief is not particularly helpful.

But even if the ACRA claim is a contract case, Arkansas law still applies. The subject matter of this contract is not just billboards, as Lamar claims, but the moral standards in the individual communities in which those billboards lie. Lamar-Arkansas, not Lamar-Indiana, sought Big Lamar's permission to break the contract. This request was based on the community standards of Little Rock and Springdale (both in Arkansas), not Boone County or Jasper (both in Indiana).

The ACRA claim, to some extent, raises a property issue. If property law controls, the ACRA claim only applies to the Arkansas billboards. But at most that should only mitigate punitive damages, not eliminate them as an option.

*1.1: Arkansas law governs if the ACRA claim is a tort.*

Lamar opens its choice-of-law analysis with a silent assumption. See doc. 23, at 7. Lamar assumes that TST's ACRA claim only sounds in contract. Id. As sole support, Lamar cites a wrongful discharge case. Id. (citing *Loftin v. United Parcel Serv., Inc.*, No. 4:07-CV-564, 2009 WL 33048 (E.D. Ark. Jan. 5, 2009)). While true that *Loftin* involved an ACRA claim, the *Loftin* claim sounded in wrongful discharge which, under Arkansas law, "sounds exclusively in contract." *Loftin*, 2009 WL 33048, at *10. *Loftin* is unhelpful for a different reason, punitive damages are unavailable in the employment context. ACA § 123-107(a)(1), (b) (punitive damages are only available for a "violation of subdivisions (a)(2)-(5)).")

This ACRA claim sounds in tort because TST complains of religious discrimination. Complaint, doc. 3, at ¶ 106. To be precise, a claim sounds in tort if it evaluates "conduct which is tortious" or whether the conduct "is claimed to be tortious but is not." Restatement (Second) of Conflict of Laws Ch. 7, Topic. 1, Intro. Note (1971) (the "**Restatement**").

While TST's ACRA *involves* a contract relationship, that does not end the analysis. Just as a party may breach the terms of its agreement (a contract issue), in so doing it may also incur tort liability. *See DWB, LLC v. D & T Pure Tr.*, 2018 Ark. App. 283, 550 S.W.3d 420 (affirming both attorney's fees, which

sounds in contract, and punitive damages, which sounds in tort). The choice-of-law analysis requires us to tease apart the issues. In a torts case, the test involves two steps. Each step is addressed under separate header below.

### 1.1.1: The tort "occurred" in Arkansas.

First, we are to determine whether the case has "any significant contacts with Arkansas" by looking to where the wrong took place (*lex loci delicti*). *Ganey*, 366 Ark. at 251; see also Restatement § 6, cmt. *e*. (1971) The tort at issue is Lamar's intentional religious discrimination against TST in contracting, prohibited and punished by the ACRA.

To determine where that tort "occurred," we look to the Restatement. See Restatement (Second) of Conflict of Laws § 145, cmt. *e* and § 147, cmt. *e* (1971). The Restatement teaches a distinction between where the conduct takes place and where the injury occurs. *Ibid.* Arkansas law applies because the impetus for the conduct arose out of Arkansas and deprived TST of its Arkansas statutory right to be free from religious discrimination.

Lamar-Arkansas started the chain of events in Arkansas. Tom Gibbens (General Manager Lamar-Arkansas), expressed to Hal Kilshaw (Big Lamar's corporate Vice President of Governmental relations) a desire to reject any designs because of TST's religious identity.; doc. 3-5. The stated ground for exclusion was that Arkansas "moral standards" precludes placing the displays.

Doc. 3-5. About an hour later, Whit Weeks (General Manager for Lamar-Arkansas) instructed his team not to respond to any customer requests "without gaining knowledge of the customer." Id. ¶ 62; doc. 3-7.

