**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**THE SATANIC TEMPLE, INC.**                                          **PLAINTIFF**

**V.**                              **CASE NO. 5:22-CV-05033**

**LAMAR MEDIA CORP.; LAMAR**
**ADVANTAGE GP COMPANY, LLC;**
**and LAMAR ADVANTAGE HOLDING**
**COMPANY**                                                          **DEFENDANTS**

**MEMORANDUM OPINION AND ORDER**

Plaintiff The Satanic Temple ("TST") sues Defendants Lamar Media Corporation,[1] Lamar Advantage GP Company, LLC, and Lamar Advantage Holding Company (collectively, "Defendants") for religious discrimination pursuant to the Arkansas Civil Rights Act ("ACRA"), § 16-123-107(a)(3), and breach of contract. Lamar moves to dismiss, arguing this Court lacks subject matter jurisdiction, proper venue, and personal jurisdiction.

For the below reasons, the Court finds it may exercise subject matter jurisdiction over this dispute, and venue is proper. It further concludes it may assert personal jurisdiction over Lamar Advantage GP Company, LLC and Lamar Advantage Holding Company—but not Lamar Media Corp. Accordingly, the Court **DENIES** Defendants' Motion as to Lamar Advantage GP Company, LLC and Lamar Advantage Holding Company, and **GRANTS** the Motion as to Lamar Media Corp. due to lack of personal jurisdiction.[2]

---

[1] TST identifies "Lamar Media Company" as a defendant in the caption of its Complaint. The correct name for this defendant is "Lamar Media Corp." See Doc. 3, p. 4.

[2] The Court reviewed TST's Complaint (Doc. 3), Defendants' Motion (Doc. 11), Plaintiff's Response in Opposition (Doc. 18), and Defendant's Reply (Doc. 23); heard oral argument

## I.      BACKGROUND

According to the complaint,[3] TST is a religious organization in the "nontheistic branch of Satanism." (Doc. 3, p. 8). Adherents "venerate[] (but do[] not worship) the biblical adversary as a promethean icon against tyranny." *Id.* at p. 2. TST practices the "Satanic Abortion Ritual," described as the "ceremonious casting off of guilt, doubt, and mental discomfort that the member may be experiencing in connection with their election to abort the pregnancy." *Id.* at p. 10.  According to TST, this ritual reflects the religion's core tenets, particularly its commitment to bodily autonomy and the idea that scientific understanding should guide one's beliefs. *Id.* at p. 3.

Defendants own and operate billboards located across the country, which they rent for use as advertising space. Defendant Lamar Advantage GP Company, LLC is a Delaware entity operating primarily in Indiana ("Lamar-Indiana"). Defendant Lamar Advantage Holding Company is a Delaware corporation with its principal place of business in Arkansas ("Lamar-Arkansas"). Lamar Advertising Company ("Lamar-HQ"), a publicly traded Delaware corporation headquartered in Louisiana, wholly owns both Lamar-Indiana and Lamar-Arkansas, albeit through several layers of other wholly owned subsidiaries.[4]  Lamar-HQ also wholly owns Defendant Lamar Media Corp. *See id.* at pp. 3–5; Docs. 10-1, 12, 13, 14.

---

on Defendants' motion; and considered supplemental briefing on choice-of-law from both parties (Docs. 27 & 28).

[3] For purposes of ruling on the instant motion, the Court recites the factual background from TST's perspective as alleged in the Complaint (Doc. 3).

[4] Lamar Advertising Company is not presently a named defendant. Through discussions with counsel at the Case Management Conference, the Court understands that in naming Lamar Media Corp. to its suit, TST intended to name Lamar-Indiana's and Lamar-

TST engaged a marketing firm, SeedX, to grow public awareness about the abortion ritual. On September 2, 2020, SeedX CEO Jacqueline Basulto spoke with Lamar-Indiana Senior Account Executive Tom Hill about renting eight billboards in Arkansas and Indiana. Location was key, Basulto told Hill, because TST wanted its advertisements placed near "fake abortion clinics."[5] (Doc. 3, p. 13). On September 15, 2020, they executed a contract. For $16,387, TST would have its content displayed on eight billboards, four located in Arkansas and four in Indiana, between September 28 and October 25, 2020.

When Lamar-Arkansas heard the news that morning, they were not pleased. *See* Doc. 3, p. 18. Whit Weeks, General Manager of Lamar-Arkansas's Fayetteville office, told his staff that he was "embarrassed" Lamar would be working with TST. *See* Doc. 3-7. Tom Gibbens, General Manager of Lamar-Arkansas's Little Rock office, emailed Lamar-HQ's Corporate Vice President of Governmental Relations Hal Kilshaw: "I do not have the final artwork yet. Can we reject this based on not meeting the moral standards of our community?" (Doc. 3, p. 18). The contract, per paragraph 6, "reserve[d] [to Lamar] the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed" and allowed Lamar to "reject or remove copy" that failed to comply. (Doc. 3-1, p. 2). Gibbens sent the email after the

---

Arkansas's ultimate parent entity as a defendant. However, "Lamar Advertising Company"—not Lamar Media Corp.—is that ultimate parent entity; Lamar Media Corp. is simply another wholly-owned subsidiary.

