**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**THE SATANIC TEMPLE, INC.**                                                               **PLAINTIFF**

**V.**                                        **CASE NO. 5:22-CV-5033-TLB**

**LAMAR ADVANTAGE GP COMPANY, LLC and**
**LAMAR ADVANTAGE HOLDING COMPANY**                              **DEFENDANTS**

**BRIEF IN SUPPORT OF LAMAR ADVANTAGE GP COMPANY, LLC AND LAMAR**
**ADVANTAGE HOLDING COMPANY'S MOTION FOR SUMMARY JUDGMENT**

The Satanic Temple ("TST") asserts that its Satanic Abortion Ritual "averts many state restrictions" on abortion.   Am. Compl. (Doc. 3) at ¶ 69.  This position has yet to be accepted by any abortion clinic or court.  Mot. Ex. 1, TST Dep. at 12:20-13:22.  TST now seeks to hold Lamar Advantage GP Company, LLC ("Lamar Indiana") and Lamar Advantage Holding Company ("Lamar Arkansas") liable for violation of the Arkansas Civil Rights Act, breach of contract, and promissory estoppel because Lamar Indiana determined that billboards advertising TST's unproven exemption from state abortion laws were misleading and offensive and declined to post them.  There is no evidence, however, that either defendant discriminated against TST on the basis of religion or did anything other than exercise a contractual right to reject TST's proposed billboard designs.  Defendants are entitled to judgment as a matter of law as to all of TST's claims.

**STANDARD FOR SUMMARY JUDGMENT**

Summary judgment should be granted when the moving party demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 2002).  "[T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case,

and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Although evidence must be viewed in the light most favorable to the nonmoving party, the nonmoving party "may not . . . rest on mere allegations or denials but must demonstrate on the record the existence of specific facts which create a genuine issue for trial." *Krenik*, 47 F.3d at 957 (quotation omitted).

**UNDISPUTED FACTS**

**1. TST's Early Challenges To Abortion Restrictions And Development Of The Satanic Abortion Ritual**

Since at least 2015, TST has asserted that certain abortion restrictions imposed by state law conflict with Satanic religious beliefs. *See Mary Doe v. Parson*, 567 S.W.3d 625, 626 (Mo. 2019) (alleging that certain abortion-related requirements imposed by the State of Missouri conflicted with the Satanic religious belief that a fetus is not a person). TST's early attempts to challenge Missouri's informed-consent law in state and federal court, however, were unsuccessful. S*ee Judy Doe v. Parson*, 960 F.3d 1115, 1120 (8th Cir. 2020) (affirming dismissal of Satanist's claim for exemption from Missouri's informed-consent law); *Mary Doe v. Parson*, 567 S.W.3d at 632–33 (same); Mot. Ex. 2, Jarry Dep. at 25:21 to 26:12 and 29:24-30:14 (testifying that TST was involved in and funded *Mary Doe* and *Judy Doe*).

In the summer of 2020, after the Eighth Circuit Court of Appeals and Missouri Supreme Court rejected Satanists' claims for religious exemptions to abortion restrictions, TST developed the Satanic Abortion Ritual. Mot. Ex. 3, Press Kit for Religious Abortion Ritual, SEEDX000060–72. TST anticipated that the ritual would provide a new avenue for legal challenges to abortion restrictions. *See* Mot. Ex. 2, Jarry Dep. at 34:19-24 (acknowledging that a new avenue for legal challenges to abortion restrictions was "a happy consequence" of developing the Satanic Abortion Ritual). TST understood that, although it believed that "Satanists ***should be*** exempt from

2

unnecessary abortion regulations," clinics would be "hesitant" to recognize an exemption. Mot. Ex. 3, Religious Abortion Ritual Press Kit, at SEEDX000069.   Indeed, in later litigation seeking to establish a religious exemption to Texas abortion requirements, TST conceded that it "did not fault" an abortion provider for refusing to grant a religious exemption, since, if the clinic did so, it "would incur sanctions." *See* Mot. Ex. 4, Compl. (Doc. 1) in Case No. 4:21-cv-00387 (S.D. Tex) at p. 11; Mot. Ex. 2, Jarry Dep. at 44:1-45:5 (confirming TST's position); *see also* Mot. Ex. 4 at p. 25 ("[P]lease know that TST and Ms. Doe both support the mission of Planned Parenthood and understand its obligation to adhere to applicable Texas law and regulations."); Mot. Ex. 2, Jarry Dep. at 46:7-25 (agreeing with this statement).

To date, TST is not aware of any clinic granting someone an exemption because of Satanic beliefs or participation in the Satanic Abortion Ritual. Mot. Ex. 1, TST Dep. at 12:20-13:11. Nor is TST aware of any court finding that someone was exempt from an abortion requirement imposed by state law because of Satanic beliefs or participation in the Satanic Abortion Ritual. Mot. Ex. 1, TST Dep. at 13:12-22; Mot. Ex. 2, Jarry Dep. at 33:5-19.

