IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

THE SATANIC TEMPLE, INC.                                              PLAINTIFF

V.                       CASE NO. 5:22-CV-5033-TLB

LAMAR ADVANTAGE GP COMPANY, LLC and
LAMAR ADVANTAGE HOLDING COMPANY                                       DEFENDANTS

LAMAR ADVANTAGE GP COMPANY, LLC AND LAMAR ADVANTAGE HOLDING
COMPANY'S STATEMENT OF UNDISPUTED FACTS

Lamar Advantage GP Company, LLC ("Lamar Indiana") and Lamar Advantage Holding Company ("Lamar Arkansas"), for their statement of undisputed facts, state:

### TST's Position Regarding Abortion

1. Since at least 2015, The Satanic Temple ("TST") has asserted that certain abortion restrictions imposed by state law conflict with Satanic religious beliefs. *See Mary Doe v. Parson*, 567 S.W.3d 625, 626 (Mo. 2019) (alleging that certain abortion-related requirements imposed by the State of Missouri conflicted with the Satanic religious belief that a fetus is not a person).

2. TST's challenges to Missouri's informed-consent law in state and federal court were unsuccessful. S*ee Judy Doe v. Parson*, 960 F.3d 1115, 1120 (8th Cir. 2020) (affirming dismissal of Satanist's claim for exemption from Missouri's informed-consent law); *Mary Doe v. Parson*, 567 S.W.3d at 632–33 (same); Mot. Ex. 2, Jarry Dep. at 25:21 to 26:12 and 29:24-30:14 (testifying that TST was involved in and funded *Mary Doe* and *Judy Doe*).

### Development of The Satanic Abortion Ritual

3. In the summer of 2020, TST developed the Satanic Abortion Ritual. Mot. Ex. 3, Press Kit for Religious Abortion Ritual.

4. TST anticipated that the ritual would provide a new avenue for legal challenges to abortion restrictions. *See* Mot. Ex. 2, Jarry Dep. at 34:19-24 (acknowledging that a new avenue for legal challenges to abortion restrictions was "a happy consequence" of developing the Satanic Abortion Ritual).

5. TST understood that, although it believed that "Satanists ***should be*** exempt from unnecessary abortion regulations," clinics would be "hesitant" to recognize an exemption. Mot. Ex. 3, Religious Abortion Ritual Press Kit, at SEEDX000069.

6. In later litigation seeking to establish a religious exemption to Texas abortion requirements, TST conceded that it "did not fault" an abortion provider for refusing to grant a religious exemption, since, if the clinic did so, it "would incur sanctions." *See* Mot. Ex. 4, Compl. (Doc. 1) in Case No. 4:21-cv-00387 (S.D. Tex) at p. 11; Mot. Ex. 2, Jarry Dep. at 44:1-45:5 (confirming TST's position); *see also* Mot. Ex. 4 at p. 25 ("[P]lease know that TST and Ms. Doe both support the mission of Planned Parenthood and understand its obligation to adhere to applicable Texas law and regulations."); Mot. Ex. 2, Jarry Dep. at 46:7-25 (agreeing with this statement).

7. To date, TST is not aware of any clinic granting someone an exemption because of Satanic beliefs or participation in the Satanic Abortion Ritual. Mot. Ex. 1, TST Dep. at 12:20-13:11.

8. To date, TST is not aware of any court finding that someone was exempt from an abortion requirement imposed by state law because of Satanic beliefs or participation in the Satanic Abortion Ritual. Mot. Ex. 1, TST Dep. at 13:12-22; Mot. Ex. 2, Jarry Dep. at 33:5-19.

## The Lamar Copy Acceptance Policy

9. Lamar Advertising Company ("LAC") and its subsidiaries prominently display the name "Lamar" on the bottom (usually in the center) of their billboard structures. Am. Compl. (Doc. 3) at ¶ 70. The name is visible at all times, whether advertising designs are displayed or not. *Id*.

10. It is standard for billboard companies to reserve the right to review and approve copy before posting it. Mot. Ex. 5, Lamar Copy Acceptance Policy & Mot. Ex. 8, Contract between SeedX and Lamar Indiana (reflecting the practice of LAC and its subsidiaries); Mot. Ex. 6, Emails between Basulto and Jarry (Nov. 5, 2020) (reflecting the copy review process of another billboard company, Clear Channel).

11. As indirect subsidiaries of Lamar Advertising Company ("LAC"), Lamar Indiana and Lamar Arkansas follow the Lamar Copy Acceptance Policy. Mot. Ex. 5, Lamar Copy Acceptance Policy.

12. Under this policy, LAC and its subsidiaries do not "accept or reject copy based upon agreement or disagreement with the views presented." *Id*.

