IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS

THE SATANIC TEMPLE, INC.                                    PLAINTIFF

                                    Case no.:
            V.                    5:22-CV-5033-TLB

LAMAR ADVANTAGE GP COMPANY, LLC;
LAMAR ADVANTAGE HOLDING COMPANY;
AND LAMAR ADVERTISING COMPANY                               DEFENDANTS

---

## SECOND AMENDED COMPLAINT

COMES NOW Plaintiff The Satanic Temple, Inc. ("**TST**"), by and through counsel Matthew A. Kezhaya ABA # 2014161, with a second amended complaint about the material breach of an advertising contract on religiously discriminatory grounds, which violates the Arkansas Civil Rights Act encoded at ACA § 16- 123-107.

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction under 28 USC § 1332 (diversity jurisdiction). There is a complete diversity of citizenship. Plaintiff is a Massachusetts religious corporation. No Defendant is a Massachusetts resident. Defendants are: a Louisiana corporation (Lamar Advertising Company), an Arkansas LLC (Lamar Advantage GP Company, LLC), and an Indiana LLC (Lamar Advantage Holding Company). The asserted damages in this cause exceed $75,000.

2. The Court has personal jurisdiction over the defendants because they regularly do business in this State.

3. Venue properly lies with this Court. 28 USC § 1391. The advertising contract which is the subject of this cause was to be performed in Benton County, Arkansas.

## PARTIES

4. The Satanic Temple, Inc. ("**TST**,") plaintiff, is a Massachusetts religious corporation with its principal place of business in Salem, Massachusetts. TST is a famous IRS-recognized atheistic religious organization with an international following exceeding 540,000 and which was recently the subject of the film, *Hail Satan?* (Magnolia Films, 2018). *See also Satanic Temple v. City of Scottsdale*, No. CV18-00621-PHX-DGC, 2020 WL 587882 (D. Ariz. Feb. 6, 2020) (holding that TST is a bona fide religion). TST's membership can be found in every State, importantly to include Arkansas and Indiana. TST venerates (but does not worship) the biblical adversary as a promethean icon against tyranny. For TST's membership, the Satan depicted in Paradise Lost and like works is a revolutionary antihero who stood up against impossible odds to seek justice and egalitarianism for himself and others in the pursuit of Enlightenment ideals. TST propagates its Seven Tenets:

> (1) One should strive to act with compassion and empathy toward all creatures in accordance with reason.

(2) The struggle for justice is an ongoing and necessary pursuit that should prevail over laws and institutions.

(3) One's body is inviolable, subject to one's own will alone.

(4) The freedoms of others should be respected, including the freedom to offend. To willfully and unjustly encroach upon the freedoms of another is to forgo one's own.

(5) Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs.

(6) People are fallible. If one makes a mistake, one should do one's best to rectify it and resolve any harm that might have been caused.

(7) Every tenet is a guiding principle designed to inspire nobility in action and thought. The spirit of compassion, wisdom, and justice should always prevail over the written or spoken word.

https://thesatanictemple.com/pages/about-us (last visited September 25, 2020).

5. To further its organizational purposes, TST contracted with Lamar Advertising of Louisiana, LLC to erect billboards in Arkansas and Indiana for the period beginning September 28, 2020 and ending October 25, 2020. **EXHIBIT 1** (the contract). The purpose of the contract was to spread awareness of TST's then-recently unveiled Satanic Abortion Ritual, which offers TST's

membership relief from societal efforts to instill guilt, doubt, and shame for having an abortion and provides catharsis in a celebration of bodily autonomy.

6. Lamar Advantage GP Company LLC and Lamar Advantage Holding Company, defendants, are the Arkansas and Indiana subsidiaries of codefendant Lamar Advertising Company, a publicly traded advertising corporation organized under the laws of Delaware with its principal place of business in Louisiana. NASDAQ: LAMR. Lamar's website boasts that it is one of the largest outdoor advertising companies in the world. See id:

http://www.lamar.com/About (Last visited September 25, 2020).[1]  Even that

## Our Company

Founded in 1902, Lamar Advertising Company (Nasdaq: LAMR) is one of the largest outdoor advertising companies in the world, with approximately 385,000 displays across the United States and Canada. Lamar offers advertisers a variety of billboard, interstate logo, transit and airport advertising formats, helping both local businesses and national brands reach broad audiences every day. In addition to its more traditional out of home inventory, Lamar is proud to offer its customers the largest network of digital billboards in the United States with over 3,600 displays.

is too modest: Lamar has a monopoly on every billboard in TST's suitable advertising area. Lamar contracted with TST to erect billboards in Arkansas and Indiana. **Exhibit 1** (the contract).

7. Lamar Advantage Holding Company is the Arkansas subsidiary of Lamar Advertising Company. It is a Delaware Corporation with a principal place of business in Little Rock, AR.

---

[1] The screenshot is contemporaneous to the time of breach. Since then, the stated number of displays have increased by 300, to 3900 displays. Id. (last visited February 9, 2022).

8. Lamar Advantage GP Company, LLC is the Indiana subsidiary of Lamar Advertising Company. It is a Delaware LLC whose membership is not of public record but is believed to be a wholly owned subsidiary of Lamar Advertising Company. Importantly for the diversity jurisdiction inquiry, no member is believed to be a Massachusetts resident. Lamar Advantage GP Company, LLC is not licensed to do business in Arkansas.

FACTS

## Background

*Context for the advertisement*

9. Arkansas and Indiana have implemented regulations on how, when, and whether a woman can terminate her pregnancy.

10. Arkansas and Indiana have also adopted a statutory mechanism to challenge laws when they substantially interfere with the plaintiff's religious beliefs and practices, irrespective of whether the legislative motivation behind the law is religious discrimination. See Arkansas's Religious Freedom Restoration Act, encoded at ACA § 16-123-401 *et seq.* and Indiana's Religious Freedom Restoration Act, encoded at Ind. Code Ann. § 34-13-9-0.7 *et seq.* (generically, "**RFRA**.")

11. TST holds the view that some abortion restrictions substantially interfere with its religious beliefs. Particularly, abortion restrictions violate the

Third Tenet[2] when they interfere with bodily autonomy and violate the Fifth Tenet[3] when not grounded in science.

12. TST holds the view that some abortion regulations substantially interfere with its religious practices. On August 5, 2020, TST unveiled the Satanic Abortion Ritual, which includes the abortive procedure into the above-described sacramental act that confirms bodily autonomy and the adherence to scientific supremacy, wards off the effects of unjust persecution, and reasserts as ideals the dual paths of reason and confidence. For further information about the religiosity of TST's Satanic Abortion Ritual, see ¶¶ 15-35 below.

13. TST was excited to spread awareness about the progressive statutory framework of RFRA and the rights conferred by RFRA to TST's membership for religious exemptions from abortion restrictions which offend TST's religious beliefs and practices.

14. To that end, and as detailed in ¶¶ 44-56, TST entered into an advertising contract with Lamar for the purpose of posting billboards which would have spread awareness about the Satanic Abortion Ritual.

---

[2] One's body is inviolable, subject to one's own will alone.

[3] Beliefs should conform to one's best scientific understanding of the world. One should take care never to distort scientific facts to fit one's beliefs.

*Religiosity of the Satanic Abortion Ritual*

15. Part of this case will involve proving that TST's Satanic Abortion Ritual is substantively different than getting a secular abortion, even though it involves the abortive act, such that this advertising contract contemplated a religious message. That requires some important background on what TST means when it describes itself as "Satanic." But the following is not an invitation to litigate the truth, the reasonableness, or the centrality of the intended advertisements to TST's beliefs or practices. *Employment Div., Dep't of Human Res. of Oregon v. Smith*, 494 U.S. 872, 887, 110 S. Ct. 1595, 1604 (1990) ("Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular belief in a religion or the plausibility of a religious claim.")

16. TST shares with all other Satanic groups a veneration for the biblical concept *ha satan* (literally: "the adversary" or "the accuser.")

17. *Ha satan* is an adjective, not a particular individual.

18. Satanism is divided into "nontheistic" and "theistic" groups.

19. Nontheistic Satanists (which includes TST) venerate the concept of the Biblical Satan and may participate in ritual, but do not literally worship the divine entity that Christians identify as "The Devil."

20. Despite that nontheistic Satanists (like TST) reject the supernatural, they still participate in ritual. Ritual has a powerful, and studied, effect on the

subjective experience of participants; no faith in a higher power is required. Hobson NM, Schroeder J, Risen JL, Xygalatas D, Inzlicht M. *The Psychology of Rituals: An Integrative Review and Process-Based Framework*. Personality and Social Psychology Review. 2018;22(3):260-284. doi:10.1177/1088868317734944. Unlike their theistic cousins, a nontheistic Satanist does not have any expectation that participating in ritual, by itself, will affect the outside world.

21. TST is a nontheistic branch of Satanism. This is enshrined in TST's Fifth Tenet, which posits that beliefs and actions should be guided by scientific consensus, not tradition or superstition.

22. Theistic Satanists differ from nontheistic Satanists by taking the extra step to literally worship a deity that Christians identify as "The Devil." If they participate in ritual magic, a theistic Satanist will believe that the ritual, by itself, causes an effect on objective reality.

23. Satanists–both nontheistic and theistic–believe that authority is to be rebelled against ("accused") if it is directly and substantively conflicts with their beliefs. This is an inversion of Christian norms, which holds that authority–particularly divine authority–is not to be questioned.

24. Another Satanic inversion of Christian norms is the balance of perceived importance between the self and the outside world. TST's membership does not subscribe to self-deprecation as virtues. This is an

inversion of the Christian norm that the outside world (God and the Church, particularly) may rightfully dictate the thoughts and actions of the people.

