IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

THE SATANIC TEMPLE, INC.                                            PLAINTIFF

V.                          CASE NO. 5:22-CV-5033-TLB

LAMAR ADVANTAGE GP COMPANY, LLC,
LAMAR ADVANTAGE HOLDING COMPANY, and
LAMAR ADVERTISING COMPANY                                          DEFENDANTS

DEFENDANTS' RESPONSE TO THE SATANIC TEMPLE, INC.'S
MOTION FOR PARTIAL SUMMARY JUDGMENT

Lamar Advertising Company and its subsidiaries, including Lamar Advantage GP Company, LLC ("Lamar Indiana") and Lamar Advantage Holding Company ("Lamar Arkansas") do not "accept or reject copy based upon agreement or disagreement with the views presented." Defs.' Mot. (Doc. 47-1) at Ex. 5.  The Satanic Temple ("TST") recognized this and sought to advertise with a Lamar entity because of their "reputation for a willingness to post controversial billboards."  TST's Statement of Facts (Doc. 53-1) at App. 125.  Although it is true that defendants are willing to post controversial billboards, they reject copy if does not comply with the Lamar Copy Acceptance Policy, including because it is "factually inaccurate, misleading, fraudulent or deceptive," it is "obscene, offensive or otherwise inconsistent with local community standards," or it "promotes an illegal activity."  Defs.' Mot. (Doc. 47-1) at Ex. 10.

TST now asks this Court to hold, as a matter of law, that the defendants acted in bad faith by determining that it was misleading and offensive for TST to advertise that participants in the Satanic Abortion Ritual are exempt from state laws governing abortions.  It also asks this Court to hold, as a matter of law, that the defendants cannot apply editorial standards to proposed billboards that touch upon religious beliefs.  *See* TST's Br. (Doc. 54) at 20 (arguing that Lamar should not

have formed "a subjective opinion of what it considers acceptable and unacceptable religious speech" by determining that the proposed advertisements were offensive).  TST has fallen far short of establishing that it is entitled to judgment as a matter of law on its breach of contract claim or its claim under the Arkansas Civil Rights Act, and this Court should deny its motion for partial summary judgment.

## FACTUAL BACKGROUND

**1.     TST's Proposed Billboards**

Notably absent from TST's motion for summary judgment and supporting documents is an explanation of the specific content of the bulletin boards that TST claims the defendants were legally required to post.  The advertisements announce that the Satanic Abortion Ritual "averts many state restrictions":

<u>TST Design 1</u>



<u>TST Design 2</u>



**TST Design 3**



**TST Design 4**





Defs.' Mot. (Doc. 47-1) at Ex. 22; Am. Compl. (Doc. 3) at 69.

TST developed the Satanic Abortion Ritual referenced in these advertisements in the summer of 2020, after the Eighth Circuit Court of Appeals and Missouri Supreme Court rejected Satanists' claims for religious exemptions to abortion restrictions. Defs.' Mot. (Doc. 47-1) at Ex. 3, SEEDX000060–72; *Judy Doe v. Parson*, 960 F.3d 1115, 1120 (8th Cir. 2020) (affirming dismissal of Satanist's claim for exemption from Missouri's informed-consent law); *Mary Doe v. Parson*, 567 S.W.3d 625, 632–33 (Mo. 2019) (same); Ex. 2 to Defs.' Mot., Jarry Dep. at 25:21 to 26:12 and 29:24-30:14 (testifying that TST was involved in and funded *Mary Doe* and *Judy Doe*). TST anticipated that the ritual would provide a new avenue for legal challenges to abortion restrictions. *See* Defs.' Mot. (Doc. 47-1) at Ex. 2, 34:19-24 (acknowledging that a new avenue for legal challenges to abortion restrictions was "a happy consequence" of developing the Satanic

