# 5:22-CV-5033

IN THE UNITED STATES DISTRICT COURT OF ARKANSAS
FAYETTEVILLE DIVISION

The Satanic Temple, Inc.
*Plaintiff*

*v.*

Lamar Advantage GP Company, LLC;
Lamar Advantage Holding Company; and
Lamar Advertising Company

*Defendants.*

## TST'S RESPONSE TO LAMAR'S FACTS BEYOND A GENUINE DISPUTE



| | |
|---|---|
| **Matt Kezhaya** | matt@crown.law |
| Ark. # 2014161 | direct: (479) 431-6112 |
| Minn. # 0402193 | general: (612) 276-2216 |

121 Washington Ave. N., 4th Floor, Minneapolis, MN 55401

**COMES NOW** TST, by and through counsel of record, with a response to Lamar's LR 56.1 statement of facts. ECF 49.

1.  Since at least 2015, The Satanic Temple ("TST") has asserted that certain abortion restrictions imposed by state law conflict with Satanic religious beliefs. See Mary Doe v. Parson, 567 S.W.3d 625, 626 (Mo. 2019) (alleging that certain abortion-related requirements imposed by the State of Missouri conflicted with the Satanic religious belief that a fetus is not a person).

**Response**: Admitted.

2.  TST's challenges to Missouri's informed-consent law in state and federal court were unsuccessful. *See Judy Doe v. Parson*, 960 F.3d 1115, 1120 (8th Cir. 2020) (affirming dismissal of Satanist's claim for exemption from Missouri's informed-consent law); Mary Doe v. Parson, 567 S.W.3d at 632–33 (same); Mot. Ex. 2, Jarry Dep. at 25:21 to 26:12 and 29:24-30:14 (testifying that TST was involved in and funded Mary Doe and Judy Doe).

**Response**: Denied in part. The Missouri legislature dropped the requirement of reading religious literature following the litigation.

3. In the summer of 2020, TST developed the Satanic Abortion Ritual. Mot. Ex. 3, Press Kit for Religious Abortion Ritual.

**Response**: Admitted.

4. TST anticipated that the ritual would provide a new avenue for legal challenges to abortion restrictions. See Mot. Ex. 2, Jarry Dep. at 34:19-24 (acknowledging that a new avenue for legal challenges to abortion restrictions was "a happy consequence" of developing the Satanic Abortion Ritual).

**Response**: Admitted in part, but the argumentative implication is denied. See id. ("the primary motivation is to support the needs of our members.")

5. TST understood that, although it believed that "Satanists should be exempt from unnecessary abortion regulations," clinics would be "hesitant" to recognize an exemption. Mot. Ex. 3, Religious Abortion Ritual Press Kit, at SEEDX000069.

**Response**: Admitted.

6.     In later litigation seeking to establish a religious exemption to Texas abortion requirements, TST conceded that it "did not fault" an abortion provider for refusing to grant a religious exemption, since, if the clinic did so, it "would incur sanctions." See Mot. Ex. 4, Compl. (Doc. 1) in Case No. 4:21-cv-00387 (S.D. Tex) at p. 11; Mot. Ex. 2, Jarry Dep. at 44:1-45:5 (confirming TST's position); see also Mot. Ex. 4 at p. 25 ("[P]lease know that TST and Ms. Doe both support the mission of Planned Parenthood and understand its obligation to adhere to applicable Texas law and regulations."); Mot. Ex. 2, Jarry Dep. at 46:7-25 (agreeing with this statement).

**Response**: Admitted, although the argumentative wording is denied. Just because Texas's theocratic executive branch refuses to give equal application of Texas RFRA to Satanists does not change the plain meaning of the statute.

7. To date, TST is not aware of any clinic granting someone an exemption because of Satanic beliefs or participation in the Satanic Abortion Ritual. Mot. Ex. 1, TST Dep. at 12:20-13:11.

**Response**: Admitted, although the argumentative wording is denied. Clinics are staffed by clinicians, not unbiased judges.

8. To date, TST is not aware of any court finding that someone was exempt from an abortion requirement imposed by state law because of Satanic beliefs or participation in the Satanic Abortion Ritual. Mot. Ex. 1, TST Dep. at 13:12-22; Mot. Ex. 2, Jarry Dep. at 33:5-19.

