# 5:22-CV-5033

---

IN THE UNITED STATES DISTRICT COURT OF WESTERN ARKANSAS
FAYETTEVILLE DIVISION

---

The Satanic Temple, Inc.
*Plaintiff*

*v.*

Lamar Advantage GP Company, LLC;
Lamar Advantage Holding Company; and
Lamar Advertising Company

*Defendants.*

---

### APPENDIX OF EXHIBITS

---



**Matt Kezhaya**                    **matt@crown.law**
Ark. # 2014161                      direct: (479) 431-6112
Minn. # 0402193                     general: (612) 276-2216

121 Washington Ave. N., 4th Floor, Minneapolis, MN 55401

Appendix 1

# Table of contents

| Date | Title | Page |
| --- | --- | --- |
| 07/28/2020 | Email from Noyes to Kilshaw | 3 |
| N/A | Billboard copy | 5 |
| 08/11/2020 | Email from McAlpin to Kilshaw | 6 |
| 09/14/2020 | Lamar contract | 9 |
| 01/30/2023 | Deposition of Whit Weeks | 12 |
| 01/31/2023 | Deposition of Thomas Hill | 20 |
| 02/01/2023 | Deposition of Thomas Gibbens | 25 |

| From: | Dan Noyes |
| Date: | July 28, 2020 8:57:09 AM (-05) |
| To: | Hal Kilshaw |
| Cc: | Kevin King; Katy Lanmon; Laura Alvis |
| Subject: | **Fwd: Reproductive Right Artwork** |
| Attachments: | vf-lilithfund-billboard-10x24.jpg; |

Hi Hal:

One of our Account Executives has been provided the attached creative (I am also of the impression Co 072/Shreveport is also involved).  I wanted to pass along to you for review and feedback.  I know the panels for Co 268 are located in two small communities in the event that is of any consequence.  Please let us know if this is copy that can be approved.

Thanks,
Dan

---------- Forwarded message ---------
From: **Katy Lanmon** <klanmon@lamar.com>
Date: Tue, Jul 28, 2020 at 8:48 AM
Subject: Reproductive Right Artwork
To: Dan Noyes <dnoyes@lamar.com>, Kevin King <KEKing@lamar.com>

Attached.

--

**Katy Lanmon** // Sales Account Executive

**Lamar Advertising Company of Tyler (#268)**
**Office:** 936.564.1495 // **Mobile:** 936.371.9438
**Live Pitch Link:** http://view.lamar.com/klanmon
**lamar.com**

**You can now pay your invoices online http://payments.lamar.com**

--
**Dan Noyes | General Manager**

Lamar Advertising Company of Tyler
2301 E. Erwin St.
Tyler, TX  75702

O: 903.592.3889 ext.14
C: 903.316.0603
F: 903.592.6975
W: lamar.com/tyler-longview

**Appendix 4**

LADV000914

LADV000915

Appendix 5

# ABORTION IS A BLESSING.

"My decision to have an abortion was guided by my faith and my love for my family."

## LILITHFUND.ORG/BLESSING

PAID FOR BY: LILITH FUND

| From: | Allie McAlpin |
|---|---|
| Date: | August 11, 2020 9:52:30 AM (-05) |
| To: | Hal Kilshaw |
| Cc: | Dan Noyes |
| Subject: | **Re: Reproductive Right Artwork** |
| | |
| Attachments: | |

Sure thing. Here is our standard response when Lamar accepts sensitive copy that is running in your market:

Lamar Advertising supports the First Amendment right of advertisers to promote legal products and services. We also allow our medium to be used to convey political, editorial, public service and other noncommercial messages. While we do not accept or reject copy based on agreement or disagreement with the views expressed, we do reserve the right to reject any copy found to be factually inaccurate, obscene or offensive.

Lamar has a formal process in place for evaluating any submitted copy that may not meet our standards. In summary, the copy in question is initially reviewed by our local General Managers in consultation with Regional Managers and our Vice President of Governmental Relations. If it is determined at that point that the copy should be rejected, it is then submitted for additional review to an internal committee including representatives from Lamar's legal, investor relations and marketing teams. If the committee agrees with the initial assessment, Lamar communicates the reasoning for the decision to reject and attempts to work with the client to make the necessary revisions that will bring the copy into compliance with our standards.

All Lamar employees are trained and instructed to follow this process when presented with questionable or controversial copy. For more detailed information, please click here to download the Lamar Advertising Copy Acceptance Policy.



**Allie McAlpin** / Communications Director
amcalpin@lamar.com
**Lamar Advertising Company**
225.926.1000 ext. 6412
5321 Corporate Blvd, Baton Rouge, LA 70808
www.lamar.com

On Tue, Aug 11, 2020 at 9:30 AM Hal Kilshaw <hkilshaw@lamar.com> wrote:
Allie,

Would you please send Dan your standard message on copy acceptance issues?

Dan,

It is extremely rare for us to remove copy once posted. But we can discuss if there is a huge issue.

---------- Forwarded message ---------
From: **Dan Noyes** <dnoyes@lamar.com>
Date: Tue, Aug 11, 2020 at 8:30 AM
Subject: Re: Reproductive Right Artwork
To: Hal Kilshaw <hkilshaw@lamar.com>


Hi Hal:

This copy will begin to post this week and I anticipate some type of negative attention.  I saw last week in Spokane, we installed some copy and ended up removing it (albeit, not abortion related).  I want to be prepared to respond in the event we are pressed on this copy, at what point do we act on removing something? (Believe it or not, I've not ever had any copy posted

Appendix 6

I believe to have been as sensitive as this may become).

Thanks,
Dan

On Tue, Jul 28, 2020 at 9:08 AM Hal Kilshaw <hkilshaw@lamar.com> wrote:
 We take reasonable pro-life and pro-choice copy. So O. K. to post.

On Tue, Jul 28, 2020 at 8:57 AM Dan Noyes <dnoyes@lamar.com> wrote:
 Hi Hal:

 One of our Account Executives has been provided the attached creative (I am also of the impression Co 072/Shreveport is also involved). I wanted to pass along to you for review and feedback. I know the panels for Co 268 are located in two small communities in the event that is of any consequence. Please let us know if this is copy that can be approved.

 Thanks,
 Dan

 ---------- Forwarded message ---------
 From: **Katy Lanmon** <klanmon@lamar.com>
 Date: Tue, Jul 28, 2020 at 8:48 AM
 Subject: Reproductive Right Artwork
 To: Dan Noyes <dnoyes@lamar.com>, Kevin King <KEKing@lamar.com>


 Attached.

 --

 Katy Lanmon // Sales Account Executive

 **Lamar Advertising Company of Tyler (#268)**
 **Office:** 936.564.1495 // **Mobile:** 936.371.9438
 **Live Pitch Link:** http://view.lamar.com/klanmon
 **lamar.com**

 **You can now pay your invoices online http://payments.lamar.com**

--
**Dan Noyes | General Manager**

Lamar Advertising Company of Tyler
2301 E. Erwin St.
Tyler, TX 75702

O: 903.592.3889 ext.14
C: 903.316.0603
F: 903.592.6975
W: lamar.com/tyler-longview

--
Hal P. Kilshaw
Vice President of Governmental Relations
Lamar Advertising
5321 Corporate Blvd.
Baton Rouge, LA 70808
225-237-1047
Fax 225-923-0658


--
**Dan Noyes | General Manager**

Lamar Advertising Company of Tyler
2301 E. Erwin St.
Tyler, TX 75702

O: 903.592.3889 ext.14
C: 903.316.0603
F: 903.592.6975
W: lamar.com/tyler-longview


--
Hal P. Kilshaw
Vice President of Governmental Relations
Lamar Advertising
5321 Corporate Blvd.
Baton Rouge, LA 70808
225-237-1047
Fax 225-923-0658

**Appendix 8**

LADV000965

Indianapolis
5711 W. Minnesota St
Indianapolis, IN 46241
Phone: 317-484-0396
Fax: 317-484-1522

**LAMAR**

**CONTRACT # 3482055**

Date: 9/9/2020
New/Renewal: NEW
Account Executive: THOMAS HILL
Phone: 317-484-0396

| CONTRACTED DIRECTLY BY ADVERTISER | |
|---|---|
| Customer # | 759005-1 |
| Name | SEEDX |
| Address | 1420 S FIGUEROA ST #204 |
| City/State/Zip | LOS ANGELES, CA 90015 |
| Contact | |
| Email Address | |
| Phone # | |
| Fax # | |
| P.O./ Reference # | |
| Advertiser/Product | THE SATANIC TEMPLE |
| Campaign | Indiana & Arkansas |

**Production/Other Services**

| Department | Plant | Production Type | Misc | Service Dates | # Billing Periods | Invest Per Period | Cost |
|---|---|---|---|---|---|---|---|
| Vinyl | 286 Little Rock, AR | Printing & Installation of (4) vinyls for Arkansas | | 09/21/20 | 1 | $2,962.00 | $2,962.00 |
| Vinyl | 405 Indianapolis, IN | Printing & Installation of (4) vinyls for Indiana | | 09/21/20 | 1 | $4,400.00 | $4,400.00 |

