# 5:22-CV-5033

IN THE UNITED STATES DISTRICT COURT OF ARKANSAS
FAYETTEVILLE DIVISION

The Satanic Temple, Inc.
*Plaintiff*

*v.*

Lamar Advantage GP Company, LLC;
Lamar Advantage Holding Company; and
Lamar Advertising Company

*Defendants.*

## TST'S OPPOSITION TO
## LAMAR'S MOTION FOR SUMMARY JUDGMENT



**Matt Kezhaya**                    matt@crown.law
Ark. # 2014161                direct: (479) 431-6112
Minn. # 0402193           general: (612) 276-2216

121 Washington Ave. N., 4th Floor, Minneapolis, MN 55401

COMES NOW TST, by and through counsel of record, in opposition to Lamar's motion for summary judgment. ECF 47-49.

Lamar unlawfully discriminated against TST by: (1) running "thousands of church ads" but only running the "occasional" Satanic ad because they "have to"; (2) withholding from TST its "pledge" to work with advertisers to achieve workable copy; (3) withholding from TST its "standard" public explanation that it does not reject copy solely based on disagreement with the message contained; and (4) rejecting TST's designs because of "*all* of the content," religious iconography included. The evidence shows that Lamar makes its billboards more easily available to Christians than Satanists.

Lamar does not have a Free Speech right to engage in selective treatment among religions. Notwithstanding that Lamar's billboards are branded, the designs are the speech of the advertisers because (1) Lamar does not design the advertisements; (2) Lamar disclaims endorsement by requiring ads to identify the advertiser; and (3) Lamar does not claim any religious mission or purpose.

Lamar breached the contract by failing to post the contemplated designs for the specified terms. Contract ¶ 6 does not excuse Lamar's nonperformance because Lamar abused its right to review the designs in bad faith to escape performance. Lamar failed to fulfill its "pledge" to communicate specific issues and work with TST to achieve workable copy. When pressed for more details, Lamar simply refused to elucidate. By stating that "*all* of the content" was the problem, Lamar overtly and explicitly took issue with the religious iconography and viewpoint of the design.

Nor does Lamar have a credible claim that the designs were "misleading" or "offensive." An Indiana judge, applying Indiana RFRA, has already agreed that abortion regulations do not survive statutory scrutiny when applied to religions that do not believe "life" begins at "conception." TST adds onto this belief a sincere religious practice which further increases statutory scrutiny. The moral standards of a community are determined by reference to statutory law. The State legislatures enacted these statutes for the specific purpose of providing exemptions in cases of religious hardship. That Satanists obtain equal entitlement to this statutory benefit may offend some small subset of the population, but it is no more "offensive" to the morals of the community than the prohibition for denominational preference set forth by the Establishment Clause.

**1: Lamar unlawfully discriminated against TST.**

Lamar moves for summary judgment on the ACRA claim. ECF 48, at 11. Lamar is not entitled to summary judgment because it refused to give TST equal benefit of its "pledge" to "work with advertisers to achieve acceptable copy." (ECF 53-1, at 130). Lamar honors this "pledge" when working with Christian pro-life advertisers (ECF 53-1, at 3, 6, 8) but did not give the same benefit to TST (see id., at 28). This differential and adverse treatment is the very definition of discrimination. Black's Law Dictionary, DISCRIMINATION (11th ed. 2019) ("Differential treatment; esp., a failure to treat all persons equally when no reasonable distinction can be found between those favored and those not favored.")

*1.1: Lamar conflates "motive" with "intent."*

The ACRA prohibits intentional religious discrimination in private contracting and in property transactions. ACA § 16-123-107(a)(3), (4), and (b). Lamar resists the conclusion that

