# 5:22-CV-5033

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

The Satanic Temple, Inc.
*Plaintiff*

*v.*

Lamar Advantage GP Company, LLC;
Lamar Advantage Holding Company; and
Lamar Advertising Company

*Defendants.*

## REPLY IN SUPPORT OF TST' MOTION FOR SUMMARY JUDGMENT



**Matt Kezhaya**
Ark. # 2014161
Minn. # 0402193

matt@crown.law
direct: (479) 431-6112
general: (612) 276-2216

100 S. Fifth St., Ste 1900, Minneapolis, MN 55402

## SUMMARY

Lamar's defense to the contract count belies the existence of a contract and is undermined by the text of the agreement. The contract entitled Lamar to money and entitled TST to the use of Lamar's billboards, it was not a "mere reservation" subject to Lamar's whim-based decision to cancel at any time. Pursuant to the canon that contracts must be interpreted as a whole such that they are enforceable, Contract ¶ 6 is bounded by the implied covenant of good faith and fair dealing. Lamar unilaterally deprived TST of the benefit of the bargain and stymied all of TST's effort to remedy the purported issue. This is textbook bad faith.

Lamar's defense to the ACRA count ignores the issue presented. The issue is not whether Lamar can review designs, it is whether Lamar can treat Satanists worse than its other customers by withholding standard conduct. Lamar has no First Amendment defense because it sold the right to not speak, presents no evidence that branded billboards are "speech," and requires advertisements disclaim any endorsement by Lamar.

## ARGUMENT

**1: Defendants breached the contract.**

TST asserts entitlement to a liability judgment on the breach of contract claim. Although Lamar disagrees with TST's interpretation of the contract, contract interpretation is a question of law, not one of fact. *Tri-Eagle Enterprises v. Regions Bank*, 373 S.W.3d 399, 403, 2010 Ark. App. 64, 5. To the extent there are any ambiguities, those are to be strictly construed against Lamar as the drafter of the contract. *Sturgis v. Skokos*, 335 Ark. 41, 53, 977 S.W.2d 217, 222 (1998).

*1.1: The parties agree there is a valid contract.*

Lamar's response acknowledges that an enforceable contract exists between TST and Lamar. Response, at 12. The first element of the breach-of-contract claim is satisfied.

*1.2: The contract required Lamar to post the designs.*

The second element requires a showing that the contract required the defendant to perform a duty. Lamar was to post designs for TST on specified billboards for specified dates. Lamar disputes this,

arguing instead that its obligation was merely to "reserve" billboards for TST's use. ECF 59 at 11. The text of the contract says otherwise:

> Advertiser [TST] authorizes and instructs The Lamar Companies (Lamar) to display in good and workmanlike manner, and to maintain for the terms set forth above, outdoor advertising displays described above.

ECF 53-1, at 18. Lamar accepted this duty by having its general manager sign the contract. ECF 53-1 at 19; *see also Altice USA, Inc. v. Johnson*, 2023 Ark. App. 120, 7 ("A party's manifestation of assent to a contract is judged objectively").

Lamar's interpretation that the contract merely "reserved" the billboards is further undermined by the standard conditions at ¶¶ 1 and 3. ECF 53-1, at 19. Billing is triggered by "commencement of *service*," ¶ 3, and was to occur even if TST failed to provide designs, ¶ 1. These billboards were not merely "reserved," Lamar was to provide the service of posting TST's designs.

Lamar's contrary argument is founded on cherrypicked communications which predates the fully executed contract with a merger

clause. ECF 53-1, at 19 ¶ 5. A merger clause "extinguishes all prior and contemporaneous negotiations, understandings, and verbal agreements." *Altice*, 2023 Ark. App. 120, 11. Lamar's relied-upon email was merged into the contract, it does not vary the terms.

Lamar's proffered atextual interpretation of the contract cannot be credited without rendering the contract void as illusory. *Showmethemoney Check Cashers, Inc. v. Williams*, 342 Ark. 112, 120 (2000) (illusory contracts are those which do not affix a "real liability" on both parties, and are not enforceable). Contrary to Lamar's circular argument, there is no "real" contract liability in a mere reservation because Contract ¶ 6 purports to vest Lamar a unilateral cancel the contract at any time. ECF 53-1, at 19 ¶ 6. Absent a finding that Contract ¶ 6 is bounded by the implied covenant of good faith and fair dealing, this is the very definition of an illusory promise. See Restatement (Second) of Contracts § 77, Illustration 2 (1981).

