**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF ARKANSAS**
**FAYETTEVILLE DIVISION**

**THE SATANTIC TEMPLE, INC.**                                                    **PLAINTIFF**

**V.**                               **CASE NO. 5:22-CV-05033**

**LAMAR ADVERTISING COMPANY;**
**LAMAR ADVANTAGE GP COMPANY, LLC;**
**and LAMAR ADVANTAGE HOLDING**
**COMPANY**                                                              **DEFENDANTS**

<u>**MEMORANDUM OPINION AND ORDER**</u>

**Table of Contents**

I.   BACKGROUND ................................................................................. 4

   A.  The Satanic Abortion Ritual ................................................. 4

   B.  Lamar .................................................................................... 5

   C.  Events Giving Rise to Litigation .......................................... 7

      1.  Lamar and TST Negotiated and Executed a Contract .................................... 7

      2.  Lamar Confused the Nature of TST's Upcoming Ad Campaign ..................... 8

      3.  Lamar Approved the Never Be Hit Campaign ................................................ 9

      4.  Lamar Rejected the Satanic Abortion Ritual Campaign Artwork ................. 10

      5.  TST sent Lamar a Demand Letter ................................................................. 12

      6.  Lamar Canceled the Contract ....................................................................... 13

II.  LEGAL STANDARD ....................................................................... 14

III. DISCUSSION .................................................................................. 15

   A.  Discrimination ...................................................................... 15

      1.  Framework ..................................................................................................... 16

      2.  Lamar's Decision to Reject TST's Designs ................................................. 18

      3.  Lamar's Decision to Forgo Feedback & Cancel the Contract ...................... 20

   B.  Breach of Contract .............................................................. 26

IV.  CONCLUSION ............................................................................... 29

This matter begins with a contract. Defendants Lamar Advantage GP Company, LLC ("Lamar-Indiana"), Lamar Advantage Holding Company ("Lamar-Arkansas"), and Lamar Advertising Corporation ("Lamar-HQ") (collectively, "Lamar") own and operate billboards, which they rent out for use as advertising space.[1] On September 15, 2020, Lamar agreed to run Plaintiff The Satanic Temple's ("TST") advertising campaign on billboards in Indiana and Arkansas between September 28 and October 25, 2020. Ultimately, however, Lamar rejected TST's advertising copy and canceled the contract. TST, an atheistic religious organization in the nontheistic branch of Satanism, blames religious animus.

TST alleges Lamar breached the contract and violated the Arkansas Civil Rights Act ("ACRA"), Ark. Code Ann. § 16-123-107(a)(4), which guarantees the right to engage in contractual transactions without religious discrimination. *See* Doc. 56. In response, Lamar argues the contract preserved its right to reject advertising copy, and it neither breached the contract nor violated Arkansas law. *See* Doc. 66. Now all parties move for summary judgment on the issue of liability.

---

[1] On March 13, 2023, TST filed its amended complaint (Doc. 56) adding Lamar-HQ as a defendant. Lamar did not oppose amendment. *See* Doc. 41. However, because the dispositive motion deadline occurred before TST filed its amended complaint, Lamar's Motion for Summary Judgment (Doc. 47) was brought on behalf of Lamar-Arkansas and Lamar-Indiana—not Lamar-HQ, which had not yet been formally named in the litigation. Lamar asks that Lamar-HQ be allowed to join its subsidiaries' motion. (Doc. 73, p. 1, n.1). The Court finds that appropriate and treats the motion as if brought by all three Lamar entities.

The Court finds a material issue of disputed fact remains. Neither party is entitled to summary judgment. Accordingly, TST's Motion for Partial Summary Judgment and Lamar's Motion for Summary Judgment are both **DENIED.**[2]

## I.       BACKGROUND[3]

### A.       The Satanic Abortion Ritual

In August 2020, TST introduced the "Satanic Abortion Ritual," which it describes as the "ceremonious casting off of guilt, doubt, and mental discomfort that the member may be experiencing in connection with their election to abort the pregnancy." (Doc. 56, p. 10). The ritual incorporates the abortion procedure into a "sacramental act that confirms bodily autonomy and the adherence to scientific supremacy, wards off the effects of unjust persecution, and reasserts as ideals the dual paths of reason and confidence." *Id.* at p. 6.

In some states, the Satanic Abortion Ritual conflicts with state law restricting access to abortion care. But, according to TST, Arkansas's Religious Freedom Restoration Act ("RFRA"), Ark. Code Ann. § 16-123-401, *et seq.*, and Indiana's RFRA, Ind. Code Ann. § 34-13-9-0.7, *et seq.*, protect the right of TST members to participate in

---

[2] The Court considered Lamar's Motion for Summary Judgment (Docs. 47 & 47-1); Lamar's Brief in Support of Summary Judgment (Doc. 48); Lamar's Statement of Facts (Doc. 49); TST's Response to Lamar's Statement of Facts (Docs. 64 & 64-1); TST's Response in Opposition to Lamar's Motion (Doc. 65); Lamar's Reply to TST's Response to the Statement of Facts (Doc. 72); and Lamar's Reply to TST's Response in Opposition (Docs. 73 & 73-1).

It also considered TST's Motion for Partial Summary Judgment (Doc. 52); TST's Statement of Facts (Docs. 53 & 53-1); TST's Brief in Support of Partial Summary Judgment (Doc. 54); Lamar's Response in Opposition to TST's Motion for Partial Summary Judgment (Doc. 60); Lamar's Response to TST's Statement of Facts (Doc. 62); and TST's Reply to Lamar's Response in Opposition (Doc. 70).