Lamar violated TST's Arkansas right to be free from religious discrimination in contracting. ACA § 16-123-107. TST entered into the subject contract to emplace designs of religious significance on Arkansas billboards. Doc. 3 at ¶¶ 9-35. Arkansas individuals refused to emplace the designs on the Arkansas billboards. They refused to emplace the designs because they did not agree with the underlying religious beliefs and iconography. Doc. 3-5, at 1; Doc. 3-7, at 1; Doc. 3-8, at 1-2; Doc. 3-10, at 1.

The injury was "caused" in Arkansas because these two Arkansas individuals formed an illegal intention to discriminate against TST because of TST's religious beliefs and iconography. Complaint, doc. 3, at ¶¶ 58, 62; docs. 3-7 and 3-9. They argued that Arkansas community standards supported their decision. Id. So, operating out of their Arkansas offices, they communicated their intention to Big Lamar, in Louisiana, who blessed their illegal desire to refuse to perform as contracted. Doc. 3-9; see also Doc. 10-1 at ¶ 11.

Because of conduct arising out of Arkansas, an "injury" to TST took place in Arkansas. TST had a contract right to advertise its religious beliefs and iconography on Arkansas billboards. TST has an Arkansas right to be free from

religious discrimination in contracting. These rights were violated when La-mar-Indiana unilaterally canceled the contract. Complaint, doc. 3, at 29 ¶ 80. Because both the conduct and the injury occurred in Arkansas, this claim has at least some "significant contacts" with Arkansas. *Ganey*, 366 Ark. at 251.

### 1.1.2: The Leflar factors further point to Arkansas law.

The second step requires application of the five Leflar factors:

(1) predictability of results,
(2) maintenance of interstate and international order,
(3) simplification of the judicial task,
(4) advancement of the forum's governmental interests, and
(5) application of the better rule of law.

*Id.*, 366 Ark. at 251-52; see also Watkins, *A Guide to Choice of Law in Arkansas*, 2005 Ark. L. Notes at 159–162.

*First*, applying Arkansas law will enhance predictability of results. The point is to enforce the justified expectations of parties to planned transactions. Wat-kins, *A Guide to Choice of Law in Arkansas*, 2005 Ark. L. Notes at 160; see also Restatement (Second) of Conflict of Laws § 6(2)(d), cmt. *g*. This is a weak factor because parties typically act in tort without giving thought to the legal conse-quences of their conduct or to the law that may be applied. *Ibid.* TST had a well-justified expectation that the Arkansas prohibition on religious discrimi-nation in contracting would protect TST from the risk of religious

discrimination. Presumably, defendants were not thinking about TST's rights when they took their complained-of actions. This factor favors Arkansas law.

*Second*, applying Arkansas law will further interstate order. This is another weak factor. Watkins, *A Guide to Choice of Law in Arkansas*, 2005 Ark. L. Notes at 160. This factor tries to further harmonious relations between the States. Restatement § 6, cmt. *d*. To do so requires consideration of the other States' policies. Id., cmt. *f*. But it is an impossible task to achieve harmony among all of the involved States' policies on this issue. The parties involved were spread across Massachusetts (TST), Indiana (Lamar-Indiana), Arkansas (Lamar-Arkansas), and Louisiana (Big Lamar). Each State protects the right to be free from religious discrimination in the rendering of services.[2, 3, 4, 5] As do all but four States.[6]  But half, each, vote in diametric opposition as to whether punitive

---

[2] Massachusetts: GL Ch. 272, § 98

[3] Indiana: ICA § 22-9-1-2

[4] Arkansas: ACA § 16-23-107

[5] Louisiana: LSA § 51:2247

[6] The four States without public accommodations laws are Georgia, Mississippi, North Carolina, and Texas. National Conference of State Legislatures, https://www.ncsl.org/research/civil-and-criminal-justice/state-public-accommodation-laws.aspx (last visited June 28, 2022).

damages should be recoverable for the violation of that civil right.[7, 8, 9, 10] This factor is a wash.

*Third*, applying Arkansas law will simplify the task. This is another weak factor. Watkins, *A Guide to Choice of Law in Arkansas*, 2005 Ark. L. Notes at 161; see also Restatement § 6, cmt. *j*. The goal is to promote ease of application. It is intuitive that the Arkansas law would apply to whether Arkansas's "community standards" supported Lamar-Arkansas's refusal to adhere to its contract obligations. This factor favors applying Arkansas law.