[5] According to TST, "[f]ake abortion clinics, also known as 'crisis pregnancy centers,' are clinics that offer 'pregnancy related services' (to an unsuspecting layperson, this would include abortions) but will do anything to deter its patrons from obtaining an abortion including shaming, deception, manipulation, and outright intimidation." (Doc. 3, p. 13).

contract had been signed but before Lamar received the design copy TST intended to use in its campaign.

Gibbens received TST's content later that morning—still September 15—which he forwarded to Kilshaw. Lamar-Indiana also forwarded the content to Kilshaw for his review. About an hour later, Kilshaw replied to both Lamar-Arkansas and Lamar-Indiana, stating: "All of these are misleading and offensive so no on all of them." (Doc. 3-9, p. 1).

On September 21, 2020, Hill (of Lamar-Indiana) told Basulto (SeedX) that Lamar would not display TST's content. *See* Doc. 3, p. 21.  Basulto requested guidance about how to resolve the objection but received no insight. *See id.* at pp. 21 & 28. On September 25, Jason Graham canceled the contract, citing paragraph 6. *See id.* at p. 29.  Mr. Graham is a "Lamar General Manager" and Vice President of Lamar-Indiana. *See* Doc. 3-1, p. 2; Doc. 3-9, p. 2.

TST calls foul. It contends Defendants' proffered justification is merely pretext for religious animus. TST alleges Defendants' conduct violates ACRA and constitutes a breach of contract, and seeks compensatory damages, punitive damages, and attorney's fees.

## II.    SUBJECT MATTER JURISDICTION

Defendants argue the Court must dismiss TST's Complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) because the Complaint does not plausibly allege the necessary minimum amount in controversy to establish diversity jurisdiction.

Federal diversity jurisdiction requires the parties to be citizens of different states and the amount in controversy to exceed $75,000. *See* 28 U.S.C. § 1332(a). While TST's Complaint alleges damages in excess of $75,000, *see* Doc. 3, p. 1, Defendants argue

that such a recovery is impossible as a matter of law.[6] "If the defendant challenges the plaintiff's allegations of the amount in controversy, then the plaintiff must establish jurisdiction by a preponderance of the evidence." *Peterson v. The Travelers Indem. Co.*, 867 F.3d 992, 995 (8th Cir. 2017) (quoting *Kopp v. Kopp*, 280 F.3d 883, 884–85 (8th Cir. 2002)).

A complaint that alleges "the jurisdictional amount in good faith will be dismissed only if it appears to a legal certainty that the claim is really for less than the jurisdictional amount." *Am. Fam. Mut. Ins. Co. v. Vein Ctrs. for Excellence, Inc.*, 912 F.3d 1076, 1080–81 (8th Cir. 2019) (quotation marks and alteration omitted). "The legal certainty standard is met where the legal impossibility of recovery is so certain as virtually to negative the plaintiff's good faith in asserting the claim." *Peterson*, 867 F.3d at 995 (quotations and brackets omitted) (quoting *Schubert v. Auto Owners Ins. Co.*, 649 F.3d 817, 822 (8th Cir. 2011)).

---

[6] Defendants' Motion to Dismiss does not specify whether it makes a facial or factual challenge to the Court's subject matter jurisdiction. Because Defendants do not challenge the truthfulness of those allegations relevant to the Court's jurisdictional analysis, the Court construes Defendants' Motion to be a facial challenge.

"In a facial attack, the court restricts itself to the face of the pleadings, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6)." *Carlsen v. GameStop, Inc.*, 833 F.3d 903, 908 (8th Cir. 2016) (quotation marks omitted). "In other words, . . . the Court 'determines whether the asserted jurisdictional basis is patently meritless by looking to the face of the complaint and drawing all reasonable inferences in favor of the plaintiff.'" *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 279 F. Supp. 3d 846, 860 (D. Minn. 2017) (alterations omitted), *modified*, 2019 WL 1516934 (D. Minn. Apr. 8, 2019) (quoting *Biscanin v. Merrill Lynch & Co.*, 407 F.3d 905, 907 (8th Cir. 2005)).

Arguably, however, the amount in controversy may depend on whether Arkansas's or Indiana's substantive law governs TST's claims. Accordingly, the Court first conducts a choice-of-law analysis before addressing Defendants' challenge to diversity jurisdiction.