**2.      The Lamar Copy Acceptance Policy**

It is standard for billboard companies to reserve the right to review and approve copy before posting it. Mot. Ex. 5, Lamar Copy Acceptance Policy & Mot. Ex. 7, Contract between SeedX and Lamar Indiana (reflecting the practice of LAC and its subsidiaries); Mot. Ex. 6, Emails between Basulto and Jarry (Nov. 8, 2020) (reflecting the copy review process of another billboard company, Clear Channel). As indirect subsidiaries of Lamar Advertising Company ("LAC"), Lamar Indiana and Lamar Arkansas follow the Lamar Copy Acceptance Policy. Mot. Ex. 5, Lamar Copy Acceptance Policy. Under this policy, LAC and its subsidiaries do not "accept or reject copy

based upon agreement or disagreement with the views presented," but maintain standards for the advertisements displayed on their billboards:

**Lamar reserves the right to reject advertising copy for any reason, but rejects copy for the following specific reasons:**

- The copy is factually inaccurate, misleading, fraudulent or deceptive.
- The copy is obscene, offensive or otherwise inconsistent with local community standards.
- The copy promotes an illegal activity.
- Advertisers who have a pattern of using provocative and critical copy to create negative impressions of other entities may be barred from posting copy.

Mot. Ex. 5, Lamar Copy Acceptance Policy.  Every proposed advertisement is reviewed by Lamar personnel to ensure that it complies with the policy.  *Id*.  Local general managers and regional managers can accept proposed advertising copy that unquestionably complies with the policy.  *Id*. When there is a question about a proposed billboard, however, it must be sent to Hal Kilshaw, the Vice-President of Governmental Relations, for review.  *Id*.  Kilshaw is "in charge of the co[py] acceptance policy . . . ."  Mot. Ex. 7, Kilshaw Dep. at 5:17-18; *see also* Mot. Ex. 5, Lamar Copy Acceptance Policy.   Only Kilshaw may reject a proposed billboard design.  *Id*.

The contract used by LAC's subsidiaries reflects the importance of the Lamar Copy Acceptance Policy.  In it, LAC's subsidiaries "reserve[] the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed" and to "reject or remove any copy either before or after installation, including immediate termination of [the] contract."  Mot. Ex. 8, Contract at LADV000030.

**3.     TST Seeks To Advertise The Religious Abortion Ritual.**

After developing the Satanic Abortion Ritual, TST engaged a marketing firm called SeedX to publicize it. Am. Compl. (Doc 3), at ¶ 36.  SeedX contacted Tom Hill of Lamar Indiana about billboard space in Arkansas and Indiana.  Mot. Ex. 9, Emails between Hill and SeedX (Aug. 24– Sept. 2, 2020).  A SeedX representative quickly let Hill know that the potential advertiser was The Satanic Temple.  *Id*.  She also sent him a picture of "our past campaign with Lamar to show you

4

what creative looked like in the past." *Id*. The picture displayed a billboard with The Satanic Temple's name, prominent Satanic Temple iconography (including a pentagram and horned goat), and the message "Never be hit in school again." *Id*.; *see also* Am. Compl. (Doc. 3) at ¶ 48.





Am. Compl. (Doc. 3) at ¶ 48; *see also* Mot. Ex. 9, Emails between Hill and SeedX (Aug. 24-Sept. 2, 2020).

Hill followed the process outlined in the Lamar Copy Acceptance Policy by forwarding the "Never be hit in school again" copy to his general manager for confirmation that it was approved content. Mot. Ex. 10, Emails between Hill, Graham, and Kilshaw (Sept. 8, 2020). That general manager forwarded it to Kilshaw, who quickly approved it. *Id*. (stating that the "Never be hit in school again" billboard was "O.K. with required disclaimer").

Later, when employees of Lamar Arkansas had concerns about the "Never be hit in school again" copy, they, too, followed the process in the Lamar Copy Acceptance Policy and forwarded the billboard design to Kilshaw.  Mot. Ex. 11, Emails between Gibbens and Kilshaw (Sept. 15, 2020).  Kilshaw told them that it was approved, and they prepared to implement that decision.  *Id.* (Kilshaw informing Lamar Arkansas that the "Never be hit in school again" copy was approved and should be posted); Mot. Ex. 12, Gibbens to Cooper & Fulmer (Sept. 15, 2020) (Arkansas Territory Manager stating that "Never be hit in school again" billboard would be displayed and instructing personnel to forward any calls about the billboard to his voicemail); Mot. Ex. 13, Weeks to Neal, et al. (Sept. 15, 2020) (General Manager in Northwest Arkansas stating that TST ads would be running in the market).