13. The Lamar Copy Acceptance Policy provides:

> Lamar reserves the right to reject advertising copy for any reason, but rejects copy for the following specific reasons:
> - The copy is factually inaccurate, misleading, fraudulent or deceptive.
> - The copy is obscene, offensive or otherwise inconsistent with local community standards.
> - The copy promotes an illegal activity.
> - Advertisers who have a pattern of using provocative and critical copy to create negative impressions of other entities may be barred from posting copy.

*Id*.

14. The Lamar Copy Acceptance Policy further provides:

> When a local General Manager questions whether copy should be accepted, he will forward the copy to his Regional Manager. If the Regional Manager decides the copy should be accepted, he communicates that decision to the General Manager. If the Regional Manager decides the copy is unacceptable or is unsure, he will further communicate with the Vice-President of Governmental Relations. All copy which a General or Regional Manager thinks should be rejected must be forwarded. If necessary, the Chief Executive Officer and General Counsel will be consulted as well. The decision rendered in this process will be final.

*Id*.

15. Hal Kilshaw, the Vice-President of Governmental Relations, is "in charge of the co[py] acceptance policy . . . ." Mot. Ex. 7, Kilshaw Dep. at 5:17-18; *see also* Mot. Ex. 5, Lamar Copy Acceptance Policy.

16. Only Kilshaw may reject a proposed billboard design. Mot. Ex. 5.

17. The contract used by LAC's subsidiaries states:

> 6. Copy Acceptance: Lamar reserves the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed. Lamar reserves the right to reject or remove any copy either before or after installation, including immediate termination of this contract.

Mot. Ex. 8, Contract, at LADV000030.

### TST Seeks To Advertise The Religious Abortion Ritual.

18. After developing the Satanic Abortion Ritual, TST engaged a marketing firm called SeedX to publicize it. Am. Compl. (Doc 3), at ¶ 36.

19. SeedX contacted Tom Hill of Lamar Indiana about billboard space in Arkansas and Indiana. Mot. Ex. 9, Emails between Hill and SeedX (Aug. 24–Sept. 2, 2020).

20. A SeedX representative let Hill know that the potential advertiser was The Satanic Temple. *Id*.

21. She also sent him a picture of "our past campaign with Lamar to show you what creative looked like in the past." *Id*.

22. The picture displayed a billboard with The Satanic Temple's name, prominent Satanic Temple iconography (including a pentagram and horned goat), and the message "Never be hit in school again." *Id.*; *see also* Am. Compl. (Doc. 3) at ¶ 48.

*Past Design 1:*



23. Hill forwarded the "Never be hit in school again" copy to his general manager for confirmation that it was approved content. Mot. Ex. 10, Emails between Hill, Graham, and Kilshaw (Sept. 8, 2020).

24. That general manager forwarded it to Kilshaw, who approved it. *Id.* (stating that the "Never be hit in school again" billboard was "O.K. with required disclaimer").

25. Later, employees of Lamar Arkansas also forwarded the "Never be hit in school again" billboard design to Kilshaw. Mot. Ex. 11, Emails between Gibbens and Kilshaw (Sept. 15, 2020).

26. Kilshaw told Lamar Arkansas that it was approved. *Id*. (Kilshaw informing Lamar Arkansas that the "Never be hit in school again" copy was approved and should be posted).

27. Lamar Arkansas employees prepared to implement that decision. Mot. Ex. 12, Gibbens to Cooper & Fulmer (Sept. 15, 2020) (Arkansas Territory Manager stating that "Never be hit in school again" billboard would be displayed and instructing personnel to forward any calls about the billboard to his voicemail); Mot. Ex. 13, Weeks to Neal, et al. (Sept. 15, 2020) (General Manager in Northwest Arkansas stating that TST ads would be running in the market).

28. SeedX was aware that Lamar Indiana had to approve the final billboard designs. Mot. Ex. 14, Emails between Basulto and Hill (Sept. 8–14, 2020)

29. SeedX encountered delays in getting final approved billboard designs to send to Lamar Indiana. Mot. Ex. 15, Emails between Hill and Basulto (Sept. 8–14, 2020) (outlining delays in getting TST's approval for copy).

30. On September 9, 2020, Jacqueline Basulto of SeedX told Hill, "I do not think the artwork will be finalized tomorrow… *can we send the samples for approval first*? What do you think?" Mot. Ex. 14, Emails between Basulto and Hill (Sept. 8–14, 2020) (emphasis added).

31. Hill responded, "The design you sent me last w[ee]k [the "Never be hit in school again" design] was approved[.]" *Id*.