25. TST has enshrined this inversion in the Third Tenet ("One's body is inviolable, subject to one's own will alone.") Other common applications of bodily inviolability include a religious objection against corporeal punishment of minors (See Past Designs 1 and 2 at ¶ 48 below), a *laissez faire* view on body modification and sexuality, and a broad acceptance of the LGBTQ+ community.

26. TST and its membership are nontheistic Satanists, with an added influence by the philosophy of the Enlightenment thinkers. In this worldview, TST shares much with the Founding Fathers. This great nation began as an act of insurrection against a tyrant-king who claimed divine authority. The Founding Fathers pursued justice and egalitarianism for all. Replace George Washington with Satan, and TST's membership sees no substantive moral difference.

27. But despite holding all these ideals in the highest esteem, TST makes no claim to having the "highest ideal" or "divine truth," and will vigorously defend religious freedom in its many forms. This commitment to pluralism is rooted in a profound respect for the individual but is accompanied by an unflinching demand for reciprocity.

28. As addressed at ¶ 15, above, many of TST's membership believe that

ritual can have an important function. Other than the Satanic Abortion Ritual, TST's membership engages in destruction rituals (ceremonious destruction of an item with symbolic meaning), the unbaptism (ceremonious casting off of religious indoctrination), various meditations and mantras, and sex magic. The Satanic Abortion Ritual is just one in a constellation of religious practices. See, *e.g.*, Shiva Honey, *The Devil's Tome: A Book of Modern Satanic Ritual* (Serpentīnae, March 25, 2020).

29. The Satanic Abortion Ritual is a ceremonious casting off of guilt, doubt, and mental discomfort that the member may be experiencing in connection with their election to abort the pregnancy. See **EXHIBIT 2** (informational pamphlet for the Satanic Abortion Ritual). The ritual also confirms the member's choice and wards off effects of unjust persecution. **Id.**

30. It has long been recognized that the personal choice to terminate a pregnancy originates from the "zone of conscience and belief," such that regulating the personal choice to terminate a pregnancy entails a sensitive balancing of privacy rights. *Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 852, 112 S. Ct. 2791, 2807, 120 L. Ed. 2d 674 (1992).

31. But for TST's membership, abortion regulations involve more than a potential invasion of privacy rights; they entail a burden on the member's adherence to the Third Tenet. When the State intrudes into the member's decision about their own bodily autonomy, it forces the member to choose

between the Third Tenet and the laws of the State. And they entail a special burden on the member's adherence to the Fifth Tenet, that actions (including compliance with the regulations) be rooted in scientific consensus rather than tradition.

32. Even the political rhetoric surrounding abortion is notably religious. The question of when life begins (*i.e.*, when a cluster of cells becomes a "person") is the subject of substantial religious debate. Catholics have one answer (the moment of conception), but that isn't the only one. *The Conversationalist*, "When does life begin? There's more than one religious view," available at https://theconversation.com/when-does-life-begin-theres-more-than-one-religious-view-167241 (last visited February 9, 2022).

33. From the perspective of TST's membership, abortion regulations place the State in the role of a tyrant-king who purports to command that the member conform their conduct to religious norms. This is deeply offensive to those who subscribe to the Third and Fifth Tenets.

34. The Satanic Abortion Ritual was created to combat those efforts and, for TST's membership, it is empowering to assert or re-assert (as appropriate) power and control over their own mind and body. The Satanic Abortion Ritual is thus a celebration of bodily autonomy and an affirmation of the subscription to scientific consensus.

35. The Satanic Abortion Ritual depends on the nature of the abortion. For

surgical abortions:

> Immediately before receiving any anesthetic or sedation, look at your reflection to be reminded of your personhood and responsibility to yourself. Focus on your intent, take deep breaths, and make yourself comfortable. When you are ready, say the Third Tenet aloud. The surgery can now begin. During the operation, take another deep breath and recite the Fifth Tenet. Immediately after the surgery, return to your reflection and recite the personal affirmation. Feel the doubts dissipating and your confidence growing as you have just undertaken a decision that affirms your autonomy and free will. The religious abortion is now complete.

**Exhibit 2** at p. 4.

And for medical abortions:

> Immediately before taking the medication(s) to terminate your pregnancy, look at your reflection to be reminded of your personhood and responsibility to yourself. Focus on your intent, take deep breaths, and make yourself comfortable. When you are ready, read the Third Tenet aloud to begin the ritual. After swallowing the medication(s), take another deep breath and recite the Fifth Tenet. After you have passed the embryo, return to your reflection and recite the personal affirmation. Feel the doubts dissipating and your confidence growing as you have just undertaken a decision that affirms your autonomy and free will. The religious abortion is now complete.

**Id.**

*The placement and ownership of the suitable locations*

36. To spread awareness of the belief that the Satanic Abortion Ritual is predicate for RFRA exemptions, TST engaged a marketing firm called SeedX, Inc. to design and place billboards about TST and its abortion ritual.

37. Critical to TST's marketing campaign was placement of billboards. The billboards needed to be in high traffic areas and needed to be located in and around fake abortion clinics.

38. Fake abortion clinics, also known as "crisis pregnancy centers," are clinics that offer "pregnancy related services" (to an unsuspecting layperson, this would include abortions) but will do anything to deter its patrons from obtaining an abortion including shaming, deception, manipulation, and outright intimidation.

39. Of importance to this litigation, there are fake abortion clinics in Fayetteville, Springdale, Jacksonville, and Little Rock; and several in Indiana, as well.

40. TST objects to fake abortion clinics as an improper bait-and-switch and as an affront to the Third Tenet.

41. To that end, TST intended to place billboards announcing to every prospective patron of fake abortion clinics: "We are with you."

42. With the aid of SeedX, TST identified suitable billboards in strategically targeted areas: those in high traffic areas and which either face fake abortion clinics or were en route to them.

43. Lamar owns all of the suitable billboards in both Arkansas and Indiana.

**Contract negotiations and execution**

44. On September 2, 2020 at 1:00 pm (EST), Jacqueline Basulto (CEO of SeedX) and Tom Hill (Senior Account Executive for Lamar) discussed by telephone the above-described advertisements.

45. During this phone call, Jacqueline notified Tom that the advertisements needed to be in the above-targeted locations, would be pro-reproductive rights in nature, and would pertain to the religious practices of The Satanic Temple. She also notified Tom that Lamar had worked with TST before.

46. Tom acknowledged the nature of the advertisement and said this would be "no problem."

47. Tom asked for the specific locations of the billboards and Jacqueline emphasized that they must be in these particular locations for the reasons identified in ¶ 42, above.

48. On September 2 at 10:58 pm (EST), Jacqueline emailed Tom with the specific locations for approval and stated, "I am also attaching our *past*

campaign with Lamar to show you what creative looked like *in the past*"

(emphasis added). This was the past design:

*Past Design 1:*



49. In that same past campaign, Lamar also posted this design:

*[remainder intentionally left blank, next design following]*

*Past Design 2:*



50. On September 4, 2020, at 4:00 pm (EST), Jacqueline and Tom confirmed the subject locations by email.

51. On September 15, 2020, the parties entered into a valid, enforceable contract on a form prepared by Lamar, wherein Lamar would place several billboard designs advertising TST's abortion ritual at the subject locations for the period beginning September 28, 2020 and ending October 25, 2020 and, in return, TST would pay Lamar $16,387. **Exhibit 1** (the contract).

52. One of the billboards was to be in Benton County. **Id.** at p. 1 ("Springdale, AR").

53. The contract–like all contracts–includes an implied warranty of good faith and fair dealing. *W. Memphis Adolescent Residential, LLC v. Compton*, 2010 Ark. App. 450, 5, 374 S.W.3d 922, 925.

54. At **Contract ¶ 6**, Lamar purports to reserve a unilateral right to determine if designs are "in good taste and within the moral standards of the individual communities in which it is displayed," and purports to permit Lamar a unilateral "right to reject or remove any copy either before or after installation, including immediate termination of this contract."

55. But Lamar has also publicly stated that its policy for approving billboard messaging requires Lamar to be content-neutral:

> Lamar Advertising supports the First Amendment rights of advertisers who want to use our medium to convey political, editorial, public service, and other noncommercial messages. Per policy, we do not accept or reject copy based on our agreement or disagreement with the views expressed.

**EXHIBIT 3** (email from Lamar's public relations employee to a reporter); Jo Anne Embleton *Jacksonville Progress* "Pro-abortion billboards short-lived in Rusk" (available at https://www.jacksonvilleprogress.com/news/pro-abortion-billboards-short-lived-in-rusk/article_c40df5f8-e65d-11ea-939c-9bd1d3d3d301.html) (last visited on February 25, 2022); see also **EXHIBIT 4** ("Lamar will not accept or reject copy based upon agreement or disagreement with the views presented.")

56. And Arkansas law prohibits religious discrimination in private contracts. ACA § 16-123-107(a)(4). Or, if leasing a billboard is a "property transaction," Arkansas law prohibits religious discrimination there. ACA § 16-123-107(a)(3).

**TST's performance and Lamar's breach**

*Submission and denial of TST's designs*

57. On September 14, 2020, Tom indicated that TST's billboard designs needed to be submitted by September 16.

58. On September 15 at 9:38 am, which was after the contract was signed but before Lamar received any of TST's designs, Tom Gibbens (General Manager of Lamar's Little Rock office), expressed to Hal Kilshaw (Lamar's corporate Vice President of Governmental relations) a desire to reject the forthcoming designs because of TST's religious identity. EXHIBIT 5 (emphasis added):

> Can you buzz me about the satanic temple. We just found out this buy is coming through an agency. The contract originated from the Indaniapolis office. *I do not have the final artwork yet.* Can we reject this based on not meeting the moral standards of our community? I would include Springdale AR as well.