Abortion Ritual).  TST hoped that advertising the Satanic Abortion Ritual would help it identify plaintiffs who wished to challenge state abortions laws.  *Id.*; *see also* Def. Mot. (Doc. 47-1) at Ex. 3, SEEDX000069 (soliciting contact from people denied a religious exemption to abortion requirements so that TST could "decide whether to take legal action"); see also Pl.'s Br. (Doc. 54) at 17 (asserting that defendants' failure to post billboards "deprived [TST] of the reputational value of being first to lay claim to a religious exemption from abortion restrictions").  It did not, however, expect that clinics would honor its claim to an exemption from state law.  Defs.' Mot. (Doc. 47-1) at Ex. 3 ("In states that have enacted the Religious Freedom Restoration Act (RFRA), Satanists ***should be*** exempt from unnecessary abortion regulations . . . .  A clinic may be hesitant to recognize the legal rights of TST members. . . .") (emphasis added).  Indeed, in later litigation, TST conceded that it "did not fault" an abortion provider for refusing to grant a religious exemption, since, if the clinic did so, it "would incur sanctions."  *See* Defs.' Mot. (Doc. 47-1) at Ex. 4, p. 11; Def. Mot. (Doc. 47-1) at Ex. 2, 44:1-45:5 (confirming TST's position); *see also* Defs.' Mot. (Doc. 47-1) at Ex. 4, p. 25 ("[P]lease know that TST and Ms. Doe both support the mission of Planned Parenthood and understand its obligation to adhere to applicable Texas law and regulations."); Defs.' Mot. (Doc. 47-1) at Ex. 2, 46:7-25 (agreeing with this statement).

To date, TST is not aware of any clinic granting someone an exemption from an abortion restriction because of Satanic beliefs or participation in the Satanic Abortion Ritual.  Defs.' Mot. (Doc. 47-1) at Ex. 1, 12:20-13:11.  Nor is TST aware of any court finding that someone was exempt from an abortion requirement imposed by state law because of Satanic beliefs or participation in the Satanic Abortion Ritual.  Defs.' Mot. (Doc. 47-1) at Ex. 1, 13:12-22 & Ex. 2, 33:5-19.

2.    **TST's Advertising Company Approaches Lamar Indiana, Which Approves TST's "Never Be Hit In School Again" Copy.**

When TST's advertising company, SeedX, first contacted Tom Hill of Lamar Indiana about billboard space, it sent Hill a picture of a billboard design that was very different from what TST now claims the defendants were legally required to post.  Defs.' Mot. (Doc. 47-1) at Ex. 9.  The picture displayed a billboard with The Satanic Temple's name, prominent Satanic Temple iconography (including a pentagram and horned goat), and the message "Never be hit in school again":

*Past Design 1:*



Am. Compl. (Doc. 3) at ¶ 48; *see also* Defs.' Mot. (Doc. 47-1) at Ex. 9.

Jacqueline Basulto of SeedX claims that she told Hill that TST's new campaign would be "pro-reproductive rights" rather than related to corporal punishment, but Hill does not recall that

conversation. *See* TST's Statement of Facts (Doc. 53-1) at App. 104 & 125. It is undisputed, at any rate, that Hill forwarded the "Never be hit in school again" billboard to his general manager to confirm that it complied with the Lamar Copy Acceptance Policy. Defs.' Mot. (Doc. 47-1) at Ex. 10. That manager sent it to Hal Kilshaw, the Vice President of Governmental Relations. *Id.*; Defs.' Mot. (Doc. 47-1) at Ex. 5. Kilshaw approved the "Never be hit in school billboard." *Id.* (stating that the "Never be hit in school again" billboard was "O.K. with required disclaimer").

Later, when employees of Lamar Arkansas had concerns about the "Never be hit in school again" copy, they, too, forwarded the billboard design to Kilshaw. Defs.' Mot. (Doc. 47-1) at Ex. 11. Kilshaw, who is the only person who is authorized to reject copy, said it was approved, and Lamar Arkansas prepared to implement that decision. *Id.* (Kilshaw informing Lamar Arkansas that the "Never be hit in school again" copy was approved and should be posted); Defs.' Mot. (Doc. 47-1) at Ex. 5 (providing that only the Vice President of Governmental Relations may reject copy), Ex. 12 (Arkansas Territory Manager stating that "Never be hit in school again" billboard would be displayed and instructing personnel to forward any calls about the billboard to his voicemail), & Ex. 13 (General Manager in Northwest Arkansas stating that TST ads would be running in the market).

### 3.    SeedX Signs a Contract to Reserve Billboard Space.

SeedX was aware that Lamar Indiana had to review and approve TST's final billboard designs but found it "impossible" to get designs from TST in a timely fashion. Defs.' Mot. (Doc. 47-1) at Ex. 16, LADV000161. On September 9, 2020, Jacqueline Basulto of SeedX told Hill, "I do not think the artwork will be finalized tomorrow… ***can we send the samples for approval first***?" Defs.' Mot. (Doc. 47-1) at Ex. 14 (emphasis added); *see also* Defs.' Mot. (Doc. 47-1) at Ex. 15 (outlining delays in getting TST's approval for copy). Hill responded, "The design you

6

sent me last w[ee]k [the "Never be hit in school again" design] was approved[.]"  Defs.' Mot. (Doc. 47-1) at Ex. 14.  Basulto did not clarify to Hill that the "Never be hit in school again" design was dramatically different from the billboard TST wanted to post, nor did she provide different samples for approval.  *Id*.