**Response**: Denied. The belief that "life" does not begin at "conception" is adopted by Satanists just as well as the Pagans, Jews, Unitarians, and Episcopalians who benefitted from the preliminary injunction stated in ECF 53-1, at 62 *et seq.*

9. Lamar Advertising Company ("LAC") and its subsidiaries prominently display the name "Lamar" on the bottom (usually in the center) of their billboard structures. Am. Compl. (Doc. 3) at ¶

70. The name is visible at all times, whether advertising designs are displayed or not. Id.

**Response**: Admitted.

10. It is standard for billboard companies to reserve the right to review and approve copy before posting it. Mot. Ex. 5, Lamar Copy Acceptance Policy & Mot. Ex. 8, Contract between SeedX and Lamar Indiana (reflecting the practice of LAC and its subsidiaries); Mot. Ex. 6, Emails between Basulto and Jarry (Nov. 5, 2020) (reflecting the copy review process of another billboard company, Clear Channel).

**Response**: Denied. No evidence of record supports the commonality of billboard company review rights.

11. As indirect subsidiaries of Lamar Advertising Company ("LAC"), Lamar Indiana and Lamar Arkansas follow the Lamar Copy Acceptance Policy. Mot. Ex. 5, Lamar Copy Acceptance Policy.

**Response**: Denied. The subsidiaries rejected TST's designs solely because they disagreed with the viewpoint contained. ECF 53-1, at 31 ("*All* of the content") (emphasis added).

12. Under this policy, LAC and its subsidiaries do not "accept or reject copy based upon agreement or disagreement with the views presented." Id.

**Response**: Admitted that the policy says this.

13. The Lamar Copy Acceptance Policy provides:

> Lamar reserves the right to reject advertising copy for any reason, but rejects copy for the following specific reasons:
> - The copy is factually inaccurate, misleading, fraudulent or deceptive.
> - The copy is obscene, offensive or otherwise inconsistent with local community standards.
> - The copy promotes an illegal activity.
> - Advertisers who have a pattern of using provocative and critical copy to create negative impressions of other entities may be barred from posting copy.

**Response**: Admitted that the policy (which is not incorporated in the contract which bears a merger clause) says this.

14. The Lamar Copy Acceptance Policy further provides:

> When a local General Manager questions whether copy should be accepted, he will forward the copy to his Regional Manager. If the Regional Manager decides the copy should be accepted, he communicates that decision to the General Manager. If the Regional Manager decides the copy is unacceptable or is unsure, he will further communicate with the Vice-President of Governmental Relations. All copy which a General or Regional Manager thinks should be rejected must be forwarded. If necessary, the Chief Executive Officer and General Counsel will be consulted as well. The decision rendered in this process will be final.

**Response**: Admitted that the policy (which is not incorporated in the contract which bears a merger clause) says this.

15. Hal Kilshaw, the Vice-President of Governmental Relations, is "in charge of the co[py] acceptance policy . . . ." Mot. Ex. 7, Kilshaw Dep. at 5:17-18; see also Mot. Ex. 5, Lamar Copy Acceptance Policy.

**Response**: Admitted.

16. Only Kilshaw may reject a proposed billboard design. Mot. Ex. 5.

**Response**: Admitted.

17. The contract used by LAC's subsidiaries states:

**Response**: Admitted.

18. After developing the Satanic Abortion Ritual, TST engaged a marketing firm called SeedX to publicize it. Am. Compl. (Doc 3), at ¶ 36.

**Response**: Admitted.

19. SeedX contacted Tom Hill of Lamar Indiana about billboard space in Arkansas and Indiana. Mot. Ex. 9, Emails between Hill and SeedX (Aug. 24–Sept. 2, 2020).

**Response**: Admitted.

20. A SeedX representative let Hill know that the potential advertiser was The Satanic Temple. Id.

**Response**: Admitted.

21. She also sent him a picture of "our past campaign with Lamar to show you what creative looked like in the past." Id.

**Response**: Admitted.

22. The picture displayed a billboard with The Satanic Temple's name, prominent Satanic Temple iconography (including a pentagram and horned goat), and the message "Never be hit in school again." Id.; see also Am. Compl. (Doc. 3) at ¶ 48.

**Response**: Admitted.

23. Hill forwarded the "Never be hit in school again" copy to his general manager for confirmation that it was approved content. Mot. Ex. 10, Emails between Hill, Graham, and Kilshaw (Sept. 8, 2020).

**Response**: Denied as stated. The email states: "I'm told *this* has run in other Lamar markets in the past. Can we confirm *this* is approved content?" (emphasis added). "This" applies generically to the entire design, not just the text "Never be hit in school again." In addition to that text, "this" includes TST's claim to a religious exemption against an otherwise-applicable law, and TST's religious iconography, and TST's name, and the assertion of religious rights.

24. That general manager forwarded it to Kilshaw, who approved it. Id. (stating that the "Never be hit in school again" billboard was "O.K. with required disclaimer").