Total Production/Other Services Costs: $7,362.00

**Space**

# of Panels: 8

Billing Cycle: Every 4 weeks

| Panel # TAB ID | Market | Location | Illum | Media Type | Size | Misc | Service Dates | # Billing Periods | Invest Per Period | Cost |
|---|---|---|---|---|---|---|---|---|---|---|
| 2364 364291 | 286-NORTH LITTLE ROCK, AR | I-40 N/S 1.2 MI E/O I-440 P3-EFT | Yes | Perm Bulletin | 12' 0" x 48' 0" | | 09/28/20-10/25/20 | 1 | $925.00 | $925.00 |
| 60006 364483 | 286-JACKSONVILLE, AR | US 67/167 E/S 0.6 MI N/O I-440 JCT P1-NF | Yes | Perm Bulletin | 10' 6" x 36' 0" | | 09/28/20-10/25/20 | 1 | $800.00 | $800.00 |
| 70218 364588 | 286-LITTLE ROCK, AR | I-30 S/S 0.4 MI E/O S HAMILTON P1-EF | Yes | Perm Bulletin | 14' 0" x 48' 0" | | 09/28/20-10/25/20 | 1 | $1,500.00 | $1,500.00 |
| 1399 264319 | 405-BOONE CO, IN | I-65, 1.5 MI N/O SR 334 W/S | Yes | Perm Bulletin | 14' 0" x 48' 0" | | 09/28/20-10/25/20 | 1 | $1,500.00 | $1,500.00 |
| 1597 264481 | 405-JASPER, IN | I-65, 1.5 MI S/O SR 114 | No | Perm Bulletin | 12' 0" x 34' 0" | | 09/28/20-10/25/20 | 1 | $1,000.00 | $1,000.00 |
| 5070 14925260 | 405-MORGAN CO, IN | E/S SR 67 1/4 MI S/O SR 144 | Yes | Perm Bulletin | 10' 6" x 36' 0" | | 09/28/20-10/25/20 | 1 | $1,200.00 | $1,200.00 |
| 9003 570856 | 405-DECATUR CO, IN | I-74 1680' E/O HWY 3 | Yes | Perm Bulletin | 10' 0" x 30' 0" | | 09/28/20-10/25/20 | 1 | $600.00 | $600.00 |
| 68412 30970109 | 434-SPRINGDALE, AR | I-49 W/S, 0.30 mi S/O Wagon Wheel Rd, Springdale, AR, NB, S/F-2 | Yes | Perm Bulletin | 10' 0" x 40' 0" | | 09/28/20-10/25/20 | 1 | $1,500.00 | $1,500.00 |

Total Space Costs: $9,025.00

**Total Costs: $16,387.00**

**Special Considerations:**

Advertiser authorizes and instructs The Lamar Companies (Lamar) to display in good and workmanlike manner, and to maintain for the terms set forth above, outdoor advertising displays described above or on the attached list. In consideration thereof, Advertiser agrees to pay Lamar all contracted amounts within thirty (30) days after the date of billing. Advertiser acknowledges and agrees to be bound by the terms and conditions on all pages of this contract.

The Agency representing this Advertiser in the contract executes this contract as an agent for a disclosed principal, but hereby expressly agrees to be liable jointly and severally and in solido with Advertiser for the full and faithful performance of Advertiser's obligations hereunder. Agency waives notice of default and consents to all extensions of payment.

The undersigned representative or agent of Advertiser hereby warrants to Lamar that he/she is the    Partner

_____
**(Officer/Title)**

of the Advertiser and is authorized to execute this contract on behalf of the Advertiser.



Page 1 of 3

**Appendix 9**

Indianapolis
5711 W. Minnesota St
Indianapolis, IN 46241
Phone: 317-484-0396
Fax: 317-484-1522

Date: 9/9/2020
New/Renewal: NEW
Account Executive: THOMAS HILL
Phone: 317-484-0396

**LAMAR**

## CONTRACT # 3482055

| | |
|---|---|
| **Customer:** | SEEDX |
| **Signature:** | *Jacqueline Basulto* |
| | (signature above) |
| **Name:** | Jacqueline Basulto |
| | (print name above) |
| **Date:** | Sep 14, 2020 |
| | (date above) |

**THE LAMAR COMPANIES**

This contract is NOT BINDING UNTIL ACCEPTED by a Lamar General Manager.

| ACCOUNT EXECUTIVE: THOMAS HILL | *Jason Graham*  GENERAL MANAGER | Sep 15, 2020  DATE |
|---|---|---|

## STANDARD CONDITIONS

1. Late Artwork: The Advertiser must provide or approve art work, materials and installation instructions ten (10) days prior to the initial Service Date. In the case of default in furnishing or approval of art work by Advertiser, billing will occur on the initial Service Date.

2. Copyright/Trademark: Advertiser warrants that all approved designs do not infringe upon any trademark or copyright, state or federal. Advertiser agrees to defend, indemnify and hold Lamar free and harmless from any and all loss, liability, claims and demands, including attorney's fees arising out of the character contents or subject matter of any copy displayed or produced pursuant to this contract.

3. Payment Terms: Lamar will, from time to time at intervals following commencement of service, bill Advertiser at the address on the face hereof. Advertiser will pay Lamar within thirty (30) days after the date of invoice. If Advertiser fails to pay any invoice when it is due, in addition to amounts payable thereunder, Advertiser will promptly reimburse collection costs, including reasonable attorney's fees plus a monthly service charge at the rate of 1.5% of the outstanding balance of the invoice to the extent permitted by applicable law. Delinquent payment will be considered a breach of this contract. Payments will be applied as designated by the Advertiser; non designated payments will be applied to the oldest invoices outstanding.

4. Service Interruptions: If Lamar is prevented from posting or maintaining any of the spaces by causes beyond its control of whatever nature, including but not limited to acts of God, strikes, work stoppages or picketing, or in the event of damage or destruction of any of the spaces, or in the event Lamar is unable to deliver any portion of the service required in this contract, including buses in repair, or maintenance, this contract shall not terminate. Credit shall be allowed to Advertiser at the standard rates of Lamar for such space or service for the period that such space or service shall not be furnished or shall be discontinued or suspended. In the case of illumination, should there be more than a 50% loss of illumination, a 20% pro-rata credit based on four week billing will be given. If this contract requires illumination, it will be provided from dusk until 11:00p.m. Lamar may discharge this credit, at its option, by furnishing advertising service on substitute space, to be reasonably approved by Advertiser, or by extending the term of the advertising service on the same space for a period beyond the expiration date. The substituted or extended service shall be of a value equal to the amount of such credit.

5. Entire Agreement: This contract, all pages, constitutes the entire agreement between Lamar and Advertiser. Lamar shall not be bound by any stipulations, conditions, or agreements not set forth in this contract. Waiver by Lamar of any breach of any provision shall not constitute a waiver of any other breach of that provision or any other provision.

6. Copy Acceptance: Lamar reserves the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed. Lamar reserves the right to reject or remove any copy either before or after installation, including immediate termination of this contract.

7. Termination: All contracts are non-cancellable by Advertiser without the written consent of Lamar. Breach of any provisions contained in this contract may result in cancellation of this contract by Lamar.

8. Materials/Storage: Production materials will be held at customer's written request. Storage fees may apply.

9. Installation Lead Time: A leeway of five (5) working days from the initial Service Date is required to complete the installation of all non-digital displays.

10. Customer Provided Production: The Advertiser is responsible for producing and shipping copy production. Advertiser is responsible for all space costs involved in the event production does not reach Lamar by the established Service Dates. These materials must be produced in compliance with Lamar production specifications and must come with a 60 day warranty against fading and tearing.



Appendix 10

Indianapolis
5711 W. Minnesota St
Indianapolis, IN 46241
Phone: 317-484-0396
Fax: 317-484-1522

**LAMAR**

**CONTRACT # 3482055**

Date: 9/9/2020
New/Renewal: NEW
Account Executive: THOMAS HILL
Phone: 317-484-0396

11. Bulletin Enhancements: Cutouts/extensions, where allowed, are limited in size to 5 feet above, and 2 feet to the sides and 1 foot below normal display area. The basic fabrication charge is for a maximum 12 months.

12. Assignment: Advertiser shall not sublet, resell, transfer, donate or assign any advertising space without the prior written consent of Lamar.

Appendix 11

Transcript of

# Whit Weeks

January 30, 2023

The Satanic Temple
vs.
Lamar Advantage
5:22-CV-5033

Job # 161180

---

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF ARKANSAS
 2

 3   THE SATANIC TEMPLE, INC.,

 4          Plaintiff,

 5   -vs-                      Case No. 5:22-cv-5033-TLB

 6   LAMAR MEDIA COMPANY, LAMAR
 7   ADVANTAGE GP COMPANY, LLC
     and LAMAR ADVANTAGE HOLDING
 8   COMPANY,

 9          Defendants.

10

11       VIDEOTAPED DEPOSITION OF WHIT WEEKS

12       TAKEN ON BEHALF OF THE PLAINTIFF

13    ON JANUARY 30, 2023, BEGINNING AT 1:00 P.M.

14                VIA ZOOM

15

16

17   APPEARANCES

18   on behalf of the PLAINTIFFS

19   Mr. Matt Kezhaya (Via Zoom)
     CROWN LAW
20   100 South Fifth Street
     Suite 1900
21   Minneapolis, MN 55402
     (612) 276-2216
22   matt@crown.law

23

24   (Appearances continued on next page.)

25   REPORTED BY:  Shannon S. Harwood, CSR, RPR, CRR
```

---

Page 2

```
 1   (Appearances continued.)

 2   on behalf of the DEFENDANTS

 3   Ms. Sarah Keith-Bolden (Via Zoom)
     QUATTLEBAUM, GROOMS & TULL, PLLC
 4   111 Center Street
     Suite 1900
 5   Little Rock, AR 72201
     (501) 379-1789
 6   sbolden@qgtlaw.com

 7
     ALSO APPEARING:  Mr. Jim Herzig, Videographer (Via Zoom)
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

---

Page 3

```
 1                  I N D E X

 2                                              PAGE

 3   Direct Examination by Mr. Kezhaya            5

 4

 5

 6

 7                  EXHIBITS

 8   Exhibit      Description

 9   1. Lamar Advertising Copy Acceptance Policy  17

10   6. Exhibit 1 answer to amended complaint     18

11   2. 9-15-20 email chain from Tom Gibbens      23

12   3. 9-15-20 email chain from Whit Weeks       25

13   (Exhibits 7 through 10 not specifically mentioned.)

14

15

16

17

18

19

20

21

22

23

24

25
```