it intentionally discriminated against TST because, it claims, it was "always willing to contract with TST." ECF 48, at 12. Contrary to Lamar's claim that SeedX "misrepresented" the nature of the billboards,[1] though, Basulto procured an explicit and subjective understanding from Tom Hill that the designs would be controversial, religious, pro-reproductive rights, and from TST. ECF 53-1, at 125 ¶¶ 5-6. Tom Hill testified he had no recollection of this conversation. ECF 53-1, at 104, and Appx. 22 (Depo. Hill), at 8:1-5. Hill's claimed memory loss precludes Lamar from contesting that the nature of the billboards was disclosed before Lamar entered into this contract. *See Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 986 (8th Cir. 2016) ("proof with proof" standard). Because these facts were disclosed in the course of Tom Hill's actual agency for Lamar, Lamar contracted with TST to post controversial, religious, pro-reproductive rights designs. *See Restatement (Second) of Agency* §§ 268, 273, 275 (1958) (the knowledge of an actual agent is imputed onto the principle).

Lamar then refused to treat TST the same as similarly-situated Christian advertisers. Lamar-Arkansas wanted to reject TST based on viewpoint: Before ever seeing the designs, Lamar's Arkansas territory manager (Tom Gibbens) requested authorization to break the contract. ECF 53-1, at 23:

> Can you buzz me about the satanic temple. … *I do not have the final artwork yet*. Can we reject this based on not meeting the moral standards of our community? I would include Springdale AR as well.

---

[1] ECF 31, at 16 ¶ 145

(emphasis added); see also Opposition Appx. 29 (Depo. Gibbens), at 14:12-15:6 (Gibbens oversees all of Arkansas, including Springdale). This is an outcrop of Lamar's general practice of running "thousands of church ads," yet only running "the occasional atheist, satanic, etc." ad because they "have to." ECF 53-1, at 23.

Less than one hour later, Whit Weeks (territory manager for Northwest Arkansas and Ft. Smith) instructed his sales agents to refuse to contract with agencies until after "gaining knowledge of the customer." ECF 53-1, at 25. Weeks was "embarrassed" by TST's designs and found it "ridiculous" that they were even being considered. Id., at 25-26. Weeks claimed in his testimony to have been similarly "embarrassed" by a billboard critical of the poultry industry.[2] Appx. 15 (Depo. Weeks), at 31:10-13. But he did not send a similar email to make it harder for those critical of the poultry industry to gain access to Lamar's billboards on equal terms as those in favor of the poultry industry. Id. at, at 31:14-32:13.

Nor did Lamar give TST equal benefit of the "pledge[] to … work with advertisers to achieve acceptable copy if the originally submitted copy is not accepted." ECF 53-1, at 130. For Christian groups (both pro-choice and pro-life), Lamar engaged in a conciliatory process to address any fact disputes. See ECF 53-1, at 3-7. For a Christian pro-choice group, Lamar had no issue posting a religious pro-choice message. See Appx. 3 (message at Appx. 5). Anticipating "some type of negative attention," Lamar came prepared to provide its "standard response" to complaining callers. Appx. 6. Lamar has no explanation why this "standard response" could not have resolved any complaints about TST's designs. Giving a

---

[2] Weeks suffered "embarrassment" from the poultry billboard because he received two phone calls. Appx. 18 (Depo. Weeks), at 42:14-17.

"standard" response for one religion, but not another, *is* religious discrimination. Black's Law Dictionary, DISCRIMINATION (11th ed. 2019).

Lamar's contrary argument is rooted in conflating "motive" with "intent." See ECF 48, at 12-13 (wrongly arguing that, because Lamar was willing to contract with TST in the abstract, its subsequent discriminatory treatment is non-actionable). One can be held liable for intentionally discriminating against a suspect class even without proof of invidious motive. *Hassan v. City of New York*, 804 F.3d 277, 297 (3d Cir. 2015) ("intent" asks whether a person acts "intentionally or accidentally," while "motive" asks, "If he did it intentionally, *why* did he do it?") (citing 1 John William Salmond, Jurisprudence § 134, at 398 (7th ed.1924)) (emphasis in original). Contrary to Lamar's argument, the ACRA ascribes liability for intentional religious discrimination, it does not further require TST make a showing of religious malfeasance.