> A promises B to act as B's agent for three years from a future date on certain terms; B agrees that A may so act, but reserves the power to terminate the agreement at any time. B's agreement is not consideration,

since it involves no promise by him.

TST did not promise payment in return for an empty "reservation" of billboards, subject to Lamar's whim-based right to cancel the contract "at any time." Instead, TST entered into a contract obligation to remit payment in return for Lamar's contract obligation to "display … outdoor advertising displays designs" on the specified billboards for the specified dates. *Ponder v. McCain*, 2020 Ark. App. 210, 3 (mutual promises form contract obligations). The contract text belies Lamar's response.

*1.3: TST provided the designs, per the agreement.*

The third element requires a showing that TST fulfilled its end of the bargain. The bargain required that TST provide designs 10 days before the initial service date. ECF 53-1, at 19 ¶ 1. The initial service date was September 28, making the designs due on September 18. ECF 53-1, at 18 (09/28/20-10/25/20); *accord.* ECF 47-1, at 85. TST provided designs three days early, on September 15, the day that Lamar signed the contract. ECF 53-1, at 22, 19. TST also communicated the gist of the designs on September 2 and 4. ECF 53-1, at

125 ¶¶ 5-6. The specific designs were provided on September 15, the same day that Lamar signed the contract.

Lamar's response baldly asserts that TST failed to provide designs in a "timely fashion", its cited evidence is an email from before the contract. Response, at 6 (citing ECF 47-1, at 85, a Sept. 9 email). There are two problems.

*First*, there was nothing "untimely" about TST's provision of the designs. As addressed, TST provided the designs three days early and provided the gist of the designs two weeks early.

*Second*, if the designs really were materially late then Lamar would not have prompted Basulto to sign the contract on September 14 despite subjectively understanding that she was still waiting on creative approval. ECF 47-1, at 85 ("could you sign the contract so we can get the locations locked in while we await creative approval"); ECF 53-1, at 32 (on September 18, Hill couldn't push out the service date any further). There is no genuine dispute meriting a trial, TST fulfilled its end of the bargain.

*1.4: Lamar inexcusably failed to post the contracted-for designs.*

The final element requires a showing that Lamar failed to perform a contract obligation. *Zufari v. Architecture Plus*, 323 Ark. 411, 420 (1996) (failure to perform a duty is a breach). Lamar failed to perform the duty to emplace TST's designs on the specified billboards for the specified dates. To excuse its nonperformance, Lamar contends it has an unqualified and unilateral right to refuse to perform its contract obligation. Not so, Lamar's right to review the designs is bounded by the implied covenant of good faith and fair dealing. *Cantrell-Waind & Assocs., Inc. v. Guillaume Motorsports, Inc.*, 62 Ark. App. 66, 71 (1998) ("When a contract term leaves a decision to the discretion of one party, … courts will become involved when the party making the decision is charged with bad faith.")

*1.4.1: Lamar abused its right to review designs to evade the contract.*

Lamar responds that it rejected TST's designs in good faith. Not so. "Bad faith" is flexibly defined, with guidance at Restatement (Second) of Contracts § 205, cmt. *d* and *e* (1981). Bad faith "may

consist of inaction," as where Kilshaw declined to elucidate as to the precise nature of the objection. ECF 53-1, at 28.

Bad faith is found where one party evades the spirit of the bargain. Restatement (Second) of Contracts § 205, cmt. *d* (1981). The spirit of this bargain was to exchange the use of Lamar's billboard to advertise TST's Satanic Abortion Ritual (and underlying claim to a religious exemption from abortion regulations pursuant to the Arkansas and Indiana RFRA statutes), for and in consideration of money. Lamar evaded the spirit of this bargain by refusing to post any billboards whatsoever. See ECF 47-1, at 135.