[3] Unless otherwise noted, the facts recited below are undisputed.

the ritual—even if Arkansas and Indiana law would otherwise prevent an individual from obtaining an abortion. *See id.* at p. 5. In both states, the RFRA statute prohibits the government from substantially burdening a person's religious exercise unless the government can establish that imposing such a burden is both in furtherance of a compelling governmental interest and the least restrictive means of doing so.

TST sought to spread awareness about the Satanic Abortion Ritual, particularly TST's belief that engaging in the ritual exempted an individual from state abortion restrictions. To that end, it hired SeedX, a marketing firm, to develop an advertising campaign.

## B.        Lamar

Lamar-HQ, a publicly traded corporation, wholly owns both Lamar-Indiana and Lamar-Arkansas, albeit through several layers of other wholly owned subsidiaries. *See* Docs. 12 & 14.

This case centers on the choices made by and interactions among several Lamar employees, including the Lamar-HQ Vice President for Governmental Relations (Hal Kilshaw); three general managers, one in Indiana (Jason Graham) and two in Arkansas (Thomas Gibbens and Whit Weeks) and one account executive in Indiana (Thomas Hill).



Within Lamar-Arkansas and Lamar-Indiana, account executives sell advertising space to individual clients. That may involve working out the locations, timing, and other logistics. An account executive within a particular market may rent Lamar-owned billboard space within his or her area—but may also rent Lamar-owned space in other territories. To execute the contract with a client, however, requires a general manager to sign off. *See* Doc. 47-1, p. 63 ("This contract is NOT BINDING UNTIL ACCEPTED by a Lamar General Manager.").

General managers may also flag advertising content as potentially controversial. *Id.* at p. 55. But the ultimate decision to accept or reject a given design rests with Lamar-HQ—specifically, in this matter, Hal Kilshaw, Vice President for Governmental Relations,

who was responsible for reviewing and approving potentially controversial designs. *Id.* at p. 69.

### C.       Events Giving Rise to Litigation

### 1.       Lamar and TST Negotiated and Executed a Contract

On September 2, and again on September 4, 2020, SeedX CEO Jacqueline Basulto spoke with Senior Account Executive Thomas Hill about renting billboards in Arkansas and Indiana. Location was key, according to Basulto, because TST wanted its advertisements placed in high traffic areas near "fake abortion clinics."[4] *Id.* at p. 13.

Over the next ten days or so, Basulto and Hill settled on billboard locations, a time frame, and pricing for the ad campaign. Because Basulto had not yet received TST's final approval for the artwork and ad copy, she did not immediately sign the contract. But, on September 14, Hill asked Basulto to execute the contract to "get the locations locked in while we await creative approval." (Doc. 47-1, p. 85). Basulto signed the contract on TST's behalf the same day. *Id.* at p. 63. The next morning—September 15, at 8:28 a.m.— Jason Graham, a general manager in Indiana, signed on behalf of Lamar. *Id.* at p. 137.

The contract obligated Lamar to "display in good and workmanlike manner" TST's advertising campaign on eight billboards, four in Indiana and four Arkansas, between September 28, and October 25, 2020. In exchange, TST agreed to pay Lamar $16,387. *Id.* at p. 62. Critically, paragraph 6 of the contract reserved Lamar's right to reject advertising copy not "in good taste" or "within the moral standards" of the community in

---

[4] According to TST, "Fake abortion clinics, also known as 'crisis pregnancy centers,' are clinics that offer 'pregnancy related services' (to an unsuspecting layperson, this would include abortions) but will do anything to deter its patrons from obtaining an abortion including shaming, deception, manipulation, and outright intimidation." (Doc. 56, p. 13).

which it was to be displayed, and to "reject or remove any copy either before or after installation." *Id.* at p. 63.

### 2. Lamar Confused the Nature of TST's Upcoming Ad Campaign

Hill and his managers knew that Basulto represented TST and that the contracted-for billboards would be used to display TST's advertisements.[5] Nevertheless, it appears Lamar employees misunderstood the nature of TST's upcoming ad campaign.

On September 2, Basulto shared with Hill an example of a prior TST campaign that ran on Lamar billboards. *Id.* at p. 65. The advertisement (pictured below) reads, "Never be hit in school again. Exercise Your Religious Rights." *Id.* (hereinafter, "Never Be Hit").



*Id.* Basulto's email to Hill clearly stated the Never Be Hit example related to a prior campaign. *Id.* ("I am also attaching our past campaign with Lamar to show you what creative looked like in the past."). Furthermore, Basulto claims she made clear to Hill that

---

[5] The contract expressly acknowledged that Basulto executed it "as an agent for a *disclosed* principal." (Doc. 47-1, p. 63) (emphasis added)). Furthermore, prior to signing the contract, Hill sent an email to other Lamar employees with the subject line, "The Satanic Temple – Creative Approval." *Id.* at p. 69).

the campaign would be pro-reproductive rights and related to the religious practices of TST, and "[t]he locations were material because they faced and were on the route to 'fake abortion' clinics." (Doc. 53-1, p. 125). Hill, however, has no recollection of what he discussed with Basulto on the phone. *Id.* at p. 105.

Hill appears to have believed that TST's upcoming campaign would again use the Never Be Hit copy. On September 8, he forwarded the Never Be Hit image to two Lamar employees, one of whom was Graham, to ensure it complied with Lamar's copy acceptance policy, (Doc. 47-1, pp. 69–70). Graham forwarded the image to Kilshaw, who was responsible for reviewing and approving potentially controversial designs. *Id.* at p. 69.