*Fourth*, applying Arkansas law advances the governmental interests at play. This factor calls for consideration of "current socio-economic, cultural, and political attitudes in the community." Watkins, *A Guide to Choice of Law in Arkansas*, 2005 Ark. L. Notes at 161; see also Restatement § 6, cmt. *e*. Beyond dispute, Lamar could not lawfully break its contract obligations because, *e.g.*, Whit

---

[7] Massachusetts (yes): GL Ch. 272, § 98; GL Ch. 151B § 9; *Dalis v. Buyer Advert., Inc.*, 418 Mass. 220, 224, 636 N.E.2d 212, 215 (1994).

[8] Indiana (no): *Indiana C.R. Comm'n v. Alder*, 714 N.E.2d 632, 637–38 (Ind. 1999)

[9] Arkansas (yes): ACA § 16-23-107(b).

[10] Louisiana (no): *Devillier v. Fid. & Deposit Co. of Maryland*, 97-1200 (La. App. 3 Cir. 3/6/98), 709 So. 2d 277, writ denied, 98-0920 (La. 6/5/98), 720 So. 2d 680.

Weeks found it "embarrassing" that TST's religious beliefs and iconography would be displayed in his market on equal terms. Doc. 3-7. Applying Arkansas law (*i.e.*, punitive damages), will deter future religious discrimination. That is the point of punitive damages. Additionally, an Arkansas jury should adjudge the "community standards" which, ostensibly, was the basis for Tom Gibbens's insistence that no TST design could ever be allowed. Doc. 3-5.

*Fifth*, Arkansas has the better rule of law. See Watkins, *A Guide to Choice of Law in Arkansas*, 2005 Ark. L. Notes at 162; see also Restatement § 6, cmt. *h*. Arkansas has the better rationale because it best furthers the irreducible purpose of the civil courts to provide a remedy for private wrongs. U.S. Const. Amend. I ("Congress shall make no law abridging the right of the people to petition the Government for a redress of grievances") (cleaned up). The purpose in having public remedies for private wrongs is to induce injured parties and their clan to seek relief from courts rather than resorting to violent means of self-help. See Restatement (Second) of Torts § 901, cmt. *c* (1979). Punitive damages not only deter defendants from engaging in wrongful conduct, they deter plaintiffs from engaging in violent retribution in kind. Id. States that provide for punitive damages posit that a given harm is made worse when the defendant intended to cause the harm.

Punitive damages deter an evil intent. Ark. Model Jury Instr., Civil AMI 2218. The jury will answer whether Lamar had that evil intent. If so, Lamar's

breach of contract impacts more than the limited question of this commercial wrong. The ACRA was supposed to ensure that TST's right to access the free market without fear that its religious beliefs or practices would be an impediment. TST was entitled to access Lamar's services on equal footing as other religions because the law of this State punishes intentional religious discrimination in contract. Not because Lamar has enlightened management who believes in equal rights for all, but because we believe so strongly in the right of conscience that even freedom of contract must yield to the right to think freely.

## 1.2: Arkansas law governs if the ACRA claim is a contract

Indisputably there will be contract issues in this case. See Doc No. 3, at 35-41, Counts 2-4 (the contract issues). Resolving which State's laws apply may head off future disputes. Arkansas law applies because the contract's subject matter, as well as the Defendants' justification for the breach of the contract, arise out of Arkansas.

Arkansas contract choice of law principles follow the Restatement. *Crisler v. Unum Ins. Co. of Am.*, 366 Ark. 130, 133, 233 S.W.3d 658, 660 (2006). The goal is to determine which State has the most significant relationship to the issue at hand should. *Id.*, 366 Ark. at 133. That involves a five-factor test:

> (1) the place of contracting;
> (2) the place of negotiation of the contract;
> (3) the place of performance;

> (4) the location of the subject matter of the contract;
> (5) the domicile, residence, nationality, place of incorporation and place of business of the parties.