### A.      Choice-of-Law Analysis

Defendants argue Indiana law controls, and because Indiana law does not provide for attorney's fees or punitive damages on any of TST's claims, the amount in controversy falls well short of the jurisdictional minimum.   According to Defendants, the amount in controversy is—at best—the $16,387 contracted value of the billboard advertising. The Court disagrees. The Court concludes that Arkansas law governs both of TST's claims, which means TST has placed in controversy an aggregate sum that may include compensatory damages, attorney's fees, and punitive damages.

In a diversity case, federal courts apply the choice-of-law principles of the state in which the court sits. *See Cassirer v. Thyssen-Bornemisza Collection Found.*, 142 S. Ct. 1502, 1509 (2022) ("According to long-settled precedent, a federal court sitting in diversity borrows the forum State's choice-of-law rule."); *Schwan's Sales Enters., Inc. v. SIG Pack, Inc.*, 476 F.3d 594, 595 (8th Cir. 2007). Accordingly, Arkansas law governs the choice-of-law analysis.

Arkansas choice-of-law analysis depends on the type of claim involved. *See Shelby Cnty. Health Care Corp.*, *v. S. Farm Bureau Cas. Ins. Co.*, 855 F.3d 836, 841 (8th Cir. 2017). If the dispute sounds in contract, the court must identify which state has the "most significant relationship to the issue at hand." *Crisler v. Unum Ins. Co. of Am.*, 366 Ark. 130, 133 (2006) (citing *Ducharme v. Ducharme,* 316 Ark. 482 (1994)). If the dispute instead sounds in tort, the court considers the following:

> [F]irst which State has the most significant relationship to the action and the parties, and then . . . the Leflar factors: (1) predictability of results, (2) maintenance of interstate and international order, (3) simplification of the judicial task, (4) advancement of the forum's governmental interests, and (5) application of the better rule of law.

*Shelby Cnty. Health Care Corp.*, 855 F.3d at 842.

Importantly, though, "before entangling itself in messy issues of conflict of laws a court ought to satisfy itself that there actually is a difference between the relevant laws of the different states." *Phillips v. Marist Soc. of Wash. Province*, 80 F.3d 274, 276 (8th Cir. 1996) (quoting *Barron v. Ford Motor Co. of Can., Ltd.*, 965 F.2d 195, 197 (7th Cir. 1992)). In other words, absent a conflict between relevant legal principles, a court need not conduct a full-blown choice-of-law analysis. *See Leonards v. S. Farm Bureau Cas. Ins. Co.*, 279 F.3d 611, 612 (8th Cir. 2002).

Below, the Court addresses, first, TST's religious discrimination claim, and, second, TST's breach of contract claim.[7]

### 1. Arkansas Law Governs TST's Religious Discrimination Claim

The Court finds that a conflict exists between Arkansas and Indiana religious discrimination law.

The Arkansas Civil Rights Act of 1993 recognizes that individuals have a civil right to "be free from discrimination" based on religion. Ark. Code Ann. § 16-123-107(a). This right expressly encompasses "[t]he right to engage in property transactions . . . and other contractual transactions without discrimination." *Id.* "Such transactions include purchases on credit at retail stores and related establishments as well as other types of contractual

---

[7] The Court will not separately assess the amounts in controversy associated with TST's claims for Declaratory Judgment and Promissory Estoppel. Those claims are likely subsumed within the value of TST's breach of contract claim.

agreements, including franchise agreements, sales contracts, and employment contracts." Theresa M. Beiner, *An Overview of the Arkansas Civil Rights Act of 1993*, 50 Ark. L. Rev. 165, 186–87 (1997).

Any person injured by an intentional act of such discrimination—as TST alleges here—"shall have a civil action . . . to enjoin further violations, to recover compensatory and punitive damages, and, in the discretion of the court, to recover the cost of litigation and a reasonable attorney's fee." Ark. Code Ann. § 16-123-107(b).

Arguably, the Indiana Civil Rights Act ("ICRA") does not recognize freedom from religious discrimination in business transactions as a civil right, *see* Ind. Code Ann. § 22-9-1-2,[8] which means that there is a substantive difference between Arkansas and Indiana law. Even if Indiana law is construed to impliedly provide a cause of action for religious discrimination in business transactions, a second substantive difference exists: The availability of punitive damages. The ACRA allows recovery of punitive damages; the ICRA does not.[9]

---

[8] The ICRA recognizes that "[e]qual education and employment opportunities and equal access to and use of public accommodations and equal opportunity for acquisition of real property" constitute civil rights and declares "[t]he practice of denying these rights" by reason of religion to violate Indiana public policy, Ind. Code Ann. § 22-9-1-2(a) & (b), but does not expressly acknowledge the right to contract or engage in business transactions as a civil right. Nor does it clearly create a cause of action. In fact, the ICRA directs most discrimination claims to its Civil Rights Commission or a local equivalent, and judicial review is available only after administrative remedies are exhausted. *Id.* § 22-9-1-6. While the parties may elect to have ICRA claims heard in a court of law, *see id.* § 22-9-1-17, both parties must agree to do so, *see id.* § 22-9-1-16.