SeedX was aware that Lamar Indiana had to approve the final billboard designs but encountered delays in getting final, approved designs from TST.  On September 9, 2020, Jacqueline Basulto of SeedX told Hill, "I do not think the artwork will be finalized tomorrow… *can we send the samples for approval first*?  What do you think?"  Mot. Ex. 14, Emails between Basulto and Hill (Sept. 8–14, 2020) (emphasis added); *see also* Mot. Ex. 15, Emails between Hill and Basulto (Sept. 8–14, 2020) (outlining delays in getting TST's approval for copy).  Hill responded, "The design you sent me last w[ee]k [the "Never be hit in school again" design] was approved[.]" Mot. Ex. 14, Emails between Basulto and Hill (Sept. 8–14, 2020).

Having received approval for the "Never be hit in school again" billboard, Hill also asked Basulto if she "could sign the contract so we can get the locations locked in while we await creative approval."  *Id.* This allowed TST to ensure that the billboards would be available even though the proposed billboard designs were not yet complete.  *See id.*  The contract (the "Contract") reserved billboards at eight locations for TST between September 28, 2020, and October 25, 2020, at a total

cost of $7,362 for printing and installation and $9,025 for billboard space.  Mot. Ex. 8, Contract, at LADV000029.  As with every contract, Lamar Indiana "reserve[d] the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed" and "to reject or remove any copy either before or after installation, including immediate termination of this contract."  *Id*. at LADV000030.

At 9:41 AM on September 15, 2020, the day Lamar Indiana executed the Contract, SeedX provided Hill with a very different set of designs.  Mot. Ex. 8, Contract; Mot. Ex. 16, Emails between Hill and SeedX (Aug. 24 to Sept. 22, 2020) at LADV0000160–61.  The new designs announced that "The Satanic Abortion Ritual permits First Trimester Abortions upon Demand":











Mot. Ex. 17, Proposed Designs.  Ten minutes later, Hill noted that he would "have to get these approved on my end" since "the content is totally different than what we had originally approved." Mot. Ex. 18, Emails between Hill and Basulto (Sep. 4–15, 2020).

The new designs were forwarded to Kilshaw so that he could determine whether they complied with the Lamar Copy Acceptance Policy.  Mot. Ex. 19, Emails between Kilshaw and Graham (Sept. 15, 2020).  Kilshaw determined that the designs were misleading and offensive and rejected them.  *Id*.  Kilshaw has testified:

> Q      . . . . What was it about the billboards that were misleading?
>
> A      To me, the copy would lead the reader to believe that if they accepted The Satanic Temple's view, they could violate state law. . . .  It's - - so it's one of the areas we're very, very sensitive about and so we don't provide as much leeway when we think something is criminal or suggests violating law, so that was the reason for the decision in this case.

Mot. Ex. 7, Kilshaw Dep. at 17:16-18:2.

> Q      . . . . Why were they offensive?
> A      They were offensive because they were sending the message out to readers of the billboard that it's okay to violate the law if you agree with the [S]atanic ritual.

*Id*. at 31:2-5; *see also* Mot. Ex. 20, Kilshaw to Graham (Sept. 22, 2020) (Kilshaw explaining that he rejected the advertisements because "[t]he right to have an abortion in the U.S. is provided under law, not the Satanic Temple's abortion ritual").

Eventually, TST settled on designs that explicitly announced, "Our Religious Abortion Ritual Averts Many State Restrictions":

**TST Design 1**

**TST Design 2**



**TST Design 3**



**TST Design 4**



Mot. Ex. 21, Basulto to Hill & Rashidi (Sept. 21, 2020); Mot. Ex. 22, Designs (Sept. 21); Am.
Compl. (Doc. 3) at 69.  From TST's perspective, the central purpose of these billboards was to
convey the message that Kilshaw determined to be misleading and offensive.  Mot. Ex. 2, Jarry
Dep. at 74:16-21 (explaining that the language "averts many state restrictions" was "central to the
billboard, otherwise . . . it's not really conveying a whole lot").

10

Less than two days after being informed that its proposed copy violated the Copy Acceptance Policy, TST sent a demand letter threatening a lawsuit.  Mot. Ex. 23, Kezhaya to Hill (Sept. 23, 2020).  Lamar Indiana then cancelled the contract.  Mot. Ex. 24, Hill to Baird and Gibbens (Sept. 25, 2020); Mot. Ex. 25, Hill to Basulto (Sept. 30, 2020).  At all relevant times, however, Lamar Indiana remained willing to accept other advertising copy from The Satanic Temple, including the "Never be hit in school again" advertisement.  Mot. Ex. 16, Hill and Basulto (Sept. 22, 2020) (Hill asking SeedX, "Can we not use the original design you'd sent?") & Mot. Ex. 25, Hill to Basulto (Sept. 30, 2020) (Hill offering to SeedX, after cancellation of the contract, to revisit the campaign "[i]f we get revised designs similar to the last ones").  TST was not billed for the billboards.  Mot. Ex. 26, Emails between Gibbens and Rust (Sept. 21, 2020) (removing the contract from billing).