32. Hill also asked Basulto if she "could sign the contract so we can get the locations locked in while we await creative approval." *Id*.

33. This allowed TST to ensure that the billboards would be available even though the proposed billboard designs were not yet complete. *See id*.

34. The contract (the "Contract") reserved billboards at eight locations for TST between September 28, 2020, and October 25, 2020, at a total cost of $7,362 for printing and installation and $9,025 for billboard space. Mot. Ex. 8, Contract, at LADV000029.

35. The contract stated that Lamar Indiana "reserve[d] the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed" and "to reject or remove any copy either before or after installation, including immediate termination of this contract." Mot. Ex. 8, Contract at LADV000030.

36. At 9:41 AM on September 15, 2020, the day Lamar Indiana executed the Contract, SeedX provided Hill with a different set of designs for copy to be displayed. Mot. Ex. 8, Contract; Mot. Ex. 16, Emails between Hill and SeedX (Aug. 24 to Sept. 22, 2020) at LADV0000160–61.

37. The new designs announced that "The Satanic Abortion Ritual permits First Trimester Abortions upon Demand." Mot. Ex. 17, Proposed Designs.





7







38.     Ten minutes later, Hill noted that he would "have to get these approved on my end" since "the content is totally different than what we had originally approved." Mot. Ex. 18, Emails between Hill and Basulto (Aug. 28 to Sept. 15, 2020).

39.     The new designs were forwarded to Kilshaw for review. Mot. Ex. 19, Emails between Kilshaw and Graham (Sept. 15, 2020).

40.     Kilshaw determined that the designs were misleading and offensive and rejected them. Mot. Ex. 7, Kilshaw Dep. at 17:16-18:2, 31:2-5 ("To me, the copy would lead the reader to

8

believe that if they accepted The Satanic Temple's view, they could violate state law. . . . It's - - so it's one of the areas we're very, very sensitive about and so we don't provide as much leeway when we think something is criminal or suggests violating law, so that was the reason for the decision in this case. . . . they were offensive because they were sending the message out to readers of the billboard that it's okay to violate the law if you agree with the [S]atanic ritual."); *see also* Mot. Ex. 20, Kilshaw to Graham (Sept. 22, 2020) (Kilshaw explaining that he rejected the advertisements because "[t]he right to have an abortion in the U.S. is provided under law, not the Satanic Temple's abortion ritual").

41. Eventually, TST settled on designs that explicitly announced, "Our Religious Abortion Ritual Averts Many State Restrictions." Mot. Ex. 21, Basulto to Hill & Rashidi (Sept. 21, 2020); Mot. Ex. 22, Proposed Designs; Am. Compl. (Doc. 3) at 69.

TST Design 1



TST Design 2



9

TST Design 3



TST Design 4



42. The central purpose for TST of these billboards was to convey the message that Kilshaw determined to be misleading and offensive. Mot. Ex. 2, Jarry Dep. at 74:16-21 (explaining that the language "averts many state restrictions" was "central to the billboard, otherwise . . . it's not really conveying a whole lot").

43. Approximately two days after being informed that its proposed copy violated the Copy Acceptance Policy, TST sent a demand letter threatening a lawsuit. Mot. Ex. 23, Kezhaya to Hill (Sept. 23, 2020).

44. Lamar Indiana later cancelled the contract. Mot. Ex. 24, Hill to Baird and Gibbens (Sept. 25, 2020); Mot. Ex. 25, Hill to Basulto (Sept. 30, 2020).

45. Lamar Indiana remained willing to accept other advertising copy from The Satanic Temple, including the "Never be hit in school again" advertisement. Mot. Ex. 16, Hill and Basulto

(Sept. 22, 2020) (Hill asking SeedX, "Can we not use the original design you'd sent?") & Mot. Ex. 25, Hill to Basulto (Sept. 30, 2020) (Hill offering to SeedX, after cancellation of the contract, to revisit the campaign "[i]f we get revised designs similar to the last ones").

46. TST was not billed for the billboards. Mot. Ex. 26, Emails between Gibbens and Rust (Sept. 21, 2020) (removing the contract from billing).

        Respectfully Submitted,

        QUATTLEBAUM, GROOMS & TULL PLLC
        111 Center Street, Suite 1900
        Little Rock, Arkansas 72201
        Telephone: (501) 379-1700
        Facsimile: (501) 379-1701
        mshannon@qgtlaw.com
        sbolden@qgtlaw.com

        By: /s/ Sarah Keith-Bolden
            Michael N. Shannon (92168)
            Sarah Keith-Bolden (2007235)

        *Lamar Advantage GP Company, LLC, and*
        *Lamar Advantage Holding Company*