59. The plain text of this email is that Lamar's Little Rock office objected to TST's Designs specifically because of TST's religious identity ("I do not have

the final artwork yet.") The rejection was not because of "community standards," which is the only contractual basis to reject designs, but on the impermissible grounds of religious discrimination (prohibited by the ACRA) and content-based discrimination (barred by Lamar's stated policy).

60. On September 15 at 9:41 am, Jacqueline timely sent five designs to Tom for approval.

61. On September 15 at 9:54 am, Tom requested corporate review of the original designs. EXHIBIT 6. Tom apparently misunderstood the part of Jacqueline's September 2 email that Past Design 1 was from "our *past* campaign with Lamar" which she had shared "to show you what creative looked like in the *past*" (emphasis added). Compare **id.** ("She says these designs were previously approved by Lamar but best we double check.")

62. On September 15 at 10:44 am, after receiving TST's original designs, Whit Weeks (General Manager for Lamar's Fayetteville office) forwarded the designs to his team and instructed them to have an understanding of who the advertiser was before entertaining any designs. EXHIBIT 7:

> One of these pieces of creative [referring to TST's copy] that will be running in NW Arkansas starting at the end of the month. This is why we shouldn't respond to agency requests listed as 'Client X' or without gaining knowledge of the customer. This will be running in our market and below rate. I'm embarrassed that this will represent us.

63. The subtext of this email is that Lamar's Fayetteville office objected to TST's Designs both because of TST's religious identity–which is prohibited by the ACRA–and a disagreement with the views expressed–which is explicitly barred by Lamar's policy. **Exhibit 4** ("Lamar will not accept or reject copy based upon agreement or disagreement with the views presented.") This had nothing to do with "community standards" and everything to do with Whit Weeks's distaste for a differing viewpoint.

64. On September 15 at 10:46 am, Whit Weeks complained that the notion of Lamar considering TST's Designs was "ridiculous." Exhibit 8.

65. On September 15 at 10:58 am, Hal Kilshaw (Lamar's corporate Vice President of Governmental relations) stated without explanation that "All of these are misleading and offensive so no on all of them." Exhibit 9.

66. On September 17, Tom and a co-worker discussed another instance of Lamar's practice of rejecting copy based on religious identity and a disagreement with the views expressed can be found in other areas, too. See Exhibit 10 (instant message chats between Tom and his co-worker) On September 17, 2020, a Lamar employee commented in an instant message, "I tried to get the Atheists to do something 3 years ago after that little keep Christ out of Christmas campaign but Carter said No." Exhibit 10.

67. While TST was not involved in any "Keep Christ Out of Christmas" campaigns, it is clear that Carter said "No" because of the identity of the

speaker and a disagreement with the views expressed. This tends to show that Lamar has a general practice of rejecting displays which come from religions that explicitly reject the Christian viewpoint, like Atheism or TST.

68. On September 21, 2020, at 10:01 am, Tom indicated to Jacqueline by email that Lamar rejected all of the designs without further explanation.

69. On September 21 at 10:16 am, Jacqueline attempted to resolve the objection. She sent the following four designs (TST Designs 1-4) and asked: "What is Lamar's criteria for approving billboard messaging?"

*TST Design 1*



*TST Design 2*



*TST Design 3*



*TST Design 4*



*Previously accepted designs*

70. These designs are of better taste than some designs about abortion which have previously been accepted by Lamar (Acceptable Designs 1-6):

*[remainder intentionally left blank, next design following]*

*Acceptable Design 1*



[*remainder intentionally left blank, next design following*]

*Acceptable Design 2:*



[*remainder intentionally left blank, next design following*]

*Acceptable Design 3:*



*Acceptable Design 4:*



*Acceptable Design 5:*



*Acceptable Design 6:*



*Lamar's bad faith rejection*

71. Tom did not provide Jacqueline with Lamar's criteria for approving billboard messaging. Instead, On September 21 at 10:33 AM, Tom flatly informed Jacqueline that the designs were rejected and referenced Contract ¶ 6. This contradicted Lamar's "pledge[] to communicate the reason for any rejection of advertising copy" and to "work with advertisers to achieve acceptable copy if the originally submitted copy is not accepted." EXHIBIT 4. It also violated TST's contract rights. *See Cantrell-Waind & Assocs., Inc. v. Guillaume Motorsports, Inc.*, 62 Ark. App. 66, 71, 968 S.W.2d 72, 74 (1998) (when, as here, a contract term leaves a decision to the discretion of one party, "courts will become involved when the party making the decision is charged with bad faith.")

72. On September 22, the following email exchange occurred between 12:54 pm and 1:13 pm EST:

(a) Jacqueline emailed Tom: "We are working to understand how we can accommodate Lamar's policy. Is there anything specific about the messaging or imagery that we should focus on?"

(b) Tom responded: "the content is misleading and offensive."

(c) Jacqueline responded: "All of the content? In what ways is it misleading and in what ways is it offensive? Can you clarify?"

(d) Tom declined to elucidate, and instead reiterated: "All of the content."

(e) Jacqueline responded: "In order to revise the designs, we need more specific information about what is misleading or offensive. The messaging and content is in line with the beliefs of the Satanic Temple and their religious beliefs, so we can't move forward without an understanding of what characteristics are specifically off-base."

(f) Tom responded: "I'll see if I can get more details."

73. Tom never sent TST more details.

**Post-breach efforts by TST to avoid litigation**

74. With the aid of SeedX, which is in the business of finding billboards, TST diligently searched for alternative suitable billboards.

75. TST could not find alternative suitable billboards.

76. On September 23, TST issued a demand letter and preservation notice. EXHIBIT 11 (demand letter).

77. In its demand letter, TST reminded Lamar that it has a contract obligation to put up billboards advertising TST's abortion ritual by September 28. **Id.**

78. TST explained that Lamar's refusal to indicate what, exactly, was wrong with the designs frustrated TST's ability to remediate the problem,

which is a plain violation of the implied warranty of good faith and fair dealing. *See Cantrell-Waind & Assocs., Inc.*, 62 Ark. App. at 71 ("A party has an implied obligation not to do anything that would prevent, hinder, or delay performance.")

79. TST also indicated that Lamar's objection to the content and refusal to place the billboards appeared to be religious discrimination in a contractual transaction, which is barred by the Arkansas Civil Rights Act, ACA § 16-123-107(a)(4).

80. On September 25, Jason Graham (Vice President of Lamar) responded that Lamar will be canceling the contract pursuant to Contract ¶ 6.

81. TST was thus deprived of the benefit of its bargain and, since Lamar holds a monopoly on suitable billboard locations, TST cannot obtain that same benefit elsewhere.

**Post-demand letter admission of fault**

82. On October 6, Tom Hill confided in a co-worker that he had experienced retaliation from corporate for complying with Lamar's stated policy that it does not engage in content-based discrimination. EXHIBIT 12 ("I got this satanic temple deal hanging over my head down there right now so my name isn't gold right now") (ASCII converted for legibility).

83. Tom Hill also acknowledge in the same conversation that TST "wanted to change the content but we just replied with 'we will cancel the contract.'" **Id.** (ASCII converted for legibility.)

84. By putting "we will cancel the contract" between apostrophes, Tom Hill intended to convey that Lamar canceled the contract in bad faith based on TST's religious identity and a disagreement with the views expressed.

85. Lamar had no objective basis to determine the "community standards" surrounding TST's Designs. Lamar did not conduct any public polling, did not consult with anyone outside of Lamar, and appears to be under the misbelief that it can engage in overt religious discrimination in Arkansas, notwithstanding that it violates the ACRA and Lamar's own policy.

86. By falsely stating that the rejection was due to "community standards," when it was really rooted in religious discrimination and a disagreement of the views expressed, Lamar abused Contract ¶ 6 in bad faith.

**TST's post-complaint efforts to procure a competitor's billboard space**

87. TST originally sued out this action in the Circuit Court of Benton County. *Satanic Temple, Inc. v. Lamar Advertising of Louisiana* (04CV-20-2100).

88. On December 16, after the original complaint, Lamar indicated to TST through counsel that the following competitors might have billboards available

in the same areas: (1) Ashby; (2) Arkansas Outdoor Advertising Association; and (3) "AAA.org."

89. None of these led to discovery of a viable competitor.

90. According to Billboard Insider (a billboard trade publication), Lamar acquired Ashby in 2019. "Ashby Street Outdoor Acquired by Lamar Advertising" (https://billboardinsider.com/ashby-street-outdoor-acquired-by-lamar-advertising/) (last visited December 18, 2020). Thus, Ashby isn't even a competitor.

91. Arkansas Outdoor Advertising Association's website is http://www.arkansasoutdooradvertising.com/ and, as of December 18, 2020, has a suspended account with its webmaster. This may be a lead, if the Advertising Association ever renews its website.

92. Through counsel, TST found a telephone number for Arkansas Outdoor Advertising Association by a separate search. Counsel called that number, and the answerer identified themselves as "Lamar Advertising." Counsel terminated the call without further discussion. Arkansas Outdoor Advertising Association is not a competitor, either.

93. SeedX found the American Academy of Advertising (aaasite.org), which is an academic organization that studies advertising. "About AAA" (https://www.aaasite.org/mission-vision-goals) (last visited on December 18, 2020). But they don't lease out billboard space.

94. Since the filing of the original complaint, TST has contracted with Clear Channel to post TST Designs 2 and 4 in Dallas, Houston, and Miami.