Having received approval for the "Never be hit in school again" billboard, Hill asked Basulto if she could "sign the contract so we can get the locations locked in while we await creative approval."  *Id*.  This allowed TST to ensure that the billboards would be available even though the proposed designs were not yet available for Lamar Indiana to review.  *See id*.  The contract (the "Contract") reserved billboards for TST at eight locations between September 28, 2020, and October 25, 2020.  Defs.' Mot. (Doc. 47-1) at Ex. 8, LADV000029.  As with every contract, however, Lamar Indiana "reserve[d] the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed" and "to reject or remove any copy either before or after installation, including immediate termination of this contract."  *Id*. at LADV000030.

### 4.   Lamar Indiana Learns That TST Seeks to Advertise a Purported Exemption from State Abortion Laws.

After executing the Contract, SeedX provided Hill with a very different set of designs. Defs.' Mot. (Doc. 47-1) at Ex. 8; Defs.' Mot. (Doc. 47-1) at Ex. 16, LADV0000160–61.  The new designs announced that "The Satanic Abortion Ritual Permits First Trimester Abortions Upon Demand":











Defs.' Mot. (Doc. 47-1) at Ex. 17.  Ten minutes later, Hill noted that he would "have to get these approved on my end" since "the content is totally different than what we had originally approved." Defs.' Mot. (Doc. 47-1) at Ex. 18.  Basulto expressed no surprise that the designs would have to be approved and instead apologized "for the difficulty."  *Id*.

The new designs were forwarded to Kilshaw so that he could determine whether they complied with the Lamar Copy Acceptance Policy.  Defs.' Mot. (Doc. 47-1) at Ex. 19.  Kilshaw determined that the designs were misleading and offensive and rejected them.  *Id*.  Kilshaw has testified:

> Q      . . . . What was it about the billboards that were misleading?
>
> A      To me, the copy would lead the reader to believe that if they accepted The Satanic Temple's view, they could violate state law. . . .  It's - - so it's one of the areas we're very, very sensitive about and so we don't provide as much leeway when we think something is criminal or suggests violating law, so that was the reason for the decision in this case.
>
> . . . .
>
> Q      . . . . Why were they offensive?
>
> A      They were offensive because they were sending the message out to readers of the billboard that it's okay to violate the law if you agree with the [S]atanic ritual.

Defs.' Mot. (Doc. 47-1) at Ex. 7, 17:16-18:2, 31:2-5; *see also id*. at Ex. 20 (Kilshaw explaining that he rejected the advertisements because "[t]he right to have an abortion in the U.S. is provided

under law, not the Satanic Temple's abortion ritual").  Eventually, TST settled on designs that explicitly announced, "Our Religious Abortion Ritual Averts Many State Restrictions."  Defs.' Mot. (Doc. 47-1) at Ex. 21 & Ex. 22; Am. Compl. (Doc. 3) at 69.

Two days after being informed that its proposed copy violated the Lamar Copy Acceptance Policy, TST sent a demand letter threatening a lawsuit.  Defs.' Mot. (Doc. 47-1) at Ex. 23. The demand letter made it clear that only billboards "advertising TST's abortion ritual" would be acceptable to TST.  *Id.*  This is because, from TST's perspective, the central purpose of these billboards was to convey the message that Kilshaw determined to be misleading and offensive. Defs.' Mot. (Doc. 47-1) at Ex. 2, 74:16-21 (explaining that the language "averts many state restrictions" was "central to the billboard, otherwise . . . it's not really conveying a whole lot"); Sec. Am. Compl. (Doc. 56) (alleging that the billboards were intended to "spread awareness that the Satanic Abortion Ritual is predicate for [Religious Freedom Restoration Act] exemptions"). Lamar Indiana then cancelled the Contract.  Defs.' Mot. (Doc. 47-1) at Ex. 24 & Ex. 25.