**Response**: Denied as stated. The email states in full "O.K. with required disclaimer." What was "O.K. with required disclaimer" included TST's claim to a religious exemption against an otherwise-

applicable law, and TST's religious iconography, and TST's name, and the assertion of religious rights.

25. Later, employees of Lamar Arkansas also forwarded the "Never be hit in school again" billboard design to Kilshaw. Mot. Ex. 11, Emails between Gibbens and Kilshaw (Sept. 15, 2020).

**Response**: Denied. No part of the email references the "Never be hit in school" copy, only the name "the satanic temple."

26. Kilshaw told Lamar Arkansas that it was approved. Id. (Kilshaw informing Lamar Arkansas that the "Never be hit in school again" copy was approved and should be posted).

**Response**: Denied. The email states in full: "I approved the copy on 9/8. We run thousands of church ads and have to post the occasional atheist, satanic, etc. submissions we receive." No part of this email references the "Never be hit in school again" copy, it relates solely to TST's religious viewpoint and Lamar's obligation to post material with that viewpoint on equal terms as it would post material from a Christian viewpoint.

27. Lamar Arkansas employees prepared to implement that decision. Mot. Ex. 12, Gibbens to Cooper & Fulmer (Sept. 15, 2020) (Arkansas Territory Manager stating that "Never be hit in school again" billboard would be displayed and instructing personnel to forward any calls about the billboard to his voicemail); Mot. Ex. 13, Weeks to Neal, et al. (Sept. 15, 2020) (General Manager in Northwest Arkansas stating that TST ads would be running in the market).

**Response**: Denied. Exhibit 12 again relates back to Kilshaw's prior email that Satanists are entitled to equal treatment as Christians. Exhibit 13 complains about the designs at issue.

28. SeedX was aware that Lamar Indiana had to approve the final billboard designs. Mot. Ex. 14, Emails between Basulto and Hill (Sept. 8–14, 2020).

**Response**: Admitted.

29. SeedX encountered delays in getting final approved billboard designs to send to Lamar Indiana. Mot. Ex. 15, Emails between Hill

and Basulto (Sept. 8–14, 2020) (outlining delays in getting TST's approval for copy).

**Response**: Denied. SeedX provided the designs in advance of September 18, which was timely under the contract. See ECF 53-1, at 19 ¶ 1.

30. On September 9, 2020, Jacqueline Basulto of SeedX told Hill, "I do not think the artwork will be finalized tomorrow… can we send the samples for approval first? What do you think?" Mot. Ex. 14, Emails between Basulto and Hill (Sept. 8–14, 2020) (emphasis added).

**Response**: Admitted.

31. Hill responded, "The design you sent me last w[ee]k [the "Never be hit in school again" design] was approved[.]" Id.

**Response**: Admitted.

32. Hill also asked Basulto if she "could sign the contract so we can get the locations locked in while we await creative approval." Id.

**Response**: Admitted.

33. This allowed TST to ensure that the billboards would be available even though the proposed billboard designs were not yet complete. See id.

**Response**: Admitted. It also bound Lamar in contract to post designs advertising the Satanic Abortion Ritual for the dates specified on the billboards specified.

34. The contract (the "Contract") reserved billboards at eight locations for TST between September 28, 2020, and October 25, 2020, at a total cost of $7,362 for printing and installation and $9,025 for billboard space. Mot. Ex. 8, Contract, at LADV000029.

**Response**: Admitted.

35. The contract stated that Lamar Indiana "reserve[d] the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed" and "to reject or remove any copy either before or after

installation, including immediate termination of this contract." Mot. Ex. 8, Contract at LADV000030.

**Response**: Admitted.

36. At 9:41 AM on September 15, 2020, the day Lamar Indiana executed the Contract, SeedX provided Hill with a different set of designs for copy to be displayed. Mot. Ex. 8, Contract; Mot. Ex. 16, Emails between Hill and SeedX (Aug. 24 to Sept. 22, 2020) at LADV0000160–61.

**Response**: Denied. The "*past* design" for a "*past* campaign" which had nothing to do with a religious claim for pro-reproductive rights, was never suggested as one of the present designs for the present campaign.

37. The new designs announced that "The Satanic Abortion Ritual permits First Trimester Abortions upon Demand." Mot. Ex. 17, Proposed Designs.

**Response**: Admitted.

38. Ten minutes later, Hill noted that he would "have to get these approved on my end" since "the content is totally different than what we had originally approved." Mot. Ex. 18, Emails between Hill and Basulto (Aug. 28 to Sept. 15, 2020).