---

Page 4

```
 1              STIPULATIONS

 2

 3         It is hereby stipulated and agreed by and

 4   between the parties hereto, through their respective

 5   attorneys, that the deposition of WHIT WEEKS may be

 6   taken pursuant to agreement and notice and in accordance

 7   with the Arkansas Rules of Civil Procedure on January

 8   30, 2023, via Zoom, before Shannon S. Harwood, CSR, RPR,

 9   CRR.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 25

1 the -- the past approved sign.  Was this email dated

2 September 2 at 9:58 on the same document, "Never be hit

3 in school again," is that the one that you were

4 referencing earlier?

5      A.   Yes, that is.

6      Q.   So of the two that you can recall, it was just

7 this one and one with the two ladies; is that correct?

8      A.   No, I mean, there was -- the -- the series

9 that you had before that had four or five together --

10     Q.   Uh-huh.

11     A.   -- I -- I -- I know that I had seen those at

12 some point --

13     Q.   Okay.

14     A.   -- in that process, too.

15     Q.   Okay.  So chronologically the next one -- and

16 to recap, you received this at 9:52 a.m.  At 10:44 a.m.,

17 it appears that you send this email to a series of

18 people.  Who are these series of people?

19     A.   Those are sales individuals that work in our

20 offices.

21          (Deposition Exhibit No. 3 was marked for

22 identification and made part of the record.)

23     Q.   (By Mr. Kezhaya)  And for -- for benefit of a

24 clear record, we are now looking at Exhibit 3.  It's an

25 email from Whit Weeks to a series of people dated

Page 26

1 September 15 at 10:44 a.m.  You state as follows:  "Good

2 morning.  One of these pieces of creative that will be

3 running in Northwest Arkansas starting at the end of the

4 month.  This is why we shouldn't respond to agency

5 requests listed as 'Client X' or without getting

6 knowledge of the customer.  This will be running in our

7 market and below rate.  I'm embarrassed that this will

8 represent us."

9          Why were you embarrassed that it will

10 represent you?

11     A.   Can I ask a question first?

12     Q.   Sure.

13     A.   So -- so you said that -- that this email was

14 in response to the one before?

15     Q.   No, this is chronologically afterward.

16     A.   This is --

17     Q    It's not in response --

18     A.   -- so this would be significantly after,

19 though, right?  Like --

20     Q.   I mean, by an hour.

21     A.   Right, but your -- the -- the -- it sounded

22 like, though, we were saying that I saw the a kid will

23 not get hit and then -- then I was sending this.

24     Q.   That's correct --

25     A.   But this has the attached -- but this has the

Page 27

1 attachments with all of the other pieces of creative

2 that are on -- that were sent to us.

3      Q.   Correct.

4      A.   So -- so -- so this -- this -- I just want to

5 make sure that whatever my response is here is in

6 reference to the five pieces of creative or however many

7 are on this email that I was sending, it wasn't to the a

8 kid -- a kid -- you know, a kid can't be hit or whatever

9 that piece was.  This was in response to those -- those

10 pieces of creative that are there as an attachment.

11     Q.   That's correct.  And there are -- I just

12 counted it while you were talking.  There are five of

13 them and it appears that these are the new ones.  I see

14 it says New Version Billboard in the attachment names

15 version 2, so this -- this must be the new ones.

16     A.   Okay.

17     Q.   Which means I'm missing one in my -- in my set

18 of pictures, but that's okay.  In fact, let's see here.

19 I think these -- these file names might match up.  TST

20 version V2, ST1 -- yeah, these file names don't match up

21 so I don't know which goes to which, but suffice it to

22 say, it's the new ones.  There are two sets.  The former

23 set we looked at earlier.  That was proposed Designs 1

24 through 5, and then there were designs at least 1

25 through 4.  I probably have a fifth one in the

Page 28

1 complaint, but suffice it to say, we know the new ones

2 versus the old ones.  We're talking about the new ones

3 now.

4          MS. KEITH-BOLDEN:  Object to the form.

5      Q.   (By Mr. Kezhaya)  For example, this one with

6 the cake, "Our religious abortion ritual averts many

7 state restrictions."  On the left, it says, "Not a

8 cake," and it's a picture of batter and on the right,

9 it's a picture of sperm about to enter an egg that says,

10 "Not a baby."

11          Was this one of the things that you were

12 embarrassed by?

13     A.   I -- I had not seen that creative.  That's not

14 part of it.

15     Q.   Okay.  So then let's pull up the two with the

16 ladies.  This one you recall seeing, correct?

17     A.   That looks to be of the 1 through 5.

18          MS. KEITH-BOLDEN:  Object to the form.

19     Q.   (By Ms. Kezhaya)  Well, I mean, just from your

20 -- from your recollection, this is one of the ones that

21 you had testified earlier that you remember seeing.

22          MS. KEITH-BOLDEN:  Object to the form.

23     Q.   (By Mr. Kezhaya)  Correct?

24     A.   I would have to go back and look at the emails

25 to see if this is one of the ones that was in it.

Page 29

1    Q.  Okay.  Well, in any event, as you sit here
2  today, can you tell me why that you were embarrassed
3  that the new copy wouldn't -- would represent you?
4    A.  I'd like to see the email traffic in
5  chronological order to -- to -- to know what we're
6  referencing.  It feels -- it feels like we skipped a lot
7  and -- from an email traffic standpoint.
8    Q.  Well, no, it's -- this is chronologically the
9  next email.  It goes from 9:52 to 10:44.  This is --
10 this is the emails that I was provided.  This is -- this
11 is what we have.
12       So are you telling me that there are more
13 emails between these two.
14    A.  No, I don't know.  It just seems that -- that
15 it was a big jump from the -- the one piece of creative
16 that -- that -- that we were talking about then to this,
17 but this is -- if that's what is chronological, then
18 that's chronological.
19    Q.  Well, when you say "the one piece of
20 creative," let's -- let's go back to Exhibit 2 here.  In
21 this email from Jacqueline -- first of all, do you know
22 who Jacqueline is?
23    A.  I do not.
24    Q.  Okay.  From Jacqueline to Tom Hill.  Do you
25 know who Tom Hill is?

Page 30

1    A.  I do not.
2    Q.  Okay.  Well, I'll just tell you, Jacqueline is
3  the head of the marketing company.  She was the one who
4  provided Tom Hill who was, if memory serves, the
5  salesperson out of Indiana who booked the billboards.
6  What she said is, I'm attaching our past campaign with
7  Lamar to show you what creative looked like in the past.
8  This is -- obviously it's a picture of a billboard.
9  This is a billboard that Lamar ran in Texas.  I don't
10 remember exactly when the past, but suffice to say,
11 before the facts at issue.
12       So here what we see is a billboard that says,
13 "Exercise your religious rights.  Never be hit in school
14 again."  It's not saying that it is illegal to hit kids.
15 It's not commenting about the legality or illegality.
16 It's saying that our religion does not believe in kids
17 being hit.  You see?
18       So going back now to the new designs, to which
19 you may or may not recall, we'll actually look up the
20 old ones that is from Lamar.  So according to Lamar,
21 these are designs that were received.  Please explain to
22 me why these are embarrassing to you.
23    A.  Because they would be considered controversial
24 as in the market, meaning that we would get -- we would
25 get calls of them from both customers and -- and members

Page 31

1  of the community.
2    Q.  And that's embarrassing to you why?
3    A.  Because it is creative that's controversial in
4  the market.  I don't -- I don't like controversial --
5  not that I have a say in it.  I don't -- I don't ever
6  get to deny creative on my own, but controversial
7  creative is something that we -- that we typically do
8  not -- typically it gets sent to Hal to determine
9  whether or not we can or cannot run it.
10    Q.  So going back to our negative poultry ad that
11 you had mentioned within the past 60 days, did that also
12 embarrass you?
13    A.  It did.
14    Q.  Did you also send an email saying that we
15 shouldn't be sending emails like this, I'm embarrassed
16 that this represents us?
17       MS. KEITH-BOLDEN:  Object to the form.
18    A.  Those are two separate questions.
19    Q.  (By Mr. Kezhaya)  Well, both of those
20 statements are on this email.  I'm asking, did you send
21 a similar email with regard to that poultry?
22       MS. KEITH-BOLDEN:  Object to the form.
23    Q.  (By Mr. Kezhaya)  Did you hear the question?
24    A.  Can you repeat it?
25    Q.  Did you send a similar email with regard to

Page 32

1  the poultry billboard as the one that we are looking at
2  right now on this Exhibit 3?
3       MS. KEITH-BOLDEN:  Object to the form.
4    Q.  (By Mr. Kezhaya)  Whit, it's a straight
5  forward question.  Did you or did you not send an email
6  with regard to that poultry billboard?
7    A.  It is a straight forward question and I'm --
8  my -- I'm not sure from a counsel standpoint if I'm to
9  answer or not based on her objection.
10       MS. KEITH-BOLDEN:  You can answer.
11       THE WITNESS:  Okay.
12       MS. KEITH-BOLDEN:  Yeah, go ahead.
13    A.  No, I did not send an email after that.
14    Q.  (By Mr. Kezhaya)  Okay.  With regard to this
15 statement --
16    A.  Can I -- can I -- can I follow that up,
17 though?
18    Q.  Yeah, of course.
19    A.  Okay.  So I objected to the creative and I
20 sent it to Hal, as I am supposed to do, and Hal told us
21 to run it and so I ran it.  It was -- if I -- I had
22 submitted my request to not run it, but it's not my call,
23 so Hal said to run it, so we ran it.
24    Q.  Were you embarrassed in that instance?
25    A.  I was.

Page 33

1   Q.   Even though you did everything you could to
2   avoid the controversy?
3   A.   Yes, sir.
4   Q.   All right.
5   A.   Just because I -- I don't -- just because I
6   have to run it doesn't mean I approve or disapprove of
7   it.  It's not my call on it.  I can just object -- I can
8   say that this does not comply with the market, it's
9   going to be controversial, and Hal tells me to run it,
10  so I run it.
11  Q.   And it still embarrasses you, correct?
12  A.   Correct.
13  Q.   Okay.  You've been working in the outdoor sign
14  industry since 2006; is that right?
15  A.   That's correct.
16  Q.   Okay.  Has any of your signs ever been damaged
17  because of someone's disapproval of a sign that's been
18  posted?
19  A.   We have had signs vandalized in the past, yes.
20  Q.   And tell me the most recent time that that
21  happened.
22  A.   It's been several years.  I -- I don't know
23  the specific time.
24  Q.   Do you remember how many years ago it's been?
25  A.   I do not.

Page 34

1   Q.   Do you remember the design that was posted?
2   A.   I do not.
3   Q.   Do you remember who did it?
4   A.   I -- I do not.
5   Q.   Do you know why they did it?
6   A.   I do not.
7   Q.   So the best you can say is that a sign has
8   been vandalized in the past?
9   A.   That's correct.
10  Q.   Was it a Lamar sign?
11  A.   I -- I honestly don't know if it was as Lamar
12  or pre Lamar.
13  Q.   Well, actually, come to think of it you --
14  well, yeah, it's been four years that you've been
15  working there now, so I guess that's close enough to the
16  line.  Okay.
17  A.   It's not four years.  It's three years and a
18  handful of months.
19  Q.   All right.  Do you have any particular
20  religious persuasion?
21  A.   I -- I -- yeah, yes, yes.  We'll stop -- we'll
22  stop there.
23  Q.   What is your religious persuasion?
24  A.   We attend a Protestant church.
25  Q.   Protestant.

Page 35

1   A.   It's a -- kind of a generic term for.
2   Q.   Just -- just broadly Protestant.  Okay.
3   A.   It's a -- yeah, I think it's a Protestant
4   Baptist kind of a -- I don't think it's
5   non-denominational, but it's not -- I don't -- I don't
6   know specifically, if I'm being honest.
7   Q.   That's fine.  Do you have any personal
8   opinions about The Satanic Temple?
9   A.   I do not.
10  Q.   You have no -- no personal opinions
11  whatsoever?
12  A.   It's not -- it's not for me, but I don't --
13  it's -- it is a religious choice that someone has.
14  Q.   So you recognize it is a -- as a religion?
15  A.   That's a good question.  I don't know.
16  Q.   The billboards at issue, do you recognize that
17  to be a religious topic?
18  A.   To me, it's a political topic.
19  Q.   What are your opinions on abortion?
20  A.   Honestly, I'm -- I'm -- I'm kind of in the
21  middle --
22  Q.   You're in the middle?
23  A.   -- if I'm a hundred percent honest.
24  Q.   You're -- you're completely in the middle, you
25  see pros and cons on both sides?

Page 36

1   A.   I see pros and cons on both sides.
2   Q.   Okay.  So for those who desire an abortion,
3   you can understand, then, why they would want an
4   abortion, correct?
5        MS. KEITH-BOLDEN:  Object to the form.
6   A.   I've never heard faced with that -- with that
7   question, so I cannot understand their reasoning.
8   Q.   (By Mr. Kezhaya)  Okay.  Well, then, what are
9   the pros that you see to abortion rights?
10  A.   I think that -- that from the pros of an
11  abortion?  Sorry.  I need to re-hear that question.
12  Q.   Well, yeah, so particularly with regard to the
13  right to have an abortion, what are the pros that you
14  see?
15       MS. KEITH-BOLDEN:  Object to the form.
16  Q.   (By Mr. Kezhaya)  The advantages.
17       MS. KEITH-BOLDEN:  Object to the form.
18  A.   I guess I'm -- I'm really struggling to
19  understand the question, because it almost sounds like
20  it's changing as it's coming across.
21  Q.   (By Mr. Kezhaya)  Well, I'm not saying pros as
22  in the manner of speaking.  I'm saying pros as opposed
23  to cons.  What are the advantages to the right to have
24  an abortion, and in your perception as someone who is in
25  the middle?

Page 37