Nor is it persuasive for Lamar to rely on *World Peace Movement of Am. v. Newspaper Agency Corp.*, 879 P.2d 253 (Utah 1994). At issue there was a newspaper, not a billboard. Unlike the stand-alone advertisements here, the newspaper at issue in *World Peace* was disseminated by a particular religious organization whose religious beliefs were challenged by the advertisements at issue. *Id.*, at 254. Also, unlike here, the newspaper in *World Peace* "reserve[d] the right to decline to publish an advertisement on the basis of content." *Id.*; *contra.* ECF 53-1, at 130 ("Lamar will *not* accept or reject copy based upon agreement or disagreement with the views presented") (emphasis added).

There is a marked difference between overtly discriminatory religious newspapers and purportedly nondiscriminatory stand-alone advertisements. Religious newspapers are read by

a discrete religious group, whose subscription fees[3] may be jeopardized by a contrary ideology. This is why a "church" is excluded from Utah's definition of a "place of public accommodation." Utah Code Ann. § 13-7-2(3)(b). But Lamar does not claim to have any particular religious ideology and is publicly owned; not owned by a church. See ECF 3, at 4 ¶ 6 (screenshot from Lamar's website) (admitted at ECF 31, at 2 ¶ 6). Obviously, Lamar does not charge passersby subscription fees for viewing the billboards; Lamar receives money only from its advertisers. See ECF 47-1, at 62-64 (the contract).

*World Peace* is also distinguishable because the opinion recites no evidence of differential treatment among religions. This record, however, shows explicit differential treatment between Christians and Satanists. Particularly, Lamar discriminated against TST by: (1) running "thousands of church ads" but only running the "occasional" Satanic ad because they "have to"; (2) withholding from TST its "pledge" to work with advertisers to achieve workable copy; (3) withholding from TST its "standard" public explanation that it does not reject copy solely based on disagreement with the message contained; and (4) rejecting TST's designs because of "*all* of the content," religious iconography included. None of this was an accident, Lamar intentionally treated TST differently and adversely relative to all other religious advertisements of record. The Court should deny Lamar's cross-motion.

### 1.2: Lamar's discriminatory conduct is not protected "speech."

Rather than present any genuine evidence that Lamar does *not* treat other religions with the same contempt as it did TST, Lamar contends that the Free Speech Clause entitles it to discriminate among religions notwithstanding the plain text of the ACRA. Lamar is wrong

---

[3] See https://pages.deseret.com/subscribe

because: (1) Lamar waived any Free Speech rights by contracting to emplace the billboards; (2) branding the billboards does not render the designs "speech" by Lamar; and (3) the argument is untethered to the evidence.

*1.21: Lamar waived any Free Speech rights by contract.*

Even if Lamar had a Free Speech right to engage in religious discrimination, that right was waived when Lamar incurred a contract obligation to "display in good and workmanlike manner … for the terms set forth above, outdoor advertising displays described above." ECF 47-1, at 62 (*i.e.*, these billboards for this campaign during 9/28/20 - 10/25/20). All rights, even constitutional rights, may be waived by contract. *See T.C. v. State*, 2010 Ark. 240, 16 (2010) (waiver is the "intentional relinquishment or abandonment of a known right or privilege"); *compare Rownak v. Rownak*, 103 Ark. App. 258 (upholding contempt order against a First Amendment challenge because the contemnor breached a contract term, reduced to order and by his own request, to raise the children Protestant).

Lamar sold TST a right to emplace designs on the specified billboards for the specified times. ECF 47-1, at 62 (the contract). It cannot thereafter claim a Free Speech right to refuse to emplace the designs as contracted.[4]

---

[4] Lamar also claims absolute editorial control over the designs under its copy acceptance policy. The copy acceptance policy is not part of the contract. See ECF 47-1, at 63 ¶ 5 (integration clause). Lamar's sole contractual basis for editorial control is the ¶ 6 right to reject designs for not being "within the moral standards of the individual communities in which it is to be displayed." As addressed at § 2.2, however, that right must be exercised in good faith.