At a minimum, good faith would have entailed adherence to Lamar's own Copy Acceptance Policy, where they "pledge[]to communicate the reason for any rejection of advertising copy and will work with advertisers to achieve acceptable copy if the originally submitted copy is not accepted." ECF 53-1, at 130. Lamar did not initially provide a reason for why the designs were denied, stating only *that* "these designs were rejected." ECF 53-1, at 31; compare *Restatement (Second) of Contracts* § 205, cmt. *e* (1981) (bad faith

includes: "rejection of performance for unstated reasons"). Only after further questioning did Lamar convey a nebulous assertion that the designs were "misleading and offensive," but offered no guidance as to how the designs could be altered to meet Lamar's approval. Lamar then stymied TST's efforts at conciliation with a flat assertion that "All of the content" was "misleading and offensive." Compare *id.*, illustration 9 ("A contracts to sell and ship goods to B. On arrival B rejects the goods on the erroneous ground that delivery was late. B is thereafter precluded from asserting other unstated grounds then known to him which A could have cured if stated seasonably.") Despite Hill's offer to procure details, those details never emerged. Id. (bad faith includes "abuse of a power to determine compliance or to terminate the contract.")

Kilshaw did not provide those details until two years later and in the midst of litigation. Ostensibly, the designs were denied because Kilshaw (a non-lawyer) thought the billboards proffered a misleading legal conclusion. ECF 53-1, at 116. But if Lamar's contemporaneous noncommittal refusal was truly rooted in a nonlawyer's

ignorance of the law, Kilshaw should have sought substantiating information as he did with non-Satanic groups. ECF 53-1, at 6-7. Instead, he simply ignored Tom Hill's request for further explanation.

*1.4.2: Lamar's purported unilateral mistake is meaningless.*

As a fallback, Lamar offers a slipshod excuse that it was willing to post TST's "past campaign" that showed Hill "what creative looked like in the past." ECF 53-1, at 13. The parties did not contract to post a claim to exemption from corporeal punishment, they contracted to post pro-reproductive rights designs. ECF 53-1, at 125 ¶¶ 5-6. Even if the legal standard allowed the Court to credit Lamar's post hoc and unverified assertion of a unilateral mistake over the affidavit of Basulto to the contrary,[1] unilateral mistakes do not excuse nonperformance. *E.g. Bishop v. Bishop*, 961 S.W.2d 770, 775, 60 Ark. App. 164, 172 (1998).

There is no genuine issue of material fact on the contract claim.

---

[1] It doesn't. *Bolderson v. City of Wentzville, Missouri*, 840 F.3d 982, 986 (8th Cir. 2016) ("proof with proof" standard).

Lamar contracted to post designs for TST with notice of what those designs would entail. But once Lamar no longer felt like adhering to the very contract which it prompted TST to sign, it refused to perform. The controlling canon is that contracts must be interpreted as a whole such that they are enforceable. *See RAD-Razorback Ltd. P'ship v. B.G. Coney Co.*, 289 Ark. 550, 554, 713 S.W.2d 462, 465 (1986). Lamar's right to review designs, contract ¶ 6, is bounded by the implied covenant of good faith and fair dealing. Lamar breached the implied covenant of good faith and fair dealing by unilaterally preventing the exchange of services for money as contracted, not flatly object to "all of the content." All four elements being satisfied, Lamar is liable for breach of contract. The Court should reserve the trial setting for a determination of damages.

**2: Lamar violated the ACRA.**

TST also seeks a judgment on the ACRA claim because the evidence shows that Lamar does not treat non-Satanists with the same contempt as it did TST. See ECF 3-7 (the record shows three

instances, ranging from 1-3 months prior to this contract, that Lamar had no difficulty giving particularized feedback and a meaningful opportunity to respond to non-Satanists).

*2.1: Lamar can review designs, but it can't treat religions differently.*

Rather than address the evidence or the argument, Lamar offers a defense of its right to review, generally. ECF 59, at 18-19. But Lamar's undisputed right to review designs says nothing of Lamar's demonstrated (and undisputed) inconsistency in application of its standards based on the religious ideology of its advertisers.