### 3.      Lamar Approved the Never Be Hit Campaign

Kilshaw signed off on the Never Be Hit artwork on September 8, 2020. *Id.* He stood by that decision, even when Thomas Gibbens, a general manager in Arkansas, expressed discomfort about working with TST.

On September 15, 2020, at 9:21 a.m.—i.e., after both Basulto and Graham had signed the contract—Hill forwarded the Never Be Hit image to Gibbens. *Id.* at p. 72. Gibbens forwarded it to Kilshaw, and the two engaged in the following email exchange:

Gibbens:     Can you buzz me about the satanic temple. We just found out this buy is coming through an agency. The contract originated from the Indianapolis office. I do not have the final artwork yet. Can we reject this based on not meeting the moral standards of our community? I would include Springdale AR as well. I'll send you the contract in the next e-mail

Kilshaw:     I approved the copy on 9/8. We run thousands of church ads and have to post the occasional atheist, satanic, etc. submissions we receive.

Gibbens:     Just covering my bases.

Kilshaw:      No worries

*Id.* at pp. 71–72. Gibbens forwarded that email chain with Kilshaw to two other Lamar employees at 9:54 am, stating: "See below. If anyone calls during the campaign direct to my voicemail. We will make no comments." *Id.* at p. 78.

### 4.      Lamar Rejected the Satanic Abortion Ritual Campaign Artwork

Kilshaw's approval and Gibbens' acquiescence were ultimately irrelevant because TST's upcoming campaign focused on the Satanic Abortion Ritual. On September 15, at 9:41 a.m., Basulto emailed Hill draft versions of the artwork for that campaign.[6] *Id.* at p. 92. All five of the proposed designs incorporated text stating, "The Satanic Abortion Ritual Permits First-Trimester Abortions Upon Demand." *Id.* at pp. 102–06.

Hill replied to Basulto, stating, "I'll have to get these approved on my end ..... the content is totally different than what we had originally approved." *Id.* at p. 92 (ellipses in original). Basulto responded, explaining that "[t]he others were previously approved billboards that we ran in the past." *Id.*

Hill forwarded the five proposed designs to Graham and Gibbens. Both forwarded them to Kilshaw for review. *Id.* at p. 115. Gibbens also sent the email chain to several others, including Whit Weeks, another General Manager in Arkansas.

Weeks was not pleased. In response to Gibbens, he wrote, "This is ridiculous." (Doc. 53-1, p. 26). Weeks also emailed his staff, attaching the five proposed designs and stating:

Good morning.

---

[6] At this point, Basulto was still waiting on TST's final approval of the designs. *Id.* at p. 92.

> One of these pieces of creative that will be running in NW Arkansas starting at the end of the month.
>
> This is why we shouldn't respond to agency requests listed as "Client X" or without gaining knowledge of the customer. This will be running in our market and below rate.
>
> I'm embarrassed that this will represent us.

(Doc. 53-1, p. 25). That was at 10:44 a.m. At 10:58 a.m., Kilshaw replied to both Graham and Gibbens: "All of these are misleading and offensive so no on all of them." (Doc. 47-1, p. 115).

On September 21, Hill emailed Basulto stating that "our corporate office has rejected all copy pending approval. The original design you shared was approved but not the newest versions." *Id.* at p. 120. Basulto responded by sharing four images—the final artwork that TST intended to use. The designs resembled some of the earlier work but incorporated a different tag line. Each final advertisement stated: "Our Religious Abortion Ritual Averts Many State Restrictions." *Id.* at pp. 129–132. Hill replied, explaining again that the designs were rejected and attaching paragraph 6 of the contract. (Doc. 53-1, p. 31).

Hill emailed Basulto again on September 22, to ask whether Lamar should expect to receive revised/updated designs that day. They engaged in the following email exchange:

Basulto:    Hi Tom,

We are working to understand how we can accommodate Lamar's policy.

Is there anything specific about the messaging or imagery that we should focus on?

Hill:    I [sic] was the content is misleading and offensive.

| Basulto: | All of the content? In what ways is it misleading and in what ways is it offensive? Can you clarify? |
|---|---|
| Hill: | All of the content |
| Basulto: | In order to revise the designs, we need more specific information about what is misleading or offensive. The messaging and content is in line with the beliefs of the Satanic Temple and their religious beliefs, so we can't move forward without an understanding of what characteristics are specifically off-base. |
| Hill: | I'll see if I can get more details. |
| | Can we not use the original design you'd sent? |
| Basulto: | That was a design from a past campaign with Lamar, not the current campaign. |

*Id.* at p. 31.

Hill forwarded to Kilshaw Basulto's question about which specific elements Lamar considered misleading or offensive to Kilshaw. He copied Gibbens and Graham.

Graham replied to the group: "For starters they asked about a campaign to protect children. Then switched to aborting them. But I'll let Hal guide us to word the reply." (Doc. 47-1, p. 117). Kilshaw responded: "The right to have an abortion in the U.S. is provided under law not the Satanic Temple's abortion ritual." *Id.*[7]

### 5.     TST sent Lamar a Demand Letter

TST, through its attorney Matthew Kezhaya, emailed a demand letter and preservation notice to Hill on September 23, 2020. Hill promptly forwarded it to Kilshaw,

---

[7] The records provided to the Court for the purpose of ruling on the parties' summary judgment motions indicate Hill did not actually shared the final artwork with Lamar's decisionmakers. It appears Kilshaw's rejection was based on the draft designs provided on September15, 2020.