*Id.*; Restatement (Second) Conflict of Laws § 188 (1971).

This is not a "simple arithmetic issue." *Holistic Indus. of Arkansas, LLC v. Feuerstein Kulick LLP*, No. 2:20-CV-230-LPR, 2021 WL 4005872, at *9 (E.D. Ark. Sept. 2, 2021); *see also Hoosier v. Interinsurance Exch. of the Auto. Club*, 2014 Ark. 524, 6, 451 S.W.3d 206, 210 (2014). The Court should weigh the "qualitative force of each factor" and resolve how strongly that particular factor points in the direction of a particular State. *Ibid.*

## 1.2.1: The parties did not clearly contract in Indiana.

The first factor asks the place of the contracting. This is a weak factor. Restatement § 188, cmt. *e*. The question is where the last act took place to give the contract a binding effect under the laws of the forum State. *Id.* The last act necessary to give this contract a binding effect was acceptance. *See Cogswell v. Cooper*, 2021 Ark. App. 336, 6, 634 S.W.3d 555, 561.

Under the terms of this contract, Lamar's acceptance must be demonstrated by "a Lamar General Manager." Doc. 3-1, at 2. Jason Graham, Lamar-Indiana's General Manager, signed the contract. Id. Lamar points out that this act of acceptance happened in Indiana. Doc. 23 at 8. That is where Lamar's analysis ended.

But there is more to the analysis. Lamar-Indiana does not own real property in Arkansas. Doc. 10-1, at 3 ¶ 14. Lamar-Indiana could only lease out the Arkansas billboards pursuant to actual authority given by Lamar-Arkansas in an agency agreement. See Restatement (Third) Of Agency § 2.01 (2006); ACA § 1-2-119 (Arkansas has generally adopted the common law). At the June 24, 2022 hearing, Lamar stipulated that Lamar-Indiana had authority to create bind Lamar-Arkansas. So, when Lamar-Indiana's General Manager signed that contract, he was signing for both Lamar-Indiana and Lamar-Arkansas. The act may have happened in Indiana, but it created rights and obligations that arise under both Indiana and Arkansas law. Thus, this factor is either a wash or it weakly points toward Indiana.

### 1.2.2: The parties did not clearly negotiate in any State.

The second factor asks where the contract was negotiated. This is a weak factor because the parties conducted their negotiations "from separate states by mail or telephone." Restatement § 188, cmt. *e*. Particularly, through agents located in New York and Indiana, respectively. See Doc. 23-1. Because the parties negotiated in "no one single place," this factor is a wash.

### 1.2.3: Performance was to be in Arkansas, if anywhere.

The third factor inquires into the place of performance. This is another weak factor because the performance "is to be divided more or less equally among two or more states." Restatement § 188, cmt. *e*. The contract at issue required

Lamar to emplace designs on eight billboards: four in Arkansas, and four in Indiana. (Doc No. 3-1, at 1). At first blush, this factor is a wash.

But there is more to the analysis. Lamar-Arkansas made the call, pursuant to Big Lamar's policies, to determine if TST's copy meets Lamar's advertising copy acceptance policy. Doc. 10-1, at 2 ¶ 6; but see docs. 3-5 ("I do not have the final artwork yet"), 3-7 ("I'm embarrassed that this will represent us"), 3-8 ("This is ridiculous.") Performance never happened, but the reason why came out of Arkansas. Moreover, Lamar-Arkansas's stated justification for not performing was the "moral standards" of Little Rock, Arkansas and Springdale, Arkansas. Doc. 3-5. Thus, this factor either favors Arkansas or is a wash.

### 1.2.4: The subject matter is clearly in Arkansas.

The fourth factor inquires into the place of the subject matter of the contract. The subject matter of this contract was to emplace nonspecific designs on specified billboards, subject to Lamar's right to review copy. Doc. 3, at 1 and 2 ¶ 6.