[9] *Compare In re Aircraft Accident at Little Rock, June 1, 1999*, 231 F. Supp. 2d 852, 872 (E.D. Ark. 2002) (finding differences in availability of punitive damages to constitute a substantive conflict between laws), *aff'd*, 351 F.3d 874 (8th Cir. 2003), *and* Ark. Code Ann. § 16-123-107(b) (authorizing punitive damages for intentional acts of discrimination in contractual transactions), *with Ind. C.R. Comm'n v. Alder*, 714 N.E.2d 632, 638 (Ind.

Because substantive differences exist between Arkansas and Indiana law, the Court must conduct a choice-of-law analysis. The first step in that inquiry requires the Court to consider whether religious discrimination claims sound in contract or tort.

"[W]hether an action is based on contract or tort depends upon the nature of the right sued upon[.]" *Curry v. Thornsberry*, 81 Ark. App. 112, 121, *aff'd*, 354 Ark. 631 (2003) (citing *Bankston v. Pulaski Cnty Sch. Dist.*, 281 Ark. 476 (1984)). "If based on breach of promise it is contractual; if based on breach of a non-contractual duty it is tortious." *Id.* (citing *L.L. Cole & Son, Inc. v. Hickman*, 282 Ark. 6 (1984)).

According to TST, Defendants' conduct constitutes religious discrimination, which sounds in tort even if the alleged discrimination occurred in the context of a contractual transaction.[10] Defendants disagree and argue that the claim sounds in contract. In support, they cite *Loftin v. United Parcel Serv., Inc.*, which characterizes a wrongful discharge claim under ACRA as contractual. 2009 WL 33048, at *10 (E.D. Ark. Jan. 5, 2009). But Defendants' reliance is misplaced; *Loftin* fundamentally differs from the present dispute. "[A] wrongful discharge claim in violation of public policy" does indeed "sound[] exclusively in contract," *id.*, but that holding is specific to the employment context.

Arkansas law recognizes a "limited exception" to the employment at will doctrine. An "at-will employee has a cause of action for wrongful discharge if he or she is fired in

---

1999) ("The plain language of the Civil Rights Law simply does not authorize the Commission to award punitive damages.").

[10] The parties do not point to—and the Court has not identified—any Arkansas case law addressing the choice-of-law question with respect to allegations of religious discrimination in the context of contractual transactions. Thus, the Court must determine "what decision the state court would make if faced with the same facts and issue." *Lane v. Celadon Trucking, Inc.*, 543 F.3d 1005, 1007 (8th Cir. 2008). In these circumstances, the "federal court should consider relevant state court decisions, analogous decisions, considered dicta, and any other reliable data." *Id.* (cleaned up).

violation of a well-established public policy of the state," such as protection for whistleblowers. *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 249 (1988). According to the Arkansas Supreme Court, such a claim sounds in contract because it "is essentially predicated on the breach of an implied provision that an employer will not discharge an employee for an act done in the public interest." *Id.* In *Loftin*, the court simply recognized that firing an employee on the basis of a protected characteristic breaches that implied provision, and claims alleging as much sound in contract. 2009 WL 33048, at *10. *Loftin* does not stand for the proposition that *all* civil rights claims under ACRA are based in contract.

The Court concludes that TST's religious discrimination claim sounds in tort. According to the Complaint, Defendants discriminated against TST's religious viewpoint in breach of a duty imposed by Arkansas statutory law. That Defendants may have also breached a contractual promise is incidental. Based on the statute's plain text, liability may attach regardless of whether a contract—or even a promise—exists between parties. ACRA protects the right to participate in business transactions and would provide a cause of action even if, for example, Defendants decided *not* to contract based on discriminatory animus.

Moreover, the "[d]amages prayed for are [also] a factor to consider in determining whether an action is in tort or contract." *Bankston*, 281 Ark. at 479. Here, TST seeks— and ACRA specifically authorizes—punitive damages, *see* § 16-123-107(b), which are "ordinarily sought in tort actions, not contract." *Id.* Additionally, ACRA expressly authorizes courts construing its provisions to rely on state and federal decisions

interpreting 42 U.S.C. § 1983 for guidance. *See* Ark. Code Ann. § 16-123-105. Section 1983 claims sound in tort,[11] suggesting that ACRA claims generally do too.

Having determined TST's religious discrimination claim sounds in tort, the court next considers "which State has the most significant relationship to the action and the parties, and then analyzes the Leflar factors." *Shelby Cnty. Health Care Corp.*, 855 F.3d at 842.  Ultimately, this analysis weighs in favor of applying Arkansas law.