## DISCUSSION

**1.     Defendants Are Entitled To Judgment As A Matter Of Law On TST's Claim For Religious Discrimination Under The Arkansas Civil Rights Act.**

TST's first claim is that Lamar Indiana and Lamar Arkansas violated the Arkansas Civil Rights Act ("ACRA") by rejecting TST's designs "because of TST's religious beliefs and TST's religious iconography."   Am. Compl. (Doc. 3) at ¶ 106.   The undisputed facts, however, demonstrate that Lamar Indiana and Lamar Arkansas were willing to post advertisements for TST—including advertisements that prominently featured TST's beliefs and iconography.   The particular advertisements that TST sought to display were rejected, not because of TST's religious identity, but because they violated the Lamar Copy Acceptance Policy by suggesting that the Satanic Abortion Ritual allows adherents to violate state law.  Mot. Ex. 7, Kilshaw Dep. at 31:2-5; Ex. 20, Kilshaw to Graham (Sept. 22, 2020).  There are no facts to support the conclusion that the defendants discriminated against TST because of religion by simply applying the Lamar Copy

Acceptance Policy to TST's proposed copy and concluding that it was misleading and offensive. Defendants are entitled to judgment as a matter of law on TST's discrimination claim.

> **A.**     **The Undisputed Facts Show That Neither Defendant Discriminated Against TST Because Of Its Religion.**

The Arkansas Civil Rights Act proscribes discrimination in property and contractual transactions "because of . . . religion" and provides a cause of action for those "injured by an intentional act of discrimination." Ark. Code Ann. § 16-123-107(a), (b).  Arkansas courts "may look to state and federal decisions which interpret the federal civil rights laws as persuasive authority for interpretive guidance." *Faulkner v. Ark. Children's Hosp.*, 347 Ark. 941, 954, 69 S.W.3d 393, 401.  For claims alleging discrimination in contracting, 42 U.S.C. § 1981 is instructive. *Mosby v. Int'l Paper Co., Inc.*, No. 5:07-CV-314, 2008 WL 2669148, at *3 (E.D. Ark. July 1, 2008) ("It seems to me that claims brought under Ark. Code Ann. § 16-123-107(a)(4) should be analyzed in the same manner as claims brought under 42 U.S.C. § 1981."); *see also Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004) (explaining that Section 1981 protects a citizen's rights to "purchase both personal and real property without any impairment due to private or public [] discrimination").  To prevail on a section 1981 claim, "a plaintiff must show: (1) membership in a protected class; (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant." *Combs v. The Cordish Companies, Inc.*, 862 F.3d 671, 680 (8th Cir. 2017) (internal quotations omitted).

TST's ACRA claim fails on the discriminatory intent prong.  The undisputed evidence shows that the defendants were always willing to contract with TST.  *See Hurley v. Irish-American Gay, Lesbian and Bisexual Group of Boston*, 515 U.S. 557, 572-73 (1995) (explaining that an anti-discrimination law was applied in a "peculiar"—and unconstitutional—manner when it was

interpreted to require parade organizers to allow members of a protected class not only to participate in a parade but to display a particular message); *see also World Peace Movement of Am. v. Newspaper Agency Corp., Inc.*, 879 P.2d 253, 257–58 (Utah 1994) (concluding that the Utah Civil Rights Act precluded a newspaper publisher "from denying its advertising services on the basis of the religion of the person seeking those services" but did not preclude the publisher from "discriminat[ing] on the basis of content even when content overlaps with a suspect classification like religion"). Contrary to the allegations in TST's Amended Complaint, moreover, the defendants were always willing to display designs that "prominently display[ed] . . . TST's religious beliefs and . . . religious iconography." *See* Mot. Ex. 10, Emails between Hill, Graham, and Kilshaw (Sept. 8, 2020) (approving "Never be hit in school again" copy); Mot. Ex. 16, Hill and Basulto (Sept. 22, 2020) (Hill asking SeedX, "Can we not use the original design you'd sent?") & Mot. Ex. 25, Hill to Basulto (Sept. 30, 2020) (Hill offering to SeedX, after cancellation of the contract, to revisit the campaign "[i]f we get revised designs similar to the last ones").