95. Clear Channel does not have any billboards in Arkansas or Indiana.

96. Clear Channel suffered no adverse side effects from contracting with TST.

97. People recognize that billboard companies are in the business of advertising, so any offense they take from TST's billboards is not appropriately addressed to the owner of the billboard, but to TST–or, for reasons unclear to TST, Planned Parenthood. See Carter Sherman, *Vice*, "The Texas GOP Really Thinks Planned Parenthood Works With Satanists" (https://www.vice.com/en/article/pkdza8/the-texas-gop-really-thinks-planned-parenthood-works-with-satanists) (last visited on December 18, 2020).

98. Subsequently, Lamar offered another nine potential competitors, none of whom are viable for the following reasons:

(a) "Ace" does not have any billboards in Arkansas or Indiana.

(b) "Carter" does not have any billboards in Arkansas or Indiana.

(c) "Outfront" does not have any billboards in Arkansas and declined to work with TST in Indiana.

(d) "Lindmark" does not have any billboards in Indiana, has limited availability in Arkansas, and even then declined to work with TST.

(e) "Vision" does not have any billboards in Indiana and turned away TST via telephone.

(f) "Custom" does not have any billboards in Indiana and turned away TST via telephone.

(g) "Ram" does not have any billboards in Arkansas and turned away TST via telephone.

(h) "Fairway" does not have any billboards in Arkansas or Indiana.

(i) "Missouri Neon" is a sign manufacturer, not a billboard company.

99. To minimize its exposure to further advertising discrimination, TST engaged in a nationwide search to purchase a billboard. None were available in Arkansas or Indiana. But TST did find one in Phoenix, Arizona. On November 17, 2020, TST obtained it for $80,000 plus $450 per month for the next 18 years (until July 22, 2039). But for Lamar's refusal to work with TST, TST would not have had to accrue this expense.

100. TST nonsuited the state court case on February 26, 2021.

101. Justice demands specific enforcement of this contract because TST cannot otherwise procure billboard space in the suitable advertisement areas.

CAUSES OF ACTION

## Count 1: Violation of the ACRA

102. The ACRA prohibits religious discrimination in private contracting. ACA § 16-123-107(a)(4). If leasing a billboard is a "property transaction," the ACRA prohibits religious discrimination there, too. ACA § 16-123-107(a)(3).

103. TST holds the religious beliefs propagated by TST Designs 1-4.

104. TST's designs prominently display TST's religious iconography, *i.e.*, the sabbatic goat superimposed over an inverted pentagram.

105. "All of the content"(¶ 72(d)) on the designs necessarily include TST's religious beliefs and TST's religious iconography.

106. Lamar's refusal to post the designs because of "all of the content" (¶ 72(d)) is a refusal because of TST's religious beliefs and TST's religious iconography. That's religious discrimination.

107. Moreover, as is clear in Acceptable Designs 3 and 4, Lamar cannot claim to object to "religious" messages.

108. And, as is clear in Acceptable Designs 1 and 6, Lamar cannot claim to object to "pro-choice" messages.

109. And, as is clear in Acceptable Design 6, Lamar cannot claim that a religious pro-choice message runs afoul of community standards.

110. As detailed in Lamar's contemporaneous internal communications, Lamar intentionally engaged in religious discrimination by rejecting TST's

designs because of TST's religious identity, disagreement with TST's religious viewpoint, and TST's religious iconography.

111. TST is entitled to a court order enjoining Lamar from further violations, recovery of compensatory and punitive damages, and costs and attorney's fees. ACA § 16-123-107(b). These sums are expected to exceed $75,000.

## Count 2: Breach of contract

112. The parties have a valid and enforceable contract. **Exhibit 1**. For this count, we assume Contract ¶ 6 (which purports to give Lamar a unilateral right to cancel contracts) carries an implicit caveat that the clause cannot be abused in bad faith to preempt the material purpose of the contract. If there is no implicit caveat, Contract ¶ 6 either is unconscionable (Count 3, below) or it upends the mutuality of obligation (Count 4, below).

113. The contract must be interpreted as a whole so that all parts of the contract are consistent with each other. *RAD-Razorback Ltd. P'ship v. B.G. Coney Co.*, 289 Ark. 550, 554, 713 S.W.2d 462, 465 (1986) ("In seeking to harmonize different clauses of a contract, we should not give effect to one to the exclusion of another even though they seem conflicting or contradictory, nor adopt an interpretation which neutralizes a provision if the various clauses can be reconciled."))

114. The material purpose of this contract was that Lamar would place billboards advertising TST's Satanic Abortion Ritual for the period between September 28 and October 25.

115. Like all contracts, this contract also imposed a duty on Lamar to act in good faith and fair dealing in its performance and enforcement. *Cantrell-Waind & Assocs., Inc.*, 62 Ark. App. at 71 ("A party has an implied obligation not to do anything that would prevent, hinder, or delay performance")

116. Before contracting to place billboards for TST, Lamar subjectively understood that contracting with TST would entail posting designs that advertised a pro-choice message from TST in the nature of TST Designs 1-4. This is so because Jacqueline specifically told Tom of the nature of the advertisement and the identity of the advertiser; and because Lamar had previously posted advertisements for TST which made a RFRA claim to religious exemptions from corporeal punishment because being beaten violates the Third Tenet. It's the same logic here.

117. Moreover, any reasonable advertiser would know that working with TST would entail hosting a message like TST's Designs 1-4. TST has achieved a level of renown for this kind of activity. See David S. Cohen, *Rolling Stone*, "How the Satanic Temple Could Bring Abortion Rights to the Supreme Court" (available at https://www.rollingstone.com/culture/culture-features/satanic-

temple-abortion-rights-supreme-court-1048833/) (last visited September 26, 2020); see also Past Designs 1 and 2.

118. Although Lamar's contract reserves a right to object to designs in Contract ¶ 6, Lamar cannot abuse its right to reject design elements in bad faith to override the core purpose of the contract, *i.e.*, advertising TST's Satanic Abortion Ritual in exchange for money. *RAD-Razorback*, above; see also *Cantrell-Waind & Assocs., Inc.*, 62 Ark. App. at 71 ("A party has an implied obligation not to do anything that would prevent, hinder, or delay performance"); *Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012, 1028–30 (E.D. Ark. 2015) (denying a motion to dismiss a complaint which asserted a breach of the covenant of good faith and fair dealing because plaintiffs asserted the claim as a breach of contract, not as a separate cause of action).

119. Bringing together the implied covenant of good faith and fair dealing, the material purpose of the contract, the ACRA, and Lamar's own stated policies, the only viable legal construction of Contract ¶ 6 is that Lamar cannot reject TST's Designs in bad faith, or based on TST's religious identity, or based on a disagreement with the views expressed.

120. By rejecting TST's Designs based on the pretext of "community standard" when, really, the issue was Lamar's aversion to TST's religious identity or disagreement with the views expressed by the copy, Lamar breached

its contract obligation to place advertisements for TST in the designated places and for the designated time periods.

121. TST did what was required of it by proffering designs and making repeated good faith efforts to ascertain the nature of the objection and cure the objection.

122. TST stands ready, willing, and able to pay the contract price for its advertisements.

123. Lamar did not do what the contract required of it by abusing its right to review design elements in bad faith, refusing to provide TST a fair opportunity to cure the objection, failing to post the designs contemplated by the agreement.

124. Because Lamar refuses to perform as contracted, and because Lamar holds a monopoly on suitable billboards, TST cannot advertise its message.

125. Advertising this message in this manner is core to TST's organizational purposes.

126. Under these circumstances, TST is entitled to specific performance. *Panhandle Oil & Gas, Inc. v. BHP Billiton Petroleum (Fayetteville), LLC*, 2017 Ark. App. 201, 7, 520 S.W.3d 277, 283 (2017) ("[s]pecific performance is an equitable remedy which compels performance of a contract on the precise terms agreed upon by the parties. Whether specific performance should be awarded in a particular case is generally a question of fact"); see also *Taylor v. Eagle Ridge*

*Developers, LLC*, 71 Ark. App. 309, 314, 29 S.W.3d 767, 770 (2000) ("Where …
interest in land is the subject of an agreement, the right to specific performance
is absolute.")

127. Alternatively, TST is entitled to the sum of money (less the contract
price) that it would cost to communicate the same message to the same
audience, plus costs and attorney's fees for having to bring this matter to the
Court's attention. That sum is expected to exceed $75,000.

### Count 3: Declaratory judgment that Contract ¶ 6 is unconscionable

128. Count 2 assumes that Contract ¶ 6 implicitly carries a caveat that
Lamar cannot reject copy in bad faith. The only other possibility is that
Contract ¶ 6 means that Lamar *can* reject copy in bad faith. If Lamar can reject
copy in bad faith, the contract is either unenforceable as illusory (Count 4,
below) or the contract must continue to be enforceable but Contract ¶ 6 must
be stricken as unconscionable (this Count).

129. Contract ¶ 6 is unconscionable because it purports to grant Lamar an
unfettered right to reject designs without explanation and without objective
measures. This is procedurally and substantively unfair. See Brill, 1 Arkansas
Law Of Damages § 17:18 ("Unconscionability is typically considered in terms
of either procedural substantive unconscionability or substantive
unconscionability"); see also *LegalZoom.com, Inc. v. McIllwain*, 2013 Ark. 370,

6, 429 S.W.3d 261, 264 (2013) (an unconscionable contract is one that "no man in his senses and not under delusion would make on the one hand, and . . . no honest and fair man would accept on the other. In essence, to be unconscionable, a contract must oppress one party and actuate the sharp practices of the other.")

130. Assuming the Court finds that Contract ¶ 6 affords Lamar the right to reject copy in bad faith, TST is entitled to a declaratory judgment that Contract ¶ 6 is unconscionable. ACA § 16-111-102. In that event, Lamar has no defense and TST is entitled to contract relief (Count 1).