At all relevant times, however, the defendants remained willing to accept other advertising copy from The Satanic Temple, including the "Never be hit in school again" advertisement.  Defs.' Mot. (Doc. 47-1) at Ex. 16 (Hill asking SeedX, "Can we not use the original design you'd sent?") & Ex. 25 (Hill offering to SeedX, after cancellation of the contract, to revisit the campaign "[i]f we get revised designs similar to the last ones").  TST was not billed for the billboards.  Defs.' Mot. (Doc. 47-1) at Ex. 26 (removing the contract from billing).

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment should be granted only when the moving party demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 2002).  In deciding

a motion for summary judgment, a court must "view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion." *Scott v. Harris*, 550 U.S. 372, 378 (2007).

## DISCUSSION

**1.      TST Is Not Entitled To Judgment As A Matter Of Law On Its Claim For Breach Of Contract.**

SeedX knew when it executed the Contract that Lamar Indiana would hold eight billboards for TST's use but reserved the right to reject TST's proposed advertisements once TST provided them to Lamar Indiana for review. Defs.' Mot. (Doc. 47-1) at Ex. 14. Despite Lamar Indiana's unequivocal right to terminate the Contract when it learned that TST wanted to advertise an unsupported exemption from state law, TST argues that defendants are liable as matter of law for breach of contract. In making this claim, TST does not dispute Lamar Indiana's right to reject copy and instead argues only that the defendants could only reject copy "upon a good faith determination and a reasonable opportunity to cure." Pl's. Br. (Doc. 54) at 10. TST fails, however, to provide any evidence to support the conclusion that Lamar Indiana rejected TST's proposed copy in bad faith.

### A.      The Contract Is Not Illusory.

In arguing that this Court should impose additional requirements on Lamar Indiana that are not included in the Contract, TST argues that, without them, the Contract was illusory because it allowed Lamar Indiana to reject TST's copy. At a minimum, when Lamar Indiana entered into the Contract, it held eight billboards for TST's use and made them unavailable for other advertisers. This was of benefit to TST because it allowed it to "lock[] in" the billboard locations (which TST claims were important) despite a series of delays in getting final copy for Lamar Indiana's review. Defs.' Mot. (Doc. 47-1) at Ex. 14; Pl.'s Statement of Facts (53-1) at App. 125.

That is one reason SeedX signed the Contract knowing that Lamar Indiana would still have to review the final designs once they were complete.  The Contract was not illusory, and this Court need not add language to the Contract to make it enforceable.  *See Odom Antennas, Inc. v. Stevens*, 61 Ark. App. 182, 186, 966 S.W.2d 279, 281 (1998) ("A contract to be enforceable must impose mutual obligations on both of the parties thereto.") (quotation omitted); *Indiana-Am. Water Co., Inc. v. Town of Seelyville*, 698 N.E.2d 1255, 1260 (Ind. Ct. App. 1998) (explaining that a contract is illusory "if it fails to obligate the parties to do anything").

      **B.**      **There Is No Evidence of Bad Faith.**

All of the evidence, moreover, shows that the defendants rejected TST's proposed advertisements in good faith.  "Bad faith consists of dishonest, malicious or oppressive conduct with a state of mind characterized by hatred, ill will or a spirit of revenge."  *Conway Corp. v. Constr. Engineers, Inc.*, 300 Ark. 225, 231–32, 782 S.W.2d 36, 39 (1989); *Gordon v. Purdue Univ.*, 862 N.E.2d 1244, 1251 (Ind. Ct. App. 2007) ("[B]ad faith is not simply bad judgment or negligence.  Rather, it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity. It is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will.") (quotation omitted).  TST does not point to any evidence that Kilshaw acted with ill intent when he determined that is was misleading and offensive for TST to claim that its abortion ritual exempts participants from state law.  *See* Pl.'s Br. (Doc. 54) at 11.  Instead, TST argues only that Kilshaw was not a lawyer and was wrong when he determined that participants in the Satanic Abortion Ritual are not exempt from state law.  *Id.*  Even if this were true, merely being wrong is not bad faith.  *See, e.g., Conway Corp.*, 300 Ark. at 231–32, 782 S.W.2d at 39; *Gordon v. Purdue Univ.*, 862 N.E.2d at 1251.