**Response**: Admitted; although this is proof of pretext.

39. The new designs were forwarded to Kilshaw for review. Mot. Ex. 19, Emails between Kilshaw and Graham (Sept. 15, 2020).

**Response**: Denied, these were designs for the present campaign, not "new" designs.

40. Kilshaw determined that the designs were misleading and offensive and rejected them. Mot. Ex. 7, Kilshaw Dep. at 17:16-18:2, 31:2-5 ("To me, the copy would lead the reader to believe that if they accepted The Satanic Temple's view, they could violate state law. . . . It's - - so it's one of the areas we're very, very sensitive about and so we don't provide as much leeway when we think something is criminal or suggests violating law, so that was the reason for the decision in this case. . . . they were offensive because they were

sending the message out to readers of the billboard that it's okay to violate the law if you agree with the [S]atanic ritual."); see also Mot. Ex. 20, Kilshaw to Graham (Sept. 22, 2020) (Kilshaw explaining that he rejected the advertisements because "[t]he right to have an abortion in the U.S. is provided under law, not the Satanic Temple's abortion ritual").

**Response**: Admitted that this is a statement of Kilshaw's uninformed legal opinion. Denied that this is an accurate statement of law. See Arkansas's Religious Freedom Restoration Act, encoded at ACA § 16-123-401 *et seq.* and Indiana's Religious Freedom Restoration Act, encoded at Ind. Code Ann. § 34-13-9-0.7 *et seq.* (each providing religious exemptions, even to generally applicable laws); *see also* U.S. Const. Amend. I (Free Speech and Free Exercise Clauses) and *e.g. Kennedy v. Bremerton School District*, 142 S.Ct. 2407 (2022) (recognizing the dual constitutional protections for religiously expressive activity–such as the Satanic Abortion Ritual).

41. Eventually, TST settled on designs that explicitly announced, "Our Religious Abortion Ritual Averts Many State Restrictions." Mot. Ex. 21, Basulto to Hill & Rashidi (Sept. 21, 2020); Mot. Ex. 22, Proposed Designs; Am. Compl. (Doc. 3) at 69.

**Response**: Admitted.

42. The central purpose for TST of these billboards was to convey the message that Kilshaw determined to be misleading and offensive. Mot. Ex. 2, Jarry Dep. at 74:16-21 (explaining that the language "averts many state restrictions" was "central to the billboard, otherwise . . . it's not really conveying a whole lot").

Response: Denied. Kilshaw found "*All* of the content" to be "misleading and offensive." ECF 53-1, at 31. Including TST's religious iconography, name, and claim to equal entitlement to the plain text of Arkansas and Indiana RFRA. Admitted that the central purpose for TST was to convey that the plain text meaning of Arkansas and Indiana RFRA entitles TST's membership to "avert many state restrictions."

43. Approximately two days after being informed that its proposed copy violated the Copy Acceptance Policy, TST sent a demand letter threatening a lawsuit. Mot. Ex. 23, Kezhaya to Hill (Sept. 23, 2020).

**Response**: Admitted.

44. Lamar Indiana later cancelled the contract. Mot. Ex. 24, Hill to Baird and Gibbens (Sept. 25, 2020); Mot. Ex. 25, Hill to Basulto (Sept. 30, 2020).

**Response**: Denied. Lamar *breached* the contract. See ECF 53-1 (requiring Lamar "to display in good and workmanlike manner, and to maintain for the terms set forth above, outdoor advertising displays described above or on the attached list.")

45. Lamar Indiana remained willing to accept other advertising copy from The Satanic Temple, including the "Never be hit in school again" advertisement. Mot. Ex. 16, Hill and Basulto 11 (Sept. 22, 2020) (Hill asking SeedX, "Can we not use the original design you'd sent?") & Mot. Ex. 25, Hill to Basulto (Sept. 30, 2020)

(Hill offering to SeedX, after cancellation of the contract, to revisit the campaign "[i]f we get revised designs similar to the last ones").

**Response**: Denied. Otherwise, Lamar would have fulfilled its "pledge[] … to work with advertisers to achieve acceptable copy." ECF 53-1, at 130; see also ECF 59-1, at 4 (Depo. Kilshaw), at 9:5-15 (Kilshaw works with advertisers "a majority of the time;" the only instance of record in the "rare" instance which he does not was with TST).

Respectfully submitted on March 24, 2023, by:



| **Matt Kezhaya** | matt@crown.law |
|---|---|
| Ark. # 2014161 | direct: (479) 431-6112 |
| Minn. # 0402193 | general: (612) 276-2216 |

100 S. Fifth St., Ste. 1900, Minneapolis, MN 55402

## Certificate of service

NOTICE IS GIVEN that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on March 24, 2023, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*