```
 1        MS. KEITH-BOLDEN:  Object to the form.
 2        Q.   (By Mr. Kezhaya)  Just because she objects to
 3   the form doesn't mean you don't --
 4        A.   No, I -- I'm trying to think how -- how to --
 5   to -- to answer the question and that -- that I think
 6   that the -- if we're asking why I -- I find myself in
 7   the middle, it is because I sometimes struggle with --
 8   with -- with -- with government interference.
 9        Q.   And reasonable.  You don't like the idea of
10   the government having control over what a person does
11   with their body.  Is that --
12        A.   That was --
13        Q.   -- a fair recitation?
14        A.   -- that was not what I said, no.
15        Q.   Oh, I'm sorry.  Government interference with
16   what then?
17        A.   With -- just in general.  Government
18   interference in general.
19        Q.   Okay.  But I'm asking specifically about
20   abortion, so I'm -- I'm not -- I'm not --
21        A.   No, I know.  I mean, and I think -- I think to
22   that point, I -- I -- I struggle sometimes with -- with
23   the government interfering with -- with medical
24   procedures.
25        Q.   Okay.  And back in 2020, there was a federally
```

Page 38

```
 1   recognized right to abortion.  Do you recall that?
 2        MS. KEITH-BOLDEN:  Object to the form.
 3        A.   If -- if you want to tell me what you're
 4   referencing, I -- I can tell you if I know what you're
 5   talking about.
 6        Q.   (By Mr. Kezhaya)  Have you heard of a case
 7   called Roe v. Wade?
 8        A.   I have heard of that case, yes.
 9        Q.   Okay.  Do you know generally what Roe v. Wade
10   and it's progeny established?
11        A.   Not enough to say that I know what -- what
12   it's referencing.
13        Q.   Okay.  So I'll just tell you.  Roe v. Wade
14   established a right of privacy such that the government
15   can't interfere with a woman's right to choose as to
16   whether she wants to keep the pregnancy or not, as a
17   general proposition.  Is that something that you knew
18   before I just told you this?
19        A.   I knew the gist of Roe versus Wade.
20        Q.   Okay.  So going a little bit further then, did
21   you know that there has been, for about five decades
22   now, a pretty consistent effort on the far right to take
23   away that right from a certain segment of society?
24        MS. KEITH-BOLDEN:  Object to the form.
25        Q.   (By Mr. Kezhaya)  Did you know that?
```

Page 39

```
 1        A.   I did not know that for five decades that the
 2   -- that the right has pushed that agenda, no.
 3        Q.   Okay.  Did you also know that TST saw that as
 4   a potential issue, and hence, we developed the satanic
 5   abortion ritual?  Were you aware of that?
 6        A.   You asked a question did I also know and I
 7   just said I didn't know the other, so I don't know the
 8   other.
 9        Q.   Strike -- striking the word also.  Did you
10   know that The Satanic Temple developed the satanic
11   abortion ritual out of concern for, generally speaking,
12   the right of abortion to go away?
13        MS. KEITH-BOLDEN:  Object to the form.
14        A.   I did not.
15        Q.   (By Mr. Kezhaya)  Okay.  You live in
16   Fayetteville; is that correct, in or around
17   Fayetteville?
18        A.   I live in Fayetteville, yes.
19        Q.   Okay.  And you have a pretty good -- I gather
20   a pretty good pulse as to the local community there.  Is
21   that fair to say?
22        A.   I think pulse is a broad term.  Can you define
23   what you're asking about?
24        Q.   Do you feel like you have a good sense of what
25   the -- the people of Northwest Arkansas feel about
```

Page 40