*1.22: Branding the billboards does not render designs "speech" by Lamar.*

The first step of a Free Speech analysis is to determine whether there is any "speech" at issue. *Spence v. State of Wash.*, 418 U.S. 405, 411 (1974). Free Speech rights only attach to *speech*, that is, an "intent to convey a particularized message" of which "the likelihood was great that the message would be understood by those who viewed it." *Id.* As the party invoking First Amendment protections, it was Lamar's burden to prove these elements. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n. 5 (1984) ("it is the obligation of the person desiring to engage in assertedly expressive conduct to demonstrate that the First Amendment even applies.")

Rather than prove the "speech" elements, Lamar assumes its own conclusion that branding its billboards make all posted designs "speech" attributable to Lamar. ECF 48, at 15. The conclusion is unsupported because it is unsupportable. There is no particularized message in branding a billboard which advertises one of the "thousands of church ads" one day and an "occasional atheist, satanic, etc." ad the next. Nor can one square the argument that Lamar endorses all designs on its branded billboards with the text of the copy acceptance policy, which requires "the identity of the advertiser" to be "clearly stated in an easily readable disclaimer." ECF 53-1, at 130 (for example "Paid for by the ABC Committee.") Lamar's requirement of a disclaimer precludes a finding that Lamar endorses any of the advertisements. It is not "speech" for Lamar to lease a sign, even a branded one; a blank branded billboard conveys no message. The only "speech" taking place on Lamar's billboards is that of the advertiser. That the law prohibits Lamar from discriminatorily leasing its billboards is no more a Free Speech violation than the same law which prohibits landlords from discrimination in housing.

*1.23: The argument is untethered to the evidence.*

Lamar's Free Speech argument relies on an overextension of *Telescope Media Group v. Lucero*, 936 F.3d 740 (8th Cir. 2019). There, a videographer had a First Amendment privilege to refuse to provide services for same-sex weddings on equal terms as opposite-sex weddings, public accommodations statute notwithstanding. Lamar's interpretation of *Telescope* is that public accommodations statutes are either unconstitutional, because they compel a bigot to engage in activity which it finds offensive; or, superfluous because the commercial enterprise does not discriminate regardless. But *Telescope* turns on the point that the videographer-plaintiffs "'are Christians who' … [intend to] decline any requests for their services that conflict with their religious beliefs." *Id.*, at 748. To that end, it was their presumably-sincere religious belief[5] that God wanted them to make wedding videos, but only if their would-be customers "promote their view of marriage as a 'sacrificial covenant between one man and one woman.'" *Id. Telescope* stands for the proposition that in matters of creative expression, the creator has a First Amendment privilege to refuse to create an expressive message with which they religiously disagree. Contrast Lamar, which strenuously contends that its conduct was *not* in pursuit of any particular religious agenda and which did *not* create the designs at issue.

As with the *Telescope* plaintiffs, Lamar's Free Speech argument is nothing more than "smoke and mirrors." *Telescope Media Grp. v. Lucero*, No. CV 16-4094 (JRT/LIB), 2021 WL 2525412 (D. Minn. Apr. 21, 2021). After the *Telescope* plaintiffs won their appeal, they made

---

[5] At issue in *Telescope* was a Rule 12(b)(6) dismissal of a pre-enforcement action. As the proponents of a hybrid-rights claim, *id.* at 762, they were entitled to a presumption of sincerity at the pleadings stage. *United States v. Seeger*, 380 U.S. 163, 184 (1965).

"exactly two" videos and then left the business permanently. *Id.* Their real purpose for the litigation was "to establish binding First Amendment precedent rather than to allow them to craft wedding videos." *Id.*

Lamar's sole authority is shaky ground to justify private discrimination which "sap[s] the moral fiber of the Nation," "mars the atmosphere of a united and classless society in which this Nation rose to greatness" and would be used as justification for, e.g., "refusing to sell goods to a person based on religion," or "charging higher prices to women than to men." *Telescope*, at 763-764 (Kelly, J., concurring in part) (first two quotes from *764, citing 110 Cong. Rec. 7379 (1964) (statement of Sen. Kennedy), and 110 Cong. Rec. 7399 (1964) (statement of Sen. Magnuson) (quoting President John F. Kennedy, Feb. 28, 1963); latter quotes from *763).