The right to apply editorial standards to designs is not a license to discriminate. Editorial standards are properly constrained by the ACRA to religiously neutral rules, differential treatment breaks the law. Lamar engaged in differential engaged in religious discrimination when it:

(1) Refused TST the application of its "standard" explanation that it does not engage in content discrimination among its advertisers, yet Lamar had no problem giving a Christian pro-

  choice group the benefit of its "standard" explanation. ECF 53-1, at 3-9.;

(2) Refused TST the application of its "pledge" to communicate the reasons for denial and to achieve workable copy, yet Lamar had no problem giving application of this "pledge" to non-Satanic groups. Id.; and

(3) Called TST's religious viewpoint, ideology, and iconography all "misleading and offensive." ECF 53-1, at 24.

Lamar has no answers and no defense for this differential treatment. All it offers is the facile argument that crediting TST's position would necessarily entail requiring Lamar to post nudity and profanity "simply because it touches on religion." If Lamar provably posted nudity and profanity for non-Satanists, but refused Satanists equal treatment, then it would need to explain its differential treatment. Lamar does not explain the differential treatment, so it has failed to rebut the claim of discrimination.

*2.2: Lamar has no First Amendment defense.*

Lamar closes with a claim that the First Amendment privileges it to engage in differential treatment, couched in terms of a right to refrain from speaking. As more comprehensively discussed in the response to Lamar's motion (ECF 65, at 7-13), there are three critical flaws in Lamar's claimed First Amendment defense.

*First*, even if we credit Lamar's questionable assumption that a branded billboard renders the posted designs "speech" of Lamar, Lamar sold TST the right to use its posted billboards. ECF 53-1, at 18. Lamar contracted away its right to not speak, so any First Amendment defense is waived. *T.C. v. State*, 2010 Ark. 240, 16.

*Second*, Lamar's circular argument that branded billboards make designs the speech of Lamar is faulty. *Speech* requires an intent to convey a particularized message where there is a "great" likelihood that the receiver will understand the message. *Spence v. State of Wash.*, 418 U.S. 405, 411 (1974). Lamar bears the burden to prove its claim that branded billboards are speech. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 n. 5 (1984). But Lamar presents

no shadow of a claimed point, nor any suggestion of how anyone could recognize the asserted point.

*Third*, Lamar's sole cited authority is inapposite. *See Telescope Media Grp. v. Lucero*, 936 F.3d 740 (8th Cir. 2019). Unlike the Christian videographers there, Lamar does not design the advertisements it posts and does not purport to push any religious agenda. Instead, Lamar disclaims the advertisements it posts (ECF 53-1, at 130–requiring, *e.g.*, "Paid for by ABC Committee"), and vociferously contends that it does *not* post designs based solely on agreement with the message contained. Id.; see also ECF 53-1, at 23 (Kilshaw had to remind Gibbens that it runs "thousands of church ads" so it has to run the "occasional atheist, satanic, etc." submission it receives).

Even if the ACRA count presented an as-applied defense for Lamar, the statute survives judicial scrutiny. The prevention of immutable class-based discrimination in the marketplace is recognized to be "well within the State's usual power." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 572 (1995). And the remedy sought is narrowly tailoring because it is triggered only

upon a finding of discrimination.

TST's proffered application of the ACRA seeks to ensure that Lamar's editorial standards are applied consistently and fairly to all. This interpretation does not infringe on Lamar's First Amendment rights but upholds American principles of ordered liberty.

**WHEREFORE** the Court should grant a partial summary judgment as to liability to TST for breach of contract and the ACRA. Respectfully submitted on April 7, 2023 by:



| **Matt Kezhaya** | matt@crown.law |
|---|---|
| Ark. # 2014161 | direct: (479) 431-6112 |
| Minn. # 0402193 | general: (612) 276-2216 |

100 S. Fifth St., Ste. 1900, Minneapolis, MN 55402

### CERTIFICATE OF SERVICE

**NOTICE IS GIVEN** that I, Matt Kezhaya, submitted for electronic filing the foregoing document by uploading it to Court's CM/ECF system on April 7, 2023. The CM/ECF system sends notification to all counsel of record. */s/ Matt Kezhaya*