Graham, and Gibbens. The demand letter alleged that Lamar was in breach of the parties'

contract. Kezhaya explained: "Ostensibly, the issue is that my client's designs are not 'in

good taste and within the moral standards of the individual communities in which it is to

be displayed.' But you have refused to indicate what, exactly, is wrong with the designs

so the problem can be remediated." *Id.* at p. 134 (citation omitted).

### 6.      Lamar Canceled the Contract

On September 25, Graham emailed Kezhaya stating that Lamar would be

canceling the contract per paragraph 6. *Id.* at p. 135. Hill emailed another Lamar

employee and Gibbens stating, in part, "FYI, it's been determined that we will cancel this

contract. My GM requested we wait a few days to see how they respond and if they revise

the creative so stay tuned." *Id.*

Finally, on September 30, Hill emailed Basulto and the two engaged in the

following exchange:

> Hill:          Hey Jacqueline,
>
>                Since it doesn't appear that we will be getting any revised
>                designs to approve, we are going to cancel this contract and
>                any invoices that have ran for this contract.
>
>                Please confirm you've received this notice of cancellation.
>
>                Thank You!
>
> Basulto:     Thank you for the notification. We never received any
>                additional information on how to address changing specifics
>                on the designs.
>
> Hill:          I believe their legal team communicated with ours. If we get
>                revised designs similar to the last ones we can revisit the
>                campaign.

*Id.* at p. 137.

## II.      LEGAL STANDARD

A party moving for summary judgment must establish both the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.  *See* Fed. R. Civ. P. 56. The Court must review the facts in the light most favorable to the opposing party and give that party the benefit of any inferences that can be drawn from those facts. *Canada v. Union Elec. Co.*, 135 F.3d 1211, 1212–13 (8th Cir. 1997). If the moving party meets its burden, "the nonmoving party must then come forward with specific facts showing that there is a *genuine issue for trial*." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original) (quotations omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Id.*

"To be material, a fact must 'affect the outcome of the suit under the governing law.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "'The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient' to survive summary judgment." *Anderson v. Durham D&M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Liberty Lobby*, 477 U.S. at 252). The non-moving party must instead produce sufficient evidence "such that a reasonable jury could return a verdict" in their favor. *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994) (quoting *Liberty Lobby*, 477 U.S. at 248 (1986)).

"Cross-motions for summary judgment require viewing the evidence in the light most favorable to the plaintiff and defendant in turn, depending on whose motion is being considered." *Pitman Farms v. Kuehl Poultry, LLC*, 48 F.4th 866, 875 (8th Cir. 2022) (citing

*Fjelstad v. State Farm Ins. Co.*, 845 F. Supp. 2d 981, 984 (D. Minn. 2012)). "[T]he standard summary judgment principles apply with equal force." *Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 945–46 (S.D. Iowa 2005).

## III.     DISCUSSION

Below, the Court addresses the parties' respective motions. The Court concludes several material issues of fact remain in dispute, thereby precluding summary judgment.

### A.     Discrimination

The ACRA guarantees "the right of an otherwise qualified person to be free from discrimination because of . . . religion." Ark. Code Ann. § 16-123-107(a). This right expressly encompasses "[t]he right to engage in property transactions . . . and other contractual transactions without discrimination." *Id.* § 107(a)(4). "Such transactions include purchases on credit at retail stores and related establishments as well as other types of contractual agreements, including franchise agreements, sales contracts, and employment contracts." Theresa M. Beiner, *An Overview of the Arkansas Civil Rights Act of 1993*, 50 Ark. L. Rev. 165, 186–87 (1997). Any person injured by an intentional act of such discrimination––as TST alleges here––"shall have a civil action . . . to enjoin further violations, to recover compensatory and punitive damages, and, in the discretion of the court, to recover the cost of litigation and a reasonable attorney's fee." Ark. Code Ann. § 16-123-107(b).

TST alleges two instances of unlawful discrimination in violation of the ACRA. TST claims that religious animus caused Lamar, first, to reject TST's Satanic Abortion Ritual ad campaign, and second, to refuse to provide TST with actionable feedback and ultimately cancel the contract. The first allegation fails because TST does not establish

Lamar's decision was because of religious animus. The second allegation survives. TST establishes an issue of material fact that remains in dispute.

### 1.      Framework

As a federal court sitting in diversity, the Court must generally "follow the announced state law." *Williamson v. Hartford Life & Acc. Ins. Co.*, 716 F.3d 1151, 1154 (8th Cir. 2013). However, caselaw construing Arkansas Code § 16-123-107(a)(4) (barring discrimination in contracting) focuses almost exclusively on claims of discrimination in employment, rather than contracting among private actors more broadly. Given the dearth of analogous caselaw, this Court must "predict how the highest court in the state would rule on the issue[s]" presented here. *Id.* (quotations omitted).

In the context of the ACRA, Arkansas courts routinely look to caselaw construing federal anti-discrimination laws for guidance. *See Island v. Buena Vista Resort*, 352 Ark. 548, 556 (2003) ("We have explained that our state courts may look to federal decisions for persuasive authority when considering claims under the Arkansas Civil Rights Act."). The Court agrees with Lamar that 42 U.S.C. § 1981—which protects the right to make and enforce contracts free of racial discrimination—provides the most apt framework by which to analyze non-employment related claims of discrimination in contracting among private actors.[8] While not binding, at least one other court agrees. In *Mosby v.*

---

[8] TST proposes application of the *Arlington Heights* framework, first articulated in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 260 (1977). In that case, the Supreme Court held that a plaintiff must establish that discriminatory purpose or intent motivated the state's allegedly discriminatory act to succeed on an equal protection challenge. Evidence of discriminatory impact did not suffice, according to the Court.