Lamar only recognizes the billboards as the subject matter of this contract. Doc. 23 at 8. As Lamar fairly points out: half are in Arkansas and half are in Indiana. Doc. 3, at 2 ¶ 6. But that answers performance, and only part of the performance at that. It does not answer the subject matter.

At least as important to this contract, to Lamar, was the "individual communities" to whom those billboards advertise. Doc. 3, at 2 ¶ 6. No part of the

complaint suggests that Indiana's communities objected to these designs. La-
mar only contended that Arkansas communities would never countenance
TST's designs. Docs. 3-5 (Lamar-Arkansas sought to reject TST's displays,
even though "I do not have the final artwork yet"), 3-7 ("I'm embarrassed that
this will represent us"), 3-8 ("This is ridiculous.")

Because Lamar's stated justification to terminate the contract relies upon
Arkansas's "moral standards," it is only rational that Arkansas public policy
would determine if Lamar was within its rights to terminate the contract. That
question should be submitted to an Arkansas jury, not an Indiana one. This
factor strongly and clearly points to Arkansas law.

## 1.2.5: The parties do business in Arkansas.

The last factor asks about the parties' domicil, residence, nationality, place
of incorporation, and place of business. Big Lamar is incorporated in Delaware
and headquartered in Louisiana. Doc. 10-1, at 2 ¶ 3. Lamar-Indiana is incor-
porated in Delaware and headquartered in Indiana. Doc. 3, at 5 ¶ 8. Lamar-
Arkansas is incorporated in Delaware and headquartered in Arkansas. Doc. 3,
at 4 ¶ 7. And TST is both incorporated and headquartered in Massachusetts.
Doc. 3, at ¶ 4. At first blush, these disparate places suggest this factor is a wash.

But there is more to the analysis. All of the parties do business in Arkansas.
TST has members here. Doc. 3, at 2 ¶ 4. TST is litigating a case of national

interest here. *Cave v. Thurston*, No. 4:18-cv-342 (E.D. Ark.) And about half of the *Hail Satan?* portrays TST's activities here, in Arkansas. See Doc. 3, at 2 ¶ 4.

Same for Lamar. Big Lamar purports to have special insight into the "moral standards" of Arkansas communities. Doc. 3-1, at 2 ¶ 6; Doc. 10-1, at 2 ¶ 6. This, despite having no employees, no offices, no places of business, real property, any other assets, or even a bank account in Arkansas. Doc. 10-1, at 3 ¶ 13. As stipulated, Lamar-Indiana has the actual authority to enter into lease agreements, in Arkansas, for billboards that it does not own. See Doc. 10-1, at 3 ¶ 14. And Lamar-Arkansas, obviously, owns the subject Arkansas billboards.

### 1.3: Arkansas law governs if the ACRA is a property issue.

In a property case, the situs controls the determination. Brill, Arkansas law of Damages § 2:25 (citing Watkins, A Guide to Choice of Law in Arkansas, 2005 Ark. L. Notes at 166–168). "Like most states, Arkansas follows the traditional approach...the governing law is that of the state in which the land is located. This 'situs rule' applies to questions concerning title to land." *2 Arkansas Civil Prac. & Proc.* § 6:8 (5th ed.). "Leases are subject to the law of the situs as to the nature of the rights created in land." Id. A lease is a "contract by which a rightful possessor of real property conveys the right to use and occupy the property in exchange for consideration." Black's Law Dictionary, LEASE (11th ed. 2019)

Here, TST was given a lease, under the contract, in Arkansas to advertise its message through the billboards at issue for a term lasting from September 28, 2020 to October 25, 2020. (Doc. No. 3-11, at 1). There is no dispute that the Lamar defendants were the rightful possessors of the billboards at issue in Arkansas. And, there is no dispute that Lamar conveyed the right to use the billboards to TST in exchange for consideration from TST. In fact, under the contract, TST was prohibited from *subletting*, reselling, transferring, donating or assigning any "advertising space without the prior written consent of Lamar," during the term that TST was granted the right to use the billboards. (Doc. No. 3-1, at 3).