"In determining which State has the most significant relationship to the action and parties, Arkansas courts examine the contacts that are most relevant in the particular case." *Id.* Here, the most significant contacts do not clearly weigh in favor of any single state:

- TST is a Massachusetts corporation with its principal place of business in Massachusetts.

- SeedX, Inc., the non-party marketing firm hired by TST, appears to be a California corporation.

- Lamar-Indiana negotiated and executed the contract, which would have provided TST with billboard rental space in Arkansas and Indiana. In doing so, Lamar-Indiana coordinated with Lamar-Arkansas and shared the advertiser, content, and location of the billboard locations in Arkansas.  See Doc. 3, pp. 18–19.

---

[11] *Monroe v. Pape*, 365 U.S. 167, 187 (1961) (holding that § 1983 should be read against the background of tort liability); *Davis v. Bd. of Trustees of Ark. A & M Coll.*, 270 F. Supp. 528 (E.D. Ark. 1967) (holding that an action involving deprivation of civil rights under § 1983 "sounds in tort and exemplary or punitive damages may be awarded").

- Lamar-Arkansas was the first to raise concerns about TST's advertising copy and the first to suggest avoiding performance under the contract. *See* Doc. 3-7. Importantly, Lamar-Arkansas did not address its concerns to the contracting entity, Lamar-Indiana. Instead, they complained upstream to the parent entity, Lamar-HQ. *See* Doc. 3, pp. 18–20.

- Lamar-Indiana and Lamar-Arkansas are wholly-owned subsidiaries of Lamar-HQ—which is presently a non-party.[12] Lamar-HQ is a Delaware corporation that is headquartered in Louisiana. It was a Lamar-HQ executive based in Louisiana who found TST's advertising copy "misleading and offensive" and instructed Lamar-Indiana not to run it. *See* Doc. 3, p. 20; Doc. 3-9.

Next, the Court considers the five Leflar factors. The first three have little impact on the analysis. The first, predictability of results, is "primarily aimed at avoiding forum shopping." *Miller v. Pilgrim's Pride Corp.*, 366 F.3d 672, 674 (8th Cir. 2004). Here, both Arkansas and Indiana have an interest in the case, so TST's decision to file suit in Arkansas does not implicate such concerns.

The second factor, maintenance of interstate and international order, is most relevant when "nearly all of the significant contacts are with one state, while the other state has little or no contact with a case." *Allen v. Cooper Tire & Rubber Co.*, 2011 WL 13110320, at *3 (W.D. Ark. Dec. 16, 2011). But, "when the state whose law is to be applied"—here, Arkansas—"has sufficient contacts with and interest in the facts and issues being litigated," this factor is "generally not implicated." *Hughes v. Wal-Mart Stores, Inc.*, 250 F.3d 618, 620 (8th Cir. 2001).

---

[12] *See supra* note 4, at p. 2; Doc. 3, pp. 4–5.

The third factor, simplification of the judicial task, is also neutral because "[f]ederal courts are generally capable of resolving disputes under the laws of multiple states." *Allen*, 2011 WL 13110320, at *2.

The fourth factor, advancement of the forum's governmental interests, "examines the Arkansas contacts to decide [Arkansas's] interest." *Schubert v. Target Stores, Inc.*, 360 Ark. 404, 411 (2005). Here, the Arkansas contacts suggest the state has a significant interest in this case. Lamar-Arkansas operates in Arkansas; half of the leased billboards at issue are located in the state; and the concerns about TST's advertising copy originated with Lamar employees in Arkansas. Arkansas has an interest in protecting those who seek to do business in the state from religious discrimination. It also has an interest in ensuring that the advertising posted on its roadways and encountered by its citizens is not limited by unlawful discriminatory animus.

The fifth Leflar factor, better rule of law, "is aimed at avoiding the application of unfair or archaic laws." *Miller*, 366 F.3d at 675 (8th Cir. 2004). "[W]hen the forum state's law is less restrictive of a plaintiff's recovery, the forum state's law is regarded as being the 'better law.'" *Lee v. Overbey*, 2009 WL 2386095, at *3 (W.D. Ark. July 31, 2009). In *Schubert v. Target Stores, Inc.*, for example, the Arkansas Supreme Court held Arkansas law was superior to Louisiana law because the latter would have rendered the defendant immune from tort liability. 360 Ark. at 411–12. Here, TST may bring a civil suit in Arkansas and recover punitive damages. In Indiana, TST may bring only an administrative claim without the possibility of punitive damages. This factor favors Arkansas.

For these reasons, the Court concludes that Arkansas law governs TST's claim of religious discrimination. Arkansas possesses significant contacts with the case and has a significant interest in its outcome.