Lamar Indiana treated TST the same as any other advertiser when it sent the proposed billboards to Kilshaw to determine whether they complied with the Lamar Copy Acceptance Policy. Mot. Ex. 5, Lamar Copy Acceptance Policy. Kilshaw determined that the billboard designs were misleading and offensive because they wrongly implied that participants in TST's Satanic Abortion Ritual did not have to comply with state law. Mot. Ex. 7, Kilshaw Dep. at 31:2-5; *see also* Ex. 20, Emails between Kilshaw and Graham (Sept. 22, 2020). Even if Kilshaw had been mistaken in this conclusion, it would not constitute religious discrimination. And the undisputed facts demonstrate that Kilshaw was not wrong: TST concedes that, as far as TST knows, no abortion clinic or court has recognized such an exemption. Mot. Ex. 1, TST Dep. at 12:20-13:22; Mot. Ex. 2, Jarry Dep. at 33:5-19.

No reasonable person could find that either defendant rejected TST's designs "because of [] religion," let alone that TST was injured by an intentional act of discrimination. Defendants are entitled to summary judgment on TST's claim under the Arkansas Civil Rights Act.

**B.** **Interpreting The ACRA To Require The Defendants To Publish A Message That Does Not Comply With The Lamar Copy Acceptance Policy Would Violate The Defendants' First And Fourteenth Amendment Rights To Free Speech.**

As explained above, there is no genuine issue of material fact regarding whether the defendants were willing to enter into a contract with TST, nor is there a genuine issue of material fact that the defendants were willing to display advertisements that related to TST's religious beliefs and included prominent Satanic iconography. This is fatal to TST's claim under the ACRA, which does not compel the defendants to accept misleading and offensive advertisements simply because they are proposed by a religious organization or touch upon religious beliefs.

To the extent that TST asks this Court to interpret the ACRA to require Lamar Indiana and Lamar Arkansas to post a proposed advertisement, regardless of content, simply because it touches upon a religious belief, the ACRA must yield to the United States Constitution, which protects the defendants' First and Fourteenth Amendment rights to free speech.[1] The Supreme Court has made clear that the First Amendment's protections extend to corporations. *Pac. Gas & Elec. Co. v. Citizens United v. FEC*, 558 U.S. 310, 342 (2010) (collecting cases).

---

[1] Because the defendants were unquestionably willing to display advertisements that prominently included TST's name, iconography, and religious messaging, this case does not present the question of whether requiring the defendants to do so would violate their constitutional rights. Since Lamar Indiana and Lamar Arkansas are not governmental actors, moreover, TST's First and Fourteenth Amendment rights are not at issue here.

14

The First Amendment, made applicable to the states through the Fourteenth Amendment, "prohibits laws 'abridging the freedom of speech.'" *Telescope Media Group v. Lucero*, 936 F.3d 740, 750 (8th Cir. 2019) (quoting U.S. Const. amend. I).  The First Amendment also proscribes regulations that "[c]ompel[] individuals to mouth support for views they find objectionable." *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018).  The Supreme Court has "held time and time again that the freedom of speech includes . . . the right to refrain from speaking at all." *Id.* (quotation omitted).  For that reason, "the choice of a speaker not to propound a particular point of view . . . is presumed to lie beyond the government's power to control." *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 654 (2000).  The First and Fourteenth Amendments apply to state action, including a court's potential application of a state statute in private litigation. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 265 (1964) ("The test for [state action] is not the form in which state power has been applied but, whatever the form, whether such power has in fact been exercised.").  The First Amendment "is relevant whenever the government compels speech, regardless of who writes the script." *Telescope*, 936 F.3d at 753.

Lamar Indiana and Lamar Arkansas speak when they display advertisements. LAC and its subsidiaries prominently display the name "Lamar" on the bottom (usually in the center) of their billboard structures. *See* Am. Compl. (Doc. 3) at ¶ 70.  The name is visible at all times, whether advertising designs are displayed or not. *Id.*  This display lets potential customers know who owns a sign on which they may want to place a design.

Although LAC and its subsidiaries are committed to accepting advertisements that reflect a wide range of viewpoints and do not "accept or reject copy based upon agreement or disagreement with the views presented" (Mot. Ex. 5), they nonetheless "exercise substantial 'editorial control and judgment" about potential advertisements by reviewing each potential design

to ensure that it complies with the Lamar Copy Acceptance Policy. *See Telescope*, 936 F.3d at 751 (quoting *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 258 (1974)). In the contract between SeedX and Lamar Indiana, "Standard Condition" number six states, "Lamar reserves the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed. Lamar reserves the right to reject or remove any copy either before or after installation, including immediate termination of this contract." Mot. Ex. 8, Contract. This provision grants Lamar editorial control over any ad that it displays. *Id*. The Supreme Court has consistently recognized that editorial control is a touchstone of First Amendment speech "upon which the State cannot intrude." *Hurley*, 515 U.S. at 575.