## Count 4: Promissory estoppel

131. Count 2 assumes that Contract ¶ 6 implicitly carries a caveat that Lamar cannot reject copy in bad faith. Count 3 assumes that Contract ¶ 6 does not carry that caveat, but without that caveat Contract ¶ 6 in unenforceable as against public policy. This Count assumes that Contract ¶ 6 does not carry that caveat and the caveat is not necessary for Contract ¶ 6 to survive scrutiny. In that event, Contract ¶ 6 upends mutuality of obligation and therefore renders this agreement legally unenforceable. *Essential Acct. Sys., Inc. v. Dewberry*, 2013 Ark. App. 388, 7, 428 S.W.3d 613, 617 ("A contract … which leaves it entirely optional with one of the parties as to whether or not he will perform his promise would not be binding on the other.") Promissory estoppel relief is proper.

132. Lamar promised that it would place billboards advertising TST's Satanic Abortion Ritual. **Exhibit 1**.

133. Lamar made that promise with the expectation that TST would rely on that promise by creating billboard designs and offering Lamar money in exchange.

134. TST actually relied in good faith on Lamar's promise by creating the billboard designs, making every reasonable effort to cure Lamar's objections, and offering Lamar money.

135. Notwithstanding its promise, Lamar now refuses to place any form of billboard which advertises TST's religious abortion ritual.

136. Injustice has resulted from the refusal. TST cannot communicate the same message to the same audience in the same manner by any other means. Since Lamar has a monopoly on all suitable billboards, TST is deprived of that communication.

137. TST is entitled to specific performance. *Taylor v. Eagle Ridge Developers, LLC*, 71 Ark. App. 309, 29 S.W.3d 767 (2000). Alternatively, TST is entitled to the same monetary damages as in a contract action. See AMI 2442 (which pertains to damages in a contract action) ("This instruction is designed to be used both for claims of breach of contract and promissory estoppel that may be submitted to a jury.")

**WHEREFORE** TST prays this Court enter an order finding Lamar intentionally liable for violation of the ACRA's bar against religious discrimination in a contract or property transaction, find Lamar liable for either breach of contract or promissory estoppel, order compensatory and punitive damages pursuant to the ACRA, permanently enjoin Lamar from future religious discrimination, order specific performance pursuant to any of the above causes of action, or order Lamar pay TST compensation in an amount the Court finds appropriate which is anticipated to be more than $75,000, for costs and attorney's fees for having to raise this matter to the Court's attention; and for all other relief which this Court finds appropriate.

> Respectfully submitted on January 26, 2023,
> on behalf of The Satanic Temple, Inc.
>
> By:  Matthew A. Kezhaya
>
> Matthew A. Kezhaya, ABA# 2014161
> KEZHAYA LAW PLC
> 100 S. Fifth St., Ste 1900
> Minneapolis, MN 55402
> phone:   (479) 431-6112
> email:    matt@kezhaya.law

# Certificate of service

I, Matthew A. Kezhaya, e-filed a copy of this document by uploading it to the Court's CM/ECF system on January 27, 2023, which sends service to registered users, including all other counsel of record in this cause. */s/ Matthew A. Kezhaya*

*[remainder intentionally left blank, exhibit list following]*

### EXHIBIT LIST

1. Contract.

2. Informational pamphlet for the Satanic Abortion Ritual.

3. Email from Lamar's public relations employee explaining that Lamar policy prohibits content-based rejection of copy.

4. Lamar's Advertising Copy Acceptance Policy

5. Email from the general manager of the Little Rock office announcing an objection to any display by TST before seeing any proposed copy.

6. Email from sales executive to corporate requesting review of TST's original designs.

7. Email from the general manager of the Fayetteville office which requires all future advertisers pass an unspecified litmus test before the Fayetteville office will consider any copy.

8. Email from the general manager of the Fayetteville office which objects to the content of TST's copy.

9. Email from corporate rejecting TST's original designs without further comment.

10. September 17 instant message chat log between the sales executive and a coworker discussing Lamar's general practice of discriminating against Atheists.

11. Demand letter from TST.

12. October 6 instant message log between the sales executive and a different coworker discussing Lamar's retaliation against the sales executive for accepting a TST contract and that the refusal to contract with TST was done in bad faith.

Indianapolis
5711 W. Minnesota St
Indianapolis, IN 46241
Phone: 317-484-0396
Fax: 317-484-1522

**LAMAR**

Date: 9/9/2020
New/Renewal: NEW
Account Executive: THOMAS HILL
Phone: 317-484-0396

## CONTRACT # 3482055

| Customer# | 759005-1 |
|---|---|
| Name | SEEDX |
| Address | 1420 S FIGUEROA ST #204 |
| City/State/Zip | LOS ANGELES, CA 90015 |
| Contact | |
| Email Address | |
| Phone # | |
| Fax # | |
| P.O./ Reference # | |
| Advertiser/Product | THE SATANIC TEMPLE |
| Campaign | Indiana & Arkansas |

### Production/Other Services

| Department | Plant | Production Type | Misc | Service Dates | # Billing Periods | Invest Per Period | Cost |
|---|---|---|---|---|---|---|---|
| Vinyl | 286 Little Rock, AR | Printing & Installation of (4) vinyls for Arkansas | | 09/21/20 | 1 | $2,962.00 | $2,962.00 |
| Vinyl | 405 Indianapolis, IN | Printing & Installation of (4) vinyls for Indiana | | 09/21/20 | 1 | $4,400.00 | $4,400.00 |

Total Production/Other Services Costs: $7,362.00

### Space

# of Panels: 8
Billing Cycle: Every 4 weeks

| Panel # TAB ID | Market | Location | Illum | Media Type | Size | Misc | Service Dates | # Billing Periods | Invest Per Period | Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| 2364 364291 | 286-NORTH LITTLE ROCK, AR | I-40 N/S 1.2 MI E/O I-440 P3-EFT | Yes | Perm Bulletin | 12' 0" x 48' 0" | | 09/28/20-10/25/20 | 1 | $925.00 | $925.00 |
| 60006 364483 | 286-JACKSONVILLE, AR | US 67/167 E/S 0.6 MI N/O I-440 JCT P1-NF | Yes | Perm Bulletin | 10' 6" x 36' 0" | | 09/28/20-10/25/20 | 1 | $800.00 | $800.00 |
| 70218 364588 | 286-LITTLE ROCK, AR | I-30 S/S 0.4 MI E/O S HAMILTON P1-EF | Yes | Perm Bulletin | 14' 0" x 48' 0" | | 09/28/20-10/25/20 | 1 | $1,500.00 | $1,500.00 |
| 1399 264319 | 405-BOONE CO, IN | I-65, 1.5 MI N/O SR 334 W/S | Yes | Perm Bulletin | 14' 0" x 48' 0" | | 09/28/20-10/25/20 | 1 | $1,500.00 | $1,500.00 |
| 1597 264481 | 405-JASPER, IN | I-65, 1.5 MI S/O SR 114 | No | Perm Bulletin | 12' 0" x 34' 0" | | 09/28/20-10/25/20 | 1 | $1,000.00 | $1,000.00 |
| 5070 14925260 | 405-MORGAN CO, IN | E/S SR 67 1/4 MI S/O SR 144 | Yes | Perm Bulletin | 10' 6" x 36' 0" | | 09/28/20-10/25/20 | 1 | $1,200.00 | $1,200.00 |
| 9003 570856 | 405-DECATUR CO, IN | I-74 1680' E/O HWY 3 | Yes | Perm Bulletin | 10' 0" x 30' 0" | | 09/28/20-10/25/20 | 1 | $600.00 | $600.00 |
| 68412 30970109 | 434-SPRINGDALE, AR | I-49 W/S, 0.30 mi S/O Wagon Wheel Rd, Springdale, AR, NB, S/F-2 | Yes | Perm Bulletin | 10' 0" x 40' 0" | | 09/28/20-10/25/20 | 1 | $1,500.00 | $1,500.00 |

Total Space Costs: $9,025.00

**Total Costs:  $16,387.00**

### Special Considerations:

Advertiser authorizes and instructs The Lamar Companies (Lamar) to display in good and workmanlike manner, and to maintain for the terms set forth above, outdoor advertising displays described above or on the attached list. In consideration thereof, Advertiser agrees to pay Lamar all contracted amounts within thirty (30) days after the date of billing. Advertiser acknowledges and agrees to be bound by the terms and conditions on all pages of this contract.

The Agency representing this Advertiser in the contract executes this contract as an agent for a disclosed principal, but hereby expressly agrees to be liable jointly and severally and in solido with Advertiser for the full and faithful performance of Advertiser's obligations hereunder. Agency waives notice of default and consents to all extensions of payment.

The undersigned representative or agent of Advertiser hereby warrants to Lamar that he/she is the   Partner

_____
**(Officer/Title)**

of the Advertiser and is authorized to execute this contract on behalf of the Advertiser.



Indianapolis
5711 W. Minnesota St
Indianapolis, IN 46241
Phone: 317-484-0396
Fax: 317-484-1522

**LAMAR**

**CONTRACT # 3482055**

Date: 9/9/2020
New/Renewal: NEW
Account Executive: THOMAS HILL
Phone: 317-484-0396

| | |
|---|---|
| Customer: | SEEDX |
| Signature: | *Jacqueline Basulto* |
| | (signature above) |
| Name: | Jacqueline Basulto |
| | (print name above) |
| Date: | Sep 14, 2020 |
| | (date above) |

| THE LAMAR COMPANIES | This contract is NOT BINDING UNTIL ACCEPTED by a Lamar General Manager. | |
|---|---|---|
| *[signature]* | *Jason Graham* | Sep 15, 2020 |
| ACCOUNT EXECUTIVE: THOMAS HILL | GENERAL MANAGER | DATE |

## STANDARD CONDITIONS

1. Late Artwork: The Advertiser must provide or approve art work, materials and installation instructions ten (10) days prior to the initial Service Date. In the case of default in furnishing or approval of art work by Advertiser, billing will occur on the initial Service Date.