And Kilshaw was not wrong.  On the contrary, TST concedes that, as far as TST knows, no abortion clinic or court has recognized its claimed exemption.  Defs.' Mot. (Doc. 47-1) at Ex. 1, 12:20-13:22 & Ex. 2, 33:5-19.  Unable to point to anything that supports its claim that a participant in the Satanic Abortion Ritual can receive an "abortion on demand" without complying with state restrictions, TST instead points to an FDA regulation that exempts peyote from the FDA's list of Schedule 1 controlled substance when it is used in religious ceremonies.  Pl.'s Br. (Doc. 54) at 11 (citing 21 C.F.R. § 1307.31).  This regulation has no bearing on whether participants in the Satanic Abortion Ritual are exempt from state law, let alone on whether Kilshaw acted in bad faith when he determined that it was misleading and offensive for TST to post billboards that suggested "it's okay to violate the law if you agree with the [S]atanic ritual."  Defs.' Mot. (Doc. 47-1) at Ex. 7, 17:16-18:2, 31:2-5.

Nor can TST demonstrate that Kilshaw was wrong, let alone acting in bad faith, by pointing to a decision in December 2022—more than two years after Kilshaw rejected TST's proposed copy—by a Superior Court in Indiana granting certain non-Satanic plaintiffs a preliminary injunction against enforcement of an Indiana statute that bans abortions except in certain limited circumstances.  *See* TST's Statement of Undisputed Facts (Doc. 53-1) at App. 61.  The fact remains that TST is not aware of any situation in which a participant in the Satanic Abortion Ritual received an exemption from a state abortion law either before Kilshaw determined that it was misleading to claim such an exemption or in the two-and-a-half years since.  Defs.' Mot. (Doc. 47-1) at Ex. 1, 12:20–13:22 & Ex. 2, 33:5-19.

## C. The Defendants Were Always Willing to Post the "Never Be Hit In School Again" Copy.

Unable to point to any evidence that Kilshaw acted in bad faith, TST instead asserts that the defendants acted in bad faith because employees of Lamar Arkansas expressed concerns about

TST's billboards.  Pl.'s Br. (Doc. 54) at 10.  In making this argument, TST makes much of the fact that some of these concerns were raised before TST provided its final approved copy.  There is no evidence, however, to suggest that anyone involved with the defendants understood that TST intended to provide final designs that were significantly different from the "Never be hit in school again" copy.  *See* Defs. Mot. (Doc. 47-1) at Ex. 10 (Kilshaw approving "Never be hit in school again" copy), Ex. 11 (Hill providing "Never be hit in school again" copy to Lamar Arkansas), Ex. 12 (Gibbens telling Lamar Arkansas employees that "Never be hit in school again" copy would be running in Arkansas), Ex. 14 (Hill telling SeedX that "Never be hit in school again" copy" had been approved), & Ex. 18 (Hill expressing surprise that copy is "totally different than what we had originally approved").

More importantly, TST has not provided any evidence to support the conclusion that the opinion of any employee of Lamar Arkansas factored into Lamar Indiana's decisions with respect to TST's proposed copy.  On the contrary, the undisputed facts show that only Kilshaw had the authority to reject copy.  Defs.' Mot. (Doc. 47-1) at Ex. 5.

When Kilshaw told Lamar Arkansas that the "Never be hit in school again" copy was approved and should be posted, Lamar Arkansas prepared to post it.  Defs.' Mot. (Doc. 47-1) at Ex. 12 (Arkansas Territory Manager stating that "Never be hit in school again" billboard would be displayed and instructing personnel to forward any calls about the billboard to his voicemail) & Ex. 13 to Defs.' Mot. (Doc. 47-1) (General Manager in Northwest Arkansas stating that TST ads would be running in the market).  The only reason the "Never be hit in schools" copy was not posted is that TST did not want to post it.  Defs.' Mot. (Doc. 47-1) at Ex. 16 (Hill asking SeedX, "Can we not use the original design you'd sent?") & Ex. 25 (Hill offering to SeedX, after cancellation of the contract, to revisit the campaign "[i]f we get revised designs similar to the last

ones"). Nor is there any evidence to suggest that any employee of Lamar Indiana was involved in Kilshaw's decision to reject copy asserting an exemption from state abortion laws.