```
 1   certain topics or know about certain topics?
 2        A.   I can't speak to what other people know or
 3   don't know.
 4        Q.   Okay.  What about what they feel or don't
 5   feel?
 6        A.   I can't speak directly to what an individual
 7   feels.
 8        Q.   Well, you -- you must, right, because you have
 9   a sense of when something will or won't be
10   controversial.  That's how you know to pass it up to
11   Hal, right?
12        A.   I understand what will get us phone calls that
13   would -- that would be controversial.  I understand what
14   will get us phone calls.
15        Q.   Okay.  So but in terms of what would cause
16   those phone calls, you -- that's a step too far for you?
17        A.   Can you say that again?  I'm sorry.
18        Q.   That's a -- that's an analytical step too far
19   to ascertain as to why you would receive a phone call
20   about a particular billboard.  You can only --
21        MS. KEITH-BOLDEN:  Object to the form.
22        Q.   (By Mr. Kezhaya)  -- that's your testimony,
23   correct?
24        MS. KEITH-BOLDEN:  Object to the form.
25        A.   I'm sorry, I need to hear the question again.
```

Page 41

1    Q.  (By Mr. Kezhaya)  We've already established
2  that you know what will result in phone calls.  My
3  question to you is whether it is one analytical step too
4  far as to why you will receive those phone calls?
5        MS. KEITH-BOLDEN:  Object to the form.
6    A.  I -- I understand what will -- what topics
7  will.
8    Q.  (By Mr. Kezhaya)  uh-huh.
9    A.  I know what topics will get phone calls.
10   Q.  Yeah, but not why, correct?
11   A.  Not -- not -- no, I don't think so.  I think
12 that -- that -- that a topic that's out there could get
13 a call from whatever -- from both sides of it.
14   Q.  That -- that answers what.  I'm asking about
15 why.
16   A.  I don't -- so if -- if the topic -- if the
17 topic is going to receive a phone call, therefore, be
18 controversial, then there are people that have views on
19 one side or the other that would be making the call
20 would be my thought on that.
21   Q.  Okay.  They would feel strongly about that
22 particular topic presumably, correct?
23   A.  One way or the other.
24   Q.  Yeah, they must, right?  That's why they're
25 calling you, right?

Page 42

1    A.  I can't -- I can't say they feel strongly
2  about it.  They have an opinion.
3    Q.  Your testimony is that you cannot say whether
4  someone feels strongly about something when they're
5  calling you, the sign manufacturing -- or the sign
6  advertiser, about the topic?
7    A.  I -- I don't know what someone feels strongly
8  about.  I know they may call me, but I don't know how
9  strongly they feel about a topic.
10   Q.  Well, presumably they tell you during the
11 phone call, don't they?
12   A.  Depends on the person.  Some people do.  Some
13 people...
14   Q.  Well, we're -- let's -- let's talk about that
15 -- that poultry billboard.  You received how many phone
16 calls?
17   A.  I received two rather quickly.
18   Q.  And this is within the past 60 days, so when
19 did the billboard go up?
20   A.  I don't know the specific date that it went
21 up.
22   Q.  Okay.  When about?  You said pretty quickly.
23 What was the time delay between the billboard going up
24 and the receiving of the phone calls?
25   A.  So the advertisement was bought outside of our

Page 43

1  market to where we did not know when it went up.  I
2  believe -- and -- and I don't even want to say I
3  believe.  Like, I don't know specifically the timeline
4  of when it went up to when we received the phone calls.
5    Q.  Am I understanding your testimony properly
6  that if someone buys a billboard from outside your
7  market, you don't know when the billboard goes up?
8    A.  There are certain entities -- there are
9  certain avenues of purchasing in Lamar that it -- that
10 it does not come through us to see.
11   Q.  Okay.  You say there are certain -- how many
12 alternative avenues other than someone calling up your
13 office can someone post a billboard in your market?
14   A.  Okay.  So they can -- they can buy directly
15 from us, which is what you said the first option there.
16 There's another method that goes through our national
17 sales group, which is where they would call the national
18 sales group.  They would look to buy space in multiple
19 markets and it would go up.  And then there's an out of
20 market -- we call it out of market.  It's where someone
21 from another Lamar market purchases -- they -- they
22 purchase it through that space, so this -- this
23 particular instance would be out of market where that
24 person buys it through multiple markets from another
25 account executive in another market.

Page 44

1        The last is programmatic.  That's the one
2  where someone can buy space that -- that goes through a
3  programmatic platform that we don't know that it's
4  getting posted.  We don't sign the contract locally.  We
5  don't have anything to do with the contracting process.
6  The -- the creative runs in our market without us
7  knowing.
8    Q.  You used the word programmatic in the course
9  of defining programmatic.  Help me understand.  Is it
10 literally like a computer software or is there -- is
11 there another option that I'm not thinking of?
12   A.  The -- the national sales group at our
13 corporate could -- could better describe that, but it's
14 a -- it's a -- it's a buying service that goes through
15 and runs through that programmatic group in -- in our
16 corporate -- in our corporate national sales group.
17   Q.  Okay.
18   A.  I don't know the specifics of how they run
19 their -- their side of it.
20   Q.  All right.  All right.  Whit, is there
21 anything about your testimony that you want to clarify
22 or correct?
23   A.  I don't think so.
24   Q.  Okay.
25        MR. KEZHAYA:  Pass the witness.

PROFESSIONAL REPORTERS
800.376.1006
proreporters.com
Appendix 18

**Page 45**

1      MS. KEITH-BOLDEN:  No questions.

2      MR. KEZHAYA:  All right.  Whit, thank you for

3  your time today.

4      THE WITNESS:  Thank you.

5      THE VIDEOGRAPHER:  We are off the record at

6  1:50 p.m.

7      (Deposition concluded at 1:50 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 46**

1                    JURAT

2           The Satanic Temple VS. LAMAR ADVANTAGE

3                JOB FILE NO. 161180

4  STATE OF OKLAHOMA

5  SS

6  COUNTY OF TULSA

7        I, Whit Weeks, do hereby state under oath that

8  I have read the above and foregoing deposition in its

9  entirety and that the same is a full, true and correct

10  transcription of my testimony so given at said time and

11  place, except for the corrections noted.

12

13

14      _____

15           Signature of Witness

16

17        Subscribed and sworn to before me, the

18  undersigned Notary Public in and for the State of

19  Oklahoma by said witness, Whit Weeks, on this _____

20  day of _____, 2023.

21

22

23      _____

24           NOTARY PUBLIC

25           MY COMMISSION EXPIRES: _____

**Page 47**

1                  ERRATA SHEET

2       The Satanic Temple VS. LAMAR ADVANTAGE

3              DEPOSITION OF Whit Weeks

4  REPORTED BY:  SHANNON S. HARWOOD, CSR, RPR, CRR

5      DATE OF DEPOSITION TAKEN:  JANUARY 30, 2023

6                JOB FILE NO. 161180

7  PAGE  LINE  IS                   SHOULD BE

8  ____  ____  _____    _____

9  ____  ____  _____    _____

10  ____  ____  _____    _____

11  ____  ____  _____    _____

12  ____  ____  _____    _____

13  ____  ____  _____    _____

14  ____  ____  _____    _____

15  ____  ____  _____    _____

16  ____  ____  _____    _____

17  ____  ____  _____    _____

18  ____  ____  _____    _____

19  ____  ____  _____    _____

20  ____  ____  _____    _____

21  ____  ____  _____    _____

22  ____  ____  _____    _____

23  ____  ____  _____    _____

24  ____  ____  _____    _____

25  ____  ____  _____    _____

**Page 48**

1              C E R T I F I C A T E

2

3  STATE OF OKLAHOMA  )

4  COUNTY OF TULSA    )

5        I, Shannon S. Harwood, a Certified Shorthand

6  Reporter in and for the State of Oklahoma, do hereby

7  certify that the foregoing is a true and correct

8  transcription of my shorthand notes of proceedings had

9  in Case Number 5:22-cv-5033 heard on the 30th day of

10  January, 2023, and is only valid with my stamped seal

11  and my original signature.

12        I further certify that I am not related to nor

13  attorney for either of said parties nor otherwise

14  interested in said action.

15        IN WITNESS WHEREOF, I have hereunto set my hand and

16  seal this 7th day of February, 2023.

17

18

19

20

21

22      _____

23           Shannon S. Harwood, CSR, RPR, CRR

24

25

Transcript of

# Thomas Hill

January 31, 2023

The Satanic Temple vs.
Lamar Advantage
5:22-CV-5033

Job # 161181

Appendix 20

Page 1

```
1        IN THE UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF ARKANSAS
2               FAYETTEVILLE DIVISION

3  THE SATANIC TEMPLE, INC.,

4        Plaintiff,

5  vs.            No. 5:22-CV-5033

6  LAMAR ADVANTAGE GP COMPANY, LLC ("Lamar Indiana"); LAMAR
   ADVANTAGE HOLDING COMPANY ("Lamar Arkansas"); and LAMAR
7  ADVERTISING COMPANY ("Lamar HQ"),

8        Defendants.

9
   _____
10
          VIDEO WEB CONFERENCE DEPOSITION OF THOMAS HILL
11          TAKEN ON BEHALF OF THE PLAINTIFF
         ON JANUARY 31, 2023, BEGINNING AT 1:02 P.M.
12              TAKEN VIA WEB CONFERENCE
          REPORTED BY MIKE WASHKOWIAK, CCR
13
          APPEARANCES: (All via web conference)
14
   On behalf of the PLAINTIFF
15
          Matthew A. Kezhaya
16        Sonia Kezhaya
          CROWN LAW
17        100 S. Fifth Street, Suite 1900
          Minneapolis, Minnesota 55402
18        612-276-2216
          Matt@crown.law
19
20  On behalf of the DEFENDANTS
21        Michael N. Shannon
          QUATTLEBAUM, GROOMS & TULL PLLC
22        111 Center Street, Suite 1900
          Little Rock, Arkansas 72201
23        501-379-1716
          mshannon@qgtlaw.com
24
25  Videographer:  Sean Shell
```

Page 2

```
1               INDEX

2                              Page

3  Direct Examination by MR. KEZHAYA        3

4  Cross Examination by MR. SHANNON        29

5  Redirect Examination by MR. KEZHAYA     29

6

7               STIPULATIONS

8        It is stipulated that the deposition of THOMAS

9  HILL may be taken pursuant to agreement and in accordance

10  with the Federal Rules of Civil Procedure on JANUARY 31,

11  2023, before Mike Washkowiak, CCR.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 3

```
1        THE VIDEOGRAPHER:  This is the videotaped

2  deposition of Thomas Hill, taken on behalf of the

3  plaintiff in the matter of The Satanic Temple, Inc. versus

4  Lamar Advantage GP Company, LLC, et al, filed in the

5  United States District Court for the Western District of

6  Arkansas, Fayetteville Division, case number 5:22-CV-5033.

7  This deposition is being held via web conference on

8  Tuesday, January 31, 2023.  We're on the record at

9  1:02 p.m.  Will counsel please state their appearances for

10  the record?

11        MR. KEZHAYA:  This is Matt Kezhaya.  I'm joined

12  by my law partner Sonia Kezhaya representing The Satanic

13  Temple.

14        MR. SHANNON:  This is Mike Shannon.  I'm here on

15  behalf of the witness and on behalf of the defendants.

16        THE VIDEOGRAPHER:  The court reporter will now

17  please swear in the witness.

18              THOMAS HILL,

19  after having been first duly sworn, deposes and says in

20  reply to the questions propounded as follows, to-wit:

21          DIRECT EXAMINATION

22  BY MR. KEZHAYA:

23    Q    Please state your name for the record.

24    A    Tom Hill.

25    Q    Tom, where are you located?
```

Page 4

```
1    A    Indianapolis, Indiana.

2    Q    Okay.  Is that where you work out of as well?

3    A    Correct.

4    Q    Taking you back to 2020, there was a contract

5  between Lamar and The Satanic Temple.  You were identified

6  as the account executive on that particular contract; is

7  that correct?

8    A    Yes, sir.

9    Q    Okay.  Do you still work for Lamar?

10    A    Yes, sir.

11    Q    Okay.  Back in 2020 you were identified as a

12  senior account executive; is that correct?

13    A    Yes.

14    Q    In the course of your business as a senior

15  account executive, what was your day-to-day

16  responsibility?

17    A    Sales proposals, sales contracts.

18    Q    Okay.  So is it fair, to develop it a little bit

19  further, you presumably negotiated and helped determine

20  placement for billboards with customers of Lamar?

21    A    Correct.

22    Q    Okay.  What is your role now?

23    A    Senior account executive.

24    Q    Okay, all right.  So in late August of 2020, a

25  company called SeedX requested of Lamar some billboard
```

Page 5

1  information; is that correct?

2      A    Yes, sir.

3      Q    That was forwarded along to you for

4  troubleshooting their issues, answering their questions,

5  and otherwise administering the account, correct?

6      A    Yes, exactly.

7      Q    Okay.  In August of 2025, we have an email

8  provided to us through discovery, if I can share the

9  screen.  Let's see.

10         MR. SHANNON:  Matt, you said 2025.

11         MR. KEZHAYA:  Thank you.

12         MR. SHANNON:  I think you meant 2020.

13         MR. KEZHAYA:  Correct, August 25 of 2020.

14      Q    (BY MR. KEZHAYA)  You sent this email, it's LADV

15  262, in which you request of Sonja Barnett and Sam Cooper

16  their top ten available locations in the markets or areas

17  listed below.  Is that a fair summary of this email?