For over a century, bigots have advanced Lamar's same argument to no avail. Elizabeth Sepper, *Free Speech and the "Unique Evils" of Public Accommodations Discrimination,* 2020 U. Chi. Legal F. 273 (2020) (citing, "e.g.," *W. Turf Ass'n v. Greenberg*, 204 U.S. 359, 364 (1907); *Messenger v. State*, 41 N.W. 638, 639 (Neb. 1889); *People v. King*, 18 N.E. 245, 248-49 (N.Y. 1888)). *Telescope* notwithstanding, public accommodations statutes "are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995). The aim of these statutes is to encode the common law rule (dating to "at least the sixteenth century") that innkeepers and common carriers were obligated to serve all potential customers. *Telescope*, 936 F.3d 740, 763 (8th Cir. 2019) (Kelly, J., concurring in part)

(collecting authorities). The statutes are directed at commercial conduct (making services equally available to all with money), not speech.

Lamar's reliance on *Hurley* is confusing. In *Hurley*, a private group hosted an annual St. Patrick's Day parade and excluded a collective of Irish-American gays, lesbians, and bisexuals. Massachusetts' public accommodations law prohibited this; the question was whether the public accommodations law violated the group's Free Speech rights. It did, even though the private organizers "disclaim[ed] any intent to exclude homosexuals as such." *Id.* at 572. This was so because, unlike Lamar's standalone billboards, the *Hurley* parade was speech. *Id.* at 568. Whereas the excluded group would have a "presumably" fair shot at obtaining a permit for its own parade (*Id.*, at 578), TST's ability to disseminate its billboard designs was contingent upon Lamar's willingness to adhere to its contract obligations. ECF 53-1, at 126-128 (even with Lamar's assistance, SeedX was unable to identify a single competitor in the geographic areas).

*Hurley* also undermines Lamar through its application of *Turner Broadcasting*. *Hurley*, at 576 (discussing *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622 (1994)). In *Turner Broadcasting*, at issue was a requirement that cable companies host local public channels. As Lamar does now, the cable companies cried "compelled speech." This argument failed because cable companies had a "long history of serving as a conduit for broadcast signals," so there was "little risk that cable viewers would assume that the broadcast stations carried on a cable system convey ideas or messages endorsed by the cable operator." *Id.* (quoting *Turner Broadcasting*, at 512 U.S. at 655). The same is true with billboards: there can be no serious claim that the public thinks Lamar "endorses" the ads it posts. Lamar posts church ads and

atheistic ads, both; yet there is no evidence of consumer confusion about Lamar's mutually exclusive endorsements.

The "compelled speech" argument also failed because it is "common practice for broadcasters to disclaim any identity of viewpoint between the management and the speakers who use the broadcast facility." *Id.* (quoting *Turner Broadcasting*, at 684); *see also PruneYard Shopping Center v. Robins*, 447 U.S. 74, 87 (1980) (noting that the views expressed by speakers who are granted a right of access to a shopping center would "not likely be identified with those of the owner"). Lamar, too, disclaims any identity of viewpoint between its billboard and the design it posts. ECF 53-1, at 130 (requiring disclaimers, e.g., "Paid for by ABC Committee.")

Because Lamar's own publicly-stated policy is that it does not reject designs based on disagreement with the views expressed and further does require designs to identify the advertiser, the views expressed by the advertisers on the designs cannot be reasonably identified as an endorsement from Lamar. The designs are the advertiser's speech, not Lamar's speech. When Lamar treated TST different–worse–than Christian groups, Lamar engaged in discriminatory conduct; Lamar did not engage in offensive but protected speech. The ACRA, being applied to protect an insular religious minority, is "well within" Arkansas's usual police powers. Lamar has no First Amendment defense.

**2: Lamar breached the contract.**

Lamar next seeks summary judgment on the breach of contract claim. The parties agree that there was a binding and enforceable contract but disagree as to the meaning of its terms. The Court should find that the contract is binding only if Lamar had real contractual

obligations, which is mutually exclusive with Lamar's reading of the contract that its performance is conditioned upon its whim.