TST reads *Arlington Heights* to stand for the proposition that "an action that has a discriminatory effect is not a violation of Equal Protection or Civil Rights protections unless

*International Paper Company*, the district court concluded that "claims brought under Arkansas Code § 16-123-107(a)(4) should be analyzed in the same manner as claims brought under 42 U.S.C. § 1981." 2008 WL 2669148, at *3 (E.D. Ark. July 1, 2008) (assessing a § 16-123-107(a)(4) claim unrelated to employment). Like the ACRA, § 1981 applies to private actors and specifically governs contracting relationships.

To establish a prima facie case of discrimination under § 1981—and, by extension, the ACRA—TST must show: "(1) membership in a protected class, (2) discriminatory intent on the part of the defendant, (3) engagement in a protected activity, and (4) interference with that activity by the defendant." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 469 (8th Cir. 2009). It is the second element, discriminatory intent, at issue here.

Generally, to survive a motion for summary judgment on a discrimination claim, "the plaintiff must either present admissible evidence directly indicating unlawful discrimination, or alternatively, . . . create an inference of unlawful discrimination under the burden-shifting framework established in" *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014). Because TST lacks direct evidence of discriminatory intent, the Court applies the *McDonnell Douglas* framework to analyze its claims.[9]

---

that action is motivated by discriminatory intent." (Doc. 54, p. 19). That is not incorrect, and it certainly informs the analysis under the ACRA. But it represents a general principle of equal protection law and must be considered in the context of caselaw that more closely resembles the circumstances here.

[9] While state law does not expressly require courts to apply *McDonnell Douglas* to ACRA claims premised on indirect evidence, the Court concludes that the Arkansas Supreme Court would likely do so in these circumstances. The Arkansas Supreme Court and state intermediate courts apply the framework to claims of employment discrimination brought under the ACRA and Title VII. *See, e.g., Greenlee v. J.B. Hunt Transp. Servs.*, 2009 Ark. 506, 7 (2009); *Flentje*, 340 Ark. at 572; *Crockett v. Counseling Servs. of E. Ark., Inc.*, 85

Under this framework, the plaintiff must first make a prima facie showing of discrimination. *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015). If the plaintiff satisfies that burden, the defendant must produce evidence of a legitimate, non-discriminatory reason for the challenged action. *Id.* If the defendant does so, the plaintiff must prove the defendant's reasoning is pretext for unlawful discrimination. *Id.*

### 2.      Lamar's Decision to Reject TST's Designs

The Court begins with Lamar's decision to reject TST's Satanic Abortion Ritual advertising campaign. It is undisputed that TST satisfies the first, third, and fourth element of its prima facie case. Lamar does not dispute that TST is a member of a protected class under the ACRA. Ark. Code Ann. § 16-123-107(a) (prohibiting discrimination on the basis of religion). Nor does Lamar dispute that TST was engaged in protected activity or that its conduct interfered in that activity. Instead, the parties' respective motions focus on whether Lamar acted with discriminatory intent.

Lamar asserts that the "undisputed evidence shows that the defendants were always willing to contract with TST," (Doc. 48, p. 12), and would have run advertisements that displayed TST's religious iconography or otherwise communicated TST's beliefs, *id.* at p. 13. According to Lamar, it rejected TST's designs for one simple reason: The artwork

---

Ark. App. 371, 380 (2004). In addition, the Eighth Circuit has declared "[t]he *McDonnell Douglas* burden-shifting framework applies to motions for summary judgment in cases arising under § 1981 where there is no direct evidence of discrimination." *Harris v. Hays*, 452 F.3d 714, 717 (8th Cir. 2006). Finally, the ACRA states that "[a] defendant may avoid liability under this subchapter by showing that his or her actions were based on legitimate, nondiscriminatory factors and not on unjustified reasons," Ark. Code Ann. § 16-123-103, suggesting that the Arkansas legislature intended courts to consider a defendant's justification for the adverse action.

violated Lamar's Ad Copy Acceptance Policy. Lamar points to emails and deposition testimony to substantiate its claim that Kilshaw legitimately believed TST's Satanic Abortion Ritual advertisements violated Lamar's Ad Copy Acceptance Policy and that he reached that conclusion in a neutral fashion.

There may be room to question Kilshaw's credibility. On September 15, 2020, when Kilshaw rejected the Satanic Abortion Ritual advertisements, he wrote: "All of these are misleading and offensive so no on all of them." (Doc. 47-1, p. 118). In his deposition testimony, Kilshaw explained that he considered the ads misleading because "the copy would lead the reader to believe that if they accepted The Satanic Temple's view, they could violate state law." (Doc. 53-1, p. 116). Likewise, he explained, he considered the ads offensive "because they were sending the message out to readers of the billboard that it's ok to violate the law if you agree with the satanic ritual." (Doc. 53-1, p. 119). However, the ads that prompted Kilshaw's response stated, "The Satanic Abortion Ritual Permits First-Trimester Abortions Upon Demand." They make no mention of the law. At this point in time, *Roe v. Wade* was still in effect, making it even less clear that the ads communicated permission to violate the law.[10]

However, TST's argument ultimately fails. Here is the problem: TST fails to connect the doubts about Kilshaw's justification to religious animus. Kilshaw did not make any disparaging comments about TST, and he approved the Never Be Hit campaign, which prominently features TST's iconography. TST points to comments made by

---

[10] On September 22, when Hill asked for clarification on behalf of Basulto, Kilshaw stated, "The right to have an abortion in the U.S. is provided under law not the Satanic Temple's abortion ritual." *Id.* at p. 117. This statement, made in between his rejection of TST's designs and his eventual deposition testimony, seems more credible. Still, a reasonable factfinder might conclude his statements were inconsistent.