In order for TST to sublet the billboards, the contract conferring the right to use the billboards must have been a lease. Black's Law Dictionary, SUBLEASE (11th ed. 2019)("A lease by a lessee to a third party, transferring the right to possession to some or all of the leased property for a term shorter than that of the lessee, who retains a right of reversion.") Thus, the contract in dispute was a lease for TST to use the billboards in question, and subject to Arkansas' choice of law, by virtue of the billboards' physical location within the state.

## 2: Arkansas has an interest, so jurisdiction is proper.

Lamar's Rule 12(b)(1) motion asks the Court to sever part of the claim, leaving at least two actions for one cause of action. See Doc. 23 at 12 (asking

that Lamar-Indiana and Big Lamar be dismissed for lack of personal jurisdiction). But, as already adequately briefed, personal jurisdiction and venue rules do not purport to tell the plaintiff the only, or "best," place to litigate. Doc. 18, at 33 (citing *Johns v. Newsmax Media, Inc.*, 887 F. Supp. 2d 90, 96 (D.D.C. 2012)) Rather, they only answer whether the plaintiff has selected the "wrong" venue. *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 57 (2013).

Federal courts give "considerable deference to a plaintiff's choice of forum" for good reason. *Buckley v. G.D USA, Inc.*, No. 5:13-CV-05216, 2014 WL 3896178, at *5 (W.D. Ark. Aug. 7, 2014) (quoting *Terra Int'l, Inc. v. Miss. Chem. Corp.*, 119 F.3d 688, 695 (8th Cir.1997)). Before filing suit, before even sending the demand letter (doc. 3-11), undersigned counsel intuited the question of where the ensuing litigation would take place Arkansas court.

As better detailed in § 1, the litigation properly lies here, because Arkansas has at least "some" interest in this case. Lamar-Arkansas owns half the billboards which are the subject of this lawsuit. Lamar-Indiana created contract obligations, both for itself and for Lamar-Arkansas, to emplace TST's designs on Arkansas billboards. Lamar-Arkansas objected to TST's designs, sight unseen, because the "moral standards" of Arkansas communities would be offended by the fact, alone, of TST's equal treatment. Lamar-Arkansas prevailed on Big Lamar to give its blessing to break the contract. Big Lamar provided that

blessing. And Lamar-Indiana broke the contract obligation to emplace TST's designs in Arkansas. This coordinated conduct, by three questionably-distinct corporate actors, broke TST's rights under Arkansas law.

Big Lamar and Lamar-Indiana both "reached out beyond" their homes by acting in tandem with Lamar-Arkansas to breach TST's contractual rights and civil rights to emplace these designs on these billboards on equal terms as any other religion. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1024 (2021). They cannot seriously feign surprise that the ensuing litigation is taking place in the State which gave rise to the lawsuit. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985).

## 3: If the Court is unsure, it should defer.

Considering the posture of the case, some uncertainty is expected. That is normal. It is abnormal that TST even has Lamar's internal written correspondence of relevance to this case. But the operative question in this case is whether the Court can say, to a legal certainty, that TST is barred from seeking punitive damages as a matter of law. *Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002). Any uncertainty on that question means TST should be entitled to develop a fact record and assist the Court in answering any choice of law questions that may arise. *Buckley*, 2014 WL 3896178, at *3.

WHEREFORE, the Court should deny the motion to dismiss.

Respectfully submitted on
June 28, 2022,
on behalf of The Satanic Temple, Inc.

By:   Matthew A. Kezhaya, ABA # 2014161

KEZHAYA LAW PLC
1202 NE McClain Rd
Bentonville, AR 72712

phone:   (479) 431-6112
email:   matt@kezhaya.law

## CERTIFICATE AND NOTICE OF SERVICE

NOTICE IS GIVEN that I, Matthew A. Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on June 28, 2022 which sends service to registered users, including all other counsel of record in this cause. s/ Matthew A. Kezhaya