### 2.    Arkansas Law Governs TST's Breach of Contract Claim

With respect to the breach of contract claim, the Court finds that it need not engage in a full-blown choice-of-law analysis because there is no *substantive* difference between the laws of Arkansas and Indiana. The two states may differ with respect to availability of attorney's fees—Arkansas law entitles successful litigants in contract cases to recover attorney fees, Indiana law does not, according to Defendants[13]—but that remedial variation does not trigger the choice-of-law analysis. "Under its conflict-of-law principles, Arkansas courts apply another state's law only when the issue before the court is substantive rather than procedural." *Randy Kinder Excavating, Inc. v. JA Manning Constr. Co., Inc.*, 8 F.4th 724, 727–28 (8th Cir. 2021). "Arkansas treats the issue of attorney's fees as 'a procedural matter governed by the laws of the State of Arkansas.'" *Id.* (quoting *BAAN, U.S.A. v. USA Truck, Inc.*, 82 Ark. App. 202 (2003)).

Accordingly, because Defendants do not identify—and the Court is not presently aware of—a *substantive* difference between breach of contract law in Indiana and Arkansas, the Court may end its choice-of-law analysis here. Where there are no differences in competing state laws, the law of forum state applies. *See Phillips*, 80 F.3d

---

[13] Defendants cite a single source of authority to support their contention that Indiana bars attorney's fees in contract disputes: *Saint Joseph's Coll. v. Morrison, Inc.*, which holds that "attorney fees may not be awarded to a mechanic seeking to enforce an invalid lien, even though [he or she is] otherwise entitled to damages for breach of contract." 158 Ind. App. 272, 277 (1973). Not exactly on-point. Nevertheless, for the purpose of ruling on Defendants' Motion, the Court assumes Indiana law bars recovery for attorney's fees in contract cases.

at 276 (explaining that where the relevant legal principles are the same in two jurisdictions, the court need not engage in a choice-of-law analysis, and citing to *Forsyth v. Cessna Aircraft Company*, 520 F.2d 608, 613 (9th Cir.1975) for the proposition that "[i]n the absence of a true conflict, *lex fori* controls"); *Lewis v. Carolina Cas., Ins. Co.*, 442 F. Supp. 3d 1092, 1095 (S.D. Iowa 2020) (quoting *Jackson v. Travelers Ins. Co.*, 26 F. Supp. 2d 1153, 1156 (S.D. Iowa 1998) ("When there is no conflict or difference between the laws, then the law of the forum applies without a choice of law analysis being necessary.")). Thus, at least for purposes of resolving the Rule 12(b)(1) motion, Arkansas law governs TST's breach of contract claim.[14]

The Court next assesses the amount in controversy associated with each claim.

### B.      Amount in Controversy Under Arkansas Law

#### 1.      Religious Discrimination

ACRA explicitly provides for compensatory and punitive damages, as well as, in the court's discretion, attorney's fees and litigation costs. *See supra* pp. 7–8; § 16-123-107(b).

"The amount in controversy is measured by the value to the plaintiff of the right sought to be enforced." *Vein Centers for Excellence, Inc.*, 912 F.3d at 1081 (brackets omitted) (quoting *Federated Mut. Ins. Co. v. Moody Station & Grocery*, 821 F.3d 973, 977 (8th Cir. 2016)). "[C]ompensatory damages are awarded for the purpose of making the injured party whole, as nearly as possible." *Bayer CropScience LP v. Schafer*, 2011 Ark.

---

[14] Even if Indiana law governs TST's breach of contract claim, attorney's fees would remain available. "The Arkansas Supreme Court applies Arkansas statutory law to questions of attorney's fees even where the law of another State governs substantive issues, including the interpretation of a contract." *See S. Wine & Spirits of Nev. v. Mountain Valley Spring Co., LLC*, 712 F.3d 397, 401 (8th Cir. 2013) (cleaned up)).

518, 12 (2011). Under ACRA, compensatory damages "include elements of mental anguish, loss of dignity and other intangible injuries." *City of Little Rock v. Alexander Apartments, LLC*, 2020 Ark. 12, 18 (2020).

Here, TST contends Defendants' alleged animus deprived it of the opportunity to communicate its message in its selected markets, Arkansas and Indiana. There may exist more than one method of valuating this right, but the Court adopts a conservative estimate for now: The value the parties themselves initially assigned to the act of communicating TST's message via billboard, or $16,387.[15]

Punitive damages may also count toward the amount in controversy, although existence of such damages requires "closer scrutiny . . . than a claim for actual damages." *See Larkin v. Brown*, 41 F.3d 387, 388–89 (8th Cir. 1994). In *Allstate Insurance Company v. Dodson*, the Arkansas Supreme Court explained that a punitive damage award should reflect the "extent and enormity of the wrong, the intent of the party committing the wrong, all the circumstances, and the financial and social condition and standing of the erring party." 2011 Ark. 19, 24 (2011) (quotations omitted). It is a "penalty for conduct that is malicious or done with the deliberate intent to injure another." *Id.* at 28 (quoting *Advocat, Inc. v. Sauer*, 353 Ark. 29, 50 (2003)). TST alleges an act of intentional discrimination, thereby sufficiently pleading a basis for punitive damages.