Courts apply strict scrutiny to laws that compel speech. *Id.* at 754. To pass constitutional muster, then, TST has to prove that the application of the ACRA to require the defendants to post any message that touches upon religious belief, regardless of its content, is "narrowly tailored to serve [a] compelling state interest." *Telescope*, 936 F.3d at 754 (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)). Even if the defendants had rejected TST's proposed ads because of TST's religious identity (which they did not), "regulating speech because it is discriminatory . . . is not a compelling interest . . . ." *Id.* at 755 ("Even antidiscrimination laws, as critically important as they are, must yield to the Constitution."). There is certainly no compelling state interest in preventing the defendants from applying the Lamar Copy Acceptance Policy to proposed copy simply because it is religious in nature, and this Court should not interpret the ACRA to require the defendants to do so. *Jennings v. Rodriguez*, 138 S.Ct. 830, 836 (2018) ("[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems.").

**2.   There Is No Genuine Issue Of Material Fact Regarding Whether Either Defendant Breached A Contract.**

When Lamar Indiana and SeedX, as agent for The Satanic Temple, entered into the Contract, SeedX had not provided TST's proposed billboard copy to Lamar Indiana.  Mot. Ex. 8, Contract; Mot. Ex. 22, Emails between Hill and Basulto (Sept. 8–14, 2020) (outlining delays in getting TST's approval for copy).  SeedX was well aware of the need for Lamar Indiana to approve TST's final designs before they could be posted.  Mot. Ex. 15, Basulto to Hill (Sept. 8-14, 2020, at email dated Sept. 9, 2020, at 3:37 PM) (SeedX acknowledging the need for approval).  By signing the Contract before TST finalized the copy, however, SeedX reserved the billboards, ensuring that another advertiser would not take them off the market and make them unavailable.  *See* Mot. Ex. 15.  Since defendants never agree to post copy before determining whether it meets the Lamar Copy Acceptance Policy, however, Paragraph 6 of the Contract reserved Lamar Indiana's right to approve TST's proposed copy:

> "Lamar reserves the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed.  Lamar **reserves the right to reject or remove any copy** either before or after installation, including immediate termination of this contract."

Mot. Ex. 8 at LADV000030 (emphasis added).

TST alleges that the defendants breached the Contract when Lamar Indiana did exactly what the Contract allowed it to do:  terminate the contract after determining that TST's proposed copy violated the Copy Acceptance Policy.  There is no genuine issue of material fact regarding whether either defendant breached the Contract, and defendants are entitled to judgment as a matter of law on TST's breach of contract claim.

A.      **Paragraph 6 Of the Contract Vested Lamar Indiana With The Right To Reject The Proposed Abortion Ritual Designs And Terminate The Contract.**

The Contract clearly and specifically gives Lamar Indiana the right to reject proposed billboard designs and terminate the Contract.  Mot. Ex. 8 at LADV000030.  That is exactly what Lamar Indiana did when it learned for the first time after a contract was signed that TST sought to display billboards that suggested that participants in the Satanic Abortion Ritual do not have to comply with state law.  Lamar Indiana did not and could not breach the Contract simply by exercising its right to terminate the Contract under Paragraph 6.

Perhaps in recognition of Lamar Indiana's indisputable right to terminate the Contract, TST asserts that "Lamar cannot abuse its right to reject design elements in bad faith to override the core purpose of the contract."  Am. Compl. (Doc. 3) at ¶ 118.  The Arkansas Supreme Court, however, "narrowly construe[s] the concept of bad faith" and rejects "separate contract claim[s] for breach of the duty of good faith and fair dealing."  *Ark. Research Med. Testing, LLC v. Osborne*, 2011 Ark. 158, at 3 (quotation omitted).  A breach of the implied covenant of good faith and fair dealing is "nothing more than evidence of a possible breach of a contract between parties."  *Id.* at 3; s*ee also Mountain Home Flight Serv., Inc. v. Baxter Cty., Ark.,* 758 F.3d 1038, 1043 (8th Cir. 2014) ("Arkansas contract law does not recognize a separate contract claim for breach of a duty of good faith and fair dealing.") (quotation omitted).  A bad-faith claim fails as a matter of law if the plaintiff "does not allege any breach of contract distinct from the breach of the duty to act in good faith."  *Mountain Home*, 758 F.3d at 1043.  Here, TST cannot point to any contractual provision that Lamar Indiana violated, and its bad faith claim fails as a matter of law.

Indeed, even in the insurance contract context—the only context in which the Arkansas Supreme Court has countenanced a stand-alone bad faith claim in relation to a contract—bad faith requires evidence that an insurer "actively engaged in dishonest, malicious, or oppressive conduct

in order to avoid its liability." *Findley v. Time Ins. Co.*, 264 Ark. 647, 654–55, 573 S.W.2d 908, 911–12 (1978).  Here, there is no evidence that Lamar Indiana or Lamar Arkansas acted in a way that was "dishonest, malicious, or oppressive."  On the contrary, all the evidence shows that SeedX knew that TST's final designs would be subject to approval by Lamar Indiana and that signing the Contract merely "locked in" the locations so that another advertiser would not reserve the billboards TST wanted.  Mot. Ex. 15, Emails between Basulto and Hill (Sept. 8–14, 2020) (SeedX acknowledging the need for approval and Hill explaining the need to "lock in" the billboards).  Nor is there any evidence that Lamar Indiana engaged in malicious conduct when it terminated the Contract after Kilshaw determined that TST's proposed ads were misleading and offensive because they falsely stated that people engaged in the Religious Abortion Ritual do not have to comply with state law.