2. Copyright/Trademark: Advertiser warrants that all approved designs do not infringe upon any trademark or copyright, state or federal. Advertiser agrees to defend, indemnify and hold Lamar free and harmless from any and all loss, liability, claims and demands, including attorney's fees arising out of the character contents or subject matter of any copy displayed or produced pursuant to this contract.

3. Payment Terms: Lamar will, from time to time at intervals following commencement of service, bill Advertiser at the address on the face hereof. Advertiser will pay Lamar within thirty (30) days after the date of invoice. If Advertiser fails to pay any invoice when it is due, in addition to amounts payable thereunder, Advertiser will promptly reimburse collection costs, including reasonable attorney's fees plus a monthly service charge at the rate of 1.5% of the outstanding balance of the invoice to the extent permitted by applicable law. Delinquent payment will be considered a breach of this contract. Payments will be applied as designated by the Advertiser; non designated payments will be applied to the oldest invoices outstanding.

4. Service Interruptions: If Lamar is prevented from posting or maintaining any of the spaces by causes beyond its control of whatever nature, including but not limited to acts of God, strikes, work stoppages or picketing, or in the event of damage or destruction of any of the spaces, or in the event Lamar is unable to deliver any portion of the service required in this contract, including buses in repair, or maintenance, this contract shall not terminate. Credit shall be allowed to Advertiser at the standard rates of Lamar for such space or service for the period that such space or service shall not be furnished or shall be discontinued or suspended. In the case of illumination, should there be more than a 50% loss of illumination, a 20% pro-rata credit based on four week billing will be given. If this contract requires illumination, it will be provided from dusk until 11:00p.m. Lamar may discharge this credit, at its option, by furnishing advertising service on substitute space, to be reasonably approved by Advertiser, or by extending the term of the advertising service on the same space for a period beyond the expiration date. The substituted or extended service shall be of a value equal to the amount of such credit.

5. Entire Agreement: This contract, all pages, constitutes the entire agreement between Lamar and Advertiser. Lamar shall not be bound by any stipulations, conditions, or agreements not set forth in this contract. Waiver by Lamar of any breach of any provision shall not constitute a waiver of any other breach of that provision or any other provision.

6. Copy Acceptance: Lamar reserves the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed. Lamar reserves the right to reject or remove any copy either before or after installation, including immediate termination of this contract.

7. Termination: All contracts are non-cancellable by Advertiser without the written consent of Lamar. Breach of any provisions contained in this contract may result in cancellation of this contract by Lamar.

8. Materials/Storage: Production materials will be held at customer's written request. Storage fees may apply.

9. Installation Lead Time: A leeway of five (5) working days from the initial Service Date is required to complete the installation of all non-digital displays.

10. Customer Provided Production: The Advertiser is responsible for producing and shipping copy production. Advertiser is responsible for all space costs involved in the event production does not reach Lamar by the established Service Dates. These materials must be produced in compliance with Lamar production specifications and must come with a 60 day warranty against fading and tearing.



Indianapolis
5711 W. Minnesota St
Indianapolis, IN 46241
Phone: 317-484-0396
Fax: 317-484-1522

**LAMAR**

**CONTRACT # 3482055**

Date: 9/9/2020
New/Renewal: NEW
Account Executive: THOMAS HILL
Phone: 317-484-0396

11. Bulletin Enhancements: Cutouts/extensions, where allowed, are limited in size to 5 feet above, and 2 feet to the sides and 1 foot below normal display area. The basic fabrication charge is for a maximum 12 months.

12. Assignment: Advertiser shall not sublet, resell, transfer, donate or assign any advertising space without the prior written consent of Lamar.



# SATANIC ABORTION RITUAL

The Satanic Abortion Ritual is a destruction ritual that serves as a protective rite. Its purpose is to cast off notions of guilt, shame, and mental discomfort that a patient may be experiencing due to choosing to have a medically safe and legal abortion.

Even the most confident and unapologetic individual can experience uncomfortable feelings and anxiety for choosing to terminate their pregnancy. Laws in many states that impose waiting periods and state-mandated counseling can exacerbate these feelings, as can social condemnation and outright harassment by those who oppose abortion.

Misinformation about abortion and guilt for pursuing that option can be a lot to handle. It can be exhausting and frustrating to try to shrug off and dismiss internal and external pressures, especially those driven by religious convictions that disregard the beliefs and freedoms of others. Even when one recognizes that these criticisms are invalid, they can make an already troubling time even harder.

This ritual is intended to alleviate some of these stressors and empower the patient to be guided by the Third and Fifth Tenets when pursuing their decision.

The purpose of the ritual is not to persuade someone to have an abortion if they are undecided. Instead, the ritual serves to assist in confirming their decision and to ward off the effects of unjust persecution, which can cause one to stray from the paths of scientific reasoning and free will that TST members strive to embody.



# ABOUT THE RITUAL          PREPARATIONS

TST's abortion ritual can be performed to address definable concerns or to overcome unproductive feelings.

The ritual, which includes the abortion itself, spans the entirety of the pregnancy termination procedure. There are steps to be performed before, during, and after the medical or surgical abortion.

Because rituals are deeply personal to those enacting them, there are variations in how it may be performed. The ritual can be personalized based on personal preferences and availability of materials. There is no need to purchase anything special or to adhere to every word. What is essential is the spirit and general intent.

One can also perform their favorite destruction ritual to target any of the unwanted feelings incited by adversity faced as a consequence of choosing to have an abortion. Feel free to take or leave whatever you wish from this one to build your own.

Before performing the ritual, you may choose to review the science about the safety and reality of abortion and the debunked claims from those who oppose abortion. You may also choose to read stories or listen to podcasts about people who made great sacrifices in the struggle to establish the reproductive rights we have today. These stories can be inspirational and may subdue stigmas you might feel from those who oppose abortion.

Your ability to choose to terminate a pregnancy is consistent with the ideals of liberty and freedom. Be proud of pursuing what you want for your life despite opposition.

## IMPLEMENTS

- A quiet space where you feel comfortable
- Something that allows you to see your reflection
- A copy of The Satanic Temple's third and fifth tenets and personal affirmation

# TENETS AND AFFIRMATIONS

## Tenet III

*One's body is inviolable, subject
to one's own will alone.*

## Tenet V

*Beliefs should conform to one's best
scientific understanding of the world.
One should take care never to distort
scientific facts to fit one's beliefs.*

## Personal Affirmation

*By my body, my blood
By my will, it is done.*



**For medical abortions:**
Immediately before taking the medication(s) to terminate your pregnancy, look at your reflection to be reminded of your personhood and responsibility to yourself. Focus on your intent, take deep breaths, and make yourself comfortable. When ready, read the Third Tenet aloud to begin the ritual. After swallowing the medication(s), take another deep breath and recite the Fifth Tenet. After you have passed the embryo, return to your reflection, and recite the personal affirmation. Feel the doubts dissipating and your confidence growing as you have just undertaken a decision that affirms your autonomy and free will. The religious abortion ritual is now complete.

**For surgical abortions:**
Immediately before receiving any anesthetic or sedation, look at your reflection to be reminded of your personhood and responsibility to yourself. Focus on your intent, take deep breaths, and make yourself comfortable. When you are ready, say the Third Tenet aloud. The surgery can now begin. During the operation, take another deep breath and recite the Fifth Tenet. Immediately after the surgery, return to your reflection and recite the personal affirmation. Feel the doubts dissipating and your confidence growing as you have just undertaken a decision that affirms your autonomy and free will. The religious abortion ritual is now complete.

| | |
|---|---|
| From: | Jo Anne Embleton |
| Date: | August 24, 2020 12:03:11 PM (-05) |
| To: | Allie McAlpin |
| Subject: | **Re: Jacksonville Progress/Abortion billboard press inquiry** |

Attachments:

I appreciate your quick response, Allie!

Sincerely,
Jo Anne Embleton
Jacksonville Progress
reporter@jacksonvilleprogress.com
(903)586-2236

On 8/24/2020 11:02 AM, Allie McAlpin wrote:

Hi Jo Anne,

Thank you for reaching out. Here are the answers to your questions:

- When was the billboard erected? The billboards went up the week of August 10.
- When was the Rusk sign removed? The Rusk sign was vandalized and completely removed on Thursday night/Friday morning.
- Are the others still up or they removed, and why? Two of the Lamar billboard locations in Texas displaying messages related to abortion were vandalized and removed. We are working with local authorities to identify those responsible. The other two locations are still up.
- Have you received public outcry about the billboards? Yes, we have received many complaints about the billboards.
- Why prompted y'all to initially post the messages? The billboard space was purchased by Lilith Fund, which developed the copy/message. Lamar Advertising supports the First Amendment rights of advertisers and those who want to use our medium to convey political, editorial, public service and other noncommercial messages. Per policy, we do not accept or reject copy based on our agreement or disagreement with the views expressed.

Best,
Allie



**Allie McAlpin** / Communications Director
amcalpin@lamar.com
**Lamar Advertising Company**
225.926.1000 ext. 6412
5321 Corporate Blvd, Baton Rouge, LA 70808
www.lamar.com

---------- Forwarded message----------
From: <donotreply@lamar.com>
Date: Sun, Aug 23, 2020 at 11:05 PM
Subject: Contact Us Form
To: <pr@lamar.com>

The following customer inquiry was submitted through Lamar.com.