### D. TST Cannot Rewrite the Contract to Impose a Duty to Provide "Particularized Feedback."

TST goes further and suggests that "good faith" required Lamar Indiana to provide "particularized feedback" to TST about why its proposed copy was unacceptable. Pls.' Br. (Doc. 54) at 13. Good faith, however, requires only an absence of ill will. *See, e.g., Conway Corp.*, 300 Ark. at 231–32, 782 S.W.2d at 39; *Gordon v. Purdue Univ.*, 862 N.E.2d at 1251. Courts do not "read into [a] contract words that are not there," nor do they "rewrite a contract or approve additional terms that would, in effect, enforce a contract that the parties might have made but did not make." *E B Mgmt. Co., LLC v. Houston Specialty Ins. Co.*, 2019 Ark. App. 294, at 8, 577 S.W.3d 408, 413; *Billingsley v. Planit Dirt Excavation & Concrete, Inc.*, 2012 Ark. App. 266, at 12, 399 S.W.3d 729, 734 ("It is the duty of a court to construe a contract according to its unambiguous language without enlarging or extending its terms."); *Lake Imaging, LLC v. Franciscan Alliance, Inc.*, 182 N.E.3d 203, 211 (Ind. 2022) ("Courts may not construe clear and unambiguous provisions, nor may courts add provisions not agreed upon by the parties.") (quotation omitted); *Flannagan v. Lakeview Loan Servicing, LLC*, 184 N.E.3d 691, 696 (Ind. Ct. App. 2022) ("It is not within the province of a court to make a new contract for the parties or to ignore or eliminate provisions of the instrument.") (quotation omitted). The contract that SeedX agreed to on TST's behalf did not outline a process of "back and forth" between Lamar Indiana and SeedX regarding proposed copy, and TST cannot use this Court to insert a new provision into the Contract now.

Arguing otherwise, TST cites only *Ripplemeyer v. National Grape Co-op. Association, Inc.*, which states that, under New York law, unless there is a valid reason not to, a party should

provide a contractual partner with notice before terminating a contract so that the partner can "seek a substitute arrangement."  807 F.Supp. 1439, 1451-52 (W.D. Ark. 1992).  This does not support the proposition that Lamar Indiana had to undertake steps not outlined in the Contract to try to fix TST's proposed advertisement.

TST notes that the Lamar Copy Acceptance Policy provides that the defendants will "work with advertisers to achieve acceptable copy if the originally submitted copy is not accepted." Defs.' Mot. (Doc. 47-1) at Ex. 5.   The policy, however, does not outline specific steps that the defendants must take or guarantee that the parties will eventually agree upon acceptable copy.  Nor was the policy part of the Contract.  Indeed, Jacqueline Basulto of SeedX has affirmatively stated that the defendants did not provide her a copy of the Policy.  Pls.' Statement of Fact (Doc. 53-1) at App. 126 (complaining that Lamar Indiana did not provide copy acceptance guidelines in advance).  Lamar Indiana's legal obligations were governed by the Contract, which did not require Lamar Indiana to take any particular steps to attempt to cure TST's proposed copy.  On the contrary, the Contract expressly states that "[t]his contract, all pages, constitutes the entire agreement between Lamar and Advertiser.  Lamar shall not be bound by any stipulations, conditions, or agreements not set forth in this contract."  Defs.' Mot. (Doc. 47-1) at Ex. 8, LADV000030.

While it is true, moreover, that the defendants attempt to work with advertisers to fix problematic designs, that was not possible here.  The problem with TST's proposed copy was not a design element or an issue of phrasing that could be fixed.  TST reserved billboards expressly for the purpose of advertising that its "Satanic Abortion Ritual" exempts participants from complying with state law—a message that Kilshaw determined to be misleading and offensive.  Defs.' Mot. (Doc. 47-1) at Ex. 2, 74:16-21 (explaining that the language "averts many state

restrictions" was "central to the billboard, otherwise . . . it's not really conveying a whole lot"); *see also* Defs.' Mot. (Doc. 47-1) at Ex. 3, SEEDX000061–62, 69–70 (press packet for Religious Abortion Ritual, focused on outlining a purported exemption from state abortion restrictions). TST's position would not have changed in any way if Lamar Indiana had provided additional feedback regarding the proposed designs, because the fundamental message it sought to convey violated the Lamar Copy Acceptance Policy. And, more importantly, there is no evidence to suggest that any defendant withheld feedback on TST's proposed designs with the type of wrongful intent that could constitute bad faith.

### D. Misleading And Offensive Copy Is Not "In Good Taste and Within the Moral Standards" of Any Community.

There is no question that the Contract reserved Lamar Indiana's "right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed" and "to reject or remove any copy either before or after installation, including immediate termination of this contract." Defs.' Mot. (Doc. 47-1) at Ex. 8, LADV000030. TST argues, however, that Lamar Indiana could not cancel the Contract because Kilshaw determined that TST's copy was "misleading and offensive," instead of stating that it was not "in good taste and within the moral standards of the individual communities in which it is to be displayed." Pl.'s Mot. at 14–15. Lamar Indiana, however, specifically referred to the Contract's cancellation provision, including the requirement for copy to be "in good taste and within the moral standards of the individual communities in which it is to be displayed," when it informed SeedX that the proposed designs had been rejected. Pl.'s Statement of Facts (Doc. 53-1) at App. 31 (Hill to Basulto at 10:33 AM on Sept. 21, 2020). When SeedX asked for additional clarification, Hill explained that the copy had been determined to be misleading and offensive. *Id*. (Hill to Basulto at 11:57 AM on Sept. 22, 2020).