18      A    Yes.

19      Q    Who is Sonja Barnett and Sam Cooper?

20      A    They would be Lamar colleagues out of the

21  Arkansas office.  I'm not exactly sure of their titles,

22  but they would be people that I would go to to retrieve

23  locations and proposal information for those markets

24  listed in Arkansas.

25      Q    Okay.  Do you remember how you came to these

Page 6

1  three locations, Little Rock, Fayetteville, and Rogers?

2      A    I would -- I don't recall specifically, but it

3  would have had to have come from somebody at SeedX.

4      Q    Okay.  So did you have a phone conversation with

5  anyone at SeedX before August 25, or was that in writing?

6      A    No.

7      Q    Well, it had to -- it had to have come from

8  SeedX, so it was either by phone call or in writing, I

9  presume?  Is that --

10      A    It would've had to have been via email, I

11  presume.  I don't recall exactly where we got the Arkansas

12  information from.

13      Q    That's no problem.

14      A    I didn't have (inaudible) with anybody.

15      Q    That's no problem.

16         We have a few different calendar invites that

17  were produced.  I'm going to pull each of them up in

18  sequence.  All right, so first in time is this one for

19  September 2nd at 11 a.m. between you and Jacqueline

20  Basulto, Jacqueline at SeedX.  This is LADV 375.  The

21  second in time is for 11:30, and that's at LADV 377, and

22  third we have another one at 1 p.m. for 378.  Do you

23  remember how many phone calls you had with Jacqueline on

24  September 2nd?

25      A    I would presume one.

Page 7

1      A    Okay.  You say you presume.  Tell me a little

2  bit more about that.

3      A    It was one phone conversation.

4      Q    Okay.  So it was definitely one phone

5  conversation.  It's just that we have the three calendar

6  invites.  Presumably it just got moved around; is that

7  fair to assume?

8      A    Yes.

9      Q    Okay.  Do you remember the substance of that

10  phone conversation?

11      A    I do not.

12      Q    So let's take you back to September 2nd.  The

13  best that we have from written discovery is this email

14  beginning at LADV 371.  Yeah, LADV 371.  We have an

15  exchange of emails, it looks like, beginning on

16  September 1st.  Let's see here.  On September 1st at 3:02

17  you ask Arif if he has any questions that you can help

18  answer.  Jacqueline responds asking if y'all could set up

19  a time to talk through it.  You say, "Would 1 p.m. Eastern

20  time work?"  And she says "Sure."  And that's the best --

21  that's the best that the written record establishes here,

22  so it's really down to your recollection.

23         MR. KEZHAYA:  Beg your pardon?

24         MR. SHANNON:  Object to the form.

25         MR. KEZHAYA:  Okay.

Page 8

1      Q    (BY MR. KEZHAYA)  So emphasizing the importance

2  of your recollection, we know that a phone call happened

3  on September 2nd, and it's your testimony that you do not

4  recall what was said during that phone call?

5      A    Correct.

6      Q    Okay.  Do you have any contemporaneous business

7  records, like journal entries, time logs, anything like

8  that that could help to refresh your recollection?

9      A    No.

10      Q    Okay.  Do you in the course of your regular

11  business keep track of prospective customers when they

12  come in, what's disclosed or what have you?

13      A    No.

14      Q    Okay.  To reiterate, importantly as it pertains

15  to this case, you have nothing that would help to refresh

16  your recollection as to what happened during that phone

17  call; is that correct?

18      A    Correct.

19      Q    Okay.  What we do know after September 2nd you

20  have an email to a Colleen Baird.  Who is Colleen Baird?

21      A    Colleen would be a Lamar colleague that was

22  helping facilitate with the Arkansas information that I

23  was presenting to SeedX.

24      Q    Okay.  So on September 3rd at 6:47 a.m. you

25  emailed her saying, "Hey, Colleen, took a call with

Page 9

1  Jacqueline yesterday.  See below for info that she shared
2  after our call regarding NE inventory."  What is NE in
3  this context?
4      A    I believe that was a typo, and that would be a
5  call regarding Arkansas inventory.  I think NE would have
6  been referring to Nebraska.
7      Q    Okay.
8      A    I think it's a typo.
9      Q    So scrolling down, we see at 10:58 p.m. the day
10 before, Jacqueline emailed you.  Let me just skim so I can
11 summarize.  I can't really summarize, so I'll just read it
12 in full.
13          "Hi, Tom, hope all is well.  As promised here
14 are the areas we are interested in in both the
15 Indianapolis area and the Little Rock area markets.  I'd
16 like to get an estimate for four billboards on the highway
17 paths I highlighted in the screenshots.  Perhaps we can
18 talk again, or you can help me figure out which ones and
19 the price.  I'm also attaching our past campaign with
20 Lamar to show you what creative looked like in the past.
21 Looking forward to hearing from you."
22          She emphasizes twice that this is a past
23 campaign.  We see here this is a picture of a billboard.
24 It says, "Never be hit in school again.  Exercise your
25 religious rights.  The Satanic Temple, Protect Children

Page 10

1  Project.com."  Have you seen this picture before?
2          MR. SHANNON:  Object to the form.
3      Q    (BY MR. KEZHAYA)  Tom, have you seen this
4  picture before?
5      A    Yes.
6      Q    All right, first of all, did I accurately recite
7  the language of the email and describe properly the
8  picture?
9          MR. SHANNON:  Object to the form.
10     Q    (BY MR. KEZHAYA)  Please answer the question.
11     A    Yes.
12     Q    For the benefit of a clear record, this is at
13 LADV 407.  So you have seen this picture before.  Does
14 this picture help -- does this picture and this email, do
15 they help refresh your recollection as to the conversation
16 on September 2nd?
17     A    I mean, I would venture to guess that
18 conversation based on this email clarified the interest in
19 Indianapolis and Little Rock.
20     Q    Okay.  But you're basing your statement upon the
21 email.  In absence of this email, do you have a
22 recollection, or are you just speculating based off what
23 you're reading here?
24     A    I'm speculating based on what I'm reading.
25     Q    Okay.  On September 4, this is, for benefit of

Page 11

1  the record, 455, there is an email exchange between you
2  and Jacqueline again about having a follow-up phone call.
3  Let's see here.  It says either today or Monday.  You
4  respond after four would be best.  Do you remember having
5  a phone call with Jacqueline on either September 4th or
6  whatever the following Monday was?
7      A    September 4th I recall.
8      Q    Okay.  Do you remember the subject of that
9  discussion?
10     A    I do not.
11     Q    Okay.  Do you remember the contents of that
12 discussion?
13     A    I do not.
14     Q    Okay.  But you definitely had a conversation
15 with her on September 4th?
16     A    Yes, sir.
17     Q    Okay.  Do you remember anything about that
18 discussion at all?
19     A    No.
20     Q    Is your memory based off of looking at this
21 email right now?
22     A    Yes.
23     Q    Okay.  So removing this email from the equation,
24 you don't have an independent recollection of a phone
25 conversation with Jacqueline Basulto on September 4th; is

Page 12

1  that correct?
2      A    I remember where I was when I got the phone
3  call.  I don't remember the contents of it.
4      Q    Okay, so you definitely had a phone call.  You
5  do distinctly recall that there was a phone call?
6      A    Yes.
7      Q    Where were you when you received the phone call?
8      A    In Plainfield, Indiana.
9      Q    I'm sorry, you were where?
10     A    In Plainfield, Indiana.
11     Q    Okay.  What were you doing in Plainfield,
12 Indiana?
13     A    That's where I live.
14     Q    Okay.  Were you at your house?
15     A    I was in the car with my family.
16     Q    Okay.  Do you remember how long the phone call
17 was?
18     A    No.
19     Q    Did you take the phone call over the car
20 speakers?
21     A    No.
22     Q    All right.  At some point during all of this,
23 Jacqueline must have informed you that this billboard is
24 for The Satanic Temple; is that correct?
25     A    Correct.

Page 37

```
 1        C E R T I F I C A T E

 2  STATE OF ARKANSAS   )
                        )  SS:
 3  COUNTY OF WASHINGTON)

 4        I, Mike Washkowiak, Certified Court Reporter

 5  within and for the State of Arkansas, do hereby certify

 6  that the above-named THOMAS HILL was by me first duly

 7  sworn to testify the truth, the whole truth, and nothing

 8  but the truth, in the case aforesaid; that the above and

 9  foregoing deposition was by me taken and transcribed

10  pursuant to agreement, and under the stipulations

11  hereinbefore set out; and that I am not an attorney for

12  nor relative of any of said parties or otherwise

13  interested in the event of said action.

14        IN WITNESS WHEREOF, I have hereunto set my hand

15  and official seal this 8th day of February, 2023.

16

17        MIKE WASHKOWIAK, CCR

18

19        State of Arkansas, No. 654

20

21

22

23

24

25
```

Transcript of

# Thomas Gibbens

February 1, 2023

The Satanic Temple vs.
Lamar Advantage
5:22-CV-5033

Job # 161182

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
                FOR THE WESTERN DISTRICT OF ARKANSAS
2                      FAYETTEVILLE DIVISION

3   THE SATANIC TEMPLE, INC.,

4           Plaintiff,

5   vs.                No. 5:22-CV-5033

6   LAMAR ADVANTAGE GP COMPANY, LLC ("LAMAR-INDIANA"); LAMAR
    ADVANTAGE HOLDING COMPANY ("LAMAR-ARKANSAS"); and LAMAR
7   ADVERTISING COMPANY ("LAMAR-HQ"),

8           Defendants.

9   _____

10          VIDEOTAPED DEPOSITION OF THOMAS GIBBENS
11          TAKEN ON BEHALF OF THE PLAINTIFF
       ON FEBRUARY 1, 2023, BEGINNING AT 12:58 P.M.
12            ALL PARTIES APPEARING REMOTELY
            REPORTED BY KERRI PIANALTO, CCR
13
                   APPEARANCES:
14
    By videoconference on behalf of the PLAINTIFF
15
            Matthew A. Kezhaya
16          CROWN LAW
            100 S. 5th Street, Suite 1900
17          Minneapolis, Minnesota 55402
            612-276-2216
18          matt@crown.law

19
    By videoconference on behalf of the DEFENDANTS
20
            Sarah Keith-Bolden
21          QUATTLEBAUM, GROOMS & TULL, PLLC
            111 Center Street, Suite 1900
22          Little Rock, Arkansas 72201
            501-379-1700
23          sbolden@qgtlaw.com

24  Videographer:  Sean Shell
25
```

**Page 2**

```
1                    INDEX

2                                        Page

3   Direct Examination by Mr. Kezhaya        4

4

5                  EXHIBITS

6   Number  Description                     Page

7   1    Bates Numbers LADV000195 - LADV000197   8

8   2    Bates Numbers LADV000046 - LADV000050   7

9   3    Bates Numbers LADV000633 - LADV000638   9

10

11               STIPULATIONS

12      It is stipulated that the deposition of THOMAS

13  GIBBENS may be taken pursuant to agreement and in

14  accordance with the Federal Rules of Civil Procedure on

15  February 1, 2023, before Kerri Pianalto, CCR.

16

17

18

19

20

21

22

23

24

25
```

**Page 3**

```
1           THE VIDEOGRAPHER:  This is the videotaped

2   deposition of Thomas Gibbens taken on behalf of the

3   plaintiff in the matter of The Satanic Temple,

4   Incorporated, versus Lamar Advantage GP Company, LLC, et

5   al., filed in the United States District Court for the

6   Western District of Arkansas, Fayetteville Division, case

7   number 5:22-CV-5033.  This deposition is being held via

8   web conference on Wednesday, February 1st, 2023.  We're on

9   the record at 12:58 p.m.