*2.1: Lamar's "Copy Acceptance Policy" is not part of the contract.*

Lamar cites its Copy Acceptance Policy in its breach of contract argument, but the Copy Acceptance Policy is not part of the contract. The contract between TST and Lamar contains a merger clause:

> Entire Agreement: This contract, all pages, constitutes the entire agreement between Lamar and Advertiser. Lamar shall not be bound by any stipulations, conditions, or agreements not set forth in this contract. Waiver by Lamar of any breach of any provision shall not constitute a waiver of any other breach of that provision or any other provision.

ECF 53-1, at 19 ¶ 5. To the extent Lamar argues that the Copy Acceptance Policy in any way excuses performance under the contract, the argument must be rejected under the parole evidence rule. The parole evidence rule is a substantive rule of law which prohibits the introduction of extrinsic evidence which is offered to vary the terms of a written agreement. *E.g. Stilley v. James*, 345 Ark. 362, 369 (2001). Lamar's claim to an expansive right to editorialize the designs posted by its advertisers is found only in the policy, *not* in the parties' written contract with a merger clause. The policy is useful information to determine how Lamar treats other customers for the greater purpose of ascertaining whether Lamar discriminated against TST. But because the policy purports to vary the parties' written agreement, the policy cannot be considered in the breach of contract analysis without violating the parole evidence rule.

*2.2: Contract ¶ 6 is a termination for convenience clause.*

Lamar's sole contractual discretion relies on the enforceability of Contract ¶ 6, which is a termination for convenience clause. A termination for convenience clause purports to release a party from liability at their mere whim. Courts find such clauses suspect between private parties because it renders consideration optional for one party, creating an illusory contract. *See Essential Acct. Sys., Inc. v. Dewberry*, 2013 Ark. App. 388, 7 ("A contract … which leaves it entirely optional with one of the parties as to whether or not he will perform his promise would not be binding on the other.")

But courts are to interpret contracts such that they *are* enforceable. *RAD-Razorback Ltd. P'ship v. B.G. Coney Co.*, 289 Ark. 550, 554, 713 S.W.2d 462, 465 (1986). To that end, courts regularly interpret termination-for-convenience clauses to be bounded by the duty of good faith and fair dealing. See 2 *Corbin On Contracts* § 5:28 (1995) ("Through the process of interpretation, in the absence of express restrictions, courts find implied promises to prevent a party's promise from being performable merely at the whim of the promisor …"); Bruner and O'Connor *Construction Law* § 18:47 (2012):

> Because all standard termination for convenience clauses confer the right to terminate only upon the owner, the judiciary long has perceived the lack of mutuality as possibly creating an unenforceable 'illusory promise' lacking consideration. To dispel this concern, the unfettered contract right of termination for convenience has been judicially circumscribed with the implied duty of good faith and fair dealing to limit its exercise only for properly motivated good-faith reasons. Minimal consideration is created by the implied obligation of the terminating party to exercise its right fairly and in good faith.

Contract ¶ 6 is a termination for convenience clause because it purports to release Lamar from liability at its whim:

> Copy Acceptance: Lamar reserves the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed. Lamar reserves the right to reject or remove any copy either before or after installation, including immediate termination of this contract.

The first sentence is contractually meaningless. Lamar's "determination" has no connection to Lamar's purported right to reject or remove "any copy," even after installation. Anyone who sees the design can determine for themselves whether the design is in good taste and meets non-specific moral standards of the community as well as Kilshaw. Nobody at Lamar performs any polling to determine the "moral standards of the individual communities." ECF 53-1, at 112; Appx. 28 (Depo. Gibbens), at 11:1-25, 12:1-25. The "determination" is solely up to Kilshaw's whim. ECF 49 ¶ 16.