Gibbens, Graham, and Weeks. But there is no evidence that these individuals participated in or even influenced the decision to reject TST's design. Kilshaw was not copied on Weeks' email, and Graham's comment was made after Kilshaw had already rejected the Satanic Abortion Ritual designs. While Gibbens had expressed concerns about TST, there is little evidence that Gibbens' comments had any impact on Kilshaw, who refused to reverse his approval of the Never Be Hit Campaign.

Accordingly, TST fails to cite sufficient evidence to create a reasonable inference that Lamar rejected TST's proposed ads because of TST's religious beliefs.[11]

### 3. Lamar's Decision to Forgo Feedback & Cancel the Contract

TST does, however, demonstrate that a triable issue of fact exists with respect to Lamar's decision to forgo feedback and cancel the contract. The Court finds that TST presents sufficient evidence to satisfy its prima facie burden, which Lamar fails to rebut with a legitimate, nondiscriminatory explanation. Because genuine issues of material fact remain, neither party is entitled to summary judgment.

For race-discrimination (or, here, religious-discrimination) claims at the summary judgment stage, courts "look to see whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race [or religion] caused" the interference in protected activity. *Wince v. CBRE, Inc.*, 2023 WL 3191422, at *3 (7th Cir. May 2, 2023) (cleaned up). As explained, a plaintiff may come forward with direct evidence of intentional discrimination, or alternatively, rely on the *McDonnell Douglas* burden-shifting framework. Here, the Court analyzes TST's allegation under the latter approach.

---

[11] As a result, this allegation of discrimination does not survive summary judgment and may not be pursued at trial.

TST satisfies the first and third elements of its prima facie case. The ACRA prohibits discrimination on the basis of religion, making TST a member of a protected class under the statute. *See* Ark. Code Ann. § 16-123-107(a). In addition, the alleged discrimination—which includes refusal to provide feedback and cancelation of the contract—implicates "protected activity." The ACRA safeguards "[t]he right to engage in credit and other contractual transactions without discrimination." Ark. Code Ann. § 16-123-107. This language makes clear that Arkansas's statutory protection against discrimination extends beyond mere execution of a contract. The Court finds that the right to "engage in contractual transactions" necessarily includes the right to negotiate and enforce a contract.[12]

TST also presents sufficient evidence—or at least establishes an issue of material fact—with respect to the fourth element, interference in a protected activity. "To demonstrate unlawful interference . . . under § 1981, . . . a plaintiff must show that [the defendant] 'thwarted' the [plaintiff's] attempt to make a contract." *Withers v. Dick's Sporting Goods, Inc.*, 636 F.3d 958, 965 (8th Cir. 2011) (quotation marks omitted). "By 'thwart,' [the Court] mean[s] that interference is established where a merchant 'blocks' the creation of a contractual relationship." *Id.* (quotation marks omitted).

---

[12] The construction of § 1981 substantiates the Court's reading of the ACRA. "Under § 1981 contract formation begins and the statutory protections are triggered once a customer has made some tangible attempt to contract." *Green v. Dillard's, Inc.*, 483 F.3d 533, 539 (8th Cir. 2007) (quotations omitted). *See also Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) ("Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship.").

Here, a reasonable factfinder could conclude that, prior to canceling the contract, Lamar intentionally made it functionally impossible for TST to submit acceptable designs. Account Executive Thomas Hill continued to request revised designs. But while Basulto repeatedly requested feedback that would enable TST to comply with Lamar's requirements, Hill evaded her inquiries. Basulto explained multiple times that TST was not interested in rerunning the Never Be Hit campaign, yet Hill continued to ask whether it could be used instead of the Satanic Abortion Ritual ads. Finally, Hill himself acknowledged that Lamar was uninterested in working with TST to revise the designs. In a chat message to a co-worker, he wrote, "[T]hey wanted to change the content but we just replied with we will cancel the contract." (Doc 56-1, p. 64).

That leaves discriminatory intent. A plaintiff may establish an inference of discriminatory intent in a "variety of ways, such as by showing more-favorable treatment of similarly-situated [customers] who are not in the protected class, by showing biased comments by a decisionmaker, or by showing pretext with evidence that [a defendant] failed to follow its own policies or shifted its explanation of the [challenged] decision." *Grant v. City of Blytheville*, 841 F.3d 767, 774 (8th Cir. 2016) (cleaned up). Here, the Court concludes TST establishes a genuine issue of material fact.