---

[15] TST attempted to mitigate Defendants' breach of contract but was unable to find a suitable alternative in its target market due to an alleged monopoly on billboard space by Defendants. Perhaps, as TST argues, this impacts the calculation of compensatory damages. But given the availability of punitive damages and attorney's fees, the Court need not speculate. For the purpose of ruling on Defendant's motion, it simply adopts the conservative estimate discussed above.

ACRA imposes no cap on punitive damages, although such an award may "violate[] due process [if] it is so grossly excessive or arbitrary that the defendant failed to receive fair notice of the severity of the penalty that might be imposed." *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520 (8th Cir. 2019) (quotations omitted). As Defendants note, a punitive damages award is unlikely to exceed "a single-digit ratio of the compensatory damages awarded." (Doc. 11, p. 6). But, here, a jury would need to award punitive damages in an amount only four times compensatory damages to ensure TST's recovery exceeds $75,000. At this stage in litigation, the Court cannot infer—much less find to a legal certainty—that such an award would be improper.

Finally, ACRA allows TST to recover attorney's fees and litigation costs. "[T]here is no fixed formula for determining what constitutes a reasonable amount for attorneys' fees." *City of Little Rock v. Nelson as Next Friend of Nelson*, 2020 Ark. 19, 4 (2020).

The Court generally agrees with TST that it is appropriate to calculate attorney's fees in civil litigation based on an hourly billing model, rather than as a percentage of total award, as Defendants argue. But it is not necessary to decide that issue now. Under either model, the availability of attorney's fees simply increases the potential recovery even further above the already established jurisdictional minimum.

In sum, the ACRA claim alone produces an amount in controversy that exceeds the jurisdictional minimum without regard to TST's other claims. Nevertheless, the Court will isolate and briefly address the jurisdictional value of TST's separate breach of contract claim.

## 2.     Breach of Contract

"In Arkansas, money damages are awarded in contract disputes in order to compensate the aggrieved party for breaching the contract as well as for any other damage that naturally and reasonably arises therefrom." *Am. Fed'n of State, Cnty. & Mun. Emps., Loc. 380 v. Hot Spring Cnty.*, 362 F. Supp. 2d 1035, 1041 (W.D. Ark. 2004). Recovery for breach of contract should "place the injured party in the same position as if the contract had not been breached." *Optical Partners, Inc. v. Dang*, 2011 Ark. 156, 14 (2011). More concretely, damages reflect "the value to the plaintiff of the performance of the contract," less any costs the plaintiff avoided due to the defendant's breach. 24 Williston on Contracts § 64:8 (4th ed.).

The parties disagree about the proper calculation of potential damages for the alleged breach: TST explains why it believes contract damages are in excess of $80,000, while the Defendants suggest the amount is closer to zero. *Compare* Doc. 18, pp. 11-12, *with* Doc. 11, p. 4.  For purposes of the 12(b)(1) analysis, the Court will use the face value of the contract, $16,387, as a proxy for the compensatory damages attributed to the breach of contract claim (and, concurrently, the value of the declaratory judgment and promissory estoppel claims). TST has pleaded entitlement to attorney fees too. Doc. 3, p. 42.  For purposes of the 12(b)(1) analysis, the Court conservatively estimates a lodestar based on 200 attorney fee hours (through a full trial on the merits), at an average hourly rate of $300 per hour, which sums to $60,000.00 worth of estimated fees. Combining the estimated compensatory damages for breach of contract with projected attorney fees, the Court concludes that the amount in controversy associated with the contract claim reasonably exceeds the jurisdictional minimum of $75,000.

### III.        VENUE

Defendants next argue the matter should be dismissed for improper venue pursuant to Rule 12(b)(3).

Venue is proper in "a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated." 28 U.S.C. § 1391(b)(2). In assessing venue, the court does not "ask which district among two or more potential forums is the best venue," *Steen v. Murray*, 770 F.3d 698, 702 (8th Cir. 2014), but instead "whether the district the plaintiff chose had a substantial connection to the claim, whether or not other forums had greater contacts," *Setco Enters. Corp. v. Robbins*, 19 F.3d 1278, 1281 (8th Cir. 1994).

Venue is proper in the Western District of Arkansas. At least one of the billboards at issue here is located in this District, as is the audience TST sought to reach with its advertisements. Defendants own or operate that billboard. Furthermore, according to TST's Complaint, Defendants apparently relied, at least to some extent, on the billboard's location in deciding to cancel the contract.