*Cantrell-Waind & Assocs., Inc., v. Guillaume Motorsports, Inc.*, 62 Ark. App. 66, 968 S.W.2d 72 (1998), which is cited in the Amended Complaint, does not support TST's claims.  In *Cantrell-Waind*, the Arkansas Court of Appeals considered a claim by a real estate agent who was entitled to a commission on a sale only if the buyer closed by a certain date.  *Id.* at 68, 968 S.W.2d at 73.  The buyer lied about being out of the country to delay closing and avoid paying a commission.  *Id.*  The appeals court reversed, holding that the non-occurrence of a condition precedent (closing by a certain date) "may be excused by prevention or hindrance of its occurrence through a breach of the duty of good faith and fair dealing."  *Id.* at 72, 968 S.W.2d at 75 (quotation omitted).

To the limited extent that *Cantrell-Waind* can be read as a general pronouncement that Arkansas recognized a claim for breach of the duty of good faith, the Arkansas Supreme Court has since clarified that Arkansas does not recognize such a claim.  *Osborne*, 2011 Ark. 158, at 6.  And,

19

at any rate, there is no evidence here to support the conclusion that Lamar Indiana or Lamar Arkansas engaged in any dishonest, malicious, or oppressive conduct to prevent TST from performing under the Contract.   All Lamar Indiana is alleged to have done is exercise its contractual right, clearly outlined in the Contract, to reject TST's proposed designs and cancel the Contract.

Through SeedX, TST chose to contract with Lamar Indiana under the terms set forth in the Contract.   This allowed TST to reserve the billboards it wanted before finalizing its copy, but it also meant that the final copy would be subject to review before they could be posted.   TST cannot now rewrite the Contract to include extra-contractual duties, and defendants are entitled to judgment as a matter of law on TST's breach of contract claim.

**B.      Paragraph 6 Of The Contract Is Not Unconscionable.**

TST's final attempt to salvage a claim for breach-of-contract in the face of Lamar Indiana's clear right to reject copy and terminate the Contract is its assertion that paragraph 6 of the Contract is unconscionable.  *See* Am. Com. (Doc. 3) ¶ 128.   According to TST, this Court should strike paragraph 6 and then find that Lamar Indiana breached the Contract by relying on paragraph 6.  *Id.* at ¶ 128

"While 'unconscionability' is not precisely defined in the law, one of the earliest applications of the doctrine described an unconscionable contract as one that no man in his senses and not under delusion would make on the one hand, and no honest and fair man would accept on the other." *Legalzoom.com, Inc. v. McIllwain*, 2013 Ark. 370, at 4, 429 S.W.3d 261, 265 (quotation omitted).   "An act is unconscionable if it affronts the sense of justice, decency, and reasonableness." *Gulfco of Louisiana, Inc. v. Brantley*, 2013 Ark. 367, at 9, 430 S.W.3d 7, 13.  An

unconscionable contract "must oppress one party and actuate the sharp practices of the other." *GGNSC Holdings, LLC v. Lamb*, 2016 Ark. 101, at 13, 487 S.W.3d at 356.

In assessing whether a contract is unconscionable, courts applying Arkansas law consider "whether there is a gross inequality of bargaining power between the parties and whether the aggrieved party was made aware of and comprehended the provision in question." *Stewart v. Nucor Corp.*, 829 F.3d 691, 694–95 (8th Cir. 2016) (quotation omitted) (affirming summary judgment where on unconscionability where there was no evidence of "fraud, duress, misrepresentation, or any other inequitable conduct"). Courts also consider "whether the provision is commercially reasonable according to the mores and business practices of the time and place." *Id.* (quotation omitted). Summary judgment is appropriate where the party that asserts unconscionability fails to provide evidence to demonstrate that a contract was unconscionable. *Id.*

A plaintiff "must prove both procedural and substantive unconscionability for an agreement to be unenforceable." *Jarrett v. Panasonic Corp. of N.A.*, 8 F.Supp.3d 1074, 1082 (E.D. Ark. 2013). Procedural unconscionability exists "where there is an absence of meaningful choice on the part of one of the parties together with contract terms that are unreasonably favorable to the other party." *Legalzoom*, 2013 Ark. 370, at 4, 429 S.W.3d 261, 265. Substantive unconscionability "generally involves excessive price or restriction of remedies." *Id.*