**Name:** Jo Anne Embleton

**Company:** Jacksonville Progress

LADV000004

**Email:** <u>reporter@jacksonvilleprogress.com</u>

**City:** Jacksonville

**State/Province:** TX

**Phone:** 9035862236

**Message:** Hi - I am with the Jacksonville Progress, and am working on a about an "Abortion is a Blessing" message recently erected in Rusk, Texas. • When was the billboard erected? • When was the Rusk sign removed? Are the others still up or they removed, and why? • Have you received public outcry about the billboards? • Why prompted y'all to initially post the messages? I am writing for a noon deadline Monday/tomorrow, and appreciate any help you are able to provide.

**Sign up for Newsletter:** 0

Category: Press Inquiry

LADV000005

# Lamar Advertising Copy Acceptance Policy

Lamar Advertising supports the First Amendment right of advertisers to promote legal products and services. We also advocate the use of our medium for political, editorial, public service and other noncommercial messages. We believe it is in the best interest of our Company and the communities we serve to accept advertising copy openly, subject only to requirements imposed by law and reasonable standards of fairness and decency. Application of this policy for several years has made it clear there are issues that require special scrutiny before copy may be accepted. All submissions which contain negative references concerning religion, human rights, nationality (such as Israeli-Palestinian or Turkish-Armenian), abortion or similar subjects must be submitted to the Vice-President of Governmental Relations for consideration before any decision on acceptance or rejection may be made.

Lamar reserves the right to reject advertising copy for any reason, but rejects copy for the following specific reasons:

> The copy is factually inaccurate, misleading, fraudulent or deceptive.
> The copy is obscene, offensive or otherwise inconsistent with local community standards.
> The copy promotes an illegal activity.
> Advertisers who have a pattern of using provocative and critical copy to create negative impressions of other entities may be barred from posting copy.

Lamar will accept copy for a sexually-oriented business **(SOB)** with the following guidelines:

> Lamar's local General Manager, in consultation with the Regional Manager, will decide which areas within his/her market are appropriate for **SOB** ads.
> No photographs or silhouettes will be accepted except tasteful head shots.
> Written copy must not be offensive.
> No **SOB** copy will be accepted near churches, schools or other such places.
> Regional Managers may impose stricter guidelines on the acceptance of **SOB** copy.
> Less restrictive guidelines apply in Las Vegas, NV and Times Square, NY.

Text addresses are acceptable in billboard copy but should include an additional statement such as "Please do not text while driving." **QR** codes may not be displayed on billboards but are acceptable for transit advertising or street level media when not intended to be read by drivers.

Lamar will not accept or reject copy based upon agreement or disagreement with the views presented.

When a website address is contained in advertising copy, the content of the website will be considered in Lamar's process of deciding whether copy is acceptable.

When a local General Manager questions whether copy should be accepted, he will forward the copy to his Regional Manager. If the Regional Manager decides the copy should be accepted, he communicates that decision to the General Manager. If the Regional Manager decides the copy is unacceptable or is unsure, he will further communicate with the Vice-President of Governmental Relations. All copy which a General or Regional Manager thinks should be rejected must be forwarded. If necessary, the Chief Executive Officer and General Counsel will be consulted as well. The decision rendered in this process will be final.

Lamar pledges to communicate the reason for any rejection of advertising copy and will work with advertisers to achieve acceptable copy if the originally submitted copy is not accepted.

For copy determined to be sensitive but acceptable by Lamar, the identity of the advertiser must be clearly stated in an easily readable disclaimer with letters no smaller than 8 inches tall on billboards up to 300 square feet and in letters no smaller than 10 inches tall on billboards larger than 300 square feet (for example "Paid for by the ABC Committee").

Revised July, 2016

LADV00000l

| From: | Thomas Gibbens |
|---|---|
| Date: | September 15, 2020 9:38:04 AM (-05) |
| To: | Hal Kilshaw |
| Subject: | **Fwd: Lamar Advertising** |

| Attachments: | Lamar - Little Rock, AK Locations.png; Lamar - Indiana Locations.png; |
|---|---|

Hal -

Can you buzz me about the satanic temple. We just found out this buy is coming through an agency. The contract originated from the Indianaipolis office. I do not have the final artwork yet. Can we reject this based on not meeting the moral standards of our community? I would include Springdale AR as well.

I'll send you the contract in the next e-mail


Thx
Tom Gibbens
VP/TM/GM
Lamar Advertising
www.lamar.com
Little Rock, AR
501-562-2476 off
501-568-0085 fx


---------- Forwarded message ---------
From: **Tom Hill** <thill@lamar.com>
Date: Tue, Sep 15, 2020 at 9:21 AM
Subject: Fwd: Lamar Advertising
To: Thomas Gibbens <tgibbens@lamar.com>


See below copy

---------- Forwarded message ---------
From: **Jacqueline Basulto** <jacqueline@seedx.us>
Date: Wed, Sep 2, 2020 at 9:58 PM
Subject: Re: Lamar Advertising
To: Tom Hill <thill@lamar.com>
Cc: Arif Afsheen <arif@seedx.us>, Justin Rashidi <justin@seedx.us>


Hi Tom,

Hope all is well! As promised, here are the areas we are interested in in both the Indianapolis-area and Little Rock-area markets. I'd like to get an estimate for 4 billboards on the highway paths I highlighted in the screenshots. Perhaps we can talk again or you can help me figure out which ones and the price?

I am also attaching our past campaign with Lamar to show you what creative looked like in the past.

Look forward to hearing from you!

Best wishes,
Jacqueline

LADV000046

| From: | Tom Hill |
|---|---|
| Date: | September 15, 2020 9:54:00 AM (-05) |
| To: | Jason Graham; Thomas Gibbens |
| Subject: | **Satanic Temple Creative** |

Attachments:

Jason, can you have Hal review the designs below? Totally different content from what they originally provided. She says these designs were previously approved by Lamar but best we double check.

Thanks

---------- Forwarded message ---------
From: **Jacqueline Basulto** <jacqueline@seedx.us>
Date: Tue, Sep 15, 2020 at 9:41 AM
Subject: Re: Lamar Advertising
To: Tom Hill <thill@lamar.com>


Hi Tom,

Thank you so much. Here is the creative I am trying to push to get approved ASAP!

Design option 1: https://marvelapp.com/prototype/69ac76h/screen/72654929
Design option 2: https://marvelapp.com/prototype/69ac76h/screen/72594823
Design option 3: https://marvelapp.com/prototype/69ac76h/screen/72525916
Design option 4: https://marvelapp.com/prototype/69ac76h/screen/72494110
Design option 5: https://marvelapp.com/prototype/69ac76h/screen/72469144


--
**Tom Hill**
m: 812.208.1239

LADV000084

| From: | Whit Weeks |
|---|---|
| Date: | September 15, 2020 10:44:15 AM (-05) |
| To: | Alex Neal; Brent McCord; Lacey Nast; Sheridan Mercer; Sonja Barnett; Steve Jackson; Tiffany Case |
| Subject: | **Agency Requests without Customer** |
| | |
| Attachments: | TST Billboard – TST-NewVersionBillboard-v2.jpg.html; TST Billboard – st1.jpg.html; TST Billboard – satanic-temple's-2.html; TST Billboard – satanic-temple's-1.jpg.html; TST Billboard – ST-VallaPublicitaria1-Boceto.png.html; |

Good Morning.

One of these pieces of creative that will be running in NW Arkansas starting at the end of the month.

This is why we shouldn't respond to agency requests listed as "Client X" or without gaining knowledge of the customer.  This will be running in our market and below rate.

I'm embarrassed that this will represent us.

**Whit Weeks** | General Manager
wweeks@lamar.com

**Lamar Advertising Company**
(o)479-442-0300 | (c) 479-200-9387
*Office:* 1855 Shelby Lane, Fayetteville, AR 72704
*Mailing:* PO Box 10352, Fayetteville, AR 72703
www.lamar.com

LADV000087

| From: | Whit Weeks |
|---|---|
| Date: | September 15, 2020 10:46:59 AM (-05) |
| To: | Thomas Gibbens |
| Subject: | **Re: Satanic Temple Creative** |

Attachments:

This is ridiculous.

**Whit Weeks** | General Manager
wweeks@lamar.com

**Lamar Advertising Company**
(o)479-442-0300 | (c) 479-200-9387
*Office:* 1855 Shelby Lane, Fayetteville, AR 72704
*Mailing:* PO Box 10352, Fayetteville, AR 72703
www.lamar.com

On Tue, Sep 15, 2020 at 10:00 AM Thomas Gibbens <tgibbens@lamar.com> wrote:
> fyi
> Tom Gibbens
> VP/TM/GM
> Lamar Advertising
> www.lamar.com
> Little Rock, AR
> 501-562-2476 off
> 501-568-0085 fx
>
>
> ---------- Forwarded message ---------
> From: **Hal Kilshaw** <hkilshaw@lamar.com>
> Date: Tue, Sep 15, 2020 at 9:58 AM
> Subject: Re: Satanic Temple Creative
> To: Thomas Gibbens <tgibbens@lamar.com>
>
>
> I have not approved any of those. It'll take awhile to review.
>
> On Tue, Sep 15, 2020 at 9:57 AM Thomas Gibbens <tgibbens@lamar.com> wrote:
>> New copy files attached for review.
>>
>> Thx
>> Tom Gibbens
>>
>>
>> VP/TM/GM
>>
>>
>> Lamar Advertising
>>
>>
>> www.lamar.com
>>
>>
>> Little Rock, AR
>>
>>
>> 501-562-2476 off

LADV000098

501-568-0085 fx


---------- Forwarded message ---------
From: **Tom Hill** <thill@lamar.com>
Date: Tue, Sep 15, 2020 at 9:54 AM
Subject: Satanic Temple Creative
To: Jason Graham <jgraham@lamar.com>, Thomas Gibbens <tgibbens@lamar.com>


Jason, can you have Hal review the designs below? Totally different content from what they originally provided. She says these designs were previously approved by Lamar but best we double check.