On the one hand, TST faults Lamar Indiana for not providing more particularized feedback. On the other, it suggests that Lamar Indiana could only use the specific language in the Contract when reviewing copy. No reasonable construction of the Contract, however, could find that "misleading and offensive" designs are "in good taste and within the moral standards" of *any* community. The Contract did not require the defendants to use certain magic words when reviewing copy, and TST cannot impose this requirement now.

### 2.   TST Has Not Demonstrated That It Is Entitled to Judgment as a Matter of Law on Its Arkansas Civil Rights Act Claim.

The Arkansas Civil Rights Act ("ACRA") prohibits companies that do business in Arkansas, including Lamar Arkansas, from refusing to do business with someone based on religion. Ark. Code Ann. § 16-123-107(a) (prohibiting discrimination in property and contractual transactions "because of . . . religion"). But the undisputed evidence shows that the defendants were always willing to do business with TST. Defs.' Mot. (Doc. 47-1) at Ex. 16 & Ex. 25. What the defendants would not do is display a billboard, whether or not religious in nature, that asserted an unsupported exemption from state law. TST has not provided evidence that any defendant violated the Arkansas Civil Rights Act ("ACRA"), and it is not entitled to judgment as a matter of law on its claim under the ACRA.

### A.   The ACRA Does Not Proscribe the Defendants from Applying Editorial Standards to Religious Billboards.

TST concedes that, to meet the burden of proof on its ACRA claim, it must show proof of discriminatory intent or purpose. Pls.' Br. (Doc. 54) at 18. TST claims that, since its copy was religious in nature, it was discriminatory for an employee of Lamar Arkansas *to even ask* whether the content of the "Never be hit in school again" billboard met the moral standards of his community—even though he was told that it did. *See id.* at 20; Defs.' Mot. (Doc. 47-1) at Ex. 10.

18

Any concerns that an employee of Lamar Arkansas had about posting billboards for The Satanic Temple, however, is irrelevant to TST's claim:   There is no evidence that anyone at Lamar Arkansas had any role in deciding whether to post TST's designs.

TST then suggests that it has shown that the defendants had discriminatory intent because "Hill's assertion that 'all of the content' is offensive is a public statement of Lamar's subjective opinion of what it considers acceptable religious speech."  Pl.'s Br. (Doc. 54) at 20.  Since its ad was "replete with TST's religious beliefs and religious iconography," TST suggests, it was discriminatory to find the content offensive or misleading.  *Id*. at 21.  In short, TST claims that, because its billboard touched on religious beliefs, the defendants could not apply the Lamar Copy Acceptance Policy to the designs or determine that TST's claim to an exemption from state law was not "in good taste or within the moral standards of . . . individual communities."

This is not the law.  If it were, billboard owners would not have the right to refuse any advertisements that touched on religious beliefs, regardless of content.  TST could demand that the defendants post billboards featuring nudity or profanity as long as the billboard also touched on religious beliefs.   Nothing in the text of the ACRA supports TST's assertion that its ads were exempt from editorial review simply because they were religious in nature, nor does TST cite any case law that supports this novel interpretation.

### B.     TST's Interpretation of the ACRA Violates the Defendants' First and Fourteenth Amendment Rights.

On the contrary, TST's proposed interpretation of the ACRA violates the defendants' First and Fourteenth Amendment "right to refrain from speaking."  *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2463 (2018) ("The First Amendment, made applicable to the States by the Fourteenth Amendment, forbids abridgment of the freedom of speech. We have held time and again that freedom of speech includes both the right to speak freely and the right to

refrain from speaking at all.") (quotation omitted).   The defendants speak when they post a billboard.  Lamar Advertising Company and its subsidiaries also prominently display the name "Lamar" on the bottom (usually in the center) of their billboard structures, where it is visible whether or not an advertising design is displayed.  *See* Am. Compl. (Doc. 3) at ¶ 70.