10          Will counsel please state their appearances for

11  the record.

12          MR. KEZHAYA:  This is Matt Kezhaya appearing on

13  behalf of The Satanic Temple.

14          MS. KEITH-BOLDEN:  Sarah Keith-Bolden.

15          THE WITNESS:  Thomas Gibbens.

16          MS. KEITH-BOLDEN:  Let's go off the record for a

17  minute.

18          THE VIDEOGRAPHER:  Yes, we're off the record at

19  12:59 p.m.

20          (Short break from 12:58 p.m. to 1:03 p.m.)

21          THE VIDEOGRAPHER:  We're back on the record at

22  1:03 p.m.

23          The court reporter will now please swear in the

24  witness.

25  WHEREUPON,
```

**Page 4**

```
1                 THOMAS GIBBENS,

2   after having been first duly sworn, deposes and says in

3   reply to the questions propounded as follows, to-wit:

4                 DIRECT EXAMINATION

5   BY MR. KEZHAYA:

6       Q    Please state your name for the record.

7       A    Thomas Gibbens.

8       Q    And, Thomas, take me back to September of 2020,

9   what was your job title?

10      A    2020, I'm thinking vice president -- vice

11  president and territory manager.

12      Q    And was that for Lamar?

13      A    For Lamar Advertising.

14      Q    Okay.  Are you still at Lamar now?

15      A    I am.

16      Q    Okay.  What is your job title now?

17      A    Senior vice president.

18      Q    Okay.

19      A    And territory manager.

20      Q    Okay.  Is there a substantive difference between

21  then and now?