But, as stated, Kilshaw's "determination" is contractually meaningless because Lamar's argument hinges only upon the second sentence which purports to confer a unilateral right to terminate the contract. The Court should find this clause is unenforceable unless it is bounded by the implied warranty of good faith and fair dealing. *Restatement (Second) of Contracts* § 208 (1981) ("If a contract or term thereof is unconscionable at the time the contract is made a court may … enforce the remainder of the contract without the unconscionable term, or may so limit the application of any unconscionable term as to avoid any unconscionable result"); *Cantrell-Waind & Assocs., Inc. v. Guillaume Motorsports, Inc.*, 62 Ark. App. 66, 71 (1998) ("When a contract term leaves a decision to the discretion of one party, that decision is virtually unreviewable; however, courts will become involved when the party making the decision is charged with bad faith.")

"Bad faith" is flexibly defined, with guidance at Restatement (Second) of Contracts § 205, cmt. *d* (1981). Bad faith "may consist of inaction," as where Kilshaw declined to elucidate as to the precise nature of the objection. ECF 53-1, at 28. Kilshaw's habitual response time was less-than-one-hour. ECF 53-1, at: 29 (56 minutes); 26 (1 minute); 23 (13 minutes); 9 (11 minutes); 8 (29 minutes); 8 (2 minutes); 6 (9 minutes). But when Tom Hill sought Kilshaw's further explanation, over a day-and-a-half elapsed before he received notice of TST's demand letter. Compare ECF 53-1, at 28 (Hill asked for Kilshaw's input on Sept. 22, at 12:12 pm) with id., at 42 (Hill notified Kilshaw of the demand letter on Sept. 23, at 5:04 pm). This inaction has a tendency to prove bad faith.

Bad faith may also be found where one party evades the spirit of the bargain. Restatement (Second) of Contracts § 205, cmt. *d* (1981). The spirit of this bargain was to exchange the use of Lamar's billboard to advertise TST's Satanic Abortion Ritual (and underlying claim to a religious exemption from abortion regulations) for and in consideration of money. Lamar evaded the spirit of this bargain by refusing to post any billboards whatsoever. See ECF 47-1, at 135. If Lamar's objection was truly rooted in insufficient proof to support TST's claim to a religious exemption, it could have sought substantiating information. See ECF 53-1, at 6-7 (Kilshaw inquired into a Christian group's substantiating evidence that "abortion is PP's number one product," but made no inquiry into TST's substantiating proof of its legal claim).

Bad faith may also be found by willful rendering of imperfect performance and abuse of power to specify terms. *Id.* Contrary to Lamar's "pledge[] … to work with advertisers to achieve acceptable copy," Lamar simply refused to work with TST after finding TST's designs to be "embarrassing" and "ridiculous." ECF 53-1, at 25-26.

No part of Lamar's refusal to adhere to its contract obligation stemmed from a good faith determination that TST's designs were not within the "moral standards of the individual communities" in which they were to be displayed. Lamar crafted for itself a reputation for a willingness to post controversial billboards. ECF 53-1, at 125 ¶¶ 4-6; 130. This willingness to wade into controversial territory for profit was no problem during the negotiations which formed the parties' meeting of the minds. ECF 53-1, at 125 ¶¶ 5-6. Upon Lamar's execution of the contract, it became irrelevant whether Whit Weeks would be incapable of handling the "embarrassment" of a couple phone calls, an infinitesimal fraction of the 519,391 weekly impressions arising from the Springdale billboard (ECF 53-1, at 14). Because Lamar abused its contract right of review in an effort to evade its contract obligations, Lamar is liable for breach of contract. *Cantrell-Waind*, 62 Ark. App. 66 (buyer breached a real estate contract by unilaterally disrupting the close-by date).

Lamar argues that *Cantrell-Waind* is bad law, and that Arkansas only recognizes a stand-alone "bad faith breach" claim in insurance contracts. Yet Lamar offers no case which overrules the statement of law that "courts will become involved when the party making the decision is charged with bad faith." *Id.*, at *71. The singular case Lamar provides is *Arkansas Research Medical Testing, LLC v. Osborne*, 2011 Ark. 158, 4 (2011). But *Osborne* plainly states that there is no cause of action "*in tort* for a breach of the covenant of good faith and fair dealing." The breach of good faith and fair dealing is a garden variety breach of contract claim, and Lamar breached the contract "to display in good and workmanlike manner, and to maintain for the terms set forth above, outdoor advertising displays described above or on the attached list." ECF 53-1, at 18. If Lamar considered the designs "material" to its

obligation to lease out the specified billboards for the specified dates, it should train its account executives to have Kilshaw review the designs *before* binding itself in contract.