### a.      Biased Comments

Several Lamar employees made arguably biased comments about TST. Before TST had even shared the Satanic Abortion Ritual designs, Gibbens, a general manager, emailed Kilshaw to ask about canceling the contract. *See* Doc. 53-1, p. 25. Weeks, also a general manager, told Gibbens the contract with TST was "ridiculous," and he told other employees that he was embarrassed that Lamar would run TST's advertisements. *Id.* at

p. 26. When Hill asked for feedback to pass along to Basulto, Graham replied in part, "For starters they asked about a campaign to protect children. Then switched to aborting them." (Doc. 47-1, p. 117).[13]

Gibbens' comment provides the strongest evidence of religious animus. Both Weeks and Graham made their comments after viewing the proposed Satanic Abortion Ritual designs, and it is possible that any animus harbored toward TST reflects disagreement with TST's position on abortion, not its religious identity.[14]

Even if the Court considers all of the above comments to reflect bias, TST "must establish *some* causal relationship to show the significance of decisionmakers' non-contemporaneous statements, or statements made by persons other than the relevant decision-maker, to the resolution of the ultimate issue of intentional discrimination." *Wittenburg v. Am. Exp. Fin. Advisors, Inc.*, 464 F.3d 831, 837 (8th Cir. 2006) (emphasis in original) (cleaned up) (examining an age and gender employment discrimination claim). Here, while the record shows that several managers expressed a negative attitude about the contract—and that Hill was aware of this sentiment—TST does not expressly link

---

[13] TST does not cite any biased comments by Hill, who was the point of contact for Basulto and, by extension, TST. Still, Hill put forth little effort to save the contract, and a reasonable factfinder might infer that Hill took his cues from the higher-ups. Hill would have seen some of Graham and Gibbens' disparaging remarks about TST in emails that he was either copied on or forwarded. Email traffic also suggests that Hill participated in offline conversations about TST with at least Graham and Gibbens.

[14] It is difficult to untangle TST's position on abortion from its religious identity, but it is not necessarily impossible. If, for example, Graham and Weeks would have made similar remarks about a Jewish or Christian group seeking to post pro-choice designs, that might evince animus toward the pro-choice stance as opposed to animus toward TST's religious identity or message. Of course, it is also possible Graham and Weeks' comments reflect animus toward religions that embrace abortion. In sum, the comments arguably demonstrate animus toward TST but the basis for that animus remains somewhat ambiguous.

those comments to the "adverse action," i.e., Lamar's refusal to provide feedback so that TST might revise its ad campaign. Therefore, the Court "considers (1) whether the statements were made by employees who took part in the decision or influenced the decision to [evade feedback and ultimately cancel the contract]; (2) the time gap between when the statements were made and the [adverse action]; and (3) whether the statement itself is an exhibition of discriminatory animus or merely an "opinion that such animus might exist." *Id.* (quotations omitted).

While it is not clear which Lamar employee made the decision to cancel the contract—or to evade requests for feedback—the Court finds it reasonable to infer that Graham, Gibbens, and Weeks at least influenced the decision. All three served as general managers with authority to execute contracts in the relevant markets, and the record shows that they communicated about TST amongst themselves. This is substantiated by evidence that Hill, who initiated the relationship with TST, received some recrimination over the contract. On October 6, 2020, Hill messaged a colleague that his name wasn't "gold right now" because "this satanic temple deal [was] hanging over [his] head." (Doc. 56, p. 64).

The timing of Gibbens and Graham's statements support a finding of animus. The disparaging remarks were made specifically about TST days before the decision to terminate the contract. The Court does not, however, find the statements themselves to exhibit discriminatory animus; they merely suggest that such animus might exist.

### b.      Failure to Adhere to Policy

More persuasive is that Lamar failed to comply with its own Advertising Copy Acceptance Policy which states that the company "pledges to communicate the reason

for any rejection of advertising copy and . . . work with advertisers to achieve acceptable copy if the original submitted copy is not accepted." (Doc. 47-1, p. 55). While Lamar employees evaded Basulto's request for feedback, evidence in the record shows that Lamar worked with other advertisers to revise ad copy, even when those ads touched on controversial topics. *See, e.g.,* Doc. 53-1, pp. 3–9. Kilshaw testified that Lamar made such efforts in the "majority" of cases. *Id.* at p. 115.

Lamar argues that "TST does not, however, cite any authority to suggest that, because defendants accept controversial copy that meets their editorial standards, they must also accept controversial copy that is misleading and offensive." *See* Doc. 73, p. 3. The Court agrees. However, Lamar fails to explain why it refused to give TST a good faith opportunity to revise its designs when it regularly does so for others. Nor does it explain why the text that Kilshaw reviewed—"The Satanic Abortion Ritual Permits First-Trimester Abortions Upon Demand"—could not be revised to resolve Lamar's concerns. At this point, it had no reason to believe that TST would refuse to make any revisions to its designs.

Construing all evidence in TST's favor, the Court finds that TST has met its prima facie burden by presenting admissible evidence that would allow a reasonable jury to infer that Lamar refused to work with TST to revise its designs and canceled the contract because of TST's religious identity. While perhaps a close call, TST chins the bar under *McDonnell Douglas*'s first prong. The burden shifts to Lamar to offer a legitimate, nondiscriminatory explanation, which it entirely fails to do.[15]

---

[15] Lamar argues that, under the First Amendment, they cannot be forced to post ads that violate their Ad Copy Acceptance Policy simply because the ads touch on religious beliefs. The analysis above requires no such thing. Neither § 1981 nor the ACRA protects

### B.       Breach of Contract

"Generally, to state a cause of action for breach of contract the complaint must assert (1) the existence of a valid and enforceable contract between the plaintiff and defendant, (2) the obligation of defendant thereunder, (3) a violation by the defendant, and (4) damages resulting to plaintiff from the breach." *Ark. Dev. Fin. Auth. v. Wiley*, 2020 Ark. 395, 5 (2020).