### IV.        PERSONAL JURISDICTION

Finally, Defendants argue the matter should be dismissed against two of the three defendants due to lack of personal jurisdiction pursuant to Rule 12(b)(2).  A plaintiff bears the burden of proving sufficient facts to "make a *prima facie* showing of personal jurisdiction over the defendant." *See Digi-Tel Holdings, Inc. v. Proteq Telecomm. (PTE), Ltd.*, 89 F.3d 519, 522 (8th Cir. 1996). But the Court "must view the evidence in the light most favorable to the plaintiff and resolve all conflicts in the plaintiff's favor." *Id.*

For a court to have personal jurisdiction over a defendant, the forum state's long-arm statute must permit service of process and the defendant must have sufficient minimum contacts with the forum state such that it would not violate federal constitutional requirements of due process for the defendant to be sued in that state. In Arkansas, these two inquiries collapse into one because Arkansas's long-arm statute authorizes the exercise of personal jurisdiction to the maximum extent permitted by the Due Process Clause. *See* Ark. Code Ann. § 16-4-101(B); *Epps v. Stewart Info. Servs. Corp.*, 327 F.3d 642, 647 (8th Cir. 2003).

The Due Process Clause allows courts to exercise personal jurisdiction only when a defendant has "certain minimum contacts with" the forum state "such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quotation marks omitted). This standard "presaged the development of two categories of personal jurisdiction": general jurisdiction and specific jurisdiction. *Daimler AG v. Bauman*, 571 U.S. 117, 126–27 (2014).

General jurisdiction allows a court to hear "any and all claims" against a defendant. *See Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). When the defendant is a corporation, the Due Process Clause permits general jurisdiction over it only when its "affiliations with the State are so continuous and systematic as to render them essentially at home in the forum State." *See id.* (internal quotation marks omitted). "The place of incorporation and principal place of business" are the "paradigm bases for general jurisdiction" over a corporation. *Daimler*, 571 U.S. at 137 (internal alterations and quotation marks omitted).

20

"Specific jurisdiction, on the other hand, depends on an affiliation between the forum and the underlying controversy, principally, activity or an occurrence that takes place in the forum State and is therefore subject to the State's regulation." *Goodyear*, 564 U.S. at 919 (alteration and quotation marks omitted). Its exercise is "confined to adjudication of issues deriving from, or connected with, the very controversy that establishes jurisdiction." *Id.* (internal quotation marks omitted). "The inquiry whether a forum State may assert specific jurisdiction over a nonresident defendant focuses on the relationship among the defendant, the forum, and the litigation." *Walden v. Fiore*, 571 U.S. 277, 283–84 (2014) (quotation marks omitted).

To aid district courts in determining whether a defendant has sufficient minimum contacts with a forum, the Eighth Circuit has crafted a five-factor test:

> (1) the nature and quality of the contacts with the forum state; (2) the quantity of the contacts with the forum state; (3) the relation of the cause of action to the contacts; (4) the interest of the forum state in providing a forum for its residents; and (5) the convenience of the parties.

*Land-O-Nod Co. v. Bassett Furniture Indus. Inc.*, 708 F.2d 1338, 1340 (8th Cir. 1983). The last two factors are of secondary importance. *Id.*

The Court has general jurisdiction over Lamar-Arkansas. While incorporated in Delaware, its principal place of business is in Arkansas. The Court also concludes it may exercise specific personal jurisdiction over Lamar-Indiana. Lamar-Indiana has at least partial control over the Arkansas billboard rental space—which it acted on by executing a contract to rent that Arkansas property to TST. Lamar-Indiana canceled that contract, and the reason it did so is at the center of this litigation.[16]

---

[16] The Court has some concerns regarding the extent to which Lamar-HQ and its subsidiaries actually operate independently as distinct entities. The subsidiaries often

The Court does not have personal jurisdiction over Lamar Media Corp. TST's complaint does not allege Lamar Media Corp. has any contact with Arkansas, much less involvement in the issues here. TST most likely confused Lamar Media Corp. with Lamar Advertising Company, i.e., Lamar-HQ—an understandable error given the layers of wholly owned subsidiaries and complicated corporate structure. To the extent this is correct, TST make seek leave to name Lamar Advertising Company as a defendant.

## V.      CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (Doc. 10) as to Lamar Advantage GP Company, LLC and Lamar Advantage Holding Company is **DENIED.** Defendants' motion as to Lamar Media Corp. is **GRANTED** due to lack of personal jurisdiction pursuant to Rule 12(b)(2),  and all claims against it are **DISMISSED.**

**IT IS SO ORDERED** on this 6th day of December, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE

---

appear to do business as "Lamar," "Lamar Advertising," or "Lamar Advertising Company," and they treat one another as satellite offices that are part of the same organization. The contract is printed on a "Lamar" letterhead. It lists an Indiana address, but the signature block is titled "The Lamar Companies," and the standard conditions refer to the contracting party simply as "Lamar." The subsidiaries also require Lamar-HQ to sign-off on regular business transactions. However, because the Court concludes it may exercise jurisdiction over both Lamar-Indiana and Lamar-Arkansas as distinct entities, it does not reach this issue.