Here, there is no evidence that SeedX was under duress when it signed the Contract or that there was unequal bargaining power between the parties. Nor is there evidence that SeedX did not understand the terms of the Contract. On the contrary, the Contract between Lamar Indiana and SeedX is short and straightforward. Mot. Ex. 8, Contract. The "Standard Conditions" comprise 12 short paragraphs, one of which clearly and unambiguously gives Lamar Indiana the right to reject copy and terminate the contract. *Id.* at 30. It is, moreover, undisputed that SeedX was aware

of that Lamar Indiana had to approve TST's final designs before they could be posted.  Mot. Ex. 15, Basulto to Hill (Sept. 8-14, 2020, at email dated Sept. 9, 2020, at 3:37 PM) (SeedX acknowledging the need for approval).

It is standard for billboard companies to reserve the right to review and approve copy before posting it.  Mot. Ex. 8, Contract & Mot. Ex. 5, Lamar Copy Acceptance Policy (reflecting the practice of LAC and its subsidiaries); Mot. Ex. 6, Emails between Basulto and Jarry (Nov. 5, 2020) (reflecting the copy review process of another billboard company, Clear Channel).  There is certainly no evidence of fraud, misrepresentation, or any other inequitable conduct by Lamar Indiana.  In short, there is no evidence to support the conclusion that no reasonable company in SeedX's position would have signed a contract to reserve billboard space while knowing that Lamar Indiana reserved the right to reject TST's final designs and terminate the contract.  Nor is there evidence that it was unconscionable for Lamar Indiana to reserve the right to review the final copy before agreeing to post it.  TST cannot manufacture a breach of contract by striking paragraph 6 of the Contract.

### 3.    The Defendants Are Entitled To Judgment As A Matter Of Law On TST's Claim For Promissory Estoppel.

In its claim for promissory estoppel, TST "assumes" that paragraph 6 of the Contract allowed Lamar Indiana to reject copy in bad faith and is not unconscionable.  Am. Compl. (Doc. 3) at ¶ 131.   Under this hypothetical scenario, TST posits, the entire Contract is legally unenforceable.  *Id*.  In the absence of a contract, TST asserts, it is entitled to promissory estoppel relief.  *Id*.  This claim also fails as a matter of law.

As outlined above, there is no evidence that Lamar Indiana acted in bad faith when it determined that TST's assertion that the Satanic Abortion Ritual excuses adherents from complying with state law was misleading and offensive.  On the contrary, it is undisputed that no

22

clinic or court has recognized such an exemption.  Mot. Ex. 1, TST Dep. at 12:20-13:22; Mot. Ex. 2, Jarry Dep. at 33:5-19.  TST cannot use the concept of promissory estoppel "to engraft a promise on a contract that differs from the written terms of the contract."  *Wilcox v. Wooley*, 2015 Ark. App. 56, 10, 454 S.W.3d 792, 798 (quotation omitted); *see also Taylor v. George*, 92 Ark. App. 264, 274, 212 S.W.3d 17, 25 (2005) ("Promissory estoppel may be a basis for recovery only when formal contractual elements do not exist.").

To prove promissory estoppel, moreover, TST must show "(1) the defendant made a promise; (2) the defendant should have reasonably expected the plaintiff to act or refrain from acting in reliance on the promise; (3) the plaintiff acted or refrained from acting in reasonable reliance on the promise to its detriment; and (4) injustice can be avoided only by enforcement of the promise." *Anderson's Taekwondo Ctr. Camp Positive, Inc. v. Landers Auto Grp. No. 1, Inc.*, 2015 Ark. 268, 9.  Here, there is no evidence that Lamar Indiana agreed not to review TST's copy before posting it, let alone that TST relied on such a promise to its detriment.  On the contrary, the evidence shows that SeedX was well aware that Lamar Indiana had to review and approve the final copy.  Mot. Ex. 15, Basulto to Hill (Sept. 8–14, 2020, at email dated Sept. 9, 2020, at 3:37PM) (SeedX acknowledging the need for approval).  The plain and unambiguous terms of the Contract, moreover, allowed Lamar Indiana to reject TST's proposed designs and terminate the contract. TST cannot alter these terms by relying on a theory of promissory estoppel.

## CONCLUSION

There is no genuine issue of material fact regarding whether TST can establish the elements of any cause of action against Lamar Indiana or Lamar Arkansas.  Defendants are entitled to judgment as a matter of law as to all of TST's claims.

23

Respectfully Submitted,

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
mshannon@qgtlaw.com
sbolden@qgtlaw.com

By:  /s/ Sarah Keith-Bolden
      Michael N. Shannon (92168)
      Sarah Keith-Bolden (2007235)

*Lamar Advantage GP Company, LLC, and*
*Lamar Advantage Holding Company*