Thanks

---------- Forwarded message ---------
From: **Jacqueline Basulto** <jacqueline@seedx.us>
Date: Tue, Sep 15, 2020 at 9:41 AM
Subject: Re: Lamar Advertising
To: Tom Hill <thill@lamar.com>


Hi Tom,

Thank you so much. Here is the creative I am trying to push to get approved ASAP!

Design option 1: https://marvelapp.com/prototype/69ac76h/screen/72654929
Design option 2: https://marvelapp.com/prototype/69ac76h/screen/72594823
Design option 3: https://marvelapp.com/prototype/69ac76h/screen/72525916
Design option 4: https://marvelapp.com/prototype/69ac76h/screen/72494110
Design option 5: https://marvelapp.com/prototype/69ac76h/screen/72469144


--
**Tom Hill**
m: 812.208.1239



--
Hal P. Kilshaw
Vice President of Governmental Relations
Lamar Advertising
5321 Corporate Blvd.
Baton Rouge, LA 70808
225-237-1047
Fax 225-923-0658

LADV000099

| From: | Hal Kilshaw |
| Date: | September 15, 2020 10:58:42 AM (-05) |
| To: | Jason Graham |
| Cc: | Thomas Gibbens |
| Bcc: | amcalpin@lamar.com |
| Subject: | **Re: Satanic Temple Creative** |

Attachments:

Jason,

All of these are misleading and offensive so no on all of them.

On Tue, Sep 15, 2020 at 10:02 AM Jason Graham <jgraham@lamar.com> wrote:

Hal,

This client has more copies they want approved.   I don't see the paid for disclaimer so I know they need that.  But how else do you feel about these copies?

**Jason Graham**

*Vice President / General Manager*

Lamar Advertising of Indianapolis / Terre Haute IN

cell 646-379-2246

office 317-484-0396

---------- Forwarded message ---------
From: **Tom Hill** <thill@lamar.com>
Date: Tue, Sep 15, 2020 at 10:54 AM
Subject: Satanic Temple Creative
To: Jason Graham <jgraham@lamar.com>, Thomas Gibbens <tgibbens@lamar.com>

Jason, can you have Hal review the designs below?   Totally different content from what they originally provided. She says these designs were previously approved by Lamar but best we double check.

Thanks

---------- Forwarded message ---------
From: **Jacqueline Basulto** <jacqueline@seedx.us>
Date: Tue, Sep 15, 2020 at 9:41 AM
Subject: Re: Lamar Advertising
To: Tom Hill <thill@lamar.com>

Hi Tom,

Thank you so much. Here is the creative I am trying to push to get approved ASAP!

Design option 1: https://marvelapp.com/prototype/69ac76h/screen/72654929
Design option 2: https://marvelapp.com/prototype/69ac76h/screen/72594823
Design option 3: https://marvelapp.com/prototype/69ac76h/screen/72525916
Design option 4: https://marvelapp.com/prototype/69ac76h/screen/72494110
Design option 5: https://marvelapp.com/prototype/69ac76h/screen/72469144

LADV000100

--
**Tom Hill**
m: 812.208.1239


--
Hal P. Kilshaw
Vice President of Governmental Relations
Lamar Advertising
5321 Corporate Blvd.
Baton Rouge, LA 70808
225-237-1047
Fax 225-923-0658

LADV000101

| | |
|---|---|
| From: | Bryan Bodkin |
| Date: | September 17, 2020 8:18:47 AM (-05) |
| To: | Thomas Hill |
| Subject: | |
| | |
| Attachments: | |

**Bryan Bodkin,** `2020-09-17 06:18:47`

Only you could pull off getting The Satanic Temple up

**Thomas Hill,** `2020-09-17 06:20:36`

haha! creative is pending approval at corportate

**Thomas Hill,** `2020-09-17 06:20:43`

where did you see that?

**Bryan Bodkin,** `2020-09-17 06:21:23`

In that TCV challenge thing. Impressive. I tried to get the Atheists to do something 3 years ago after that little keep Christ out of Christmas campaign but Carter said No

**Thomas Hill,** `2020-09-17 06:23:28`

haha!

**Thomas Hill,** `2020-09-17 06:23:47`

hey ask Chris if you&#39;re going to get anymore out of Hensley?

**Thomas Hill,** `2020-09-17 06:24:20`

He will say No.  then you say, &#39;If you let me work with Tom we&#39;d get more.  He just doesn&#39;t like working with you!&#39;

**Bryan Bodkin,** `2020-09-17 06:24:46`

Can you Quote you? Just kidding. I&#39;ll give him some shit on it.

**Thomas Hill,** `2020-09-17 06:25:25`

I just turned in $600k and desperately wants them to add posters

**Thomas Hill,** `2020-09-17 06:25:29`

you been good!

**Bryan Bodkin,** `2020-09-17 06:25:46`

Yeah that was a nice chunk

**Bryan Bodkin,** `2020-09-17 06:25:59`

We&#39;ve killed it the last 3-4 weeks

**Bryan Bodkin,** `2020-09-17 06:26:38`

we made Sept yesterday and need 35k for OCt 63k for Nov and 93k for Dec

**Bryan Bodkin,** `2020-09-17 06:26:59`

LADV000104

about 50k to make up but I've got about 20k to turn in this week still for Sept

**Thomas Hill,** 2020-09-17 06:27:10

let's Go!  nice work

**Bryan Bodkin,** 2020-09-17 06:27:22

Hopefully it continues. I think schools staying in is the key

**Bryan Bodkin,** 2020-09-17 06:27:24

and thanks!

**Thomas Hill,** 2020-09-17 06:30:09

i don't think i've ever hustled like this!

**Bryan Bodkin,** 2020-09-17 06:33:07

me either.

LADV000105



**KEZHAYA LAW PLC**

**MATTHEW A. KEZHAYA**
1202 NE MCCLAIN RD
BENTONVILLE, AR 72712

P: (479) 431-6112
F: (479) 282-2892
MATT@KEZHAYA.LAW

September 23, 2020

Lamar Advertising Company
c/o Mr. Tom Hill
        **by email only to**: thill@lamar.com

Re: <u>TST v. Lamar Advertising Company</u> – demand letter and preservation notice

Good afternoon,

I represent The Satanic Temple ("**TST**") in its efforts to place billboards advertising the news of the recently-unveiled abortion ritual. My client is working through a marketing firm called SeedX Inc., who I understand you have been directly communicating with. Near as I can tell, your organization owns all of the billboards in the suitable area for my client's advertisements. My client and your organization have a contract to display several billboards throughout Arkansas and Indiana for a period beginning September 28, 2020 and ending October 25, 2020.

The problem is that someone in your organization is declining to adhere to the terms of the deal. Ostensibly, the issue is that my client's designs are not "in good taste and within the moral standards of the individual communities in which it is to be displayed." See Agreement at ¶ 6. But you have refused to indicate what, exactly, is wrong with the designs so the problem can be remediated.

It appears that one of two things are going on. Your organization could be discriminating against my client on the basis of its religious tenets, which would violate the Arkansas Civil Rights Act. See ACA § 16-123-107(a)(4)(prohibiting discrimination because of religion in contractual transactions).

Or, your organization could simply be running afoul of the implied warranty of good faith and fair dealing. E.g. <u>W. Memphis Adolescent Residential, LLC v. Compton</u>, 2010 Ark. App. 450, 5, 374 S.W.3d 922, 925 (2010) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement.")

In any event, your organization is bound in contract to put up billboards advertising TST's abortion ritual by September 28. You can provide meaningful feedback in a timely manner to permit corrections to the designs, or you can put up the designs that have been put forward. You cannot reject them without comment. Not without incurring substantial legal expenses, at least.

Time is a critical factor on this matter. Please advise how your organization plans to proceed by **September 24, 2020** at 5:00 pm central time. Regardless, this letter is your notice to preserve all internal correspondence on this matter as it will be valuable evidence in the ensuing litigation.

Sincerely,

Matthew A. Kezhaya

| From: | Thomas Hill |
|---|---|
| Date: | October 06, 2020 7:41:01 AM (-05) |
| To: | Michael Gibson |
| Subject: | |
| Attachments: | |

**Thomas Hill,** `2020-10-06 05:41:01`

thx for sending to Hal..... I don&#39;t think cares to much for AE&#39;s sending him stuff ��

**Michael Gibson,** `2020-10-06 05:41:33`

No worries.  We have kept him busy this political season.  He is always quick to reply.

**Thomas Hill,** `2020-10-06 05:42:58`

i got this satanic temple deal hanging over my head down there right now so my name isn&#39;t gold right now

**Michael Gibson,** `2020-10-06 05:44:18`

I&#39;m sure they are playing the &quot;Free Speech&quot; argument....

**Thomas Hill,** `2020-10-06 05:51:56`

yes and they wanted to change the content but we just replied with &#39;we will cancel the contract&#39;

**Michael Gibson,** `2020-10-06 05:52:51`

Had something similar with a politician earlier this year.  Odd dude to say the least.  Tried to chase us down a rabbit hole but were able to cancel him.

**Thomas Hill,** `2020-10-06 05:53:26`

fun times.... what we signed up for riht

**Michael Gibson,** `2020-10-06 05:53:49`

Sometimes it is pretty interesting.  19 years for me this month.

**Thomas Hill,** `2020-10-06 05:54:14`

wow!  good for you man!

**Michael Gibson,** `2020-10-06 07:16:33`

Looks like we need a little more info to get the approval.

**Thomas Hill,** `2020-10-06 07:16:53`

good feedback

**Thomas Hill,** `2020-10-06 07:16:58`

just sent it over to client

LADV000232