Moreover, although LAC and its subsidiaries are committed to accepting advertisements that reflect a wide range of viewpoints, they nonetheless "exercise substantial editorial control and judgment" about potential advertisements by reviewing each potential design to ensure that it complies with the Lamar Copy Acceptance Policy.  *See Telescope Media Grp. v. Lucero*, 936 F.3d 740, 751 (quotation omitted).  The defendants' standard contract, moreover, reserves "the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed" and "the right to reject or remove any copy either before or after installation, including immediate termination of this contract."  Defs.' Mot. (Doc. 47-1) at Ex. 8.  This provision grants the Lamar Advertising Company subsidiaries editorial control over any ad that they display.  The Supreme Court has consistently recognized that editorial control is a touchstone of First Amendment speech "upon which the State cannot intrude." *Hurley v. Irish-Am. Gay, Lesbian and Bisexual Grp. of Boston*, 515 U.S. 557, 575 (1995).

Courts apply strict scrutiny to laws that compel speech.  *Telescope*, 936 F.3d at 754.  For its interpretation of the ACRA to pass constitutional muster, then, TST must prove that prohibiting application of editorial standards to billboards that touch upon religion is "narrowly tailored to serve [a] compelling state interest." *Id.* (quoting *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015)).  Even if the defendants had rejected TST's proposed ads because of TST's religious identity (which they did not), "regulating speech because it is discriminatory . . . is not a compelling interest . . . ." *Id.* at 755 ("Even antidiscrimination laws, as critically important as they are, must

yield to the Constitution.").  There is certainly no compelling state interest in preventing the defendants from applying the Lamar Copy Acceptance Policy to proposed copy simply because it is religious in nature, and this Court should not interpret the ACRA to require the defendants to do so.  *Jennings v. Rodriguez*, 138 S.Ct. 830, 836 (2018) ("[W]hen statutory language is susceptible of multiple interpretations, a court may shun an interpretation that raises serious constitutional doubts and instead may adopt an alternative that avoids those problems.").

Lamar Indiana treated TST the same as any other advertiser when it sent TST's proposed billboards to Kilshaw to determine whether they complied with the Lamar Copy Acceptance Policy.  Defs.' Mot. (Doc. 47-1) at Ex. 5.  Kilshaw determined that the billboard designs were misleading and offensive because they wrongly implied that participants in TST's Satanic Abortion Ritual did not have to comply with state law.  Defs.' Mot. (Doc. 47-1) at Ex. 7, 31:2-5; & Ex. 20.  Even if Kilshaw had been mistaken in this conclusion, it would not constitute religious discrimination.  And the undisputed facts demonstrate that Kilshaw was not wrong:  TST concedes that, as far as TST knows, no abortion clinic or court has recognized such an exemption.  Defs.' Mot. (Doc. 47-1) at Ex. 1, 12:20-13:22 & Ex. 2, 33:5-19.  No reasonable person could find that either defendant rejected TST's designs "because of [] religion," let alone that TST was injured by an intentional act of discrimination, and TST is not entitled to summary judgment on TST's claim under the Arkansas Civil Rights Act.

## CONCLUSION

As TST notes, the defendants are not afraid to post controversial copy.  TST's Statement of Facts (Doc. 53-1) at App. 125.  Nor do they object to posting advertisements regarding TST's religious beliefs.  *See, e.g.,* Defs.' Mot. (Doc. 47-1) Ex. 5.  The defendants do, however, refuse to post copy that is offensive or misleading.  *Id*.  Defendants are also particularly sensitive to copy

that suggests violating the law.  Def. Mot. (Doc. 47-1) at Ex. 7, 17:16-18:2. There is no evidence

that the defendants breached a contract or violated the ACRA by applying these standards to TST's

proposed billboards.  TST has not established that it is entitled to judgment as a matter of law on

any claim, and its motion for partial summary judgment should be denied.

<div align="center" style="margin-left:auto;margin-right:0;width:fit-content">

Respectfully Submitted,

QUATTLEBAUM, GROOMS & TULL PLLC
111 Center Street, Suite 1900
Little Rock, Arkansas 72201
Telephone: (501) 379-1700
Facsimile: (501) 379-1701
mshannon@qgtlaw.com
sbolden@qgtlaw.com

By:  /s/ Sarah Keith-Bolden
     Michael N. Shannon (92168)
     Sarah Keith-Bolden (2007235)

*Lamar Advantage GP Company, LLC, and*
*Lamar Advantage Holding Company*

</div>