22      A    Not really.  It was just a title change.

23      Q    Okay.  So focusing our attention then in

24  September of 2020, what were your day-to-day job tasks?

25      A    Day to day was running the overall operation of
```

Page 5

1 Lamar Little Rock daily is my primary responsibility and

2 oversight to other offices in Arkansas and Louisiana.

3    Q    Okay.  And in the course of this job duties --

4 in the course of these job duties, was overseeing the copy

5 part of your tasks?

6    A    No.  The overseeing of the copy, the final

7 overseeing of copy goes through Hal Kilshaw.

8    Q    Was Hal Kilshaw the only person who oversaw copy

9 posted on Lamar billboards?

10    A    Any copy that we sent to him for review.

11    Q    But in terms of a group, was he part of a group

12 or was it just him?

13    A    I'm not -- I'm not familiar once we send it to

14 him what the process is.

15    Q    Okay.  I'm going to direct your attention to a

16 particular contract, number 3482055, if I can figure out

17 how to share screen.  Oh, I cannot share screen.  There we

18 go.  All right.  And for benefit of the record, this is

19 LADV Number 195 through 197.  This is a contract that

20 my -- my computer says Zoom quit unexpectedly.  Can you

21 all still see and/or hear me?

22    A    Yeah, we can -- we can see you.

23    Q    Okay.  Great.  This contract says it's for --

24    A    We lost the contract.

25    Q    Okay.  Let's try this again.  There we go.

Page 6

1 There we go.  Are you still able to see the contract now?

2    A    I can.

3    Q    Okay.  Great.  So we have advertiser for The

4 Satanic Temple.  This is, once again, number 195.  Are you

5 familiar with this contract?

6    A    I am.

7    Q    Okay.  I see that it is signed by Jacqueline

8 Basulto for customer SEEDX?

9    A    We lost you.

10    Q    All right.  I'm not sure what's going on with my

11 -- with my Zoom.  Can -- can you all still see and/or hear

12 me?

13    A    Yeah, we see it twice.

14    MR. KEZHAYA:  Oh, you see me twice.  That's not

15 good.  Well, let's go off the record and try to figure out

16 what's going on with Zoom here.

17    THE VIDEOGRAPHER:  We're off the record at

18 1:07 p.m.

19    (Short break 1:07 p.m. to 1:09 p.m.)

20    THE VIDEOGRAPHER:  We are back on the record at

21 1:09 p.m.

22    Q    (BY MR. KEZHAYA)  Okay.  All right.  So to

23 recap, we're looking at the contract between SEEDX or The

24 Satanic Temple and Lamar Advertising.  Importantly, we see

25 a signature here by Jason Graham, general manager, dated

Page 7

1 September 15, 2020.  Do you see that, Tom?

2    A    I do.

3    Q    All right.  And as I recall, you were a general

4 manager for Arkansas.  Is this consistent with what you

5 would normally expect to see out of a fully executed

6 contract?

7    A    Could you repeat that?  It was a little fast.

8    Q    Is this what you would expect to see out of a

9 normally executed contract?

10    A    From another market, yes.

11    Q    Okay.  And is it out of the ordinary for other

12 markets to sell advertisements in Arkansas from, for

13 example, Indiana?

14    A    It happens.

15    Q    Okay.  All right.  When was the first time you

16 saw this contract to the best of your recollection?

17    A    After it was signed.

18    Q    Okay.

19    A    In Indiana.

20    Q    Okay.  Moving on to our now Exhibit 2, this is

21 LADV Number 46 and following.  We have an email that

22 appears to be from you to Hal Kilshaw.  Have you seen this

23 email before?

24    (WHEREUPON, Exhibit 2 was marked for

25 identification.)

Page 8

1    A    I have.

2    Q    Did you write this email?

3    A    I did.

4    Q    Okay.  And importantly, it says, "Can you buzz

5 me about The Satanic Temple.  We just found out this buy

6 is coming through an agency.  The contract originated from

7 the Indianapolis office.  I do not have the final artwork

8 yet.  Can we reject this based on not meeting the moral

9 standards of our community?  I would include Springdale,

10 AR as well."  Did I read that correctly?

11    A    Yes.

12    Q    And the next line says, "I'll send you the

13 contract in the next email," correct?

14    A    Correct.

15    Q    And the contract referenced in the second line

16 here is this Exhibit 1, the contract that we just looked

17 at; is that correct?

18    (WHEREUPON, Exhibit 1 was marked for

19 identification.)

20    A    That's correct.

21    Q    Okay.  I want to highlight this, you do not have

22 the final artwork yet.  Is it normal for Lamar to enter

23 into a contract without having the final copy?

24    A    I think -- well, our contract states that copy

25 has to be approved within a period of time.

Page 9

1   Q.   Sure.  So it's -- it's contemplated that Lamar
2   will enter into a contract with the understanding that it
3   does not have the final copy, correct?
4   A.   The final copy is -- in the end, is always
5   proofed through Hal if it's -- if there's anything that
6   might be perceived as negative or controversial.
7   Q.   Okay.  You all have a copy acceptance policy
8   that explicitly states that Lamar does not accept or
9   approve -- accept or reject copy based on agreement or
10  disagreement with the views expressed, correct?
11  A.   We display views from all ends.
12  Q.   Okay.  And moving forward now to Exhibit 3, Hal
13  Kilshaw responded to you stating that, "We run thousands
14  of church ads and have to post the occasional atheist,
15  satanic, et cetera submissions we receive," correct?
16      (WHEREUPON, Exhibit 3 was marked for
17  identification.)
18  A.   That's what he said, yes.
19  Q.   And that's consistent with Lamar's policy of not
20  engaging in viewpoint discrimination, correct?
21  A.   Again, he approves the final copy.
22  Q.   Yes.
23  A.   And I do not approve it or disapprove it.
24  Q.   All right.  Why was it that you wanted to reject
25  copy that you had not even received yet based on not

Page 10

1   meeting the moral standards of your community?
2   A.   My job is if any copy is -- might be considered
3   to be sensitive, negative or controversial that I'm
4   supposed to submit it for review for approval and when I
5   saw -- when I saw the artwork and I saw that it was about
6   kids being hit in school, that is what stood out to me and
7   that's why I sent it for review.  And I would like to
8   clarify when I state I do not have the final artwork, on
9   the contract we were to be paid to produce the artwork and
10  I did not have the final artwork.  The final artwork has
11  to come in a proof form and that was not the final
12  artwork.
13  Q.   I'm not sure I understand the testimony you just
14  volunteered.  You said that Lamar was supposed to produce
15  the artwork, meaning create the copy?
16  A.   No.  At some point, no, whether it be that the
17  advertiser, the agency or Lamar, there has to be a final
18  proof.  There has to be a final proof, but based on what
19  was being sent to me, it appeared that that was the copy
20  that was being reviewed and, again, I thought it looked
21  like it might be possibly negative or controversial so I
22  sent it to Hal for review and the final decision is not
23  mine, Hal reviewed it.
24  Q.   And returning back to the basis of your belief
25  that Hal needed to review it, was that based on the name

Page 11

1   The Satanic Temple or was it based on something else?
2   A.   As I stated, it was based on the fact that I saw
3   in large print about kids being hit in school.
4   Q.   And tell me more about that.  Why is it that
5   that caused you to -- to bring it up to Hal?
6   A.   It might be, and again it's not my decision, but
7   in my experience it's something that might be interpreted
8   that teachers or other individuals are being hit in school
9   and it looked to be very alarming.
10  Q.   Well, teachers do hit kids, you understand this,
11  right?
12  A.   I don't have any comment on that.
13  Q.   Well, you don't have -- you don't have a choice
14  as to whether you have a comment.  Yes or no, do you know
15  that teachers engage in corporal punishment in schools?
16  A.   I do not know.
17  Q.   Okay.  And you didn't deduce that that was the
18  case from the artwork that you were being shown here?
19  A.   Again, it looked alarming to me about being hit
20  in school.  It could be interpreted a lot of ways, which
21  is not my job, that's why I sent it to Hal for him to
22  review and give me an answer on whether or not the copy
23  was okay or not okay to post.
24  Q.   Do you send every piece of artwork to Hal?
25  A.   No, we do not.

Page 12

1   Q.   You only send what you consider to be
2   potentially controversial, correct?
3   A.   Under our copy acceptance policy if something
4   may be interpreted, might be interpreted to be sensitive,
5   controversial, negative, that's the procedure.
6   Q.   And did you find it to be sensitive?
7   A.   Again, I stated -- I stated it to be negative
8   and controversial.
9   Q.   Okay.  So you -- you found it to be negative,
10  negative and controversial, correct?
11  A.   Not myself.  I said it might be interpreted by
12  the public that way.
13  Q.   And how do you come to that determination?
14  A.   I don't.  I send it to Hal for review and he
15  makes a determination.
16  Q.   I understand, but you have to delineate which
17  ones you send to Hal and which ones you don't, correct?
18  A.   Again, it's not my decision.  If it
19  appears -- if it might be, I send it on.
20  Q.   I understand, but we're talking in circles here.
21  Do you perform polling to determine what you think the
22  public will find potentially controversial or not?
23  A.   Again, my job is if it -- if it possibly could
24  be interpreted that way, might be, then I send it for
25  review.

Page 13

1   Q    What's the threshold of might in your opinion?

2   A    Different people have different interpretations,

3   so again, it's not my call, it's Hal's final call whether

4   I post it or not.  It's out of my control.

5   Q    Well, it's not entirely out of your control

6   because you're the one that sends it to Hal, right?

7   A    If it's approved -- if it's approved to be

8   posted, we post it; if it's not approved, we don't post

9   it.  That's really the end of it.

10   Q    And if you don't send it to Hal and you just

11   post it, it just gets posted, right?  Correct?

12   A    I'm going to say this one more time.  Again, if

13   the copy appears to be negative, might be interpreted to

14   be negative or controversial, it is my job, my duty as the

15   general manager of that office to send it for review, that

16   is part of my job duties.

17   Q    I understand that, Tom, but you keep avoiding my

18   question.  Do you or do you not engage in polling to make

19   the determination of what is or is not going to be

20   controversial?

21   A    Do I engage in polling?

22   Q    Yeah, do you engage in polling?  Do you poll

23   people?  Do you ask them questions?

24   A    I do not conduct polls in my office, no.

25   Q    Okay.  Does anyone out of Lamar engage in

Page 14

1   polling to determine what is or is not going to meet --

2   A    I'm not --

3   Q    -- the standards of the community?

4   A    I'm not aware of it.  I did my job.  My job was

5   that if it might be considered to be negative or

6   controversial is that I send it in for review and that's

7   what I did.  Everything else is -- doesn't matter.  It

8   doesn't matter what I think, it doesn't matter what

9   anybody else thinks.

10   Q    You oversee all of Arkansas, correct?

11   A    Repeat that.

12   Q    You oversee Lamar's billboards for all of

13   Arkansas, correct?

14   A    My day-to-day duties are to oversee Central

15   Arkansas and Northeast Arkansas, Jonesboro.  Other general

16   managers oversee the other parts of it.  I am there for,

17   you know, oversight.

18   Q    For Central and Northeast Arkansas?

19   A    Central, Northeast.

20   Q    Okay.

21   A    Are my day-to-day responsibilities.

22   Q    Okay.

23   A    Day-to-day responsibilities for Northwest

24   Arkansas and Fort Smith, that area, is Mr. Weeks.

25   Q    Okay.  If you're not in charge of Springdale,

Page 15

1   Arkansas, why are you stating in this email, "I would

2   include Springdale, Arkansas as well?"

3   A    Yeah, because I do have oversight over

4   Springdale.

5   Q    Okay.

6   A    I included it -- I included it for Whit.

7   Q    Okay.  Did you have a phone conversation with

8   Whit about this contract?

9   A    I don't recall.

10   Q    Okay.  Did you have phone conversations with

11   anyone about this contract?

12   A    I don't recall.  As a matter of fact, I don't --

13   I don't think that Hal, even though I asked Hal to buzz

14   me, I don't think that he -- I don't even recall having a

15   conversation with him.

16   Q    Okay.  Is it -- to the best of your

17   recollection, is it your testimony today that all Lamar

18   communications, at least so far as you're aware of, were

19   in writing on this contract?

20   A    Oh, I'm sure -- I'm sure there was probably some

21   verbal.  I can't speak for other offices.  There might

22   have been some verbal discussion.

23   Q    I understand that.  I asked so far as you're

24   aware?  In other words, did you have any -- did you have

25   any phone conversations or other oral conversations with

Page 16

1   anyone about The Satanic Temple's contract?

2   A    If I did, it would have -- it would have been

3   just procedural, maybe with the contract being taken out

4   of the system, the canceling of the contract, that would

5   have -- that's all I can recall.

6   Q    Okay.  But as pertains to the decision of

7   whether to cancel it, you were not involved in any

8   conversations to that effect; is that correct?

9   A    I was not involved in any -- in cancellation of

10   the contract.

11   Q    Okay.  Other than -- other than forwarding it up

12   to Hal Kilshaw, you had no other involvement in the

13   determination of whether to cancel it?

14   A    No, I forwarded the contract.  The contract

15   originated out of Indianapolis and that's where -- I think

16   that's where the discussions on cancellations came from.

17   That's how I became aware of it.

18   Q    Okay.  And it's your testimony today that you

19   did not personally object to The Satanic Temple having

20   advertisements in your market?

21   A    Personally object?  I sent it because the

22   contract might have been interpreted as controversial or

23   negative, I sent it for review and it was not my decision.

24   I post whatever is approved.  If it was approved to be

25   posted, I would post it; if it's approved not to be

Page 17

1  posted, I wouldn't post it.

2      Q    But you had an opinion on the matter, didn't

3  you?

4      A    It's not -- it's not my decision.  It doesn't

5  matter -- it doesn't matter what my opinion is.

6      Q    I'm asking you for your testimony as to whether

7  you had an opinion one way or the other as to whether The

8  Satanic Temple should have a contract to place billboards

9  in your territory?

10     A    I really did not have an opinion one way or

11  another.  Again, the copy looked negative and

12  controversial, I sent it on for review.  If I'm told, if

13  we're asked to post it, it's approved, we post it.  Like

14  any other copy, we post it.

15     Q    And you're --

16     A    I do not have an opinion one way or another.

17     Q    And your decision was based on the artwork, not

18  the nature of the viewpoint is your testimony today?

19          MS. KEITH-BOLDEN:  Object to the form.

20     Q    (BY MR. KEZHAYA)  Correct?

21     A    I don't know if they heard.

22     Q    I heard.  I heard her.  She objects to form, but

23  you still answer it.

24     A    Say that again, repeat.

25     Q    She objects to the form, but unless she says

Page 18

1  don't answer it --

2      A    Right, right, right, I get that.  What was the

3  question?

4      Q    The question posed is whether -- or the decision

5  to send it to Hal was not based on the name The Satanic

6  Temple or the viewpoint expressed therein, it was

7  explicitly based on the artwork below here, that's your

8  testimony today, correct?

9          MS. KEITH-BOLDEN:  Object to the form.

10     A    Again, I sent it on because when I saw the large

11  copy about being hit, it appeared it might be interpreted

12  by the public, many people, as being negative,

13  controversial, so I sent it for review.

14     Q    (BY MR. KEZHAYA)  Did it have anything to do

15  with the large inverted pentagram with the sabbatic goat?

16     A    I didn't look at it that way at all.

17     Q    You looked at this billboard and the large

18  inverted pentagram with the sabbatic goat on it did not

19  factor into your analysis as to whether you wanted Hal to

20  buzz you about The Satanic Temple, that's your testimony

21  today?

22     A    Again, I sent it.  As I said, I did not look at

23  it that way.

24     Q    Okay.  Just making sure.  Is there anything you

25  want to clarify or correct about your testimony?

Page 19

1      A    No.

2          MR. KEZHAYA:  Pass the witness.

3          MS. KEITH-BOLDEN:  No questions.

4          MR. KEZHAYA:  Great.  Tom, thank you so much for

5  your time today.

6          THE VIDEOGRAPHER:  This concludes the videotaped

7  deposition of Thomas Gibbens.  We're off the record at

8  1:27 p.m.

9          (DEPOSITION CONCLUDED AT 1:27 P.M.)

Page 20

1      C E R T I F I C A T E

2  STATE OF ARKANSAS      )
                          )  SS:
3  COUNTY OF WASHINGTON   )

4          I, Kerri Pianalto, Certified Court Reporter

5  within and for the State of Arkansas, do hereby certify

6  that the above-named THOMAS GIBBENS was by me first duly

7  sworn to testify the truth, the whole truth, and nothing

8  but the truth, in the case aforesaid; that the above and

9  foregoing deposition was by me taken and transcribed

10  pursuant to agreement, and under the stipulations

11  hereinbefore set out; and that I am not an attorney for

12  nor relative of any of said parties or otherwise

13  interested in the event of said action.

14          IN WITNESS WHEREOF, I have hereunto set my hand

15  and official seal this 9th day of February, 2023.

16

17          _____
            KERRI PIANALTO, CCR

18

19          State of Arkansas, No. 651

20

21

22

23

24

25