*2.3: The designs' claim to a religious exemption is supported by RFRA.*

Regardless of bad faith, Kilshaw's lay opinion that the designs are "misleading" is completely undermined by Lamar's citation to *Telescope*. As evidenced by *Telescope*, and by the various Religious Freedom Restoration Acts, religiously expressive activity enjoys a "most-favored nation status" among constitutional rights. *Calvary Chapel Dayton Valley v. Sisolak*, 140 S.Ct. 2603, 2612 (U.S., 2020) (Kavanaugh, J,. dissenting from denial of application for injunctive relief) (citing Doug Laycock, *The Remnants of Free Exercise*, 1990 S. Ct. Rev. 1, 49–50); *see also Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

As evidenced by *Telescope* and *Hobby Lobby*, Christians may charge the day-to-day activities of their "public accommodations" into ongoing acts of religious celebration, such that they have First Amendment immunity to religiously offensive regulations that require them to provide service on equal terms to the LGBTQ+ community or provide insurance coverage for birth control. Likewise, Satanists may charge their day-to-day healthcare decisions into acts of religious celebration, such that they too have First Amendment immunity to religiously offensive regulations that require them to carry and birth unwanted pregnancies. For there to be a Free Speech exclusion to public accommodations laws for Christians it cannot be "misleading and offensive" for Satanists to demand the same leeway when it comes to abortion. *Larson v. Valente*, 456 U.S. 228, 244 (1982) ("The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another.")

Kilshaw's lay opinion notwithstanding, the sincere religiosity of the Satanic Abortion Ritual *does* avert many State restrictions through application of RFRA. While true that no *clinic* has yet given TST the plain application of these statutes, clinicians are not the final adjudicators of the law; judges are. An Indiana judge, applying the substantively identical Indiana RFRA, has agreed with the proposition that abortion regulations substantially interfere with religious beliefs where the celebrant does not believe that "life" begins at "conception." ECF 53-1, at 61 *et seq.* TST's doctrine falls within this same class of beliefs and further bolsters the claim to a religious exemption by adding a religious practice. There is no credible argument that the designs put forward a "misleading" claim.

As for the notion that the advertisements are "offensive," the argument is again belied by the existence of RFRA. The "moral standards" of Arkansas and Indiana are determined by statutes, not the idle whim of some unelected Louisiana resident. *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 249 (1988) ("It is generally recognized that the public policy of a state is found in its constitution and statutes"). The existence of RFRA statutes in both Indiana and Arkansas is proof that the "moral standards" of each State favor governments which do *not* infringe upon the sincerely held religious beliefs and practices of their constituents except when it is provably unavoidable without catastrophic results. That Satanists would get equal access to this religious exemption upon demand is a feature of our great republic, not a bug. *See Kennedy v. Bremerton School District*, 142 S.Ct. 2407, 2430 (U.S., 2022) ("learning how to tolerate speech or prayer of all kinds is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry'"); *Larson v. Valente*, 456 U.S. 228, 245 (1982) ("Free exercise thus can be guaranteed only when legislators—and voters—are required to

accord to their own religions the very same treatment given to small, new, or unpopular denominations.")

    **WHEREFORE** the Court should deny Lamar's motion for summary judgment in full.

Respectfully submitted on March 24, 2023 by:



| | |
|---|---|
| **Matt Kezhaya** | **matt@crown.law** |
| Ark. # 2014161 | direct: (479) 431-6112 |
| Minn. # 0402193 | general: (612) 276-2216 |

121 Washington Ave. N., 4th Floor, Minneapolis, MN 55401

**Certificate of service**

**NOTICE IS GIVEN** that I, Matt Kezhaya, efiled the foregoing document by uploading it to the Court's CM/ECF system on March 24, 2023, which sends service to registered users, including all other counsel of record in this cause. *s/ Matt Kezhaya*