The parties executed a valid, enforceable contract that obligated Lamar to "display in good and workmanlike manner" TST's advertising campaign on eight billboards, four in Indiana and four Arkansas, between September 28, and October 25, 2020. (Doc. 47-1, p. 62). Lamar ultimately refused to display TST's advertising campaign and canceled the contract. Liability turns on whether paragraph 6 excused Lamar's nonperformance. Paragraph 6 states:

> 6. Lamar reserves the right to determine if copy and design are in good taste and within the moral standards of the individual communities in which it is to be displayed. Lamar reserves the right to reject or remove any copy either before or after installation, including immediate termination of this contract.

*Id.* at p. 63.

TST argues paragraph 6 is a "termination for convenience" clause that impermissibly provides Lamar with unfettered discretion to cancel the contract and renders the agreement illusory. TST contends paragraph 6 is enforceable only if it is accompanied by an implied covenant of good faith and fair dealing.

---

TST's right to have its advertisements posted regardless of their content. Neither party disputes that Lamar's Ad Copy Acceptance Policy states neutral criteria, and if neutrally applied, allows Lamar to reject ad copy not in compliance. Religious discrimination only occurs if Lamar rejects an advertisement or refuses to work with an advertiser *because of* religious animus.

According to Lamar, paragraph 6 of the contract allows the company to reject advertising copy that it finds is in bad taste or outside the moral standards of a given community, as well as to reject or remove any copy more broadly. Lamar contends that, as a matter of law, paragraph 6 is valid and enforceable, and, as a matter of fact, Lamar complied with its terms when it rejected TST's designs and canceled the contract.

Here, construction of the parties' contract is a matter of law. The contract sets forth each party's obligations in plain terms, and the Court need not look beyond the four corners of the contract to determine its meaning. *See Barrows/Thompson, LLC v. HB Ven II, LP*, 2020 Ark. App. 208, 15 (2020) ("In summary-judgment cases involving the interpretation of a contract, if provisions of the contract are unambiguous, their construction is an issue of law."); *E.-Harding, Inc. v. Horace A. Piazza & Assocs.*, 80 Ark. App. 143, 149 (2002) ("The construction and legal effect of a written contract are to be determined by the court as a question of law, except where the meaning of the language depends on disputed extrinsic evidence.").

Paragraph 6 provides two bases upon which Lamar may reject ad copy and cancel the contract: if the design is in bad taste or outside the moral standards of the individual communities in which it is to be displayed. The second sentence of paragraph 6—which states that "Lamar reserves the right to reject or remove **any** copy," (Doc. 47-1, p. 63) (emphasis added)—reserves to Lamar the right to reject any copy that falls into one of these two buckets, not the right to reject any copy for any reason whatsoever. In construing a contract, the Court "aim[s] to avoid constructions that render language in an agreement 'mere surplusage.'" *United States v. City of Fort Smith*, 48 F.4th 900, 908 (8th

Cir. 2022). The latter construction—that Lamar may reject any copy for any reason—would make the first sentence of paragraph 6 entirely unnecessary.

The Court concludes that paragraph 6 is indeed valid and enforceable. It is not a "termination for convenience" clause, and it does not render the contract illusory. However, like all contracts governed by Arkansas law, it contains an implied covenant of good faith and fair dealing, *see Hanjy v. Arvest Bank*, 94 F. Supp. 3d 1012, 1028 (E.D. Ark. 2015), that obligates parties "not to do anything that would prevent, hinder, or delay performance," *Cantrell-Waind & Assocs., Inc. v. Guillaume Motorsports, Inc.*, 62 Ark. App. 66, 71 (1998). "As is the case with the contract's express terms, the implied covenant is part of the contract and creates contractual obligations that are actionable." *Yarborough v. DeVilbiss Air Power, Inc.*, 321 F.3d 728, 732 (8th Cir. 2003) (applying Arkansas law).

"To establish a breach of the covenant of good faith and fair dealing, the plaintiff has the burden to establish that the defendant exercised a judgment conferred by the express terms of the agreement in such a manner as to evade the spirit of the transaction or so as to deny the plaintiff the expected benefit of the contract." *Kmak v. Am. Century Companies, Inc.*, 754 F.3d 513, 516–17 (8th Cir. 2014) (applying Missouri law) (quotation marks and brackets omitted). "However, breach of the implied covenant does not constitute a separate cause of action under Arkansas law." *Ark. Rsch. Med. Testing, LLC v. Osborne*, 2011 Ark. 158, 6 (2011). "It remains nothing more than evidence of a possible breach of a contract between parties." *Id.* Here, the contract—and, by extension, good faith—limits Lamar's discretion to reject TST's designs or cancel the contract to those reasons set forth in paragraph 6. It does not require Lamar to provide TST with an opportunity to cure the defect.

As discussed, while TST fails to demonstrate that Kilshaw's rejection of the Satanic Abortion Ritual ads was specifically due to religious animus, TST does present sufficient evidence to undermine the credibility of Kilshaw's justification. Accordingly, a genuine issue of material fact remains with respect to why Kilshaw rejected the designs, and whether his reason for doing so breached the contract.

## IV.        CONCLUSION

For the reasons stated above, the Court **DENIES** both parties' respective motions for summary judgment on both the discrimination and breach of contract claims.

**IT IS SO ORDERED** on this 26th day of May, 2023.


/s/ Timothy L. Brooks
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE